## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

TESLA, INC.,

               *Petitioner*,

   v.

NATIONAL LABOR RELATIONS
BOARD,

              *Respondent*.

No. _____

## PETITION FOR REVIEW

Petitioner Tesla, Inc. petitions this Court under Federal Rule of Appellate Procedure 15(a) for review of the Decision and Order of the National Labor Relations Board, entered on March 25, 2021, in NLRB case nos. 32–CA–197020, 32–CA–197058, 32–CA–197091, 32–CA–197197, 32–CA–200530, 32–CA–208614, 32–CA–210879, and 32–CA–220777. A copy of the Board's Decision and Order, reported at 370 NLRB No. 101, is attached.

This Court has jurisdiction because the Board's decision is a final order within the meaning of 29 U.S.C. § 160(f) of the National Labor Relations Act, and Petitioner is an aggrieved person. Venue properly lies in this Court under 29 U.S.C. § 160(f) because Petitioner transacts business and maintains facilities within the geographical boundaries of this Circuit.

Because the Board's Decision and Order is contrary to law, Petitioner respectfully requests that the Court grant the petition, review the Board's Decision and Order, set it aside, and grant Petitioner any further relief which the Court deems just and equitable.

Dated: April 2, 2021

Respectfully submitted,

*s/ Michael E. Kenneally*

John C. Sullivan
MORGAN, LEWIS & BOCKIUS LLP
1717 Main Street, Suite 3200
Dallas, TX 75201
T. 214.466.4000
F. 214.466.4001
john.sullivan@morganlewis.com

David B. Salmons
Michael E. Kenneally
David R. Broderdorf (application for
     admission forthcoming)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
T. 202.739.3000
F. 202.739.3001
david.salmons@morganlewis.com
michael.kenneally@morganlewis.com
david.broderdorf@morganlewis.com

*Counsel for Petitioner Tesla, Inc.*

## CERTIFICATE OF INTERESTED PERSONS

### No. 21-_____, Tesla, Inc. v. National Labor Relations Board

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.    Petitioner Tesla, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

2.    Morgan, Lewis & Bockius LLP is Counsel for Petitioner.

3.    David B. Salmons is Counsel for Petitioner.

4.    Michael E. Kenneally is Counsel for Petitioner.

5.    David R. Broderdorf is Counsel for Petitioner.

6.    John C. Sullivan is Counsel for Petitioner.

7.    Respondent the National Labor Relations Board is a federal agency.

8.    Ruth E. Burdick is Deputy Associate General Counsel, Appellate and Supreme Court Litigation Branch, for Respondent the National Labor Relations Board.

Dated: April 2, 2021

*s/ Michael E. Kenneally*
Michael E. Kenneally

*Counsel for Petitioner Tesla, Inc.*

# EXHIBIT A

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**Tesla, Inc. *and* Michael Sanchez, Jonathan Galescu, Richard Ortiz and International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO.** Cases 32–CA–197020, 32–CA–197058, 32–CA–197091, 32–CA–197197, 32–CA–200530, 32–CA–208614, 32–CA–210879 and 32–CA–220777

March 25, 2021

DECISION AND ORDER

BY CHAIRMAN MCFERRAN AND MEMBERS EMANUEL AND RING

On September 27, 2019, Administrative Law Judge Amita Baman Tracy issued the attached decision. The Respondent filed exceptions and a supporting brief, the General Counsel and the Charging Parties—Michael Sanchez, Jonathan Galescu, Richard Ortiz, and the Union, collectively—filed answering briefs, and the Respondent filed reply briefs. Additionally, the General Counsel filed limited cross-exceptions and a supporting brief, the Charging Parties filed a brief in support of the General Counsel's limited cross-exceptions, the Respondent filed an answering brief, and the General Counsel filed a reply brief.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the decision and the record in light of the exceptions[1] and briefs and has decided to affirm the judge's rulings, findings,[2] and conclusions only to the extent consistent with this Decision and Order.[3]

We affirm the judge's findings that the Respondent violated Section 8(a)(1) by coercively interrogating employees Ortiz and Galescu on May 24, 2017;[4] coercively interrogating Ortiz on September 21 and October 12; coercively interrogating employee Jose Moran on October 12; promulgating a rule restricting employees' use of Workday[5] in response to protected activity;[6] and threatening employees with the loss of their stock options if they select the Union as their exclusive collective-bargaining representative. Additionally, we affirm the judge's findings that the Respondent violated Section 8(a)(3) and (1) by discharging Ortiz on October 18 and issuing a warning to Moran on October 19. For the reasons discussed below, we find, contrary to the judge, that the Respondent violated Section 8(a)(1) by maintaining a media-contact provision in its Confidentiality Agreement, and we reverse the judge and dismiss the allegations that the Respondent violated Section 8(a)(1) on June 7 by soliciting employees' grievances and impliedly promising to remedy them, by threatening employees that selecting the Union would be futile, and by stating that a majority of employees did not want a union while also questioning why employees would want to pay union dues.

---

[1] Following the issuance of the Board's decision in *Argos USA LLC d/b/a Argos Ready Mix, LLC*, 369 NLRB No. 26 (2020), the General Counsel filed a motion to withdraw his cross-exceptions 1, 2, 3, and 5, and the Board approved the request on February 18, 2020. Therefore, we have not considered those cross-exceptions.

The General Counsel has filed a motion to strike certain of the Respondent's exceptions for failure to comply with Sec. 102.46(a)(1)(i) of the Board's Rules and Regulations. We deny that motion because any deficiencies in the Respondent's exceptions are remedied by its brief in support of exceptions.

No party has excepted to the judge's findings that the Respondent violated Sec. 8(a)(1) by interfering with multiple employees' leafletting activities on February 10 and May 24, 2017; by prohibiting employees from and threatening them with discharge for distributing union stickers, leaflets, and pamphlets without the Respondent's approval on March 23, 2017; and by threatening employees that selecting the Union would be futile in August 2017. Additionally, no party has excepted to the judge's dismissal of the allegations that the Respondent violated Sec. 8(a)(1) by maintaining certain provisions in its Confidentiality Agreement (other than the media-contact provision), prohibiting an employee from photographing the Confidentiality Agreement, placing a "CONFIDENTIAL" watermark on the Cal/OSHA safety logs and summaries that it provided to employees, discriminatorily enforcing its team-wear policy against union supporters, and impliedly threatening two employees for wearing union hats.

[2] The Respondent has excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). We have carefully examined the record and find no basis for reversing the findings.

[3] We have amended the judge's conclusions of law consistent with our findings herein. We have also amended the remedy and modified the judge's recommended Order consistent with our legal conclusions herein, to conform to the Board's standard remedial language, and in accordance with our recent decisions in *Danbury Ambulance Service, Inc.*, 369 NLRB No. 68 (2020), and *Cascades Containerboard Packaging—Niagara*, 370 NLRB No. 76 (2021). We shall substitute a new notice to conform to the Order as modified.

On February 12, 2021, the Board issued a Notice and Invitation to File Briefs regarding an issue related to the allegations that the Respondent violated Sec. 8(a)(1) by maintaining and enforcing its team-wear policy. *Tesla, Inc.*, 370 NLRB No. 88 (2021). We sever and retain those allegations for further consideration.

[4] Dates are in 2017 unless otherwise indicated.

[5] Workday is a third-party HR software program that the Respondent uses to electronically store and access employees' personnel files. Employees can access Workday to, among other things, view and electronically sign documents.

[6] Member Ring notes that the promulgation of a work rule in response to protected activity is not per se unlawful, as the employer still has an opportunity to show that the rule was lawfully adopted to maintain production or discipline. See *Cordúa Restaurants, Inc.*, 368 NLRB No. 43, slip op. at 3 fn. 11 (2019) (citing cases). The Respondent has not made such a showing here.

I. MEDIA-CONTACT PROVISION

*A. Relevant Facts*

In October and November 2016, the Respondent required its employees to sign the following Confidentiality Agreement:

> In response to recent leaks of confidential Tesla information, we are reminding everyone who works at Tesla, whether full-time, temporary or via contract, of their confidentiality obligations and asking them to reaffirm their commitment to honor them.
>
> These obligations are straightforward. Provided that it's not already public information, everything that you work on, learn about or observe in your work about Tesla is confidential information under the agreement that you signed when you first started. This includes information about products and features, pricing, customers, suppliers, employees, financial information, and anything similar. **Additionally, regardless of whether information has already been made public, it is never OK to communicate with the media or someone closely related to the media about Tesla, unless you have been specifically authorized in writing to do so.**
>
> Unless otherwise allowed by law or you have received written approval, you must not, for example, discuss confidential information with anyone outside of Tesla, take or post photos or make video or audio recordings inside Tesla facilities, forward work emails outside of Tesla or to a personal email account, or write about your work in any social media, blog, or book. If you are unsure, check with your manager, HR, or Legal. Of course, these obligations are not intended to limit proper communications with government agencies.
>
> The consequence for careless violation of the confidentiality agreement, could include, depending on severity, loss of employment. Anyone engaging in intentional violation of the confidentiality agreement will be held liable for all the harm and damage that is caused to the company, with possible criminal prosecution. These obligations remain in place even if no longer working at Tesla.
>
> By acknowledging, I affirm my agreement to comply with my confidentiality obligations to Tesla. I also represent that at no time over the past 12 months have I

disclosed any Tesla confidential information outside of Tesla unless properly authorized to do so.

(Emphasis added.)[7]   The Respondent created the Confidentiality Agreement in response to leaks of its confidential information, including a leak to the media of an August 29, 2016 email from the Respondent's CEO, Elon Musk, to all employees, discussing the Respondent's financial position and future projections. The Respondent requires employees to sign documents that include confidentiality obligations when they are hired and had previously reminded employees by email not to disclose confidential information to anyone outside of the Respondent. However, the Respondent had not previously required employees to reaffirm their confidentiality obligations.

The Respondent initially tried to have every employee physically sign a copy of the Confidentiality Agreement in the presence of a human resources (HR) partner.[8]   When that method proved to be logistically difficult, the Respondent, through a November 2, 2016 email sent by Vice President of Human Resources Mark Lipscomb, instructed all employees to electronically sign the Confidentiality Agreement in Workday. Lipscomb's email stated that "[i]t's absolutely critical that we maintain strict confidentiality on all internal matters as any leak can have a negative impact on our company," and that "[i]n order to reinforce the importance of confidentiality, we are asking everyone to sign an updated confidentiality agreement."

*B. Legal Standard*

In *Boeing Co.*, 365 NLRB No. 154 (2017), the Board set out a new standard for determining whether a facially neutral work rule or policy, reasonably interpreted, would unlawfully interfere with, restrain, or coerce employees in the exercise of their Section 7 rights.[9]   In doing so, the Board overruled the "reasonably construe" prong delineated in *Lutheran Heritage Village–Livonia*, 343 NLRB 646 (2004), which held that a facially neutral work rule would be found unlawful if employees would reasonably construe it to prohibit Section 7 activity. *Boeing*, 365 NLRB No. 154, slip op. at 1–2. Instead, the Board in *Boeing* held:

> [W]hen evaluating a facially neutral policy, rule or handbook provision that, when reasonably interpreted, would potentially interfere with the exercise of NLRA rights, the Board will evaluate two things: (i) the nature and

---

[7]   The emboldened portion of the Confidentiality Agreement is the media-contact provision at issue.

[8]   Associate HR Partner Analisa Heisen testified that she informed employees who signed the Confidentiality Agreement in her presence that it was created in response to recent leaks of the Respondent's confidential information.

[9]   The reasonable interpretation of a rule is from "the perspective of an objectively reasonable employee who is aware of his legal rights but who also interprets work rules as they apply to the everydayness of his job. The reasonable employee does not view every employer policy through the prism of the NLRA." *LA Specialty Produce Co.*, 368 NLRB No. 93, slip op. at 2 (2019) (internal quotations omitted).

extent of the potential impact on NLRA rights, *and* (ii) legitimate justifications associated with the rule.

Id., slip op. at 3 (emphasis in original). In conducting this evaluation, the Board will strike the proper balance between the employer's asserted business justifications for the policy against the extent to which the policy interferes with employee rights under the Act, viewing the rule or policy from the employees' perspective. Ibid. Ultimately, the Board places work rules into one of three categories:

> *Category 1* will include rules that the Board designates as lawful to maintain, either because [(a)] the rule, when reasonably interpreted, does not prohibit or interfere with the exercise of NLRA rights; or [(b)] the potential adverse impact on protected rights is outweighed by justifications associated with the rule. . . .

> *Category 2* will include rules that warrant individualized scrutiny in each case as to whether the rule would prohibit or interfere with NLRA rights, and if so, whether any adverse impact on NLRA-protected conduct is outweighed by legitimate justifications.

> *Category 3* will include rules that the Board will designate as *unlawful* to maintain because they would prohibit or limit NLRA-protected conduct, and the adverse impact on NLRA rights is not outweighed by justifications associated with the rule.

Id., slip op. at 3–4 (emphasis in original).[10] However, these categories "will represent a classification of *results* from the Board's application of the new test" and "are not part of the test itself." *Boeing*, 365 NLRB No. 154, slip op. at 4 (emphasis in original).

As further explained in *LA Specialty*, the General Counsel has the initial burden to prove that a facially neutral rule or policy would, when read in context, be interpreted by a reasonable employee as potentially interfering with the exercise of Section 7 rights. 368 NLRB No. 93, slip op. at 2. If the General Counsel fails to meet this initial burden, the Board does not need to address the employer's legitimate justifications for the rule. Ibid. Instead, the rule is lawful and fits within *Boeing* Category 1(a). Ibid. Conversely, if the General Counsel does meet the initial burden of proving that a reasonable employee would interpret a rule as potentially interfering with the exercise of

Section 7 rights, the Board will then balance that potential interference against the employer's legitimate justifications for the rule. Id., slip op. at 3. When the balance favors general employer interests, the rule at issue will be lawful and will fit within *Boeing* Category 1(b). Ibid. When the potential interference with Section 7 rights generally outweighs any possible employer justification, the rule at issue will be unlawful and will fit within *Boeing* Category 3. Ibid. Finally, "in some instances, it will not be possible to draw any broad conclusions about the legality of a particular rule because the context of the rule and the competing rights and interests involved are specific to that rule and that employer"; such rules will fit within *Boeing* Category 2. Ibid.

### C. Discussion

The judge did not specifically analyze the media-contact provision. Instead, applying *Boeing*, she found, in general, that the Confidentiality Agreement is lawful because when "considered in the full context of the events at the time"—including the statement in the Confidentiality Agreement that it was in response to recent leaks of confidential information and similar contemporaneous explanations to employees by the Respondent's HR officials—employees would reasonably interpret the Confidentiality Agreement to apply only to confidential proprietary information. Additionally, the judge found that even if the Confidentiality Agreement potentially interferes with Section 7 rights, any such interference is outweighed by the Respondent's legitimate interest in protecting its confidential proprietary information. For the reasons discussed below, we disagree with the judge regarding the media-contact provision in the Confidentiality Agreement and instead find that the Respondent violated Section 8(a)(1) by maintaining that provision.[11]

The Board has applied *Boeing* to analyze media-contact rules in two recent cases. In *LA Specialty*, the Board found the following media-contact rule to be lawful:

> Employees approached for interview and/or comments by the news media, cannot provide them with any information. Our President, Michael Glick, is the only person authorized and designated to comment on Company policies or any event that may affect our organization.

---

[10] In *LA Specialty*, the Board redesignated the subdivisions of *Boeing* Category 1 as (a) and (b). 368 NLRB No. 93, slip op. at 2 fn. 2.

[11] As noted above, no party excepts to the judge's dismissal of the allegations that the Respondent violated Sec. 8(a)(1) by maintaining other provisions in the Confidentiality Agreement.

Contrary to his colleagues, Member Emanuel agrees with the judge that when read in context—especially in light of the statement in the first paragraph of the Confidentiality Agreement that it was created "[i]n response to recent leaks of confidential Tesla information"—employees

would reasonably interpret the Respondent's Confidentiality Agreement, including the media-contact provision, to apply only to the Respondent's confidential information. Employees do not have a Sec. 7 right to divulge (to the media or anyone else) confidential information that their employer may lawfully conceal. See, e.g., *Macy's, Inc.*, 365 NLRB No. 116, slip op. at 4 (2017). Therefore, Member Emanuel would find that the media-contact provision is lawful and would affirm the judge's dismissal of the allegation that the Respondent violated Sec. 8(a)(1) by maintaining it.

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

368 NLRB No. 93, slip op. at 1. The Board acknowledged that "Section 7 generally protects employees when they speak with the media about working conditions, labor disputes, or other terms and conditions of employment" and that a rule would be facially unlawful if employees would reasonably interpret it to infringe on their Section 7 right to express their *personal opinion* about those topics to the media. Id., slip op. at 4. The Board found, however, that employees would have reasonably interpreted the media-contact rule at issue there to provide "only that when employees are approached by the news media for comment, they cannot speak *on the [employer's] behalf*." Ibid. (emphasis in original). "The phrase 'authorized and designated' [was] key" because it signified that the employer's president was its "spokesperson, i.e., the only person authorized to comment about company matters *on the [employer's] behalf*." Id., slip op. at 5 (emphasis in original). Thus, employees would have reasonably interpreted the media-contact rule merely to prohibit them from speaking to the media on the employer's behalf. Ibid. The Board ultimately concluded that because employees do not have a Section 7 right to speak to the media on their employer's behalf, the media-contact rule at issue did not potentially interfere with the exercise of Section 7 rights and was therefore lawful. Ibid. The Board placed rules that prohibit employees from speaking to the media on their employer's behalf in *Boeing* Category 1(a). Ibid.

In *Maine Coast Regional Health Facilities, d/b/a Maine Coast Memorial Hospital*, the Board found the following media policy to be unlawful:

> No EMHS employee may contact or release to news media information about EMHS, its member organizations or their subsidiaries without the direct involvement of the EMHS Community Relations Department or of the chief operating officer responsible for that organization. Any employee receiving an inquiry from the media will direct that inquiry to the EMHS Community Relations Department, or Community Relations staff at that organization for appropriate handling.

369 NLRB No. 51, slip op. at 1 (2020). The Board agreed with the judge that the media policy above "significantly burden[ed] the employees' protected rights to communicate with third parties about labor disputes in order to seek improvements in their working conditions, and that the restrictions on Sec[tion] 7 rights far outweighed the [employer's] proffered justifications." Id., slip op. at 2 fn. 7. In finding that the media policy significantly burdened the exercise of Section 7 rights, the Board observed that it was

"not limited to communications about confidential or proprietary information, or to circumstances when the employees purport to speak on behalf of the [employer]." Id., slip op. at 17.

In *Maine Coast*, the Board also analyzed the employer's amended media policy and found that it was lawful because the employer added the following "savings clause" to the unlawful media policy above: "This Policy does not apply to communications by employees, not made on behalf of EMHS or a Member Organization, concerning a labor dispute or other concerted communications for the purpose of mutual aid or protection protected by the National Labor Relations Act." Id., slip op. at 1. The Board found that based on the clear language of that "savings clause," employees would not reasonably interpret the amended media policy to interfere with their Section 7 rights, and it placed the amended media policy in *Boeing* Category 1(a). Id., slip op. at 2–3.

As to the media-contact provision at issue here, we disagree with the judge, the Respondent, and our dissenting colleague that employees would reasonably interpret the media-contact provision to apply only to confidential information. The Confidentiality Agreement defines confidential information, in part, as information that is "not already public." The media-contact provision states that "it is never OK to communicate with the media" about the Respondent "regardless of whether information has already been made public." Because the express language of the media-contact provision clearly indicates that it applies to information beyond the Confidentiality Agreement's definition of confidential information, employees would not reasonably interpret the media-contact provision to apply only to communications with the media regarding confidential information. That is so even when the media-contact provision is read in the context of the statement in the first paragraph of the Confidentiality Agreement that it was created "[i]n response to recent leaks of confidential Tesla information." That general statement does not change the meaning of the plain language of the media-contact provision, which employees would reasonably interpret to apply to communications with the media about any matter regarding the Respondent, including working conditions, labor disputes, or other terms and conditions of employment.[12]

Further, unlike the media-contact rule in *LA Specialty*, the employees here would not reasonably interpret the media-contact provision to apply only to statements made to the media *on the Respondent's behalf* because the media-contact provision does not include any language

---

[12] We reject the Respondent's argument that employees would understand the reference to information that "has already been made public" to refer only to confidential information that has been leaked. No

language in the media-contact provision limits its coverage in that manner, and employees would not reasonably interpret it to be so limited.

designating a company spokesperson that would logically lead employees to read the provision in that manner. We do not agree with the Respondent that the phrase "unless you have been specifically authorized in writing to do so" would have the same effect as the language designating a company spokesperson in the *LA Specialty* media-contact rule because employees would not reasonably interpret the authorization language in the media-contact provision here to designate a company spokesperson. Instead, employees would reasonably interpret that language to require that they receive authorization before communicating with the media about any matter regarding the Respondent, including working conditions, labor disputes, or other terms and conditions of employment. The Respondent may not lawfully require its employees to receive preauthorization before engaging in such Section 7 activity. See, e.g., *Trump Marina Casino Resort*, 354 NLRB 1027, 1027 fn. 2 (2009) (finding unlawful a rule "prohibiting employees from releasing statements to the news media without prior approval"), affd. and incorporated by reference 355 NLRB 585 (2010), enfd. mem. sub nom. *Trump Marina Associates, LLC v. NLRB*, 435 Fed. Appx. 1 (D.C. Cir. 2011).

Additionally, we reject the Respondent's argument that employees would understand that the media-contact provision does not apply to Section 7 activity because the first sentence of the paragraph directly following the media-contact provision begins with the phrase "[u]nless otherwise allowed by law." When read in context, that phrase does not appear to apply to the media-contact provision because it is in a separate paragraph and specifically applies to a list of prohibited activities, which does not mention speaking to the media. In any event, even if employees would interpret the phrase "[u]nless otherwise allowed by law" to apply to the media-contact provision, such vague, generalized language would require employees to meticulously determine the state of the law for themselves, and employees therefore cannot be expected to interpret that language to exclude Section 7 activity from the coverage of the media-contact provision. See, e.g., *Everglades College, Inc. d/b/a Keiser University*, 368 NLRB No. 123, slip op. at 3–4 (2019) (finding that an arbitration agreement that employees would have reasonably interpreted to unlawfully restrict access to the Board was not rendered lawful because it "merely purport[ed] to except from its arbitration mandate claims or actions 'where specifically prohibited by law'"); see also *Ingram Book Co.*, 315 NLRB 515, 516 fn. 2 (1994) ("Rank-and-file employees do not generally carry lawbooks to work or apply legal

analysis to company rules as do lawyers, and cannot be expected to have the expertise to examine company rules from a legal standpoint."). The media-contact provision simply does not contain any language comparable to the "savings clause" that rendered the amended media policy lawful in *Maine Coast*.

Rather, the media-contact provision here is similar to the other media policy that the Board analyzed—and ultimately found unlawful—in *Maine Coast*. As in *Maine Coast*, because the media-contact provision is not limited to communications regarding confidential information or circumstances in which employees purport to speak on the Respondent's behalf, the General Counsel met his initial burden by proving that employees would reasonably interpret the media-contact provision to potentially interfere with the exercise of their Section 7 right to communicate with the media concerning working conditions, labor disputes, or other terms and conditions of employment.

We acknowledge that the Respondent has a legitimate and, indeed, weighty interest in protecting its confidential information. However, the right of employees to communicate with the media concerning labor disputes and terms and conditions of employment—and to do so without having to obtain preauthorization from their employer—is "central to the Act," *Boeing*, 365 NLRB No. 154, slip op. at 15, and employees would reasonably interpret the media-contact provision to wholly preclude them from exercising that right. As in *Maine Coast*, we find that the media-contact provision's potential impact on Section 7 rights outweighs the Respondent's justification.

Based on the foregoing, we find that the media-contact provision in the Respondent's Confidentiality Agreement is unlawful and that the Respondent therefore violated Section 8(a)(1) by maintaining it. Further, we place rules that prohibit employees from communicating with the media regardless of whether the communications concern confidential information or the employees purport to speak on the employer's behalf in *Boeing* Category 3.[13]

## II. JUNE 7, 2017 MEETING

### A. Relevant Facts

On June 6, employee Jose Moran hand delivered a petition to Senior HR Director for Production and Supply Chain Josh Hedges. Multiple employees had signed the petition, which stated as follows:

> As workers here at the Fremont plant, we believe in Tesla's mission, and work hard to make the company successful. But we also believe our company can expand that mission to recognize the important role

---

[13] Chairman McFerran adheres to her dissents in *Boeing Co.*, above, slip op. at 29–44, and *LA Specialty*, above, slip op. at 8–14, but she acknowledges that *Boeing* is currently governing law, and joins Member Ring in applying that standard for institutional reasons.

workers like us play in building the company's future. Tesla workers deserve to have a fair, safe, and secure work place. As we all work hard to meet our company's ambitious production goals, it's even more important that we don't lose sight of safety. We should come to work knowing we will return home to our families without being injured at work. Unfortunately, all too often, this isn't the case. Workers are getting hurt on the job, and see work areas where accidents could easily happen. In addition, too many of our coworkers don't report injuries or other safety concerns because they are afraid of retaliation. We believe the best, most fair, and most effective solution to safety and other concerns is for us to form our union so we can work together with management and have a true voice when it comes to our working conditions.

Later that same day, Moran, on behalf of the Union's voluntary organizing committee (VOC), emailed the petition to Hedges and CEO Musk. The email reiterated the safety concerns raised in the petition and the employees' belief that a union would be the most effective way to make the Respondent's Fremont, California facility a safer place to work. The email requested that the Respondent send a written response to Moran, who would accept it on behalf of the VOC.

On June 7, Hedges summoned Moran to a meeting in a conference room for a meeting with Musk and Chief People Officer Gabrielle Toledano. Employee Tony Vega accompanied Moran as a witness. Toledano began the meeting by stating that they had reviewed the petition and wanted to hear Moran's safety concerns directly. Moran and Vega explained the employees' safety and other concerns, and Moran stated that the employees were seeking a union to gain a voice. Musk responded, "[Y]ou don't really have a voice. The [Union] is a second—like two-class system where [the Union] is the only one that has a voice and not the workers." Toledano added that the majority of employees did not want a union and asked why they wanted to pay union dues. Moran and Vega defended the employees' right to form a union and said that they just wanted to make things better at the Respondent. Toledano invited them to attend the Respondent's weekly safety committee meetings to raise their safety concerns. Musk said that if the safety committee meetings did not work out, "we'll give you your union."

### B. Discussion

The judge found that the Respondent violated Section 8(a)(1) during the June 7 meeting by soliciting employees'

safety concerns and impliedly promising to remedy them, by threatening employees that selecting the Union would be futile, and by stating that the majority of employees did not support the Union while also questioning why employees wanted to pay union dues. We disagree with the judge's findings of those violations for the reasons discussed below.[14]

An employer's solicitation of grievances during a union campaign is unlawful when it "carries with it an implicit or explicit promise to remedy the grievances and impress[es] upon employees that union representation [is] . . . [un]necessary." *Albertson's, LLC,* 359 NLRB 1341, 1341 (2013) (internal quotations omitted; alterations in original), affd. and incorporated by reference 361 NLRB 761 (2014). Based on the specific factual circumstances here, we do not agree with the judge that the Respondent unlawfully solicited employees' safety concerns and impliedly promised to remedy them. The Respondent did not summon Moran to a meeting on June 7 to discuss safety concerns on its own initiative. Instead, the June 7 meeting was prompted by an employee petition that Moran had delivered to the Respondent the previous day. That petition stated that employees did not always come to work confident that they would "return home to [their] families without being injured at work," were "getting hurt on the job," witnessed "work areas where accidents could easily happen," and did not report injuries or other safety concerns in some instances because of fear of retaliation. However, the petition did not detail any specific hazards, and the Respondent understandably felt compelled to immediately learn more about the serious safety concerns the petition alleged. It also reasonably decided to meet with Moran to discuss those concerns because the VOC had apparently designated him as its representative to receive the Respondent's response to the petition. In these circumstances, the Respondent did not violate the Act simply by meeting with Moran and Vega to discuss the safety concerns raised in the petition. Further, neither Musk nor Toledano either explicitly or implicitly promised to remedy the employees' safety concerns during the June 7 meeting. They merely listened to the safety concerns raised by Moran and Vega and invited them to attend the Respondent's weekly safety committee meetings to raise those concerns. In finding an unlawful solicitation of grievances, the judge relied on Musk's statement at the end of the June 7 meeting that if the safety committee meetings did not work out, the Respondent would give the employees their Union. However, Musk's statement left open the possibility that the employees' safety concerns

---

[14] Because we find that the Respondent did not commit the alleged violations described above, we find it unnecessary to pass on the judge's finding that those allegations are not barred by Sec. 10(b).

would not be resolved by the safety committee, and therefore Musk did not impliedly promise to remedy those concerns.[15]   Accordingly, contrary to the judge and our dissenting colleague, we find that the Respondent did not unlawfully solicit employees' grievances during the June 7 meeting.

As to the Respondent's other allegedly unlawful conduct during the June 7 meeting, the Board has long held that an allegedly unlawful statement violates Section 8(a)(1) if it has a reasonable tendency to coerce employees in the exercise of their Section 7 rights.  E.g., *KSM Industries*, 336 NLRB 133, 133 (2001).  The Board considers the totality of the circumstances to make this determination, and intent is immaterial to the analysis.  Ibid.  Moreover, under Section 8(c), "[t]he expressing of any views, argument, or opinion . . . shall not constitute or be evidence of an unfair labor practice . . . if such expression contains no threat of reprisal or force or promise of benefit."  As a result, "an employer may criticize, disparage, or denigrate a union without running afoul of Section 8(a)(1), provided that its expression of opinion does not threaten employees or otherwise interfere with the Section 7 rights of employees."  *Children's Center for Behavioral Development*, 347 NLRB 35, 35 (2006).

The judge found that Musk unlawfully threatened that selecting the Union would be futile when, in response to Moran's claim that employees were seeking a union to gain a voice, he stated, "[Y]ou don't really have a voice. The [Union] is a . . . two-class system where [the Union] is the only one that has a voice and not the workers."  The Board will find that "[a]n unlawful threat of futility is established when an employer states or implies that it will ensure its nonunion status by unlawful means."  *Winkle Bus Co.*, 347 NLRB 1203, 1205 (2006).  Musk's statement did not imply that the Respondent would use unlawful means to ensure its nonunion status or that the employees' attempt to organize would be futile for any other reason. Therefore, Musk's statement was not an unlawful threat of futility.

Musk's statement was instead lawful under *Tri-Cast, Inc.*, 274 NLRB 377 (1985).  In *Tri-Cast*, the Board held that "[t]here is no threat, either explicit or implicit, in a statement which explains to employees that, when they select a union to represent them, the relationship that existed between the employees and the employer will not be as before."  Id. at 377 ("For an employer to tell its employees about this change during the course of an election campaign cannot be characterized as an objectionable retaliatory threat to deprive employees of their rights, but rather is nothing more or less than permissible campaign conduct."); see also *Stern Produce Co.*, 368 NLRB No. 31, slip op. at 4 (2019).  In *Hendrickson USA, LLC*, the Board, applying *Tri-Cast*, found that an employer did not violate the Act by stating that by signing a union authorization card, "'you no longer have a voice, you've signed that away to some third party,'" and that by supporting or voting for a union, "'you'll be giving up your right to speak for and represent yourself.'"  366 NLRB No. 7, slip op. at 1 fn. 2, 6–7 (2018), enf. denied on other grounds 932 F.3d 465 (6th Cir. 2019); see also *Overnite Transportation Co.*, 296 NLRB 669, 671 (1989) (applying *Tri-Cast* to find that an employer did not violate the Act by telling its employees that "'if this [u]nion were to get in, this freedom and this right (to come in and settle with us personally any problems you may have) . . . would definitely be taken away from you and placed in the hands of the [u]nion'"), enfd. 938 F.2d 815 (7th Cir. 1991).  Consistent with *Tri-Cast* and its progeny, Musk's statement that if the employees selected the Union as their representative, only the Union would have a voice and not the employees did not violate the Act.  Musk accurately explained that an effect of unionization would be that employees would deal with the Respondent through the Union, which would speak on their behalf.  See *Stern Produce*, 368 NLRB No. 31, slip op. at 4.[16]

The judge also found that Toledano's statement that the majority of employees did not want the Union combined with her subsequent questioning of why employees wanted to pay union dues was unlawfully coercive.  However, by stating that the majority of employees did not want the Union, Toledano simply conveyed her apparent belief that it lacked support among the Respondent's workforce.  Nothing in Toledano's statement threatened employees or otherwise interfered with their Section 7 rights.  Further, Toledano's questioning of why employees wanted to pay union dues was not coercive.  The Board

---

[15]  Unlike our dissenting colleague, we find that the present case is distinguishable from *Wake Electric Membership Corp.*, 338 NLRB 298 (2002).  In *Wake Electric*, the Board found that the employer violated the Act when, a day after soliciting employees' grievances, its operations manager told employees that he was confident that the employer could "work it out," that they should give the employer another chance, that the only way that they could get benefits sooner was to have the union withdraw the pending election petition, and that they could have a Board election in 6 months if the employer did not satisfy their concerns.  Id. at 306–307.  Here, neither Musk nor Toledano expressed confidence that

the safety committee would satisfactorily address the employees' safety concerns or stated that the Respondent could address their safety concerns sooner in the absence of the Union.

[16]  We do not agree with the judge's suggestion that Musk's statement, during the June 7 meeting, that the Respondent would give the employees their union if the safety committee did not work out would have led a reasonable employee to understand Musk's statement above as a threat of futility.  Neither statement implies that the Respondent would use unlawful means to preserve its nonunion status.

has previously found "nothing unlawful in [an employer's] statement that the employees would have to pay [u]nion dues if they selected the [u]nion" because "[i]t is an economic reality that unions may collect dues from the employees they represent." *Office Depot*, 330 NLRB 640, 642 (2000). Toledano simply pointed out that employees would likely have to pay dues if they selected the Union as their representative. At most, she implied a negative view of the Union by questioning why employees would want to pay dues, but disparaging remarks alone are insufficient to constitute a violation of the Act. See *Children's Center*, 347 NLRB at 35. Toledano did not explicitly or implicitly threaten employees with reprisals if they selected the Union or interfere with their Section 7 rights in any other manner.

Contrary to the judge and our dissenting colleague, we do not find that employees would have reasonably understood Toledano's otherwise innocuous comments to be coercive in the context of the Respondent's contemporaneous unfair labor practices. "The Board is generally 'reluctant to convert otherwise lawful statements into unlawful threats simply because of the existence of other violations.'" *Stern Produce*, 368 NLRB No. 31, slip op. at 4 (quoting *Children's Center*, 347 NLRB at 36). As discussed above, contrary to the judge's findings, the Respondent did not commit any other unfair labor practices during the June 7 meeting. The only other violations on which the judge relied were the Respondent's earlier

unlawful interrogations of two employees. Those violations did not create the type of pervasive atmosphere of hostility to Section 7 activity that could possibly have turned Toledano's otherwise lawful statements into coercive threats.

For the reasons discussed above, we reverse the judge and dismiss the allegations that the Respondent violated Section 8(a)(1) on June 7 through Musk and Toledano's discussion of employees' safety concerns with Moran and Vega, Musk's statement that only the Union, and not the employees, would have a voice if they selected the Union as their representative, and Toledano's statement that the majority of employees did not want the Union and questioning of why they wanted to pay union dues.[17]

AMENDED CONCLUSIONS OF LAW

1. Insert the following as Conclusion of Law 3(k):

(k) Maintaining the media-contact provision in the Confidentiality Agreement.

2. Delete Conclusions of Law 3(d), (e), and (f) and re-letter the subsequent paragraphs accordingly.

AMENDED REMEDY

Having found that the Respondent engaged in certain unfair labor practices, we shall order it to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act. Specifically, we amend the judge's remedy in the following respects.

---

[17] Contrary to her colleagues, Chairman McFerran would adopt the judge's findings that the Respondent violated Sec. 8(a)(1) by unlawfully soliciting employees' safety complaints during the June 7 meeting and by stating that a majority of the employees do not support the Union and questioning why employees wanted to pay union dues.

As the judge found, the day after receiving the safety petition, Musk, the Respondent's CEO, summoned Moran to a meeting with Musk and Toledano, another high-ranking manager. There is no evidence that Musk had ever met with Moran previously to discuss workplace matters. At the meeting, Toledano informed Moran that the purpose of the meeting was to hear safety concerns directly from Moran. After hearing the concerns, Toledano stated that a majority of employees "don't want a union" and questioned why the employees would want to pay union dues. Toledano also invited Moran and employee Vega (who had accompanied Moran to the meeting) to participate in the Respondent's weekly safety committee meetings to bring attention to their safety concerns. Musk concluded the meeting by informing the employees that if the safety committee did not work out, the Respondent would "give you your union."

On these facts, Chairman McFerran agrees with the judge that the Respondent's out-of-the-ordinary solicitation, by two high-ranking managers, of the employees' safety concerns, subsequent invitation of the employees to the Respondent's safety meetings, and statement that it would give the employees a union if the safety committee did not resolve the concerns constitutes an unlawful solicitation of employee grievances and implied promise to remedy them favorably. See *Charter Communications, LLC*, 366 NLRB No. 46, slip op. at 5 (2018), enfd. 939 F.3d 798 (6th Cir. 2019). In dismissing this allegation, her colleagues are persuaded there was no violation because, in their view, neither Musk nor

Toledano "explicitly or implicitly promised to remedy the employees' safety concerns" and Musk's statement at the end of the meeting left open the possibility that the employees would not be resolved. However, on facts similar to those presented here, the Board has found a respondent to have acted unlawfully. See *Wake Electric Membership Corp.*, 338 NLRB 298, 298 fn. 3, 306–307 (2002) (finding that an employer unlawfully solicited grievances where it followed up the solicitation by asking for "another chance" and stating that "[i]f [it] did not satisfy the employees' concerns within 6 months, the employees could have a Board election at that time").

In addition, Chairman McFerran would adopt the judge's finding that Toledano's statement that the majority of employees did not want the Union and questioning of why employees wanted to pay union dues was unlawful. Even assuming Toledano's statements might be lawful in isolation, they can nevertheless violate the Act if they were made in a context of other unfair labor practices that "'impart[ed] a coercive overtone' to the statements." *Shamrock Foods Co.*, 366 NLRB No. 117, slip op. at 14 (2018) (citations omitted), enfd. mem. 779 Fed. Appx. 752 (D.C. Cir. 2019) (per curiam). Here, Chairman McFerran finds Toledano's statements to be unlawfully coercive, as they were made in the context of a broader conversation where the Respondent sought to temper employee support for the Union by unlawfully soliciting grievances and impliedly promising to remedy them.

Finally, Chairman McFerran would find it unnecessary to pass on the judge's finding that, during the June 7 meeting, the Respondent violated Sec. 8(a)(1) by threatening that selecting the Union would be futile, as doing so would be cumulative and would not materially affect the remedy. She notes, however, that she would be open to reconsidering *Tri-Cast, Inc.*, 274 NLRB 377 (1985), in a future appropriate case.

Having found that the Respondent violated Section 8(a)(1) by maintaining the media-contact provision in the Confidentiality Agreement, we shall order the Respondent to rescind or revise the media-contact provision and advise its employees in writing that it has done so.

The General Counsel argues that to remedy fully CEO Musk's unlawful May 20, 2018 tweet, which coercively threatened that employees would lose their stock options if they selected the Union as their representative, the Board should order the Respondent to have Musk delete that tweet and to post a notice addressing that violation at its facilities nationwide. Consistent with our recent decision in *FDRLST Media, LLC*, we shall order the Respondent to direct Musk to delete the unlawful tweet from the @elonmusk Twitter account and to take appropriate steps to ensure that Musk complies with the directive. See 370 NLRB No. 49, slip op. at 1 fn. 5 (2020). Additionally, we agree with the General Counsel that a nationwide notice posting is appropriate under the circumstances to remedy Musk's unlawful tweet. By tweeting on the @elonmusk Twitter account that the Respondent's employees would lose their stock options if they chose the Union as their representative, Musk unlawfully threatened the Respondent's employees in a manner viewable by the public without any limitations. Moreover, the parties stipulated that the @elonmusk account has approximately 22,700,000 Twitter followers and that Musk's unlawful tweet was republished and disseminated "via Twitter, Facebook, radio, television, newspapers, news media, and various other print and social media platforms" (although the full extent of dissemination is unknown). Because the unlawful threat was made publicly to Musk's tens of millions of Twitter followers and was further disseminated by media outlets and on social media platforms, employees at all of the Respondent's facilities nationwide could have viewed it, making a nationwide notice posting appropriate and warranted here. Accordingly, in addition to ordering the Respondent to post a notice addressing all of its unfair labor practices at its Fremont, California facility, we shall order the Respondent to post a notice addressing only Musk's unlawful tweet at all of its other facilities nationwide.[18]

The Respondent excepts to the judge's recommended remedy requiring a public reading of the notice by Musk or by a Board agent in Musk's presence. The Board will order a notice-reading remedy "where the violations are so numerous and serious that the reading aloud of a notice is considered necessary to enable employees to exercise their Section 7 rights in an atmosphere free of coercion, or where the violations in a case are egregious." *Postal Service*, 339 NLRB 1162, 1163 (2003). Here, a notice-reading remedy is neither necessary nor appropriate to remedy the violations in this case because the Board's traditional remedies will suffice to ameliorate the chilling effect of the Respondent's unlawful conduct. See, e.g., *Bodega Latina Corp. d/b/a El Super*, 367 NLRB No. 34, slip op. at 1 (2018). We accordingly amend the judge's remedy to remove the notice-reading requirement.[19]

ORDER

The National Labor Relations Board orders that the Respondent, Tesla, Inc., Fremont, California, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Maintaining a rule that prohibits employee communications with the media protected by the National Labor Relations Act or that requires employees to receive authorization from the Respondent before engaging in such communications.

(b) Maintaining and enforcing a rule that prohibits off-duty employees from distributing union literature in the Respondent's parking lot.

(c) Promulgating a rule prohibiting employees from distributing union stickers, leaflets, and pamphlets without first obtaining permission and threatening discipline if they fail to comply.

(d) Interrogating employees about their union activities.

(e) Informing employees that it would be futile to vote for International Union, United Automobile, Aerospace

---

[18] Member Emanuel would order the Respondent to post a notice only at its Fremont facility. He would not order the Respondent to post a notice addressing Musk's unlawful tweet at all of its other facilities nationwide because he does not believe that a nationwide notice posting is necessary to remedy Musk's unlawful tweet.

[19] Unlike her colleagues, Chairman McFerran would adopt the judge's recommended notice-reading remedy. In particular, she notes that the Respondent committed numerous unfair labor practices, including promulgating rules in response to union activity, maintaining rules that restrict Sec. 7 activity, interfering with employees' leafletting activities, soliciting employee grievances and impliedly promising to remedy them, stating that a majority of the employees did not support the Union and questioning why employees wanted to pay union dues, threatening employees with loss of benefits if they voted for the Union, threatening

employees that selecting the Union would be futile, and interrogating and disciplining or discharging two leading Union supporters. Moreover, as the judge found, several of the violations were committed by high-ranking management officials, including the Respondent's CEO and chief human resources officer. See, e.g., *AdvancePierre Foods, Inc.*, 366 NLRB No. 133, slip op. at 5–6 (2018), enfd. 966 F.3d 813 (D.C. Cir. 2020). In these circumstances, Chairman McFerran believes a notice reading is appropriate "to dissipate as much as possible any lingering effects of the Respondent's unfair labor practices," and she agrees with the judge that a notice reading will allow the employees to "fully perceive that the Respondent and its managers are bound by the requirements of the Act." *Homer D. Bronson Co.*, 349 NLRB 512, 515 (2007) (internal quotes omitted), enfd. mem. 273 Fed. Appx. 32 (2d Cir. 2008).

and Agricultural Implement Workers of America, AFL–CIO (the Union).

(f)  Promulgating a rule regarding Workday in response to protected activity.

(g)  Threatening employees with loss of benefits if they vote for the Union.

(h)  Discharging, disciplining, or otherwise discriminating against employees because they support the Union or any other labor organization or because they engage in protected concerted activities.

(i)  In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2.  Take the following affirmative action necessary to effectuate the policies of the Act.

(a)  Rescind the portion of the Confidentiality Agreement issued in October/November 2016 that prohibits employees from communicating with the media without the Respondent's authorization (media-contact provision) or revise it to remove any language that prohibits or reasonably may be read to prohibit conduct protected by Section 7 of the Act.

(b)  Notify all employees that the media-contact provision in the Confidentiality Agreement has been rescinded or, if it has been revised, provide them with a copy of the Confidentiality Agreement with the revised media-contact provision.

(c)  Rescind the rule orally announced to off-duty employees on February 10, 2017, and May 24, 2017, which prohibited employees from distributing union literature on their nonwork time in the Respondent's parking lot.

(d)  Rescind the rule orally announced to employees on March 23, 2017, which prohibited employees from distributing union stickers, leaflets, and pamphlets without first obtaining permission and threatened discipline if employees failed to comply.

(e)  Rescind the rule regarding Workday that was promulgated on October 19, 2017, in response to protected activity.

(f)  Direct its agent and supervisor, CEO Elon Musk, to delete his May 20, 2018 statement—"Nothing stopping Tesla team at our car plant from voting union.  Could do so tmrw if they wanted.  But why pay union dues and give up stock options for nothing?  Our safety record is 2X better than when plant was UAW & everybody already gets

healthcare."—from the @elonmusk Twitter account, and take appropriate steps to ensure Musk complies with its directive.

(g)  Within 14 days from the date of this Order, remove from its files any reference to the unlawful warning issued to Jose Moran on October 19, 2017, and within 3 days thereafter, notify him in writing that this has been done and that the warning will not be used against him in any way.

(h)  Within 14 days from the date of this Order, offer Richard Ortiz full reinstatement to his former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to his seniority or any other rights or privileges previously enjoyed.

(i)  Make Richard Ortiz whole for any loss of earnings and other benefits suffered as a result of the discrimination against him, in the manner set forth in the remedy section of the decision.

(j)  Compensate Richard Ortiz for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and file with the Regional Director for Region 32, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year(s).

(k)  File with the Regional Director for Region 32 a copy of Richard Ortiz' corresponding W-2 form(s) reflecting the backpay award.

(l)  Within 14 days from the date of this Order, remove from its files any reference to the unlawful discharge of Richard Ortiz, and within 3 days thereafter, notify him in writing that this has been done and that the discharge will not be used against him in any way.

(m)  Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(n)  Post at its Fremont, California facility copies of the attached notice marked "Appendix A" and at all of its other facilities nationwide copies of the attached notice marked "Appendix B."[20]  Copies of the notices, on forms

---

[20]  If the facilities involved in these proceedings are open and staffed by a substantial complement of employees, the notices must be posted within 14 days after service by the Region.  If the facilities involved in these proceedings are closed due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notices must be posted within 14 days after the facilities reopen and a substantial complement of employees have returned to work, and the notices may not be posted until a substantial complement of employees have returned to work.  Any delay in the physical posting of paper notices also applies to the electronic distribution of the notices if the Respondent customarily communicates with its employees by electronic means.  If this Order is enforced by a judgment of a United States court of appeals, the words in the notices reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

provided by the Regional Director for Region 32, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. The Respondent shall take reasonable steps to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed its Fremont, California facility, the Respondent shall duplicate and mail, at its own expense, a copy of the notice marked "Appendix A" to all current and former employees employed by the Respondent at that facility at any time since October 17, 2016. If the Respondent has gone out of business or closed any of its other facilities, the Respondent shall duplicate and mail, at its own expense, a copy of the notice marked "Appendix B" to all current and former employees employed by the Respondent at any of the affected facilities at any time since May 20, 2018.

(o)  Within 21 days after service by the Region, file with the Regional Director for Region 32 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

IT IS FURTHER ORDERED that the allegations that the Respondent violated Section 8(a)(1) by maintaining and enforcing its team-wear policy are severed and retained for further consideration and that the complaint is otherwise dismissed insofar as it alleges violations of the Act not specifically found.

Dated, Washington, D.C.  March 25, 2021

_____
Lauren McFerran,                        Chairman


_____
William J. Emanuel,                     Member


_____
John F. Ring,                            Member

(SEAL)          NATIONAL LABOR RELATIONS BOARD

## APPENDIX A

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT maintain a rule that prohibits your communications with the media protected by the National Labor Relations Act (NLRA) or that requires you to receive authorization from us before engaging in such communications.

WE WILL NOT maintain and enforce a rule that prohibits you from distributing union literature in our parking lot on your nonwork time.

WE WILL NOT promulgate a rule prohibiting you from distributing union stickers, leaflets, and pamphlets without first obtaining permission and threatening discipline if you fail to comply.

WE WILL NOT interrogate you about your union activities.

WE WILL NOT inform you that it would be futile to vote for International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO (the Union).

WE WILL NOT promulgate a rule regarding Workday in response to activity protected by the NLRA.

WE WILL NOT threaten you with loss of benefits if you vote for the Union.

WE WILL NOT discharge, discipline, or otherwise discriminate against any of you because you support the Union or any other labor organization or because you engage in protected concerted activities.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL rescind or revise the portion of the Confidentiality Agreement issued in October/November 2016 that prohibits you from communicating with the media without our authorization (media-contact provision).

12                                     DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

We will notify you that the media-contact provision in the Confidentiality Agreement has been rescinded or, if it has been revised, provide you with a copy of the Confidentiality Agreement with the revised media-contact provision.

We will rescind the rule orally announced on February 10, 2017, and May 24, 2017, which prohibited you from distributing union literature in our parking lot on your non-work time.

We will rescind the rule orally announced on March 23, 2017, which prohibited you from distributing union stickers, leaflets, and pamphlets without first obtaining permission and threatened discipline if you failed to comply.

We will rescind the rule regarding Workday, which was promulgated on October 19, 2017, in response to protected activity.

We will direct our agent and supervisor, CEO Elon Musk, to delete his May 20, 2018 statement—"Nothing stopping Tesla team at our car plant from voting union. Could do so tmrw if they wanted. But why pay union dues and give up stock options for nothing? Our safety record is 2X better than when plant was UAW & everybody already gets healthcare."—from the @elonmusk Twitter account, and we will take appropriate steps to ensure Musk complies with our directive.

We will, within 14 days from the date of the Board's Order, remove from our files any reference to the unlawful warning issued to Jose Moran on October 19, 2017, and we will, within 3 days thereafter, notify him in writing that we have done so and that we will not use the warning against him in any way.

We will, within 14 days from the date of the Board's Order, offer Richard Ortiz full reinstatement to his former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to his seniority or any other rights or privileges previously enjoyed.

We will make Richard Ortiz whole for any loss of earnings and other benefits resulting from his discharge, less any net interim earnings, plus interest, and we will also make him whole for reasonable search-for-work and interim employment expenses, plus interest.

We will compensate Richard Ortiz for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and we will file with the Regional Director for Region 32, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year(s).

We will file with the Regional Director for Region 32 a copy of Richard Ortiz' corresponding W-2 form(s) reflecting the backpay award.

We will, within 14 days from the date of the Board's Order, remove from our files any reference to the unlawful discharge of Richard Ortiz, and we will, within 3 days thereafter, notify him in writing that we have done so and that we will not use the discharge against him in any way.

Tesla, Inc.

The Board's decision can be found at www.nlrb.gov/case/32-CA-197020 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.

APPENDIX B

Notice To Employees
Posted by Order of the
National Labor Relations Board
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

We will not threaten you with loss of benefits if you vote in favor of International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO.

We will not in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

We will direct our agent and supervisor, CEO Elon Musk, to delete his May 20, 2018 statement—"Nothing stopping Tesla team at our car plant from voting union. Could do so tmrw if they wanted. But why pay union dues and give up stock options for nothing? Our safety record is 2X better than when plant was UAW & everybody already gets healthcare."—from the @elonmusk Twitter account, and we will take appropriate steps to ensure Musk complies with our directive.

Tesla, Inc.

The Board's decision can be found at www.nlrb.gov/case/32-CA-197020 or by using the QR code below. Alternatively, you can obtain a copy of the

decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



*Edris W.I. Rodriguez Ritchie, Esq.,* and *Noah J. Garber, Esq.,* for the General Counsel.
*Mark S. Ross, Esq.* and *Keahn N. Morris, Esq.,* for the Respondent.
*Margo A. Feinberg, Esq., Daniel E. Curry, Esq.,* and *Julie S. Alarcon, Esq.,* for the Charging Party.

## DECISION

### Introduction

AMITA BAMAN TRACY, Administrative Law Judge. In the fall of 2016, the International Union, United Automobile, Aerospace and Agricultural Workers of America, AFL–CIO (Union or UAW) began an organizing campaign at Tesla, Inc. (Respondent or Tesla), at its Fremont, California manufacturing plant. Several employees joined the voluntary organizing committee, including the three Charging Parties, and after months of preparation, the "Fair Future at Tesla" campaign became well known at Tesla in early 2017.

This union organizing campaign quickly caught the attention of officials at Tesla as Jose Moran, another member of the voluntary organizing committee, published a blog post about working conditions at Tesla, which was then shared to all employees via a handbill. Employees began leafletting this handbill in the parking lot, requesting safety records from Tesla, and wearing union shirts and stickers in the workplace. As a result of these activities, employees were questioned by Tesla officials.

Based upon another leaflet as well as an employee petition regarding safety conditions in the workplace, Chief Executive Officer Elon Musk and Chief People Officer Gabriel Toledano

immediately met with Jose Moran because he presented the employee petition to Tesla. During this meeting, Musk and Toledano promised to correct problems before the Union could come to Tesla and made other coercive statements including telling Jose Moran and another employee that the UAW would not give them a voice. Soon thereafter, Tesla began enforcing its team wear rule in general assembly so that UAW shirts were prohibited.

Then, in October 2017, Tesla terminated Charging Party Richard Ortiz and disciplined Jose Moran after Richard Ortiz posted a comment and employee pictures on a private Facebook page in response to two Tesla employees opposing a UAW sponsored bill before the California State Assembly. Finally, Respondent violated the Act with Musk's May 20, 2018 Twitter post, where he suggested to his followers that the employees would no longer have stock options if the Union was elected. I find merit to all but a few allegations as set forth in the General Counsel's consolidated complaint.

### Statement of the Case

This case was tried in Oakland, California, over the course of 13 days from June to October 2018. The Union, Michael Sanchez (Sanchez), Jonathan Galescu (Galescu), and Richard Ortiz (Ortiz) (collectively, Charging Parties) filed charges and amended charges, as captioned above, from April 2017, through June 2018.[1] The General Counsel issued several complaints, dated August 31 and September 1, 2017, and March 30, June 4, and August 23, 2018, which were eventually consolidated in the current complaint.[2] Tesla filed timely answers to the complaints and amended complaints.

On the entire record,[3] including my observation of the demeanor of witnesses,[4] and after considering the briefs filed by the General Counsel, Charging Parties, and Respondent,[5] I make the following

### Findings of Fact and Legal Analysis

#### I. JURISDICTION

Respondent, a Delaware technology and design corporation with its headquarters in Palo Alto, California, an automotive manufacturing facility in Fremont, California (Fremont facility), and an automotive battery facility in Sparks, Nevada (Sparks facility), is engaged in the design, manufacture, and sale of electric vehicles and energy storage systems. During the 12-month period ending December 31, 2017, Respondent, in conducting its

---

[1] On the dates specified, the Charging Parties filed the following charges and amended charges which resulted in this consolidated complaint: 32–CA–197020 on April 17, 2017, amended July 28, 2017; 32–CA–197058 on April 17, 2017, amended July 28, 2017; 32–CA–197091 on April 18, 2017, amended July 28, 2017; 32–CA–197197 on April 19, 2017, amended July 28, 2017; 32–CA–200530 on June 12, 2017, amended July 28, 2017; 32–CA–208614 on October 25, 2017, amended March 13, 2018; 32–CA–210879 on December 1, 2017, amended on December 6, 2017; and 32–CA–220777 on May 23, 2018.

[2] The General Counsel withdrew complaint paragraphs (par.) 7(m) and 7(x) during the hearing as well as removed Andrew McIndoe (McIndoe) from complaint par. 5 (Tr. 1095–1097). In addition, the General Counsel sought to amend the complaint on the last day of the hearing, which I denied (Tr. 2495–2496).

[3] The transcripts and exhibits in this case generally are accurate other than numerous misspellings and misidentifications of the speakers. In addition, GC Exhs. 10 and 11 should have been redacted such that Ortiz' address and email address should have been removed. I order the General Counsel to contact the court reporting service to redact these documents as I directed during the hearing (Tr. 438–439).

[4] Although I have included several citations to the evidentiary record in this decision to highlight testimony or exhibits, I emphasize that my findings and conclusions are not based solely on those citations, but rather are based on my review of the entire record for this case.

[5] Other abbreviations used in this decision are as follows: "GC Exh." for the General Counsel's exhibit; "CP Exh." for Charging Parties' exhibit; "R. Exh." for Respondent's exhibit; "Jt. Exh." for Joint Exhibit; "GC Br." for the General Counsel's Brief; "CP Br." for Charging Party's Brief; and "R. Br." for Respondent's Brief.

operations at its Fremont facility purchased and received goods valued in excess of $50,000 directly from sources located outside the State of California.  During the 12-month period ending December 31, 2017, Respondent, in conducting its operations at its Sparks facility, purchased and received goods valued in excess of $50,000 directly from sources located outside the State of Nevada.  At all material times, based on the record, Respondent has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the National Labor Relations Act (the Act).  Respondent admits, and I find, that the Union is a labor organization within the meaning of Section 2(5) of the Act.

Based on the foregoing, I find this dispute affects commerce and that the Board has jurisdiction of this case, pursuant to Section 10(a) of the Act.

## II. UNFAIR LABOR PRACTICES

After an introduction and uncontested background facts, I set forth my factual findings and legal analysis including credibility determinations for each of the unfair labor practice allegations enumerated in the General Counsel's consolidated amended complaint.

Credibility of the witnesses in this matter is significant as several disputes center upon which version of events and/or explanation of events I accept.  Thus, I will explain my specific credibility determinations where relevant for key events.  Credibility determinations may rely on various factors, including "the context of the witness' testimony, the witness' demeanor, the weight of the respective evidence, established or admitted facts, inherent probabilities and reasonable inferences that may be drawn from the record as a whole."  *Hills & Dales General Hospital*, 360 NLRB 611, 617 (2014), citing *Double D Construction Group*, 339 NLRB 303, 305 (2003); *Daikichi Sushi*, 335 NLRB 622, 623 (2001).  Moreover, a credibility assessment also includes an examination of "the expression of his countenance, how he sits or stands, whether he is inordinately nervous, his coloration during examination, the modulation or pace of his speech, and other non-verbal communication."  *Shen Automotive Dealership Group*, 321 NLRB 586, 589 (1996) (citing *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1078–1079 (9th Cir. 1977)), cited with approval by the Board in *Daikichi Sushi*, supra.  Additionally, it is well established that the trier of fact may believe some, but not all, of a witness' testimony.  *NLRB v. Universal Camera Corp.*, 179 F.2d 749 (2d Cir. 1950).

## III. INTRODUCTION

Tesla is a public manufacturing and technology company and manufactures electric vehicles, charging stations, and superchargers as well the main subcomponents for vehicles at its Fremont facility (Tr. 870, 1340).  Tesla began manufacturing various models of all-electric vehicles in 2012.  The entire

vehicle is assembled and completed at the Fremont facility while the batteries are assembled at the Sparks facility (Tr. 1341).  Tesla employs approximately 40,000 employees nationwide while 12,000 employees work at the Fremont facility and an unspecified number of employees work at the Sparks facility (Tr. 877, 960).

### Respondent's management structure

Elon Musk (Musk) is the chief executive officer of Tesla (Tr. 877).  Peter Hochholdinger (Hochholdinger), who was senior vice president for production, reported directly to Musk (Tr. 1340).  Also reporting directly to Musk is the position of chief people officer (Tr. 877).  Gabrielle (Gabby) Toledano (Toledano) became Tesla's chief people officer on May 22, 2017, until she resigned, effective mid-October 2018 (Tr. 870).  Prior to Toledano, Mark Lipscomb (Lipscomb) held the position of vice president, human resources, but instead of reporting to Musk, Lipscomb reported to Arnnon Geshuri (Geshuri), who was also vice president of human resources.[6]

As the chief people officer, Toledano oversaw a vast array of day-to-day functions of Tesla.  Toledano oversaw the environmental health and safety team (EHS), the security department which includes the contract and noncontract security guards at the Fremont facility

which was led by senior security manager Greg Slettvet (Slettvet),[7] the human resources (HR) business solutions department (human resources information systems (HRIS) or HR people operations), and the employee relations and investigations team which was led by Carmen Copher (Copher) who is director and counsel for employee relations.  In addition, six HR business partners communicated with employees directly to address any complaints or concerns (Tr. 884).  Each department is led by a head of department or vice president who reported directly to Toledano including Josh Hedges (Hedges) who was senior HR director for production and supply chain; Hedges reported to Lipscomb prior to Toledano (Tr. 1113).[8]  In total, when Toledano served as the chief people officer, 1400 employees were within her chain of command (Tr. 880).

### Respondent's human resources process

When employees are hired by Respondent, they sign several documents during the on-boarding process.[9]  Among the documents received are the employee handbook as well as a proprietary information and inventions agreement (Tr. 442; R. Exh. 4).  To maintain both documents as well as personnel records, Respondent uses a third-party owned software program named "Workday" (Tr. 389, 833, 1132).  Employees download the Workday application onto their smart phone where they can update their contact information, fill out self-reviews for performance reviews, give and receive feedback, and sign documents

---

[6]  Respondent admits that Musk, Lipscomb, and Toledano are supervisors within the meaning of Section (Sec.) 2(11) of the Act and agents of Respondent within the meaning of Sec. 2(13) of the Act.  Lipscomb and Toledano no longer work for Tesla.

[7]  Slettvet is a Sec. 2(11) supervisor within the meaning of the Act as admitted by Respondent's counsel during the hearing (Tr. 1476–1477).

[8]  Respondent admits that Hedges is a supervisor within the meaning of Sec. 2(11) of the Act and an agent of Respondent within the meaning

of Sec. 2(13) of the Act.  Hedges resigned, effective October 5, 2018 (Tr. 1112).

[9]  Hedges testified extensively about the on-boarding process at Tesla, but I do not rely upon his testimony as Hedges spoke vaguely and did not have any day-to-day knowledge of the on-boarding process.  Hedges' area of coverage did not include the hiring process at Tesla.  In addition, Hedges could not provide basic details such as whether a document had been updated at any time and the time periods for when a version of a document was in effect (Tr. 1251–1253).

sent by Respondent (Tr. 441–442, 6671). Employees may also send messages to other employees via Workday (Tr. 442). The employee handbook is also maintained in Workday (Tr. 1123; R. Exh. 5).

Once hired, Respondent's employees gain access to the Fremont facility via an employee badge. The employee badge, which has their name and Workday profile photo, identifies individuals as employees, gives employees unescorted access to the Fremont facility, the ability to sign in and out of the timeclock, make purchases at the safety vending machines, and use the external transportation system (Tr. 1432–1433, 1435–1437).

### The Fremont facility

Respondent's Fremont facility is an approximately 5 million square foot building with external parking lots and other unidentified structures (Tr. 1342). This parking lot may be used by both employees and nonemployees (Tr. 384).[10] There are four unguarded entrances to the parking lot while there is one guard station located near the north administrative (admin) building (GC Exh. 2; Jt. Exh. 1; Tr. 382–383). No identification is needed to enter the parking lot without a guard station (Tr. 382). Once an employee or nonemployee parks in the parking lot, that person may attempt to enter the Fremont facility from one of four entrances or doors, labeled as door 1, door 2, door 3, and door 4.[11] Each door has an entrance reached via stairs located on the left front-facing side while the right front-facing side has a ramp. At each of the four entrances there are doors leading to the interior of the Fremont facility. Each door has a sensor where employees scan their employee badges to unlock the door and enter the Fremont facility (Tr. 85, 385, 1436–1437). The door sensor shines red or green after the employee badge is held up to the sensor. If permitted inside the Fremont facility, the door will shine green, make a beeping noise, and unlock (Tr. 387). Inside the doors, a security guard is stationed at a podium with a laptop which shows the picture of the employee who had swiped his or her employee badge (Tr. 80, 387–388, 1437). Typically, employees first encounter Respondent's security guards when they enter the Fremont facility at the podium (Tr. 384). The security guard who is stationed at an entry door is tasked with ensuring that only those with an active and valid employee badge gains access to the interior of the Fremont facility (Tr. 1439). If there is a question as to any employee's work status at the Fremont facility, security guards may communicate with the security control room to determine the employee's status. Meanwhile, visitors to the Fremont facility must check-in at a designated location, receive temporary badges, and are escorted within the Fremont facility (Tr. 1433–1434). Tesla's north admin building also contains an entrance which is referred to as the back door

(Tr. 149).

Respondent's security guards wear black colored jackets and hats which include the word, "Security" underneath the Tesla logo (Tr. 80, 387)[12] The security guards do not wear nametags (Tr. 387). Security guards at Tesla are employed directly by Tesla or by a contract security company. These security guards wear the same uniform such that the employer of the security guard would be unidentifiable to an employee (Tr. 1531–1532).[13] In February 2017, in addition to the being stationed at the four doors, security guards patrolled the exterior of the Fremont facility in Tesla "Security" vehicles (Tr. 1483, 1535). Also in February 2017, Respondent's security control room, which monitors communications and emergency systems in the Fremont facility, was staffed by both contractors and Tesla employees (Tr. 1484–1485). The security personnel in the control room would document reports on a computer assisted dispatch report (Tr. 1486–1487).

The interior of the Fremont facility is divided into various sections. The powertrain department manufactures the components of the vehicle and is located on the second floor of the main building. The production control team manages the warehouse, and material handlers bring parts to the assembly areas (Tr. 1342–1343). The stamping press center creates the body panels, doors, liftgates, and hoods for the vehicles with aluminum, and cuts items with laser machines. Once items are stamped, the parts are loaded onto racks which move into the warehouse and material handlers take the parts to the next department (Tr. 1343–1344). In body white (BIW or body assembly), the stamped parts and other purchased components will be welded together by welders to create the skeleton of the vehicle (Tr. 245–246). Once the frame of the vehicle is assembled, the vehicle is transported to the paint department on a dolly. The frame of the vehicle is then sent through a chemical bath to protect it from corrosion and erosion, and then moved through an oven for curing (Tr. 246–247, 1344–1345). Thereafter, the vehicle is painted and sent through another oven to cure the paint (Tr. 247–248). The vehicle will then go through inspections and touch-ups before being moved to general assembly (GA) via overhead carrier system (Tr. 1347).[14]

GA is approximately 500 yards in length (Tr. 191). Approximately 1000 to 3000 employees, also known as production associates, work in GA (Tr. 191, 1116). These employees are overseen by production leads and supervised by production supervisors, production associate managers, and production managers (Tr. 1399–1400). In GA, approximately 14 supervisors and 71 leads work per shift; there are two shifts per day (Tr. 1391–1392). After being hired, GA production associates receive 1 week of on-boarding training including 2 days of hands-on training involving equipment handling and how to treat unfinished

---

[10] Jeremie Hansen (Hansen), project manager and security systems specialist for Respondent, testified that the exterior of the Fremont facility is considered private property (Tr. 1434). I do not credit Hansen's testimony on this point as it is based on his opinion and is a legal conclusion.

[11] Confusingly, door 3 is also known as the Iron Man door or door 4 since the north admin building door was also considered door 3 (Tr. 393).

[12] The title of security guard is used generically in this decision as the position of security guard may be officially known as protection associate or any other formal name.

[13] Securitas Security Services USA Inc. (Securitas) provided contract security services to Respondent in February 2017 (Tr. 1458). Thus, the record is unclear as to whether the unnamed security guards in the complaint allegations are employees of Respondent or Securitas.

[14] In mid-2017, approximately 550 production associates and leads worked per two shifts.

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

vehicles where the paint has not been cured (Tr. 1368–1369). Since at least 2017 GA production associates must also wear team wear. When hired, product associates are provided two pairs of black colored pants, three short sleeve shirts, two long sleeve shirts, and a sweater; these clothing items have an imprint of the Tesla logo (GC Exh. 41; Tr. 198–199, 1370, 2411–2412, 2524–2525). Production leads and supervisors wear red colored Tesla shirts while line inspectors wear white colored Tesla shirts (Tr. 331, 1372–1373, 1597). Production associates also must wear personal protective equipment (PPE) which includes safety glasses and shoes, bump caps and gloves, and covers for their belts, rings, and watches; these items are also provided by Respondent (Tr. 199, 1373, 1599). Other employees may also be working in GA for specific reasons such as BIW employees as well as engineers, vendors, contractors, and material handlers (Tr. 256, 1378–1379).

When a vehicle moves to GA, the paint on the vehicle is cured sufficiently for light touching and general handling but not cured as completely as when the vehicle is finished (Tr. 1347). Fender covers and door protectors are placed on the vehicle for protection (Tr. 1347). These vehicles move slowly on an assembly line where the interior and exterior of the vehicle is completed (Tr. 191, 1348–1365, 1920). Towards the end of the vehicle assembly in GA, the final interior components are installed such as the seats and interior panels, and the doors are re-assembled on the vehicle (Tr. 1364–1365).

After GA, the vehicle is moved to end of line where production associates go through the brake and roll system, test diagnostics, test the charging systems, and install the final steering wheel air bag (Tr. 1345–1346, 1367). The vehicle then goes through the inspection department where the vehicle is inspected for fit and finish and mutilations, dings, and dents (Tr. 1368).[15] Mutilations are scratches, buffs, chips, dents, dings, or scratches anywhere on or in a vehicle including the seats (Tr. 1373, 1597, 1653, 2399). After final inspection, the manufacturing process for the vehicle is complete.

### The Sparks facility

The Sparks facility manufactures the electric battery for the vehicles manufactured in the Fremont facility. Respondent's training coordinators worked out of the Sparks facility where they disseminate manufacturing instruction changes on individual lines, update training matrixes, and provide general guideline classes, which include manufacturing practices, quality in station, and safety. As manufacturing instructions change, the training coordinators are responsible for updating these changes and posting them at the workstations. Training coordinators have a table adjacent to production lines, but they go out to production lines and talk to the associates working on productions lines when instructions change. When instructions change, which comes from a different division of Respondent, the training coordinator obtains updates and takes the updated instructions to the production lines. Training coordinators then place

the new instructions in folders at each workstation and remove the old instructions.

At Respondent's Sparks facility, from April to June 2017 Dave Teston (Teston), who was the associate manager of manufacturing, was responsible for the training team, which included the day-to-day duties of the training coordinators.[16] Teston was also responsible for increasing the size of the training coordinator team during that time.

### The Union organizing campaign

In the summer of 2016, Tesla employee Jose Moran (Moran) reached out to the UAW since he had been a member when the Union represented employees at New United Motors Manufacturing, Inc. (NUMMI), which was located at the Fremont facility (Tr. 51, 668, 673, 750).[17] Moran sought to unionize the workforce at Tesla. Susan Reed (Reed), the Union's international representative, was the lead organizer from June 2016 until April 2018, in the Union's campaign to represent Respondent's employees (Tr. 44–45).[18] Reed worked to build a network of employees and met frequently with the employees interested in organizing Respondent's workplace (Tr. 45–46). The Union created a voluntary organizing committee (VOC) which consisted of employees that acted as lead organizers inside the Fremont facility; these employees shared information regarding the Union inside the facility as well as outside the facility (Tr. 46–47). The VOC held meetings where employees discussed health and safety concerns at Respondent along with questions regarding compensation, job promotions, and other working conditions (Tr. 674, 677). Other members of the VOC included Charging Parties Sanchez, Ortiz, and Galescu (Tr. 86–87, 430–431, 680). The VOC continued to meet through the fall of 2016 and into 2017.

Moran and Ortiz were among the most active supporters of the Union, and they engaged in leafletting, passing out union paraphernalia, and wearing union shirts and jackets to work in 2017 (Tr. 48, 51, 536). As discussed hereinafter, Moran also authored a blog post concerning working conditions at Tesla and circulated a safety petition signed by many employees and presented to Respondent. Ortiz, who worked as an associate in BIW with Respondent from 2016 to October 18, 2017, also requested California Division of Occupational Safety and Health (Cal/OSHA) safety records. Both Moran and Ortiz spoke to California State Assembly legislators to advocate on behalf of employees in favor of unionization.

In August 2016, the employees interested in unionizing voted on a campaign slogan and a logo (Tr. 678; GC Exh. 35). The employees chose, "Driving a Fair Future at Tesla." A public website was created at www.fairfuture@tesla.org (Tr. 679; GC Exh. 39). Also, the Union created a public Facebook page called, "A Fair Future at Tesla" (Tr. 47, 682; GC Exh. 40). The Union created this Facebook page to provide a social media forum for employees to comment and share information with others. Employees, including Moran, often posted on the Facebook public

---

[15] Mutilations may be found and fixed at any stage of the vehicle manufacturing process (Tr. 1373, 1597–1599).

[16] The parties stipulated to Teston's testimony. At all relevant times until at least February 5, 2018, Teston was a supervisor within the meaning of Sec. 2(11) of the Act.

[17] Respondent employed Moran in 2012 as a production associate, and in August 2017, Moran was promoted to lead quality inspector.

[18] Reed testified in an honest and straightforward manner while her demeanor remained calm and measured relaying her participation in the union campaign. I accept Reed's testimony in its entirety.

page (Tr. 51). In August 2016, Moran created a private Facebook group called, "Tesla Employees for UAW Representation" (Tr. 433–434, 675).[19] To be a member of this Facebook group, Moran (and later Ortiz) controlled the approval process of "friend requests" and membership where only Tesla Fremont facility hourly production employees could be members (Tr. 434, 675–676). In January 2017, the VOC members and union organizers decided to distribute leaflets at the Fremont facility and Moran decided to write a blog post regarding working conditions at Tesla (Tr. 432–433). As discussed herein, employees also distributed and wore Union shirts and stickers at work during non duty time, requested safety statistics from Tesla, and advocated on behalf of unionization with the California State Assembly among other Section 7 acts.

On February 9, 2017,[20] the union organizing campaign became widely known when Moran wrote an article, titled, "Time for Tesla to Listen" about the working conditions at Respondent (GC Exh. 32; Tr. 688). This article was posted online at www.medium.com (Tr. 687). The blog post identified Moran as a Tesla employee and included his photo. In this blog post, Moran discussed the injuries Tesla employees endure due to long hours, nonergonomic machinery, shortage of employees, and a push to work faster. Moran also discussed Tesla employees' low wage rate compared to other employees in the auto industry. Moran wrote that the employees should unionize in reaction to Respondent requiring employees to sign confidentiality agreements. Moran also noted that five members of the California State Assembly wrote a letter to Tesla questioning the confidentiality policy issued to employees in the fall of 2016 (GC Exh. 8)[21] The following day, employees handed out double-sided leaflets in the Tesla parking lot which included Moran's blog post and the letter from the California State Assembly members to Tesla regarding its Confidentiality Agreement.

On February 24, 2 weeks after the employees first engaged in leafletting inside and outside the Fremont facility, Musk wrote an email to all employees about the mission of Tesla, writing:

> That is why I was so distraught when I read the recent blog post promoting UAW, which does not share our mission and whose true allegiances is to the giant car companies, where the money they take from employees in dues is vastly more than they could ever make from Tesla.
>
> The tactics they have resorted to are disingenuous or outright false. I will address their underhanded attacks below.

(R. Exh. 2.) Moreover, Musk disputed the injury claims made by Moran in his blog post. Musk also addressed "hours worked" in the "UAW blog." Musk closed his email by stating that once Tesla became "closer to being a profitable company, we will be able to afford more and more fun things" such as "a really amazing party," "free frozen yogurt stands" and a roller coaster at the

Fremont facility going in and out of the factory and connecting the parking lots (R. Exh. 2).

IV. COMPLAINT PARAGRAPHS 7(A) AND (B): RESPONDENT'S CONFIDENTIALITY AGREEMENT DOES NOT VIOLATE SECTION 8(A)(1) OF THE ACT, AND RESPONDENT DID NOT VIOLATE SECTION 8(A)(1) WHEN REFUSING TO PERMIT AN EMPLOYEE TO PHOTOGRAPH THE CONFIDENTIALITY AGREEMENT

The General Counsel alleges at paragraphs 7(a) and (b) that since at least late October 2016, Respondent has maintained certain unlawful rules in its Confidentiality Agreement at the Fremont facility. Moreover, the General Counsel alleges that in late October 2016 or early November 2016, Senior HR Partner David Zweig (Zweig) at the Fremont facility, during a one-on-one meeting with employees, prohibited employees from taking a picture of the Confidentiality Agreement. The General Counsel alleges that both the maintenance of certain unlawful rules and the prohibition on taking pictures of the Confidentiality Agreement violate Section 8(a)(1) of the Act. Specifically, the General Counsel argues that certain portions of the Confidentiality Agreement are overbroad, requires preauthorization before speaking to the media, prohibits employees from writing about their work, and threatens disciplinary action (GC Br. at 47–51). In addition, the General Counsel argues that because Galescu sought to take a photo of the Confidentiality rule, Zweig's prohibition on taking the photo was unlawful (GC Br. at 52–53). Respondent argues that the Confidentiality Agreement is a generic rule which does not interfere with Section 7 rights, and even if the rule may be read to infringe on Section 7 rights, especially when read out of context, its legitimate business justification overrides such rights. Moreover, Respondent argues that Zweig's refusal to permit Galescu to take a photo of the Confidentiality Agreement was lawful and does not infringe on any Section 7 rights (R. Br. at 25–42).

In October and November 2016, Respondent asked all employees nationwide as a term and condition of employment to sign a confidentiality acknowledgment (Confidentiality Agreement) (Tr. 372, 1167; GC Exhs. 15, 31). The Confidentiality Agreement states,

> In response to recent leaks of confidential Tesla information, we are reminding everyone who works at Tesla, whether full-time, temporary or via contract, of their confidentiality obligations and asking them to reaffirm their commitment to honor them.
>
> **These obligations are straightforward. Provided that it's not already public information, everything that you work on, learn about or observe in you[r] work about Tesla is confidential information under the agreement that you signed when you first started. This includes information**

---

[19] Earlier in 2016 Moran created a Facebook page called, "Jose organizer" to have a presence on social media for meeting organizing purposes and to connect with coworkers (Tr. 675).

[20] All dates are in 2017 unless otherwise specified.

[21] In response, that same day, Musk, in an article published by Gizmodo, responded to Moran's blog post (GC Exh. 59). The article quotes Musk as stating that compared to those unionized in UAW, "total compensation is higher for a given level of seniority when factoring in stock

grants." Musk described Tesla as "union neutral" and explained that the Confidentiality Agreement concerned the leak of trade secrets. Musk continued, as this article stated, that his understanding was that Moran "was paid by the UAW to join Tesla and agitate for a union. He doesn't really work for us, he works for the UAW," and "The UAW killed NUMMI and abandoned the workers at our Fremont plant in 2010. They have no leg to stand on." These statements allegedly made by Musk for this article are hearsay and are not relied upon in this decision.

**about** products and features, pricing**, customers, suppliers, employees,** financial information**, and anything similar. Additionally, regardless of whether information has already been made public, it is never OK to communicate with the media or someone closely related to the media about Tesla, unless you have been specifically authorized in writing to do so.**

**Unless otherwise allowed by law or you have received written approval, you must not, for example, discuss confidential information with anyone outside of Tesla, take or post photos or make video or audio recordings inside Tesla facilities, forward work emails outside of Tesla or to a personal email account, or write about our work in any social media, blog, or book. If you are unsure, check with your manager, HR, or Legal.** Of course, these obligations are not intended to limit proper communications with government agencies.

**The consequences of careless violation of the confidentiality agreement, could include, depending on severity, loss of employment. Anyone engaging in intentional violations of the confidentiality agreement will be held liable for all the harm and damage that is caused to the company, with possible criminal prosecution. These obligations remain in place even if no longer working at Tesla.**

By acknowledging, I affirm my agreement to comply with my confidentiality obligations to Tesla. I also represent that at no time over the past 12 months have I disclosed any Tesla confidential information outside of Tesla unless properly authorized to do so.

(GC Exh. 31; R. Exhs. 11 and 14, emphasis in bold added to highlight the portions the General Counsel alleges are overbroad in the complaint).

The Confidentiality Agreement, created in September and October 2016, was drafted by Vice President of Legal Jonathan Chang (Chang) among others. Chang credibly testified that the Confidentiality Agreement was drafted due to several leaks of internal, proprietary and/or confidential information including photos and/or drawings, documents, and emails (Tr. 2004–2007, 2014, 2029–2030; R. Exhs. 11, 37, 41). One such leak included an August 29, 2016 email from Musk to all employees which discussed Respondent's financial position as well as projections for the future which was shared with the media (Tr. 2009–2012; R. Exh. 38). Respondent decided to have all employees resign the Confidentiality Agreement to remind the employees of the seriousness of leaks. Prior to issuing the Confidentiality Agreement, Respondent sent out emails to employees reminding them of their obligation to maintain confidentiality; when employees were hired, they also signed several documents including the need to maintain confidentiality of Respondent's proprietary

information (Tr. 2019, 2023; R. Exhs. 4, 39, 40).

When creating the Confidentiality Agreement, Respondent did not conduct economic studies to determine any actual financial harm (Tr. 2045). However, Chang testified that leaks of internal information can affect Respondent's business where potential customers may not seek to purchase a vehicle, competitors could use the information, employee talent could be compromised and there could be Securities and Exchange Commission (SEC) concerns (Tr. 2015–2017).

On October 11, 2016, Lipscomb sent out a slightly different version of the Confidentiality Agreement which ends with, "By signing below, I affirm my agreement to comply with my confidentiality obligations to Tesla [. . .]" (GC Exh. 15; R. Exh. 12).[22] This version also requires employees to sign the document, with a witness' signature, and ends with a section which requires employees to list any disclosures as a "one-time complete forgiveness of responsibility [. . .]" (GC Exh. 15). These signatures needed to be observed by HR or "trusted managers" but that the signatures on the Confidentiality Agreement needed to be completed that week (R. Exh. 12). This October 11, 2016 version of the Confidentiality Agreement replaced the prior version (Tr. 1169).

Prior to asking employees to sign the Confidentiality Agreement, Hedges, based on information learned from Lipscomb, told his HR partner team that Respondent was having information leaks from engineering in October 2016 and they needed to remind everyone of the confidentiality agreement they signed when they became employees; the employees would be asked to sign the Confidentiality Agreement in the presence of an HR representative (Tr. 1166, 1170; R. Exh. 43).[23] HR partners met with different groups of employees to have them sign the Confidentiality Agreement.

On the evening of November 2, 2016, Lipscomb sent an email to all employees asking employees to sign the Confidentiality Agreement electronically in their Workday inbox within the next 5 days (GC Exh. 31; R. Exh. 13). Lipscomb explained that Respondent needed this affirmation to reinforce the importance of confidentiality as any leaks "can have a negative impact on our company" (GC Exh. 31). Lipscomb also noted that the Confidentiality Agreement would be signed annually. Electronic signatures were requested to enable easier linking with the employees' personnel files in Workday (Tr. 2085). If employees wanted a copy of the Confidentiality Agreement, a copy would later be provided but this offer of a copy was not specifically mentioned to employees (Tr. 2086).

On November 3, 2016, Lipscomb sent another email to the employees the following afternoon reminding them to log into their Workday inboxes to sign the Confidentiality Agreement. Two days later, in the morning, Lipscomb sent another reminder email to the employees to sign the Confidentiality Agreement. A few minutes later, he sent another email with a link to

---

[22] Lipscomb did not testify.

[23] Annalisa Heisen (Heisen), an associate HR partner, testified that Hedges informed the HR partners that the Confidentiality Agreement related to the recent information leak and asked them to oversee and execute the process of having all employee sign the Confidentially Agreement (Tr. 2075–2076). Heisen testified that she informed employees that

due to the recent information leaks at the Fremont facility, Respondent wanted to make sure all employees understood their obligation to keep information confidential with examples such as forwarding internal emails that contain proprietary information to external emails and taking and sharing photos and videos in the workplace (Tr. 2078–2080).

Workday if any employee was having trouble accessing the document (GC Exh. 31).

In November 2016, Galescu testified that he attended a small meeting with Zweig and one other employee to sign the Confidentiality Agreement (Tr. 835–836, 838).[24] During this meeting, after Galescu signed the Confidentiality Agreement, he began to take a photo of it with his phone. However, Zweig told him that he could not take a photo of the Confidentiality Agreement, but that the document would be uploaded to his Workday profile (Tr. 837–838). A week later, Supervisor Armando Rodriguez (Rodriguez) asked Galescu to electronically sign the Confidentiality Agreement again (Tr. 839–840).

Thereafter in a January 10 letter, five members of the California State Assembly, requested that Tesla revise its Confidentiality Agreement as they viewed the policy as "over-broad" and "has resulted in a chilling effect on workers' ability to engage in protected activity" (GC Exh. 8). Tesla's general counsel, Todd Maron (Maron), responded to the letter on behalf of Tesla explaining the reasons and genesis for having the employees sign the Confidentiality Agreement (R. Exh. 42).

*Legal Analysis*

An employer violates Section 8(a)(1) of the Act when it maintains a workplace rule or policy which would reasonably tend to chill employees in the exercise of their Section 7 rights. See *Lafayette Park Hotel*, 326 NLRB 824, 825 (1988), enfd. 203 F.3d 52 (D.C. Cir. 1999). In *Boeing Co.*, 365 NLRB No. 154 (2017), the Board established a new standard to determine whether a facially neutral rule or policy violates Section 8(a)(1) of the Act, overruling the "reasonably construe" standard of the analytical framework set forth in *Lutheran Heritage Village-Livonia*, 343 NLRB 646, 646–647 (2004). In *Boeing Co.*, the Board stated that when evaluating a facially neutral rule or policy "the Board will evaluate two things: (i) the nature and extent of the potential impact on NLRA rights, and (ii) legitimate justifications associated with the rule." *Boeing Co.*, supra, slip op. at 3.[25] The General Counsel concedes that the Confidentiality Agreement is a facially neutral rule.

I agree with the General Counsel that when the alleged provisions are read in isolation the Confidentiality Agreement would inhibit Section 7 rights of employees. An employee may read the rule to preclude the discussion of any information about employees which could include terms and conditions of employment and wages with any other employee or third party such as a union. Moreover, an employee could read the rule to prohibit the discussion of confidential information which could include working conditions, the taking or posting of photos, making videos or audio recordings, forwarding work email, or writing about their employment without receiving permission. Finally, the employee would know that a violation of the Confidentiality Agreement could result in discipline. Thus, employees could read this provision of the Confidentiality Agreement and understand that they could not share employee information such as wages, working conditions, and contact information with other employees and with unions which directly impacts employees' Section 7

rights. See *Rio All-Suites Hotel & Casino*, 362 NLRB 1690, 1691 (2015); *Hyundai America Shipping Agency, Inc.*, 357 NLRB 860, 871 (2011), reversed on other grounds 805 F.3d 309 (D.C. Cir. 2015).

However, the Confidentiality Agreement cannot be read in isolation and must be considered in the full context of the events at the time. See *Lafayette Park Hotel*, supra at 825, 827. To this point, the Confidentiality Agreement begins with the reason why the employees are asked to reaffirm their commitment to maintaining confidentiality of Tesla information. In the Confidentiality Agreement, the emails from Lipscomb, and the conversations by the HR partners with employees, Respondent explained that the reaffirmation of the Confidentiality Agreement was due to leaks of proprietary information at the workplace. For example, on November 2, 2016, Lipscomb again explained to the employees that "[t]here is a ton of exciting things happening at Tesla and the interest level in what we are doing has never been higher. It's absolutely critical that we maintain strict confidentiality on all internal matters as any leak can have a negative impact on our company" (R. Exh. 13). At Respondent, in the past, employees received emails from the general counsel and HR director about leaks in the workplace with context such as the launch of the Model 3 Tesla. Thus, considering the totality of the circumstances, I find that reasonable employees would understand the Confidentiality Agreement to be limited to proprietary information.

Even if the Confidentiality Agreement infringes on employees' Section 7 rights, Respondent presented legitimate business justifications to override these rights. An otherwise overbroad rule "can nevertheless be lawful if [it] is justified by significant employer interests." *Lafayette Park Hotel*, supra at 825, fn. 5. Here, Respondent presented evidence that it suffered a series of information leaks which are critical to its success. Even prior to these leaks in August 2016, Respondent sent reminders to employees to maintain confidentiality of proprietary business information. Employees also acknowledged their obligation to maintain confidentiality when they were hired. Respondent asked employees to reaffirm their commitment to not leaking or disclosing confidential information. Respondent sought to ensure every employee understood the reasons for why they needed to reiterate this rule, and later decided to make sure this Confidentiality Agreement was in each employees' Workday account. In addition, in the automotive industry, Respondent has legitimate concerns to maintain security of its confidential proprietary information by not permitting photos or recordings in the workplace. Cf. *Flagstaff Medical Center*, 357 NLRB 659 (2011) (prohibition on the use of cameras to record images of patients and/or hospital equipment, property or facilities is lawful); *Boeing Co.*, supra, slip op. at 15 (prohibition on the use of cameras and photography in the military/civilian aircraft manufacturing plant lawful).

The General Counsel and the Union attempt to connect the employees' unionizing efforts with Respondent's decision to reissue the Confidentiality Agreement thereby showing the "true"

---

[24] Zweig did not testify. Respondent admits that Zweig is a supervisor within the meaning of Sec. 2(11) of the Act and as an agent of Respondent within the meaning of Sec. 2(13) of the Act.

[25] As result of the balancing, the Board established three categories of employment rules, policies and handbook provisions which are not part of the test but are a result of the application of the test.

reason for the rule. However, in reviewing the entire record, I can find no connection. Although several employees worked on the unionization campaign in the fall of 2016, there is no evidence that Respondent knew of its existence. Even when Galescu tried to take a photo of the Confidentiality Agreement, Zweig told him that he could not take a photo and that the document would be available in his Workday account. Zweig never explained to Galescu why he could not take a photo of the Confidentiality Agreement and Galescu never told Zweig why he wanted to take a picture. Although later the Union complained to members of the California State Assembly, there is no evidence that Zweig knew or could have known that Galescu sought a photo of the Confidentiality Agreement for Section 7 purposes.

In sum, Respondent did not violate the Act as alleged in paragraphs 7(a) and (b), and the complaint allegations are dismissed.

V.  COMPLAINT PARAGRAPHS 7(C) THROUGH 7(I) AND 7(N)
THROUGH 7(P): RESPONDENT VIOLATED SECTION 8(A)(1) OF THE
ACT ON FEBRUARY 10 AND MAY 24, WHEN EMPLOYEES PASSED
OUT LEAFLETS

The General Counsel alleges at complaint paragraphs 7(c) through (i) that on February 10, Respondent's various security guards, who are agents of Tesla, on four separate occasions restrained and coerced employees who were engaged in leafleting in Respondent's parking lot, outside the Fremont facility, by repeatedly asking them to produce their employee badges and/or telling them to leave the premises (GC Br. at 53–57). The General Counsel also alleges at complaint paragraphs 7(n) through (p) that Respondent's security guards acted in a similar manner on May 24, when employees were leafletting in Respondent's parking lot outside the Fremont facility (GC Br. at 57–58). Respondent argues that the General Counsel failed to prove that the unidentified security guards and human resources person are agents of Respondent (R. Br. at 56–59).[26] Respondent also argues that the security guards lawfully requested the employees' badges (R. Br at 59–62).

### February 10 leafletting

On February 10, the day after Moran published his blog post, "Time for Tesla to Listen," members of the VOC first passed out leaflets at the Fremont facility parking lot (Tr. 450). The double-sided leaflet included Moran's blog post on the frontside and a letter from the State of California Assembly to Respondent regarding the Confidentiality Agreement on the backside (Tr. 48; GC Exh. 8). Moran, Sanchez, and Ortiz, who are members of

the VOC, as well as other Tesla employees, passed out the leaflets in the parking lot where employees and members of the public may park.

Sanchez testified that he arrived at the Union's office, which is one block from the Fremont facility, on February 10, at 3:30 a.m. to pick up approximately 100 leaflets (Tr. 90, 140–141; GC Exh. 8). Thereafter, Sanchez drove and parked his car by door 2 in the Fremont facility's parking lot (Tr. 92–94; GC Exh. 4). As he drove through the parking lot, Sanchez was not required to show or scan his employee badge, which is consistent with his prior experiences entering the Fremont facility parking lot.[27]

After Sanchez parked, he stepped out of his car and walked towards door 2. Sanchez passed out leaflets to at least three employees at door 2 (Tr. 94–95; GC Exh. 8). In addition, an unidentified security guard, who Sanchez described as a young male Latino and based on the testimony of witnesses is protection associate David Rios (Rios), approached him outside of door 2, asking if Sanchez was an employee (Tr. 95–96).[28] Sanchez told the security guard that he had been an employee for almost 5 years. Sanchez testified that the security guard told Sanchez to leave the property. Sanchez responded by stating that he was not working, was outside the Fremont facility, and legally had the right to be in the parking lot (Tr. 96). This brief encounter lasted less than 3 minutes, and upon its conclusion, the security guard went back inside of the Fremont facility via door 2 (Tr. 96).

Sanchez remained at door 2 and continued to pass out leaflets (Tr. 97). Approximately 5 minutes later, Rios returned to speak to Sanchez. Sanchez testified that the security guard "aggressively" asked for his employee badge (Tr. 97–98). Sanchez showed the security guard his employee badge, and the security guard appeared to take a photo of it with his phone (Tr. 98–99). The security guard handed the employee badge back to Sanchez. The security guard told Sanchez to again leave the parking lot. Sanchez again stated that he was within his legal rights to remain in the parking lot. Rios testified that Sanchez handed him a leaflet (Tr. 1712–1713). Rios then returned to inside the Fremont facility via door 2.[29] Sanchez moved from door 2 to door 1.

As Sanchez began to walk towards door 1, he heard someone exiting from door 2 again. Sanchez turned around, and a different security guard, described by Sanchez as "older middle eastern," walked down the stairs and asked him what he was doing (Tr. 100). Sanchez responded that he was handing out leaflets. This security guard asked what the leaflet was for and was it for a union (Tr. 101). When Sanchez responded in the affirmative,

---

[26]  Respondent does not argue that the "red shirt male supervisor no. 1" as identified in the complaint is not a supervisor or agent of Respondent. But even if Respondent does argue as such, the red colored shirt male supervisor is also an agent of Respondent due to his apparent authority during the questioning of Sanchez.

[27]  While on medical leave, Sanchez continued to have access to his work email and was never told he could not return to the Tesla parking lot (Tr. 144, 154–155). I credit Sanchez' testimony as it was uncontradicted by any evidence.

[28]  In the complaint, the General Counsel did not identify any of the names of the security guards. Respondent complains in its Brief that it was prejudiced by not knowing the identities of these security guards, and that I erroneously precluded Respondent's use of photographs of security guards during cross-examination (R. Br. at 44–45). I denied

Respondent the opportunity to use the photographs in cross-examination on day 3 of the trial because Respondent had not produced these same photos with names in response to the General Counsel's subpoena duces tecum (Tr. 417). When the trial resumed in September 2018, 4 months after the first 4 days of trial, Respondent then provided the names associated with these security guard photos to the General Counsel pursuant to the subpoena duces tecum (Tr. 790–791). Despite the General Counsel's objections due to the late receipt of these names with security guard photographs, I permitted Respondent to use the photographs to exam witnesses. Respondent cannot now claim prejudice for failing to timely comply with General Counsel's subpoena duces tecum at the start of the hearing.

[29]  These two incidents with Rios as the young male Latino security guard at door 2 are the allegations in complaint par. 7(d).

the security guard said that unions are worthless, and he should not join one. Sanchez responded that the security guard's opinion was his own, and the security guard then asked for his employee badge, which Sanchez provided for the second time that morning (Tr. 101–102). This security guard also appeared to take a picture of Sanchez' employee badge with his phone (Tr. 102). Sanchez then began walking towards door 1. Meanwhile, the security guard turned back towards door 2. Rios testified that he overheard this conversation and confirmed that the security guard made a comment that unions were no good and did nothing for him (Tr. 1704–1708).

After Rios' encounter with Sanchez, Rios phoned Senior Security Manager Greg Slettvet (Slettvet) to let him know what was happening (Tr. 1713–1714).[30] Slettvet told Sanchez to find out if the people handing out leaflets were employees, to document everything, and if they were not employees to tell them to leave as they were trespassing (Tr. 1715, 1752).[31] Thereafter, a few minutes after Sanchez left for door 1, Rios also went to door 1 (Tr. 1749).

Meanwhile, Ortiz' work shift ended around 2:30 a.m., and he then went to the Union's office and waited for Moran and a group of employees who planned to leaflet around 4:30 a.m. at the Fremont facility (Tr. 451, 689). Ortiz and Moran drove to the Fremont facility, parked by door 1, and began leafletting (Tr. 452–453, 777). After being at door 2, Sanchez met Ortiz and Moran as well as Mike Catura (Catura) at door 1 (Tr. 106).[32] Moran testified that Sanchez told him that he had been at door 2 but was being harassed so he came to door 1 to help pass out leaflets (Tr. 695, 777–778). Ortiz and Moran stood by the ramp at door 1 to pass out leaflets while Catura and Sanchez stood by the stairs to pass out leaflets (Tr. 107).

Twenty minutes after Sanchez arrived at door 1, at approximately 4:20 a.m., two security guards, one of whom was Rios, drove slowly by Sanchez, Moran, Ortiz, and Catura in a Tesla security vehicle (Tr. 108). Rios testified that he arrived at door 1 at approximately 4:23 to 4:24 a.m. to speak to Moran since Sanchez told him that the author of the leaflet blog post was at door 1 (Tr. 1749). Rios sought to gather information as asked by Slettvet (Tr. 1749). Rios testified that he spoke to Moran, Ortiz and Catura and told them that if they were not employees they would need to leave, but if they are employees, they need to show him their employee badges (Tr. 1718–1719, 1746). Moran, Ortiz and Catura responded that they were employees and provided their employee badges (Tr. 1718–1720). Rios took pictures of their employee badges since he was asked to document "everything" and let the three employees continue passing out leaflets (Tr. 1720). Rios then left the four employees to leaflet.

Before Rios' shift ended, he sent an email to Slettvet summarizing the morning events and noted the names of the persons handing out leaflets along with their employee badge numbers (R. Exh. 34). Rios later sent an email with the employee badge

pictures he took that morning to Slettvet (R. Exh. 35; Tr. 1751).

Five to 10 minutes after Rios left, at around 4:45 to 5 a.m., a female security guard partially exited door 1 on the ramp side (Tr. 455–456, 702). The female security guard told Moran, Ortiz, Sanchez, and Catura that they should leave and were not allowed to be in the Fremont facility parking lot (Tr. 110, 455, 457, 702). Moran told the female security guard that they are Tesla employees and have every right to be there to distribute leaflets (Tr. 458, 703). The security guard stated that she needed to document Moran's name, and he asked for her name as well (Tr. 702–703). The security guard then went back inside door 1 to her security podium.[33]

Thereafter, Moran, Ortiz, Sanchez, and Catura continued to distribute their leaflets for another 10 to 15 minutes when another male security guard exited door 1 (Tr. 459, 703–704). This male security guard also told them to leave the Fremont facility parking lot, and Moran and Sanchez stated that they were in the parking lot within their legal rights (Tr. 112). This security guard asked for their employee badges, and he appeared to take a photo of each employee badge with his phone. Thereafter, the security guard re-entered door 1.[34] Sanchez, Ortiz, Moran, and Catura continued to hand out leaflets until about 5:20 to 5:30 a.m. when Moran began his work shift and Ortiz went to the union office (Tr. 690–691). Catura stopped passing out leaflets at 5:45 a.m. when his work shift began, and Sanchez continued to hand out leaflets until 6:20 a.m. (Tr. 113).

Sanchez then drove to Respondent's north admin building and parked in the adjacent parking lot so he could pass out more leaflets (Tr. 115; GC Exh. 5). On his walk towards door 3, Sanchez passed out leaflets to employees (Tr. 115–116). Sanchez arrived at door 3 at approximately 6:25 to 6:30 a.m. (Tr. 120). Five minutes later, a different female security guard exited the interior of the Fremont facility at door 3. This female security guard asked Sanchez if he was an employee, to which is responded in the affirmative and offered the number of years he had worked at Tesla (Tr. 122). The security guard told him to leave the Tesla parking lot and asked for his employee badge. Sanchez offered his employee badge to the security guard who "snatched [his] employee badge aggressively from [his] hand" and appeared to take a photo of it with her phone (Tr. 122). The security guard handed the employee badge back to Sanchez and re-entered the Fremont facility at door 3.[35]

Sanchez continued to hand out leaflets for a few more minutes until 6:40 a.m., took a break in his car, and then began leafletting again at 8 a.m. (Tr. 123). After handing out more leaflets, Sanchez then decided to go to another parking lot where the Fremont facility's back entrance is located (Tr. 124). At this location, Sanchez continued to talk to employees. Sanchez then attempted to enter the Fremont facility from this back entrance due to his need to use the restroom, but when he scanned his employee badge for the first time that morning, the door would

---

[30] Rios denied telling Sanchez to leave the Fremont facility parking lot or to stop passing out leaflets (Tr. 1732). I cannot credit Rios' testimony as the sequence of events makes it more likely than not that he twice told Sanchez to leave the Fremont facility parking lot *prior* to talking to Slettvet as these two encounters with Sanchez took place approximately 5 minutes apart.

[31] Slettvet did not testify at the hearing.

[32] Catura did not testify at the hearing.

[33] This incident with the female security guard at door 1 is the allegation in complaint par. 7(e).

[34] This incident with the male security guard at door 1 is the allegation in complaint par. 7(f).

[35] This incident with the female security guard at door 3 is the allegation in complaint par. 7(g).

not unlock. Thus, a security guard, whom Sanchez had not yet met that morning, at the exterior of the back entrance used a walkie-talkie to call in his employee badge number (Tr. 125–126). Three minutes later, an unidentified male employee wearing a red colored Tesla shirt came out of the back entrance and asked, "Are you Jose Moran" (Tr. 126–127). Sanchez responded that he was not but that he was with him. This unidentified employee told Sanchez to leave the premises.[36] Sanchez responded that he was there within his legal rights and questioned whether the individual sought to take away his rights (Tr. 127). Thereafter, the individual took out his phone, aimed the back of it where the camera lens is located 6 inches away from Sanchez' face, and dialed the phone. Sanchez testified that the ring tone sounded like the Apple iPhone ringtone for the FaceTime function. Sanchez then heard from the phone a female's voice who stated that she noticed that he was on a leave of absence due to injury and should be home resting. Sanchez responded that he was on the property within his legal rights, was not acting contrary to his restrictions, and only handing out leaflets (Tr. 129). The female individual told Sanchez to go home to rest and asked him to again leave the premises. Sanchez then left the Fremont facility.[37]

Sanchez testified that he took three smoking breaks in the front parking lot during each of his work shifts, and only once did a security guard ask him to show his employee badge (Tr. 83; GC Exh. 36). Sanchez also testified that no security guard had ever told him to leave the Fremont facility parking lot when he was on his smoke breaks (Tr. 83).

Sometime in February, according to Jeremie Hansen (Hansen), Slettvet, Hansen's supervisor, told him to allow employees to engage in leafletting if the employees were not working and distributing only in nonwork areas (Tr. 1448, 1477).[38] Hansen testified that he shared this information from Slettvet to Respondent's employees who reported to him as well as with the contract security guard manager, but Hansen could not recall when specifically, he provided these instructions to the security guards (Tr. 1450, 1477, 2441–2443). The evidence shows that Slettvet first documented his instructions in September, but Slettvet orally communicated his instructions prior to then (R. Exh. 21).

## May 24 leafletting

On May 24, Branton Phillips (Phillips), who is a current material handler for Respondent, drove to the Union's office near the Fremont facility to pick up leaflets to pass out before his work shift began at 6 a.m. (Tr. 390–392; GC Exh. 9). The leaflet included the Union slogan, "Driving a Fair Future at Tesla," and concerned injuries at Tesla. The title of the article, "The Truth about Injuries at Tesla" discussed Cal/OSHA forms that employees obtained from Respondent. The article also discloses that employees provided this data to a California non-profit which analyzed the data. The leaflet provided the Union organizing office address as well as the Facebook page and union campaign website. On the back side of the leaflet was the story of a GA employee who had been injured several times while on the job.

Phillips, wearing his Tesla pants, shirt, and cap, arrived at the parking lot near door 4 of the Fremont facility a little past 5 a.m. (Tr. 392–393). Phillips entered door 4 by swiping his employee badge which permitted him to enter the Fremont facility and walked up to the female security guard at the podium. Phillips pointed to his picture on the female security guard's laptop, stating that was him and that he planned to hand out leaflets (Tr. 395–397). The female security guard stated, "No, you can't do that" (Tr. 398).[39] Phillips told her to be very careful or she could have a lawsuit on her hands.

Phillips then went outside of door 4 to pass out leaflets. Less than 10 minutes later, a male security guard approached Phillips with a walkie-talkie in his hands (Tr. 400–401). The security guard said to Phillips, "so you're the one with the fliers" (Tr. 401). Phillips stated that he was. The security guard responded stating something to the effect of leave right now or be fired (Tr. 401–402). Phillips told him that he was permitted to pass out leaflets by the National Labor Relations Board. The security guard then asked to see his employee badge (Tr. 402). Phillips gave the security guard his employee badge but due to its faded condition, the security guard could not read it (Tr. 401–402).[40] A second male security guard approached them. The first male security guard again told Phillips to leave right away.[41]

Phillips became nervous and called the union office (Tr. 403–404). With the union office on his speakerphone, Phillips told the union employee that the security guards were telling him to leave. After a short exchange, the union employee told Phillips

[36] This incident with the male, red colored Tesla shirt wearing employee is the allegation in complaint par. 7(h).

[37] This incident with the female employee on the phone is the allegation in complaint par. 7(i).

[38] Several security employees corroborated Hansen's testimony regarding instructions from Slettvet on how to handle employees and non-employees who leaflet in the parking lot at the Fremont facility. For example, an email on February 10 at 6:26 a.m. from Samuel Ali (Ali), the grave shift supervisor for Securitas, corroborates Hansen's testimony (R. Exh. 20). Ali noted in an email to communicate to the next security shift that union advocates were present at doors 1, 2, and 3 and that these union advocates were Respondent's employees which made the situation "a little difficult" (R. Exh. 20). A copy of the union leaflet was placed in the security control room. In response to Ali's email, Ian McEwen (McEwen), account manager for Securitas, replied that Slettvet asked that the union representatives only be identified but security was not to interfere as they are employees and can be on the site (R. Exh. 20). In addition, on May 24, Felipe De La Cruz (De La Cruz), who is an operator

at the security operations center or control room, testified that at 6:01 a.m., he sent an email to Slettvet and Hansen with the subject line: "U.A.W. activity" (R. Exh. 44). De La Cruz reported that several people were handing out fliers outside the doors, lobby, and gates (R. Exh. 44; Tr. 2460). De La Cruz stated that he created a "ticket" and added all the names of the employees handing out leaflets (R. Exh. 44; Tr. 2445, 2468). De La Cruz testified that he sent out all six patrols to look out for union activity (Tr. 2471). De La Cruz testified he sent the email to Slettvet because Slettvet was interested in monitoring union activity (Tr. 2459–2460, 2471).

[39] This incidents with the female security guard at door 4 is the allegation in complaint par. 7(o).

[40] Even though his photo was faded, Phillips's security badge continued to operate to open the door at the Fremont facility (Tr. 419–420). Moreover, Phillips did not replace his badge until November.

[41] This incident with the male security guard at door 4 is the allegation in complaint par. 7(p).

to not "be combative" and to ask for the security guards' identifications and employee badge numbers (Tr. 405). At this point, a third security guard then showed up. Phillips heard the walkie-talkie sound of one of the security guards where he heard the security guard report that Phillips refused to provide his employee badge which is contrary to what occurred earlier (Tr. 406–406). Then, a Tesla security vehicle arrived, and a fourth security guard exited the vehicle and spoke to the three security guards present with Phillips (Tr. 409). Phillips testified that the fourth security guard who stepped out of the Tesla security vehicle asked if Phillips was leafleting. One of the security guards responded that Phillips had leaflets, and the fourth security guard from the security vehicle responded that Phillips was permitted to leaflet (Tr. 411). The three security guards left immediately but the fourth security guard in the Tesla security vehicle remained in the area for at least 10 minutes while Phillips passed out leaflets (Tr. 411–412). Phillips stopped passing out leaflets at 5:45 a.m. A computer assisted dispatch (CAD) report was generated on May 24, based on a call received at 5:21 a.m. (R. Exh. 23). This CAD report indicated that Phillips along with Catura and Moran as well as non-employees passed out leaflets that day (R. Exh. 23). Galescu also passed out leaflets prior to the start of his shift (Tr. 856–857).

*Credibility Findings*

Here, the witnesses for both parties do not drastically differ as to what occurred on the mornings of February 10 and May 24. Specifically, the General Counsel's witnesses, aside from some minor inconsistencies which are to be expected, testified similarly and with detail as to what occurred during these leafleting events. I adopt the General Counsel's witness' version of events due to the extraordinary details they testified about as to the timing of events, where they were stationed, and with whom during the leafleting. Their collective testimony seemed truthful and unrehearsed. In contrast, Respondent only presented one witness to some of the events of February 10, while Respondent's other witnesses did not engage in any conversations with the employees on either morning and thus, are not witnesses to the complaint allegations.

Sanchez, who is a current production associate in GA on extended medical leave, provided highly credible testimony as he provided details as to the events of February 10, when he was leafleting. Moreover, even on cross-examination, Sanchez recalled how many female security guards he spoke to disagreeing with the number presented to him in the questioning. Sanchez recalled without contradiction, on cross-examination, the description of each guard at each door and in the sequence in which he encountered them. To recall with details the events of this morning with few inconsistent statements supports the truthfulness of his testimony. In addition, Sanchez is a current employee which solidifies his credibility as he is testifying against his pecuniary interests. See *Avenue Care & Rehabilitation Center*, 360 NLRB 152, fn. 2 (2014); and *Flexsteel Industries*, 316 NLRB 745 (1995), affd. mem. 83 F.3d 419 (5th Cir. 1996).

[42] In a health care setting, the Board has acknowledged an employer's interest in limiting employee solicitation or distribution based on patient care such that hospitals may be warranted to prohibit solicitation and/or distribution in immediate patient care areas, but the employer carries the

Ortiz and Moran, a current employee, also provided corroborating testimony as to their role and experience during the February 10 leafleting. Ortiz remained honest and calm when he testified regarding the February 10 leafleting. Moran also did not waver in his testimony. For example, Ortiz, Moran, and Sanchez testified consistently as to the physical positions of the individuals passing out leaflets (Tr. 454–455). Their recollections seemed plausible considering the sequence of events. Like Sanchez, Moran is testifying against his pecuniary interests.

As for the May 24 leafleting, I also found Phillips to be a highly credible witness as he is a current employee and testifying against his pecuniary interests. Phillips provided specific details as to the descriptions of the security guards he encountered. Phillips also remained calm and steadfast during both his direct and cross-examinations. Furthermore, Phillips' testimony was not contradicted by any other witness or documentary evidence.

As for Respondent's witness, Rios, who was employed directly by Respondent on February 10, I do not credit the entirety of his testimony as it is inconsistent with the credited evidence that proves to be logical in terms of the sequence of events. But I do credit his testimony that Slettvet told him to determine whether those leafleting were employees by checking their employee badges and if so to permit them to leaflet and to document their names. Respondent's other witnesses did not actually observe the alleged violations of the Act where other security guards asked employees to leave the Fremont facility parking lot and/or repeatedly asking them to produce their employee badges. However, like Rios, they did confirm that at some point during the February 10 leafleting, Slettvet advised them to check on the employment status of those who were leafleting, to document their names, and to permit them to leaflet if they were employees.

*Legal Analysis*

An employer may not prohibit employees from distributing union literature in nonworking areas on nonworking time. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803 (1945). Specifically, the Board has held that "[t]he distribution by off-duty employees of union literature in company parking lots is clearly protected by Section 7 of the Act" absent a showing that any work performed there is integral to the business operations. *St. Luke's Hospital*, 300 NLRB 836, 837 (1990); *Meijer, Inc.*, 344 NLRB 916, 917 (2005), enf. in relevant part 463 F.3d 354 (5th Cir. 2006); *Tri-County Medical Center*, 222 NLRB 1089 (1976) (rule which denies off-duty employees entry to parking lots, gates, and other outside nonworking areas will be found invalid); *Southern Bakeries, LLC*, 368 NLRB No. 59, slip op. at 1–2 (2019) (citing *Piedmont Gardens*, 360 NLRB 813 (2014)). In *St. Luke's Hospital*, the Board held that an employer violated Section 8(a)(1) of the Act when a director of security told an off-duty employee he would need to leave the employer's parking lot when he was found to be leafleting, and even after asking if he was an employee, which he was, told the employee that he needed leave the property. Id.[42]

The complaint allegations here concern the leafleting of

burden of proving legitimate business considerations. See *St. John's Hospital & School of Nursing, Inc.*, 222 NLRB 1150 (1976); *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 507 (1978) (burden is on hospital to

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

union material by off-duty employees on nonwork time in the Fremont facility parking lot on February 10 and May 24. During events on February 10 and May 24, the credited evidence shows that employees were told by Respondent's security guards, human resources person and supervisor at various times to leave the premises. They were also asked repeatedly to show their employee badges. Based on Board law, Sanchez, Moran, Ortiz, and Phillips lawfully engaged in protected concerted activity when they passed out leaflets during nonduty time in Respondent's parking lot. Respondent does not argue that the parking lot is a work area but claims that it is considered private property (R. Br. at 42). Despite Respondent's claim, Respondent does not make any arguments to support a showing that a prohibition of leafletting is justified for business reasons. Moreover, the General Counsel argues that Respondent's security guards as well as human resources person and supervisor restrained and coerced employees by repeatedly asking for their employee badges and for telling the employees they must leave the Fremont facility parking lot.

Prior to analyzing whether the security guards and human resources person restrained and coerced employees thereby violating Section 8(a)(1) of the Act, a question to be answered is whether the security guards and human resources person are agents of Respondent within the meaning of Section 2(13) of the Act. As set forth in Section 2(13), when making an agency determination, "the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." If they are not agents, then any unlawful statements cannot be attributed to Respondent. The burden of proving an agency relationship is on the party asserting its existence which in this instance is the General Counsel. "The agency relationship must be established with regard to the specific conduct that is alleged to be unlawful. An individual can be a party's agent if the individual has either actual or apparent authority to act on behalf of the party." *Cornell Forge Co.*, 339 NLRB 733, 733 (2003) (citing *Pan-Osten Co.*, 336 NLRB 305, 306 (2001)). "The test is whether, under all circumstances, the employees 'would reasonably believe that the employee in question [the alleged agent] was reflecting company policy and speaking and acting for management." *GM Electrics*, 323 NLRB 125, 125 (1997); *Southern Bag Corp.*, 315 NLRB 725, 725 (1994). The Board has found that security guards may be agents of an employer as defined by Section 2(13) of the Act when the guard may stop persons from entering a plant. *Cooking Good Division of Perdue Farms, Inc.*, 323 NLRB 345, 351 (1997) (security guards placed in a position to stop individuals from entering premises are cloaked with apparent authority).

The record established that the security guards were stationed at the entrances to each of the doors of the Fremont facility as well as patrolling the parking lot. Furthermore, all security guards, contractor, or direct employee of Respondent, wore the same attire and drove Respondent's vehicles with the word, "Security" written on its sides. In addition, the security guards possessed the authority to check an employee's badge to determine whether the employee could enter the Fremont facility. The

morning of February 10, security guards at different times asked Sanchez, Ortiz, Moran, and Catura for their employee badges. The morning of May 24, security guards asked Phillips the same questions. But these same security guards, after learning that the individuals were employees, still told them to leave the parking lot. Also, the security guards repeatedly asked these same individuals for their employee badges during the entire time of their leafletting. Based on the credited evidence, Sanchez, Ortiz, Moran, Catura, and Phillips could reasonably believe that the security guards acted as Respondent's agents with apparent authority and were acting on Tesla's orders and behest. Accordingly, Respondent's security guards who interacted with Sanchez, Ortiz, and Moran on February 10, as well as with Phillips on May 24, were agents of Respondent within the meaning of Section 2(13) of the Act. In addition, the human resources person who spoke on the phone with Sanchez acted as an agent of Respondent as she also told him to leave the premises after confronting him with his medical leave status. It should be noted that even if the human resources person who confronted Sanchez was not actually a human resources person, the result of her apparent authority is not diminished; her actions, and not her official title, is of import.

As to whether the security guards' conduct was lawful, the General Counsel's witnesses all testified consistently that they were told numerous times to leave the Fremont facility parking lot even after the security guards verified their employment with Tesla. When off-duty employees are told to leave an employer's parking lot when passing out union-related literature via leaflets, Respondent's actions violate the Act. See *New York New York Hotel & Casino*, 356 NLRB 907, 913 (2011) ("it is well established that an employer that operates on property it owns ordinarily violates the Act if it bars its employees from distributing union literature during their nonwork time in nonwork areas of its property. Moreover, such an employer's off duty employees have a presumptive right to return to their worksite and gain access to exterior, nonwork areas for purposes of otherwise protected solicitation"). Here, Rios told Sanchez twice to leave the Fremont facility parking lot the morning of February 10, after he confirmed that Sanchez was an employee. Later, a female and male security guard told Moran, Ortiz, Sanchez, and Catura that they should also leave the Fremont facility parking lot. Almost 2 hours after they began leafletting, Sanchez went to the north admin building and was told three more times (by a security guard, a male supervisor, and a human resources person) to leave the Fremont facility. On May 24, a security guard told Phillips that he could not pass out leaflets, and another security guard told Phillips twice that he needed to leave the Fremont facility parking lot even though Phillips had provided his employee badge. Despite verifying employment, Respondent's agents continued to question the individuals' employment status on both dates and told them to leave the Fremont facility parking lot. Even though the employees continued to pass out leaflets after the security guards told them to leave the Fremont facility parking lot, their actions of telling the employees that they needed to leave, and thereby stop leafleting, without a proper business justification violates Section 8(a)(1). Likewise, the actions of the male

show that the selective ban on solicitation is "necessary to avoid disruption of health-care operations or disturbance of patients").

supervisor and human resources person telling Sanchez he needed to leave the Fremont facility violates Section 8(a)(1). Thus, Respondent violated Section 8(a)(1) of the Act as alleged by the General Counsel in complaint paragraphs 7(c) through (i) and (n) through (p).

Respondent's defenses are without merit. Respondent argues that its defense was hampered by the General Counsel not naming the security guards, the supervisor, and the human resource person who spoke to the employees on February 10 and May 24. I reject Respondent's argument. Respondent could have conducted its own inquiry as to who the employees could have possibly spoken to during those morning leafletting periods. The fact that the employees do not know the names of those to whom they spoke is reasonable considering the security guards, the supervisor and human resources person did not identify themselves. The General Counsel's complaint allegations were sufficiently pled to place Respondent on notice of the allegations against it, and its method or manner to defend itself is its own responsibility.[43]

Respondent argues it had the right to verify whether the individuals who were passing out leaflets were employees. Certainly, Respondent could determine whether the individuals passing out leaflets were employees but even after checking on the employment status of the individuals, Respondent's various security guards, male supervisor and human resources person continued to tell the employees to leave the Fremont facility parking lot and therefore, stop passing out leaflets. Respondent claims that even if the security guards, male supervisor, and human resources person are considered its agents, they acted in excess of their authority and Respondent should not be liable for their actions. I do not agree. As agents of Respondent, the security guards, male supervisor, and human resources person's conduct of informing the leafletting employees that they had to leave the parking lot are properly attributable to Respondent. See *Ideal Elevator Corp.*, 295 NLRB 347, 347 fn. 2 (1989) ("the Board continues to hold that under Sec. 2(13) of the Act 'an employer is bound by the acts and statements of its supervisors whether specifically authorized or not.'" (quoting *Dorothy Shamrock Coal Co.*, 279 NLRB 1298, 1299 (1986), enfd. 833 F.2d 1263 (7th Cir. 1987)).

Even if Respondent is liable for their agents' actions, Respondent argues that the employees continued to leaflet even after they were asked for their employee badges. The Board does not consider the motivation behind remarks or their actual effect. *Miller Electric Pump & Plumbing*, 334 NLRB 824 (2001). Instead, "the basic test for evaluating whether there has been a violation of Section 8(a)(1) is an objective tests, i.e., whether the conduct in question would reasonably have a tendency to interfere with, restrain, or coerce employees in the exercise of their Section 7 rights, and not a subjective test having to do with whether the employee in question was actually intimidated."

*Multi-Ad Services*, 331 NLRB 1226, 1227–1228 (2000) (emphasis in original), enfd. 255 F.3d 363 (7th Cir. 2001). Thus, I find that Respondent violated Section 8(a)(1) of the Act as alleged in complaint paragraphs 7(c) through (i) and (n) through (p).

VI. COMPLAINT PARAGRAPH 7(J): RESPONDENT VIOLATED SECTION 8(A)(1) OF THE ACT WHEN ON MARCH 23, SUPERVISOR ARMANDO RODRIGUEZ TOLD EMPLOYEES THEY COULD NOT DISTRIBUTE STICKERS, LEAFLETS OR PAMPHLETS WITHOUT RESPONDENT'S APPROVAL AND THREATENED TERMINATION IF THEY VIOLATED THIS RULE

The General Counsel alleges that on March 23, Supervisor Armando Rodriguez (Rodriguez) informed employees that distribution of stickers, pamphlets and leaflets would be grounds for termination which violates the Act (GC Br. at 58–60). Respondent argues that Rodriguez lawfully informed employees that Respondent's property could not be vandalized (R. Br at 65–66).

On March 23, Galescu participated in a prestart meeting with approximately 30 shift co-workers led by Rodriguez (Tr. 843).[44] Galescu testified that during this meeting, Rodriguez pulled out his black notebook, and announced, "Stickers, leaflets, and pamphlets that's not approved by Tesla could be—passing them out could be a terms of termination and be active vandalism" (Tr. 844, 1063).[45] Rodriguez asked if anyone had questions but no one asked any questions. Union stickers, pamphlets and business cards had been passed out by associates in the month prior to Rodriguez' March 23 prestart meeting (Tr. 844–845).

Rodriguez testified that in March, for 1 to 2 weeks he noticed UAW stickers placed in the bathroom on stalls as well as on information sheets (known as "flow downs") (Tr. 2137, 2148–2149). However, Rodriguez admitted that he did not document the UAW stickers he saw on the walls of the bathrooms (Tr. 2153). As a result of his observations, during a prestart meeting on March 23, Rodriguez told his team that vandalism is not tolerated at Respondent (Tr. 2138, 2146). In contrast to Galescu, Rodriguez testified, "We can't be defacing Tesla property, especially with literature that's not Tesla approved [. . .] If you guys want to put it on your person, put it on your hat, put it on your shirt, it's all—all that's allowable, but we just can't post stuff on the wall because it's considered vandalism, and—and doing so could—a disciplinary action could—could—it could lead to disciplinary action if you're caught vandalizing Tesla property" (Tr. 2138). Rodriguez denied reading from a black book in which he keeps notes to be discussed during prestart meetings (Tr. 2147–2148). On cross-examination, Rodriguez could not recall any other topics he discussed during this prestart meeting (Tr. 2156). Rodriguez also denied discussing the passing out of pamphlets (Tr. 2139, 2144).

*Credibility Findings*

I adopt Galescu's version of the prestart meeting held on March 23. Galescu, who is a current employee testifying against

---

[43] Respondent never filed a motion for a bill of particulars in response to the General Counsel's complaint.

[44] At a prestart meeting, which occurs before the beginning of a work shift, a supervisor usually discusses safety and production (Tr. 843).

[45] In his Board affidavit, dated April 27, Galescu stated, "Armando pulled up a little black book, a pad of paper, and he read from his

notebook. Armando said something like, 'Stickers or leaflets and pamphlets that are not approved by Tesla—you guys can't pass them out unless it is approved by Tesla'" (Tr. 1065). Galescu's testimony at the hearing and during the investigation in his affidavit are consistent, which reinforces his credible testimony.

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

his pecuniary interests, testified with conviction as to what occurred during the meeting. Galescu's recollection at the hearing of what Rodriguez stated during the meeting regarding preapproval to pass out stickers, leaflets or pamphlets closely matches his Board affidavit taken only 1 month after the meeting. Galescu did not mention in his Board affidavit that Rodriguez threatened termination if they passed out nonapproved material, but disciplinary action was mentioned as admitted by Rodriguez. In contrast, Rodriguez could not recall any other events during that day including any other topics discussed during the meeting. This lack of recollection of other topics discussed reflects poorly on his credibility. Thus, I credit Galescu's testimony over Rodriguez' testimony.

### Legal Analysis

The Board has held that any rule requiring employees to receive preapproval for engaging in protected concerted activity, such as distributing union paraphernalia, during nonwork times and in nonwork areas is unlawful. See *Enterprise Products Co.*, 265 NLRB 544, 554 (1982), citing *Peyton Packing Co.*, 49 NLRB 828 (1943), and *Stoddard-Quick Mfg. Co.*, 138 NLRB 615 (1992); *Brunswick Corp.*, 282 NLRB 794, 795 (1987). The Board has also held that threatening employees with reprisals for engaging in union or other protected concerted activities is coercive to the exercise of their Section 7 rights under the Act. *Metro One Loss Prevention Services Group*, 356 NLRB 89, 89 (2010) (employer violates Sec. 8(a)(1) if it communicates to employees that it will jeopardize their job security, wages, or other working conditions if they support the union); *Baddour, Inc.*, 303 NLRB 275 (1991) (an employers' threats of discipline or job loss for participation in protected concerted activities constitute violations of the Act). The Board has applied this theory to explicit or implicit threats to employees, including the loss of their jobs or other adverse work consequences. *Jewish Home for the Elderly of Fairfield County*, 343 NLRB 1069, 1091–1096 (2004) (employer violated Sec. 8(a)(1) of the Act by threatening loss of benefits, loss of jobs, and closure of the facility if their employees supported the union); *Sheraton Hotel Waterbury*, 312 NLRB 304, 305 (1993) (implied threat contained in employer's posting violated Sec. 8(a)(1) of the Act); *Metro One Loss Prevention Services Group*, supra at 89–90 (employer implied working conditions could deteriorate if the employees supported the union organizing drive in violation of Sec. 8(a)(1) of the Act).

The credited evidence shows that Rodriguez told employees that they could not distribute any stickers, leaflets or pamphlets not approved by Respondent, which contradicts Respondent's argument that Rodriguez validly told employees not to vandalize Respondent's Fremont facility. Rodriguez' statement to the employees clearly violates Section 8(a)(1) of the Act. In addition, Rodriguez' threat that employees may be terminated for distributing stickers, leaflets, or pamphlets without prior approval from Respondent also violates Section 8(a)(1) of the Act. In sum, Respondent violated Section 8(a)(1) as alleged in complaint paragraph 7(j).

VII. COMPLAINT PARAGRAPHS 7(K) AND 7(Q): RESPONDENT DID NOT VIOLATE SECTION 8(A)(1) OF THE ACT WHEN ON APRIL 5, RESPONDENT BY HUMAN RESOURCES PARTNER DAVID ZWEIG ATTEMPTED TO PROHIBIT EMPLOYEES FROM DISCUSSING SAFETY

CONCERNS WITH OTHER EMPLOYEES AND/OR THE UNION, BUT VIOLATED SECTION 8(A)(1) OF THE ACT WHEN ON MAY 24, HUMAN RESOURCES BUSINESS PARTNER LIZA LIPSON INTERROGATED EMPLOYEES ABOUT THEIR PROTECTED CONCERTED ACTIVITIES

The General Counsel argues that Respondent created an unlawful rule when placing a "CONFIDENTIAL" watermark on safety logs and summaries given to Galescu and Ortiz which prevented them from sharing these logs with other employees (GC Br. at 60–62). The General Counsel further alleges that Lipson violated the Act when she interrogated Galescu and Ortiz about their protected concerted activity regarding the safety logs they received (GC Br. at 62–64). Respondent argues that Zweig did not prohibit the employees from sharing the safety logs with other employees and with the Union (R. Br. at 69–73). Furthermore, Respondent argues that any confusion as to confidentiality was clarified in subsequent correspondences between the employees and Respondent (R. Br at 73–74). Moreover, Respondent argues that Lipson did not interrogate employees about the safety logs (R. Br. at 91–94).

On April 4, Galescu, on behalf of Ortiz and himself, sent an email to several Tesla' supervisors and/or agents including Hedges requesting Cal/OSHA safety logs (Form 300) and summaries (Form 300A) (GC Exh. 16; Tr. 469, 847). Respondent is required to complete Cal/OSHA safety logs for every work-related death and every work-related injury or illness which meets a certain criterion including restricted work activity and days away from work. Respondent is also required to complete a summary of work-related injuries on a Cal/OSHA summary form. Galescu testified that he made the request for these Cal/OSHA documents because he had been injured while working and had seen other employees get injured while working, and thus, he wanted to inform the Union of the injury rates at Tesla (Tr. 846, 1037). In his email, Galescu writes that there was a concern about the health and safety conditions at Tesla and as such Ortiz and he were requesting copies of Cal/OSHA safety logs and summaries for the current calendar year and five previous calendar years per the California Code of Regulations (Tr. 845).

On April 5, Zweig responded via email to Galescu's request (GC Exh. 17). Zweig agreed to provide redacted Cal/OSHA logs and unredacted summaries to Galescu and Ortiz. Zweig writes, "Cal/OSHA Form 300 and 300A annual summaries are being provided to you with the understanding that you and Richard Ortiz are exercising your rights as current employees to access injury and illness records [. . .]. To protect the privacy and confidential health information of injured and ill employees, we have not provided names on the Cal/OSHA logs" (GC Exh. 17). The top of the Cal/OSHA 300 logs contained the following: "Attention: This form contains information relating to employee health and must be used in a manner that protects the confidentiality of employees to the extent possible while the information is being used for occupational safety and health programs" while the summaries note, "Employees, former employees, and their representatives have the right to review the Cal/OSHA Form 300

in its entirety" (GC Exhs. 17, 18).[46]  In addition, stamped in a watermark across the Cal/OSHA logs and summaries was the word "CONFIDENTIAL" (GC Exhs. 17, 18).  Zweig included Hedges in both emails to Galescu and Ortiz.

On April 13, Galescu, along with Ortiz, sent a reply via email to Zweig and Hedges (GC Exh. 20).  Galescu requested unredacted copies of the Cal/OSHA logs.  Galescu also noted that Federal and State laws permitted him to share these documents with his coworkers, former employees, and authorized representatives.  Thus, Galescu sought clarification on why the documents provided were marked as confidential (GC Exh. 20).

On April 14, Seth Woody (Woody), director of global environmental health and safety,[47] replied to Galescu's email and declined to provide the information unredacted to protect the privacy interests of current and former employees (GC Exh. 21).  Woody wrote, "We placed the "confidentiality" watermark on the documents out of concern that the documents may be shared with individuals or organizations who are not authorized by Cal. Code Regs. Title 8, §14300.35 to receive injury and confidential health information.  We are not attempting to prohibit you from sharing the documents with current or former employees" (GC Exh. 21).  On April 21, Galescu replied to Woody requesting the legal basis for his position (GC Exh. 22).  Thereafter, on April 28, Woody responded to Galescu, providing unredacted copies of the Cal/OSHA logs (GC Exh. 23).[48]  Woody wrote, "We remind you that Cal. Code Regs. Title 8, §14300.35 provides that you may share these documents only with current and former employees or authorized representatives" (GC Exh. 23).  Galescu discussed the unredacted Cal/OSHA summaries and logs with his coworkers (Tr. 1049).

In response to the release of the unredacted Cal/OSHA logs and summaries, on May 1, Hochholdinger sent an email to Hedges to be disseminated to all production employees concerning safety initiatives and progress (R. Exh. 2).  In this email, Hochholdinger summarized safety progress at the Fremont facility as well as the development of safety teams led by production associates and ergonomic improvements.  In addition, Hochholdinger informed the employees that an employee requested Tesla's Cal/OSHA logs, and that Respondent was "required by law to provide them in their entirety" (R. Exh. 2).  Hochholdinger further writes, "We wanted to provide advance notice

to employees, as we believe this request is intended to ultimately make this information public despite our efforts to protect your privacy" (R. Exh. 2).  If employees had any questions, they could email the support team.

On May 24, approximately 1 month after receiving the Cal/OSHA logs and summaries and on the same day as employees passed out leaflets concerning safety issues at the Fremont facility, Hedges asked Lipson with meet with Ortiz and Galescu to discuss Respondent's concern that the Cal/OSHA logs had been shared with individuals outside Tesla (Tr. 2362–2364; GC Exh. 9).  Prior to this meeting, Lipson had been provided a copy of the May 24 union leaflet by HR Partner Tori Tanaka (Tanaka) (GC Exh. 53).  The leaflet mentioned that employees recently received copies of Cal/OSHA logs and summaries which they shared with a California non-profit organization (GC Exh. 9).

Thus, Lipson, at approximately 7:15 to 7:30 p.m., approached Ortiz (Tr. 482).  Ortiz testified that Lipson told him that she wanted to speak about his performance (Tr. 482).  Lipson and Ortiz went into a nearby office where Lauren Holcomb (Holcomb), a senior environmental health and safety specialist, was present (Tr. 483).[49]  Lipson spoke first, informing Ortiz that he was doing a good job.[50]  She then asked what Ortiz did with the Cal/OSHA 300 logs (Tr. 483–484).  Ortiz responded that he did not do anything with them.  Lipson asked Ortiz if he received the Cal/OSHA 300 logs to which Ortiz responded that he had.  Lipson then asked Ortiz if anyone else had done anything with the Cal/OSHA 300 logs which Ortiz denied.  Lipson also asked Ortiz if Galescu had done anything with the Cal/OSHA 300 logs, and Ortiz responded that Galescu had not done nothing in his presence (Tr. 486, 2352).  After another question, Ortiz then asked Lipson and Holcomb if they brought him into the office to talk about the Cal/OSHA 300 logs or his performance, and Holcomb stated that Ortiz was doing a great job and they appreciated him (Tr. 485).[51]

Later that evening Lipson and Holcomb met with Galescu in a conference room (Tr. 857).  Lipson started the meeting by informing Galescu that the meeting would not be recorded.  She then asked Galescu if he knew anyone who was able to access the Cal/OSHA 300 logs outside of Tesla (Tr. 858).  Galescu responded that the information was given to him and he would not answer questions without his representative.  Lipson then asked

---

[46]  The Cal/OSHA 300A summaries do not appear to contain any personally identifiable information in contrast to the Cal/OSHA 300 logs which includes the names of injured or ill employees.

[47]  Respondent admits Woody is a Sec. 2(11) supervisor as defined by the Act.  Woody did not testify.

[48]  For purposes of this hearing, I ordered the General Counsel to redact the exhibit to protect any personally identifiable information as the names of the individuals listed are not relevant in this decision.

[49]  Holcomb did not testify during the hearing but the notes she took during the meeting with Ortiz and Galescu were admitted into evidence (GC Exh. 91).  In these notes, Holcomb noted that Ortiz did not know anything about the Cal/OSHA 300 logs except that he agreed to add his name to Galescu's email when Galescu requested the information from Tesla (GC Exh. 91).  As for the meeting with Galescu, Holcomb's notes are generally consistent with his testimony.

[50]  Lipson testified that she began by telling Ortiz that the purpose of the meeting was to "talk about some personal medical information of our employees that we believed had been sent externally" (Tr. 2352).  Lipson

testified that her meeting with Galescu began with her stating that the purpose of the meeting was about a "concern of employees' medical information that had been potentially released" (Tr. 2354).  However, Holcomb's notes indicate that Lipson began both meetings by stating that the purpose of the meeting was concerns about employee's health information being disclosed to the media (GC Exh. 91).  This discrepancy is significant not only in determining Lipson's credibility but also when analyzing what, if anything, the employees were told as to the purpose of the meeting.  This discrepancy is example of why I do not credit Lipson's testimony in its entirety.  Galescu and Ortiz denied Lipson informed them of the purpose of the meeting, and I credit their testimony (Tr. 483, 857).  But even if Lipson did tell them the purpose of the meeting, based on the inconsistency as described above, it is entirely unclear what she told them the purpose of the meeting was.

[51]  On about May 25, Galescu and Ortiz filed a complaint with Cal/OSHA (Tr. 1086).  Although Respondent seeks to make issue of an alleged dismissal of the Cal/OSHA complaint, the results are irrelevant here (R. Exh. 32).

Galescu if he or anyone else accessed the Cal/OSHA 300 logs outside of the system other than the information provided to him by Respondent. Again, Galescu responded that he did not know anyone, and that he would not answer any more questions without his representative. Lipson asked Galescu again if he had accessed the Cal/OSHA 300 logs outside Tesla, and he stated that he had not and would not answer questions without his representative (Tr. 858). Lipson then asked Galescu to whom he had given the Cal/OSHA 300 logs, and he responded again that he would not answer questions (Tr. 859). Lipson asked who his representative was, and Galescu stated that his representative was someone outside the building. The next day, Galescu sent Lipson an email regarding the meeting they had the prior night (GC Exh. 48).

On June 6, Galescu, on behalf of Ortiz and himself, sent an email to Woody, Hedges, Zweig, Lipson, and Holcomb with "personal representatives" noted in the email's subject line (GC Exh. 24). In this email, Galescu provided a chronology of events regarding their requests for the Cal/OSHA logs and summaries, including a synopsis of their separate meetings with Respondent's representatives. Galescu wrote that the purpose of their meetings regarding the Cal/OSHA logs and summaries was unclear but perhaps Respondent sought to know who their personal representatives are and if they shared the information with their personal representatives. Thus, Galescu shared the names of their personal representatives along with the fact that they shared the Cal/OSHA logs and summaries with them.

*Credibility Findings*

Galescu, Ortiz, and Lipson did not contradict one another in any significant way as to what questions were asked at the meetings. However, Lipson did appear to be a hesitant witness because throughout the cross-examination she looked over at Respondent's attorneys and seemed reluctant to provide responses during this portion of her examination. I cannot credit Lipson's testimony as to how she began the meeting and what she told the employees what the purpose of the meeting was due to her change in demeanor from being an eager to reluctant witness on direct and cross-examination, respectively. Most significantly, Lipson clearly knew about the leafletting that occurred on May 24 due, at least in part, to a copy of the safety leaflet she received. Lipson feigned ignorance as to the connection between the safety leaflet and why she was asked by Hedges to question Galescu and Ortiz. Lipson also could not recall whether her questions to Ortiz and Galescu occurred on May 24, the same day she was notified of the safety leaflets discussing Cal/OSHA 300 logs. Based on what most likely occurred, I credit Galescu and Ortiz' testimony, and not Lipson's testimony.

*Legal Analysis*

As discussed above, the Board has held that an employer violates Section 8(a)(1) when it maintains a work rule that reasonably tends to chill employees in the exercise of their Section 7 rights. *Lafayette Park Hotel*, supra. From the outset, I disagree with the General Counsel's premise that by placing the "CONFIDENTIAL" watermark on the Cal/OSHA safety logs and summaries, Respondent promulgated an overbroad confidentiality rule violating *Boeing*. Respondent merely placed the confidential watermark on the forms and explained clearly to

Galescu and Ortiz their justification for doing so: compliance with Cal/OSHA regulations. The General Counsel failed to show that Respondent "maintains" a rule that the Cal/OSHA logs and summaries are to remain confidential as Woody clarified that the information could be shared with current and former employees and their personal representatives. See *Flamingo Las Vegas Operating Co.*, 360 NLRB 243, 243 and fn. 5 (2014) (employer did not promulgate a rule which was directed to one employee and never repeated to any other employee as a general requirement). Moreover, even if Respondent created a "rule" by placing this "CONFIDENTIAL" watermark on the documents, the rule in no way chills employees in the exercise of their Section 7 rights due to Woody's explanation to Galescu and Ortiz. The General Counsel also claims that the "CONFIDENTIAL" watermark is in direct response to Ortiz and Galescu attempt to use the information for Section 7 purposes. The timing of events does not support such a conclusion as the workplace petition and leafletting on safety issues occurred 1 month after their request for this information. Thus, this complaint allegation at paragraph 7(k) is dismissed.

When evaluating alleged interrogations, the Board examines all the circumstances to determine if the questioning would have reasonably tended to restrain or coerce employees in the exercise of protected concerted activity. See *Rossmore House*, 269 NLRB 1176, 1178 (1984), affd. sub. nom. *Hotel & Restaurant Employees Local 11 v. NLRB*, 760 F.2d 1006 (9th Cir. 1985) (the Board set forth a test for examining whether an interrogation is unlawful). Factors to considered include the questioner's identity, the nature of the relationship between the questioner and the employee, the place and method of questioning, the nature of the information sought and whether it would reveal previously undisclosed union sympathies or activities, whether the questioner offered any legitimate explanation for the question or assurance against reprisal, the truthfulness of the employee's reply, and whether there is a history of employer hostility to union activity. See id. at 1178 and fn. 20; *Shamrock Foods Co.*, 366 NLRB No. 117, slip op. at 16–17 (2018), enfd. 779 Fed. Appx. 752 (D.C. Cir. 2019); *Novato Healthcare Center*, 365 NLRB No. 137 (2017), enfd. 916 F.3d 1095, 1106 (D.C. Cir. 2019). The Board also considers whether the interrogated employee is an open and active union supporter. See, e.g., *Southern Bakers, LLC*, 364 NLRB No. 64, slip op. at 7 (2016), enfd. in relevant part 871 F.3d 811 (8th Cir. 2017).

Here, all the factors support a finding of a violation. Lipson, along with Holcomb as notetaker, both human resources businesspersons, called Ortiz and Galescu into meetings in conference rooms. During these meetings, Lipson did not explain the purpose of the meetings. Even if she did explain the purpose of the meetings as described in her testimony, she generically explained that Respondent was concerned about the release of employees' personal medical information to an external source. Lipson never explained, as Respondent argues in its brief, to Ortiz or Galescu that there was a concern that California State regulations had been violated or any other explanation for the inquiry. Respondent claims that since Galescu had not informed Respondent who his personal representative was until after the meeting, Respondent had every right to investigate a possible Cal/OSHA violation. However, Respondent failed to provide

any explanation to Galescu or Ortiz so to possibly legitimize the inquiry. During these meetings, Lipson asked a series of questions probing into what the employees had done with the Cal/OSHA logs and summary and to whom they had provided the information. That day, employees including Galescu passed out leaflets which contained information precisely concerning the safety issues at Tesla, citing to the Cal/OSHA logs and summary. Lipson knew the contents of this leaflet prior to meeting with Galescu and Ortiz. Thus, the questioning would certainly be seen to be aimed at learning Galescu and Ortiz' protected concerted activities. Furthermore, Galescu refused to provide any responses to Lipson's questions, instead asking for his representative. See *Sproule Construction Co.*, 350 NLRB 774, 774 fn. 2 (2007) (employee attempts to conceal union support weigh in favor of finding an interrogation unlawful). Also, as discussed above, that same day Respondent violated Section 8(a)(1) when Phillips was told to leave the Fremont facility parking lot when he was passing out these same leaflets. Based on a totality of the circumstances, Respondent violated Section 8(a)(1) when Lipson interrogated Galescu and Ortiz as alleged in complaint paragraph 7(q).

VIII. COMPLAINT PARAGRAPH 7(Y): RESPONDENT ON JUNE 7, VIOLATED SECTION 8(A)(1) OF THE ACT WHEN ELON MUSK AND GABRIELLE TOLEDANO MADE STATEMENTS OF FUTILITY IN SELECTING THE UNION, SOLICITED COMPLAINTS AND IMPLIEDLY PROMISED TO REMEDY THE ISSUES, AND STATED THAT EMPLOYEES DID NOT WANT A UNION IN THE WORKPLACE

The General Counsel argues that Respondent violated Section 8(a)(1) when Musk solicited employee safety complaints and impliedly promised to fix safety issues at Tesla, when Musk told employees that selecting the Union would be futile and that they could have a union if Tesla did not remedy their safety concerns, and when Toledano stated that no one wanted the Union at Tesla (GC Br. at 64–68). Respondent argues that the complaint allegations are time barred (R. Br. at 155–164). If the complaint allegations are not time barred, Respondent denies the allegations as alleged (R. Br. at 166–171).

*Procedural Issue*

On June 4, 2018, the Regional Director issued an amendment to the second amended consolidated complaint and notice of hearing with paragraph 7(y) alleging that on about June 7, Respondent, in a conference room at its Fremont facility, during a meeting held by Musk and Toledano: (i) by Musk, solicited employee complaints about safety issues and impliedly promised to remedy their safety complaints if they refrained from their union organization activity; (ii) by Musk, informed its employees that it would be futile for them to select a union as their bargaining representative by telling them that employees did not need a union and that Respondent would allow them to have a union if Respondent failed in its efforts to remedy their safety grievances; and (iii) by Toledano, restrained and coerced employees from engaging in union organizational activity by telling them no one at Respondent's Fremont facility wanted a union and asking them why employees would want to pay union dues. On June 11, 2018, Respondent filed a motion to dismiss complaint paragraph 7(y) based on Section 10(b) of the Act. I denied Respondent's motion to dismiss without prejudice on August 10, 2018.

Then, Respondent filed a special appeal to the Board of my denial of the motion to dismiss; the Board denied Respondent's motion on September 21, 2018. Respondent renews its motion to dismiss paragraph 7(y). The General Counsel does not address Respondent's timely raised 10(b) argument in its post hearing brief, and thus, I rely upon the General Counsel's argument during the hearing as well as the opposition to the motion to dismiss paragraph 7(y) of the complaint. As discussed further, I deny Respondent's motion to dismiss paragraph 7(y).

Under Section 10(b) of the Act, "no complaint shall issue based upon any unfair labor practice occurring more than 6 months prior to the filing of the charge with the Board and the service of a copy [of the charge] upon the person against whom such charge is made." However, a complaint may be amended to allege conduct occurring outside the 10(b) period if the conduct occurred within 6 months of a timely filed charge and is "closely related" to the allegations of the charge. *Fry's Food Stores*, 361 NLRB 1216, 1216 (2014), citing *Redd-I, Inc.*, 290 NLRB 1115 (1988). Moreover, amended charges filed outside the 6-month 10(b) period, "are deemed, for 10(b) purposes, to relate back to the original charge." See *Apple SoCal LLC d/b/a Applebee's*, 367 NLRB No. 44, slip op. at 3 (2018), citing *WGE Federal Credit Union*, 346 NLRB 982, 983 (2006) (quoting *Pankratz Forest Industries*, 269 NLRB 33, 36–37 (1984), enfd. mem. sub nom. *Kelly-Goodwin Hardwood Co. v. NLRB*, 762 F.2d 1018 (9th Cir. 1985)). The Board applies a three-pong "closely related" test as set forth in *Redd-I* where the Board considers (1) whether the otherwise untimely allegations involve the same legal theory as the allegations in the timely charge; (2) whether the otherwise untimely allegations arise from the same factual situation or sequence of events as the allegations in the timely charge (i.e., the allegations involve similar conduct, usually during the same time period, and with a similar object); and (3) whether a respondent would raise the same or similar defenses to both the otherwise untimely and timely allegations. *Alternative Energy Applications, Inc.*, 361 NLRB 1203, 1203 (2014). Section 10(b) is an affirmative defense that is waived if it is not raised timely in a respondent's answer or during trial. *Public Service Co. of Colorado*, 312 NLRB 459, 461 (1993). Respondent timely raised its 10(b)-affirmative defense.

As for complaint paragraph 7(y), in first amended charges 32–CA–197020, filed April 17, and amended on July 28, 32–CA–197058, filed on April 17 and amended on July 28, 32–CA–197091, dated on April 18 and amended on July 28, and 32–CA–197197, filed on April 19 and amended on July 28, the Union alleged that within the past 6 months from February to July, Tesla violated the Act by "intimidating and harassing employees for their Section 7 activities" (GC Exhs. 1(a), 1(c), 1(e), 1(g), 1(k), 1(m), 1(o), 1(q)). Moreover, in addition to general allegations of intimidation and harassment by Respondent, amended charge 32–CA–200530, filed on June 12, and amended on July 28, alleges that Respondent violated the Act by "interrogating employees regarding their protected concerted activities" (GC Exhs. 1(i), 1(s)). The allegations against Musk and Toledano although not specified in the charges or amended charges are "closely related" under *Redd-I*. Under the first prong, the Musk and Toledano allegations would be analyzed similarly to other instances of intimidation and harassing conduct as well as

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

interrogation under Section 8(a)(1) of the Act. As for the second prong, again these allegations against Musk and Toledano arose during the same union organizing campaign which was the subject of each of these charges and amended charges. Moreover, Respondent's defenses would be similar such that no such conduct or statements occurred. Thus, paragraph 7(y) of the complaint is not time barred.

Respondent cites several Board decisions to distinguish these charges from other charges the Board found to be untimely. However, unlike in *WGE Federal Credit Union*, supra, the allegations here in complaint paragraph 7(y) would be analyzed under Section 8(a)(1) of the Act and involve the same union organizing campaign. See *Nickles Bakery of Indiana*, 296 NLRB 927, 928 (1989) (citing *G.W. Galloway Co. v. NLRB*, 856 F.2d 275, 280 (D.C. Cir. 1988) (a finding of a sufficient relation between the charge and complaint in circumstances involving "acts that are part of the same course of conduct, such as a single campaign against a union," *NLRB v. Central Power & Light Co.*, 425 F.2d 1318, 1321 (5th Cir. 1970), and acts that are all "part of an overall plan to resist organization," *NLRB v. Braswell Motor Freight Lines, Inc.*, 486 F.2d 743, 746 (7th Cir. 1973)). The Musk and Toledano allegations concern events surrounding the Union organizing campaign, and do not concern facts separate and apart from the many allegations set forth in the charges and amended charges. See *Charter Communications, LLC*, 366 NLRB No. 46, slip op at 2–5 (2018) (both timely and untimely allegations allege that employer's conduct discouraged employees from engaging in protected activities in violation of Section 8(a)(1) as well as the events were related to the employer's response to a union campaign). In sum, complaint paragraph 7(y) is not time barred.

### The employees' health and safety petition

Prior to the June 7 meeting called by Musk, between March and June, Moran, Ortiz, and other VOC members signed and distributed a petition regarding working conditions at Respondent (GC Exh. 27; Tr. 704–705). The petition states,

To Tesla Management,

As workers here at the Fremont plant, we believe in Tesla's mission, and work hard to make the company successful. But we also believe our company can expand that mission to recognize the important role workers like us play in building the company's future. Tesla workers deserve to have a fair, safe, and secure work place. As we all work hard to meet our company's ambitious production goals, it's even more important that we don't lose sight of safety. We should come to work knowing we will return home to our families without being injured at work. Unfortunately, all too often, this isn't the case. Workers are getting hurt on the job, and see work areas accidents could easily happen. In addition, too many of our coworkers don't report injuries or other safety concerns because they are afraid of retaliation. We believe the best, most fair, and most effective solution to safety and other concerns is for us to form our union so we can work together with management and have a true voice when it comes to our working conditions.

(GC Exh. 27).[52]

On June 6, Moran sent an email to Hedges and Musk regarding the employees' desire for health and safety at the workplace along with their desire for a "Democratic Process as we Form our Union" (GC Exh. 29). Moran hand-delivered this petition to Hedges prior to sending the June 6 email (Tr. 707).

On June 7, Hedges came to Moran's work location and asked to speak with him in a conference room (Tr. 713). Moran brought another employee Tony Vega (Vega) as a witness.[53]

As they walked towards the conference room at the north end of the Fremont facility, Hedges told Moran that Musk wanted to speak to him (Tr. 714).[54] When Hedges, Moran and Vega arrived at the conference room, Musk and Toledano were waiting. Hedges then left and did not attend the meeting.

Toledano spoke first and told Moran that they saw the health and safety petition and wanted to hear his concerns directly (Tr. 715, 911).[55] Musk then asked Moran to tell him his history with

---

[52] In addition to the safety petition, in April or May, Ortiz signed another petition concerning compensation (GC Exh. 26). Again, those signing the petition indicated that they were organizing to address the issues of compensation and other working conditions in a union contract. The signed compensation petition was delivered by VOC members to Hedges along with leaflets on or about July 21 (GC Exh. 45; Tr. 489–490). Thereafter, a picture of some of the employees who delivered the documents to Hedges was posted on the Facebook, "A Fair Future at Tesla" public webpage.

[53] Vega did not testify.

[54] Musk did not testify. The General Counsel requests I make an adverse inference that Musk would not have corroborated Toledano's testimony regarding what was said during the June 7 meeting (GC Br. at 22, 65). However, I decline to take an adverse inference since I do not credit Toledano's version of events, and instead rely upon Moran's testimony. Vega also did not testify. Likewise, I decline to make an adverse inference, as requested by Respondent, that Vega would not have corroborated Moran's testimony (R. Br. at 165). Toledano's lack of credibility, along with the subsequent email exchange amongst Respondent's officials as well as Moran's credible testimony convinces me that Moran's version of events must be credited.

[55] I cannot credit Toledano's testimony for various reasons. Toledano testified that when she interviewed for the chief people officer position,

the subject of the Union organizing campaign never arose (Tr. 888, 928–929). Toledano emphatically denied Musk, who interviewed her for the position, bringing up the subject of the UAW. When she began working at Tesla on May 22, she testified that she could not recall if the union campaign arose (Tr. 928–929). She also testified that she "became aware over time that there was a union organizing campaign" (Tr. 888–890, 902). The union organizing campaign was clearly known by upper management in at least February when Musk sent an email to all employees directly responding to topics mentioned by Moran in his February 9 blog post, advocating for UAW. For Toledano to claim that the subject of union organizing to have never been mentioned to her during the spring of 2017 when she interviewed for the position is not believable. Another reason I cannot find Toledano credible are her inconsistent statements. Toledano testified that she "became educated over time what a union organizing campaign was" and "was learning that there were people who had complaints" (Tr. 890–891). Toledano testified that she probably learned that Moran, Vega, Galescu, and Ortiz were union supporters between June 8 and 13 (Tr. 932–933). However, based on the timing of events, by June 8, Toledano already knew that Moran was an active union supporter. But in her Board affidavit of February 5, 2018, Toledano stated that as late as July she was not aware of employees engaging in union activities (Tr. 899–901). Furthermore, Toledano testified that prior to this meeting she had not reviewed the safety petition Moran

Tesla. Moran responded with his history and explained the safety concerns his coworkers and he had (Tr. 716). Vega also spoke on the subject. Moran then spoke again, mentioning that when he had his performance assessments, he performed well but did not received any raises. Thus, they sought a union to gain a voice at the Fremont facility (Tr. 717).

Moran testified that Musk stated, "[Y]ou know, you don't really have a voice. The UAW is a second—like two-class system where UAW is the only one that has a voice and not the workers" (Tr. 717). Toledano then spoke acknowledging problems with the performance system. According to Moran, Toledano then said, "[Y]ou know, the majority of workers at Tesla don't want a union and, you know, why do we want to pay for—why do we want to pay union dues?" (Tr. 718).[56] Moran responded that the employees have a right to form a union to have a voice to improve working conditions. Vega spoke stating that they did not want to hurt Tesla but wanted to make it better. Toledano suggested that they participate in the weekly safety committee meetings to call to attention their safety concerns (Tr. 718). Moran and Vega agreed. Musk spoke and told them that if the safety committee meetings did not work, they would "give you your union" (Tr. 719).[57] This was the first and only meeting Moran had with Musk (Tr. 720). The meeting lasted 15 to 30 minutes (Tr. 809). Toledano testified that she thought the meeting was "positive" and as a result Musk committed to weekly safety meetings (Tr. 936–937).

The next day, June 8, Toledano and Hedges scheduled a voluntary safety meeting (Tr. 912–913; GC Exh. 55). Toledano invited safety representatives from the environmental health and safety group led by Woody as well as HR representatives (Tr. 912). Production and manufacturing employees, including Moran, Ortiz, and Galescu attended this meeting. During this meeting, according to Toledano, Galescu was "mean" towards her because he publicly asked her that if the safety issues were not fixed would she be willing to resign from her job and because he was "worked up" during this meeting (Tr. 959).

During the morning of June 12, Hedges responded to Moran's June 6 petition by sending an email to all employees in manufacturing concerning safety in the workplace (GC Exh. 30). The email's subject line stated, "Tesla Production Update: Safety, Your Feedback, and the Real Facts." Hedges stated that a leaflet distributed on June 7, was to "promote the UAW, not to promote safety" (GC Exh. 30).[58] In this email, Hedges disputed the facts

set forth in the leaflet, and noted that the author of the June 6 letter had "up until now chosen not to participate on the safety teams" but he was invited to have in person discussions with HR leadership and senior members of the safety team which resulted in "a very positive and productive conversation about all the efforts that are underway to improve safety" (GC Exh. 30).

Later, during the evening of June 12, Ortiz sent an email to Hedges and Musk complaining about a safety incident involving members of middle management, which he believed exemplified the safety problems at Tesla (GC Exh. 52). Musk then forwarded the email to Woody. Woody replied immediately that he would work closely with Ortiz, Moran, Galescu, and others that had met with on June 8. Musk replied to Woody:

> I'm meeting with Jose [Moran] and Jonathan [Galescu] again in the next few days. Will ask them to join your team full time, so long as they do so in good faith and are truly as committed as they claim to safety

(GC Exh. 52.) Woody appears to have then forwarded Musk's email to Toledano who responded to Musk:

> I have to say, this is a super smart idea to have these two on the safety team full time. If that's what you mean—they would join Seth's [Woody's] team and work on safety in the factory full time one behalf of all associates (vs work to pull in the UAW)? Amazing way to turn adversaries into those responsible for the problem

(GC Exh. 52; Tr. 914, 919.) Toledano admitted that when she wrote adversaries, she was referring to Moran (Tr. 918–919). Musk replied, "Exactly" (GC Exh. 52).

The next day, Toledano sought to clarify what occurred on June 7. Toledano reminded Musk that they met with Moran and Vega, who she identified as "the nice guy who Jose brought at[sic] a 'witness'," and that they had not met with Galescu. Toledano wrote referring to her June 8 meeting:

> All 4 are pro-union (Jose [Moran], Tony [Vega], Jonathan [Galescu] and Victor [Ortiz][59]). Jonathan [Galescu] was the most vocal/aggressive in the Thursday meeting. After the meeting he wrote me the nice note I forwarded to you last night and responded to, but in the meeting he tried to get me to ok having Union organizers still come in. Obviously, I did not agree [. . .].

> [. . .] Tony Vega would be the best add to the Safety team, as

---

provided to Hedges (Tr. 931). However, Moran credibly testified that Toledano began the meeting by stating she had reviewed the safety petition and Musk and she sought to discuss it with Moran. It is also unbelievable that Toledano would not have reviewed the employees' safety petition prior to meeting with Moran.

[56] In contrast, Toledano testified that the meeting only concerned safety and safety committees, and that the topic of unions did not come up (Tr. 910, 957). Toledano denied making any statements about the Union during this meeting (Tr. 956). Toledano also denied that Musk made any statements about the Union (Tr. 956–957). Again, I cannot credit Toledano. The undisputed purpose of the meeting was to discuss the safety petition presented by Moran and other employees. This petition as well as email to Hedges and Musk discusses the desire of the employees to form a union which is even included in the subject line of the email. To deny that the subject of the Union never came up during

the meeting seems completely implausible. In addition, based on circumstantial evidence, Musk knew that Moran promoted organizing in the workplace due to his February 2017 blog post, and Musk's subsequent email to all employees. Hence, I do not credit Toledano's testimony.

[57] Toledano testified that she could not recall if Musk spoke about the safety committees during the meeting (Tr. 911). Once again, Toledano's testimony cannot be credited. The point of the meeting was to address the employees' safety concerns due to the employees' petition, and based on Toledano's suggestion, they intended to invite Moran and others to the safety committee meetings. It does not seem plausible that Musk would not have also discussed the safety committees.

[58] The leaflet is not in the record.

[59] Toledano appears to be referring to Richard Ortiz, not Victor Ortiz (Tr. 924).

he is the most reasonable but also connected with those most active to unionize.

Clearly we could ask all 4 to join Seth's team and go salaried. I am confirming now with Legal that if they join the Safety team then they would be considered part of management and not eligible to advocate for a union should they accept these roles. I will confirm when I get this answer.

(GC Exh. 52; Tr. 915). Toledano admitted that she thought adding employees such as Moran to the safety team would be a great way to involve employees in "something they think is broken" (Tr. 915).

On June 14, Hedges responded directly to Moran regarding his June 6 email; Musk and the other recipients of Moran's June 6 email were included in Hedge's reply (GC Exh. 29; Tr. 707). Hedges wrote that Respondent takes safety seriously as they discussed on June 6, when the members of the VOC delivered the petition. Hedges also noted that Respondent held safety meetings on June 8, with Moran and others to address these issues. Finally, Hedges ended his email with statistics of how the UAW has been unsuccessful nationally and in the Bay Area and noted that employees have complained to Respondent about being "bothered" at their homes as the UAW attempts to share information (GC Exh. 29).

### Credibility Findings

Only Moran and Toledano testified about the June 7 meeting. Between the two witnesses, Moran was truthful while Toledano provided contradictory and unlikely testimony. I credit the testimony of Moran as he testified with a calm demeanor and provided straightforward, unwavering testimony. During Moran's testimony regarding the June 7 meeting with Musk and Toledano, Moran testified authentically because although he appeared apprehensive, he provided thorough details. Moran appeared to be listening carefully during the questioning and paused before he responded. During cross-examination, he did not get flustered and answered the questions to the best of his recollection. Moreover, Moran's testimony remained consistent and was uncontradicted.

In direct contrast, Toledano testified nervously. Toledano's memory during her testimony was poor and directly contradicted by emails she sent and responded to after the June 7 meeting with Moran. For example, Toledano testified that she could not recall if she said that promoting Moran and other employees to the safety team would prevent them from advocating for the Union (Tr. 915–916). But her emails show extensive discussion and steps Toledano took to move four pro-union employees to management so they could no longer advocate for the Union. Toledano, during cross-examination, often glanced at Respondent's counsel when she was answering questions. Toledano appeared to be straining to provide the "right" answer as she often appeared flustered. During cross-examination, Toledano could not recall any details of the events surrounding the June 7 meeting which calls into question her reliability as a witness. Toledano admitted that prior to the hearing she spoke to Hedges to refresh her memory as to what happened in the summer of 2017 (Tr. 939–940, 1201).

### Legal Analysis

An employer's solicitation of employee grievances or complaints during a period of organizing activity inherently includes an implied promise to remedy them and is unlawful unless the employer has an established practice of soliciting and resolving grievances if the past practice is not significantly altered. See, e.g., *Shamrock Foods Co.*, 366 NLRB No. 117, slip op. at 6 (2018); *Alamo Rent-a-Car*, 336 NLRB 1155, 1155 (2001). Here, Musk, the highest-ranking official of Tesla, called a meeting with Moran the day after he delivered a safety petition to Hedges and sent an email to Musk and Hedges expressing the desire of employees to unionize. It is irrelevant, as argued by Respondent, that Moran "prompted" the meeting due to his June 6 email and petition. Musk had never met with Moran prior to this meeting and there is no evidence that Musk met with Moran again. During this meeting, Toledano began the meeting by announcing that their purpose was to hear safety concerns from Moran directly. After hearing from Moran and Vega, Toledano told the employees to the safety team meetings, and Musk stated that if the safety committee meetings did not work, they would "give you your union" (Tr. 719). Based upon the credit evidence, employees may reasonably infer that Respondent via Musk was soliciting Moran's safety complaints for the purpose of acting favorably on them to temper the employees push for a union which violates the Act.

In addition, Musk and Toledano's other statements during this meeting violated Section 8(a)(1) of the Act. In response to Moran's explanation for why employees sought to unionize, Musk told Moran and Vega: "[Y]ou know, you don't really have a voice. The UAW is a second—like two-class system where UAW is the only one that has a voice and not the workers" (Tr. 717). Toledano also remarked, "[Y]ou know, the majority of workers at Tesla don't want a union and, you know, why do we want to pay for—why do we want to pay union dues?" (Tr. 718). In *Wellstream Corp.*, 313 NLRB 698, 706 (1994), the Board held that an employer violates Section 8(a)(1) of the Act by telling employees that attempts to secure union representation would be futile where they were clearly intended to and had the effect of informing the employees the futility of their support of the Union. Here, Musk's statement in response to Moran's reasons for why the employees sought union representation was designed to impart to Moran that even with union representation the employees would not have a voice, and selection of a union would be useless. As for Toledano's statement, the Board has found that employer warnings of "serious harm" to employees who choose union representation are not per se unlawful, but the warnings or statements may be unlawfully coercive if uttered in the context of other unfair labor practices that "impart a coercive overtone". *Community Cash Stores*, 238 NLRB 265, 269 (1978), citing *Greensboro Hosiery Mills*, 162 NLRB 1275, 1276 (1967), enf. denied in relevant part 398 F.2d 414 (4th Cir. 1968); *Reno Hilton*, 319 NLRB 1154, 1155 (1995); see also *Westwood Health Care Center*, 330 NLRB 935, 940 fn. 17 (2000) (statement is assessed in the context in which it is made and whether it tends to coerce a reasonable employee). Also, in the course of organizational campaigns, statements are sometimes made of a kind that may or may not be coercive, but to derive the true import of the remarks, the circumstances in which they are made must be

viewed. Again, here, Toledano's statement that no one wanted the union was made in the context of other unfair labor practices including Musk's solicitation during the meeting and his statement of futility as well as the interrogation of other pro-union supporters regarding the Cal/OSHA 300 logs. Thus, Toledano's statement also violated the Act.

Respondent argues that if Moran's testimony is credited, Musk's statement, "[Y]ou know, you don't really have a voice. The UAW is a second—like two-class system where UAW is the only one that has a voice and not the workers" is not unlawful under Section 8(c) of the Act (R. Br. at 167–170). Section 8(a)(1) of the Act is modified by Section 8(c) of the Act which defines and implements the First Amendment in the context of labor relations. See 29 U.S.C. §158(c); *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969). Section 8(c) permits employers to express "any views, arguments or opinion" concerning union representation without violating Section 8(a)(1) if the expression "contains no threat of reprisal or force or promise of benefit." *NLRB v. Marine World USA*, 611 F.2d 1274, 1276 (9th Cir. 1980). The employer is also free to express opinions or make predictions, reasonably based in fact, about the possible effects of unionization on the company. *NLRB v. Gissel Packing*, supra at 618. When determining whether a statement is permitted under Section 8(c), the statement must be considered in the context in which it was made and in view of the totality of the employer's conduct. *NLRB v. Marine World USA*, supra.

I disagree. In my view, Musk's statement taken in context of the impetus for the meeting (the safety petition and desire to organize) along with the idea to place the employees on the safety committee to address workplace safety concerns before they would be "give[n]" their union is unlawful and violates Section 8(a)(1). See *Reno Hilton Resorts Corp.*, 319 NLRB 1154, 1156 (1995). Unlike the Board's decision in *Erickson Trucking Service, Inc. d/b/a Erickson's Inc.*, 366 NLRB No. 171, slip op. at 1 (2018), where the president of the company made a disparaging statement about the union's business manager which was found to be protected by Section 8(c) as an ancillary statement to unlawful conduct in a meeting, here the General Counsel alleged that Musk implied a sense of futility if selecting the Union as the employees would have no voice or essentially no representation. Musk's statement was not a permissible explanation of the disadvantages of union representation but was in direct response to Moran's reason for why the employees wanted union representation and was shortly followed by Musk's statement that the employees would be given a union if the safety committee meeting did not address their concerns. Taken as a whole, Musk's statement cannot be protected under Section 8(c) of the Act. In sum, Musk and Toledano's statements on June 7 violated Section 8(a)(1) of the Act as alleged in complaint paragraph 7(y).

IX. COMPLAINT PARAGRAPHS 7(L), AND 7(T) THROUGH 7(V): RESPONDENT VIOLATED SECTION 8(A)(1) OF THE ACT WHEN AT THE FREMONT FACILITY IT MAINTAINED AN UNLAWFUL TEAM WEAR POLICY BUT DID NOT VIOLATE THE ACT WHEN ALLEGED TO HAVE DISCRIMINATORILY APPLIED THE TEAM WEAR RULE IN

---

[60] This rule is the subject of complaint par. 7(l).

AUGUST

The General Counsel alleges that Respondent's team wear rule is facially unlawful and was applied in a discriminatory manner numerous times in direct response to union activity in August (GC Br. at 72–78). Respondent argues that the team wear policy is lawful under *Boeing* (R. Br. at 84–87). Furthermore, the supervisors alleged to have violated the Act were enforcing a lawful rule, did not discriminate against employees wearing Union shirts, and even under a "special circumstances" analysis, Respondent's team wear rule is lawful (R. Br. at 113–118).

Team wear rule at the Fremont facility

During the relevant time period Respondent maintained "General Assembly Expectations" (GC Exh. 37). This document contains a section concerning "team wear." The document provides:

Team Wear: It is mandatory that all Production Associates and Leads have assigned team wear.

- On occasion, team wear may be substituted by all black clothing if approved by supervisor.
- Alternative clothing must be mutilation free, work appropriate and pose no safety risks (no zippers, yoga pants, hoodies with hood up, etc.)

(GC Exh. 37).[60] As explained previously, Respondent provided all GA employees team wear compliant clothing when hired but prior to August, employees would often wear shirts in a variety of colors with pictures or emblems such as sports teams and clothing brands to work in GA without any supervisor informing them to wear only Tesla assigned team wear (Tr. 185–189, 206, 208, 238–240, 295–296, 307). Beginning in the spring of 2017 until August, production associates in GA began wearing UAW shirts which had been passed out by employees (Tr. 296, 329). These shirts were all cotton in black color with the "Driving for a Fair Future at Tesla" logo on front, and the same logo with the abbreviation "UAW" on the back (GC Exh. 25). Employees also wore union stickers and hats to work (Tr. 204–205, 208, 210, 260).

Mario Penera (Penera), who is the second shift production manager in GA, testified regarding the purpose for team wear in GA.[61] Penera testified that team wear relates to safety such that Respondent knows that all production associates are wearing appropriate clothing for the job, production associates may be quickly identified in case of an emergency, and to eliminate or reduce the risk of vehicle mutilation which leads to increased costs (Tr. 1377–1378). Penera also testified, "For me, the bigger thing with team wear is visual management of the shop. So as we discussed, it's a 5 million square foot facility. Somewhere around 10,000 people walking through the plant every day. For me, that's how I know as a manager who should be there, who shouldn't be there [. . . .] and it is easier to scan 30, 40 people individually to see if their pants are going to be too abrasive, to see if their shirt has any mutilation risk on it" (Tr. 1375). Penera testified that if a production associate was not wearing team wear, the supervisors and managers were to find out why the

---

[61] The parties stipulated at the hearing that Penera is a supervisor under the Act (Tr. 1413–1414).

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

production associate was not wearing team wear and how the issue could be resolved including corrective action (Tr. 1380–1381). Panera testified that he approved substituting all black colored clothing for team wear when Respondent hired too many employees at the same time and Respondent could not provide all employees in GA with team wear (Tr. 1382, 1411). Other supervisors and managers also permitted employees to wear clothing other than assigned team wear. Associate Production Manager Tope Ogunniyi (Ogunniyi) testified that she permitted associates to wear all black colored shirts instead of the assigned team wear if the associate did not have any team wear and the team wear store was not open (Tr. 2535).[62] She permitted associates to buy a plain black colored shirt from a local store so they could continue to work (Tr. 2535, 2539). She also permitted associates to cover any logos on a black colored shirt with mutilation protection tape which prevented the vehicles from being scratched (Tr. 2535). Business unit leader Kyle Martin (Martin) testified that there were occasions to give exceptions to wearing team wear such as when the team wear store did not have the correct size or the item was not in stock (Tr. 1634, 1645–1646).

The record reveals that in April to May, according to Martin, the end of line department, the step after GA, noticed an increasing number of mutilations to the seats in the vehicles. Management officials in GA met to determine what was causing these seat mutilations (Tr. 1601, 1653). They discussed potential causes of the seat mutilations including incoming materials, tools, non-compliance with team wear, how the associates were in the line, and how associates installed material (Tr. 1602). Thus, Respondent decided to audit the number of seat mutilations per week, and to document their causes (Tr. 1603, 1607–1608; R. Exh. 27).[63] These audits began in May and ended in September (Tr. 1622).[64] The audit reports do not reveal any details as to what specifically caused the seat mutilations (R. Exh. 28; Tr. 1608–1610, 1641–1643).[65] But Martin testified that the increased scrutiny during this time period revealed that seat mutilations were caused by tools when associates would not use a tool cover or when associates would carry a tool in their back pocket which could damage the seat as well as rivets on pants not assigned by Tesla (Tr. 1637–1638, 1641–1642, 1653). Martin, Panera and other supervisors admitted that the seat mutilations were not caused by shirts, and no management witness could provide an example of a vehicle being damaged by shirts (Tr. 1398–1399, 1641–1642, 1647–1648, 2416–2417, 2541, 2547). Martin testified that Respondent sought to prevent mutilations as a whole with the team wear rule (Tr. 1600).

In August, Respondent began enforcing the team wear rule in GA and after an initial "pardon" for the day, issued disciplinary action including dismissal for the day for non-compliance with the team wear rule (R. Exh. 29; Tr. 1623–1625, 1653, 2527). Martin testified that he asked his supervisors and associate managers to "walk the line" to check on associates' compliance with the team wear rule (Tr. 1632–1633).[66] Martin could not provide any examples of which associates were terminated for failure to wear team wear and described "dismissal" as stated in the audit report to refer to an associate's dismissal for the day from work for failure to comply with the team wear rule that day rather than termination (Tr. 1653).

Due to Martin's instructions, on August 10, Ogunniyi spoke to her subordinates including production supervisor Tim Fenelon (Fenelon) to ensure that production associates followed the team wear rule, or the supervisors would be held accountable (Tr. 2397–2398, 2409). Ogunniyi required her subordinates to report to her as to whether they checked their assigned production associates for team wear rule compliance (Tr. 2534). Ogunniyi also walked the line where the associates work to ensure that they were following the team wear rule (Tr. 2528). Ogunniyi spoke to several associates who were not wearing the assigned team wear and informed them that they would be sent home the following shift if they did not comply with the team wear rule (Tr. 204, 2528–2529, 2531–2532). Later that day, Martin followed up with Ogunniyi to ensure that she walked the line to check on employees' team wear rule compliance (Tr. 2551). Martin asked Ogunniyi to send him a list of associates who did not follow the team wear rules that day (Tr. 2551; GC Exh. 73).[67] After Ogunniyi sent her list to Martin, he then asked her how many associates wore the UAW shirt that day (GC Exh. 73). Ogunniyi noted in response to Martin's question that only production associate Jayson Henry (Henry) wore a UAW shirt that day (Tr. 2554). Martin testified that he asked which associates wore a union shirt because, "It gave me a pulse for the shop. It lets me know where my supervisors are at, with the development of their associates. If I have an associate on my line that feels that they have to seek some type of outside counsel or representation, it means that my supervisors aren't doing what they need to do to engage the associates" (Tr. 1635, 1644–1645, 1657–1659).

Henry testified that he wore a UAW shirt on August 10 after he passed out shirts to employees prior to the start of his shift that day (Tr. 181, 183, 187, 194). That day, an unknown male supervisor, identified by his red colored Tesla shirt, told Henry

---

[62] Respondent admits during the relevant time period that Ogunniyi was a supervisor and agent as defined by Sec. 2(11) and (13) of the Act, respectively.

[63] The audits did not concern mutilations to any other portion of the car, including the outer body of the car (Tr. 1642–1643).

[64] Martin presented to Musk the improvements in reducing the number of seat mutilations in GA (R. Exhs. 29 and 30; Tr. 1622, 1656).

[65] Respondent presented a series of emails with attached audit reports (R. Exhs. 28, 29, 30, and 31). However, these emails and audit reports do not indicate the relationship between seat mutilations and noncompliance with team wear. Thus, I do not find these exhibits to be probative.

[66] Martin testified that he asked supervisors to "walk the line" prior to August, but I do not credit his testimony as it is uncorroborated and

contradicted by the credible testimony of Ogunniyi and Fenelon. Multiple witnesses, including Ogunniyi, testified that enforcement of the team wear rule began in August.

[67] In contrast, Martin testified that Ogunniyi initiated the email with him after he asked her to ensure that associates followed the team wear rule (Tr. 1635–1636). I do not credit Martin's testimony on this point. Ogunniyi's email to Martin contains the subject line: team wear follow-up (GC Exh. 73). In this email, Ogunniyi informed Martin to whom she spoke with that day regarding team wear rule compliance. The subject line of this email seems to suggest that Martin asked Ogunniyi for the names of individuals not following the team wear rule which contradicts Martin's testimony.

he could not wear the union shirt again or he would be sent home (Tr. 184).[68] Henry requested to see Respondent's dress code (Tr. 184). Ogunniyi then approached Henry and gave him a copy of "General Assembly Expectations" which included the team wear rule (Tr. 184, 2531–2532). Ogunniyi testified that Henry was the third associate she spoke to that day that did not have on proper team wear; Ogunniyi denied Henry's accusation that she only spoke to him due to the UAW shirt he wore (Tr. 2531).[69]

Also, on August 10, production associate Sean Jones (Jones) wore a UAW shirt to work (GC Exh. 34). Fenelon pulled Jones aside after the morning meeting.[70] Fenelon told Jones that his Union shirt was not appropriate, and he would need to change his shirt or would be sent home (Tr. 293–294, 2405, 2414). Jones asked him why he needed to change his shirt, and Fenelon stated that his shirt was not a Tesla approved shirt, and not compliant with the team wear rule. Fenelon also told Jones that his Union shirt had an emblem on it and emblems would not be accepted on shirts anymore (Tr. 293–294). Fenelon gave Jones money for a team wear shirt from the team wear store, and Jones responded, "This is really some bullshit over a shirt" (Tr. 304). Jones then changed his shirt (Tr. 294, 2405).[71]

Later that day, Jones spoke to Ogunniyi telling her that Fenelon threatened to send him home due to his wearing a Union shirt to work. Ogunniyi told Jones that the policies have changed. Jones responded, "When? That's bullshit. I've always wore[n] different shirts" (Tr. 294). Ogunniyi stated that the policy changed where no shirts with emblems will be allowed as they can scratch a car (Tr. 294–295).[72]

Later in August, Ogunniyi and Fenelon held a meeting regarding the team wear rule with 25 to 30 employees who worked that shift on final line in GA (Tr. 297). Ogunniyi informed employees that no one could be out of "uniform" and everyone must wear assigned team wear or be sent home (Tr. 298). Production associate Tim Cotton (Cotton) testified that Ogunniyi told the employees they could not wear anything that did not say Tesla or was not approved by Tesla (Tr. 330).[73] Jones and Cotton testified that they continued to see employees wear shirts that did not comply with the team wear rule, and to their knowledge, no supervisor or manager asked those employees to change their shirt (Tr. 298, 330–331).

### Credibility Findings

Overall, the General Counsel and Respondent's witnesses did not significantly differ in what occurred during the summer of 2017. Of course, with the number of witnesses who testified about team wear, there will be inconsistencies in their testimony, so I relied upon their collective testimony when deciding this statement of facts. Beginning with the General Counsel's

witnesses, I found Henry, Jones, and Cotton to be candid witnesses on direct examination. I also credit their encounters with Ogunniyi, Fenelon, and an unnamed supervisor about their union shirts. However, I cannot credit their testimony that supervisors continued to permit employees to not comply with team wear rules after enforcing the rules in August. I cannot credit this testimony because unlike other portions of their testimony, they did not provide any details of what they observed and how they knew the supervisors turned a blind eye to the noncompliance. For example, Henry provided significant details during his testimony but on this issue of noncompliance with the team wear rule after August he provided a vague, unspecified account as to what he observed where it was unclear whether these employees he mentioned even worked in GA. In addition, Henry testified in detail about an employee who wore a white shirt to work which supervisors permitted but these details are missing from his Board affidavit which makes this portion of his testimony unreliable.

As for Respondent's witnesses, Panera testified comfortably when asked about the manufacturing process, but his credibility was undermined on cross-examination when he became defensive when responding to questions about team wear. Martin also provided credible testimony which was detailed as to the events of the summer of 2017, but I cannot credit portions of his testimony as specified above. Of all the witnesses presented by both parties on these allegations, I found Ogunniyi and Fenelon to be the most trustworthy and honest. These two supervisors followed orders from their superiors. I credit Ogunniyi's testimony that she spoke to all employees who were not compliant with the team wear rule and did not target only the employees wearing union shirts. Fenelon also provided specific details as to whom he spoke, and even provided examples of how he attempted to ensure that employees could be compliant with the team wear rule.

### Legal Analysis

In the absence of special circumstances, the Board has held that employees, particularly during an organizing campaign, have a Section 7 right to wear insignia at work referring to unions or other matters pertaining to working conditions for the purpose of mutual aid or protection. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945) (employees have a right to wear union insignia at work); *Goodyear Tire & Rubber Co.*, 357 NLRB 337, 341 (2011); *Midstate Telephone Corp.*, 262 NLRB 1291, 1292 (1982), enf. denied 706 F.2d 401 (2d Cir. 1983); *Pathmark Stores, Inc.*, 342 NLRB 378, 379 (2004); *Albis Plastics*, 335 NLRB 923, 924 (2001). However, an employer may prohibit the wearing of union insignia by employees if the employer proves special circumstances. *Pathmark Stores*, supra; *W San Diego*,

---

[68] This allegation appears to refer to complaint par. 7(t)(i).

[69] This allegation appears to refer to complaint par. 7(t)(ii).

[70] Due to Ogunniyi's instructions, Fenelon testified that at the start of every shift he would review the clothes of the associates he supervised to ensure that they had on the "right team wear" as well as personal protective equipment (PPE) (Tr. 2400–2401, 2410, 2416). Fenelon testified that when he saw someone not complying with the team wear rule, he would let them know that they needed to wear the appropriate team wear (Tr. 2401). Fenelon testified that to comply with the team wear rules, the associate would need to go to the team wear store to get the

appropriate clothing, go to their car to get the appropriate clothing, or would need to clock out of work, get the appropriate clothing and return to work (Tr. 2401). Fenelon provided several examples from the summer of 2017 when he told associates to change into assigned team wear (Tr. 2402–2407). For one employee, Fenelon permitted the employee to place a piece of black felt tape over the white stripe of his black colored Nike shirt (Tr. 2407).

[71] This allegation appears to refer to complaint par. 7(u)(i).

[72] This allegation appears to refer to complaint par. 7(u)(ii).

[73] This allegation appears to refer to complaint par. 7(v).

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

348 NLRB 372, 372 (2006). Special circumstances include "when their [union insignia] display may jeopardize employee safety, damage machinery or products, exacerbate employee dissension, or unreasonably interfere with a public image that the employer has established, or when necessary to maintain decorum and discipline among employees." *Komatsu America Corp.*, 342 NLRB 649, 650 (2004). Any rule that limits employees' Section 7 right to wear union insignia in the workplace must be narrowly tailored to the special circumstances to justify the rule. *W San Diego*, supra at 373–374.

Respondent argues that the Board's analysis of workplace rules in *Boeing* applies to the team wear rule, but I disagree. Instead Board law governing the right of employees to wear union insignia in the workplace has been analyzed by the Board according to the principles set forth in *Republic Aviation v. NLRB*, supra, and its progeny. Even if the *Boeing* analysis is applicable here, I find that Respondent's rule is overbroad and its business justification (which are the same arguments as its argument for special circumstances according to *Republic Aviation*) does not override employee's Section 7 rights to engage in union activity. Respondent also argues unpersuasively that the Board has "implicitly" permitted employers to promulgate and enforce a non-discriminatory uniform rule (R. Br. at 115). Simply because Respondent's rule does not explicitly prohibit the wearing of union insignia does not mean that if the rule is enforced equally, the rule is permitted; the rule still disallows employees to wear union insignia on their clothing in GA. However, in both cases cited by Respondent, the Board did not make such a determination as exceptions were not filed on those allegations.

Respondent's team wear rule only permits employees in GA to wear team wear or plain black colored clothing, thereby, precluding employees from wearing clothing with union insignia. Thus, Respondent's team wear rule is unlawful. Respondent may rebut this presumption by presenting special circumstances which permits the rule albeit "narrowly tailored." Respondent argues that its special circumstances for banning union shirts in GA is due to preventing mutilations to the painted vehicles and to maintain visual management; these are the same arguments Respondent raises to support its business justification if the *Boeing* analysis were to apply. Respondent must set forth more than "conjecture" to find special circumstances. *Medco Health Solutions of Las Vegas, Inc.*, 364 NLRB No. 115 (2016). Respondent claims that it requires assigned team wear in GA due to vehicle mutilations. But Respondent's argument has little sense considering the credited evidence. Here, Respondent discovered an increase in seat mutilations in April or May, and thus, Respondent began an audit in GA to determine what was the cause or causes. Not one of Respondent's managers could affirmatively point to the union shirts as the cause of the problems. The documentary evidence also does not support such an argument since the audit results do not specify what aspect of team wear noncompliance caused the seat mutilations. See *Boch Imports, Inc.*, 362 NLRB 706, 707–708 (2015) (no evidence that union pins worn by employees damaged vehicles as asserted). The only clothing issue that was mentioned during the hearing as a potential source of problems was rivets on pants, not the UAW shirt. The justification for enforcing the previous lax team wear rule was the seat mutilations, not with general vehicle mutilations

including mutilations to the paint on the vehicles. As for visual maintenance, Respondent's production associates wear black colored shirts while team leaders and managers wear red colored shirts. In GA, the black colored Tesla assigned shirts are not substantially different from the black colored UAW shirts or from the plain black colored shirts that the team wear rule allows. Respondent also argues that because employees were able to continue to wear union stickers at the workplace, Tesla did not interfere with their Section 7 rights. However, this argument is a red herring. Thus, Respondent's maintenance of the team wear rule is unlawful, and violates Section 8(a)(1) as alleged in complaint paragraph 7(l).

However, I do not find that Respondent disparately enforced the team wear rule as alleged. See, e.g., *Shelby Memorial Home*, 305 NLRB 910, 919 (1991), enfd. 1 F.3d 550, 565 (7th Cir. 1993) (nursing home's selective enforcement of its rules restricting pins or badges against union insignia, but not other insignia was unlawful). I do not credit the testimony of the General Counsel's witnesses that they observed Ogunniyi, Fenelon and an unnamed supervisor only enforcing the team wear rule with those who wore the UAW shirts. Ogunniyi's email of August 10 shows that she spoke to many employees that day, and only one person had on a UAW shirt. While the question of why Martin asked who wore the UAW shirt is suspicious, this suspicion does not address whether the supervisors enforced the rule disparately. As stated previously, Ogunniyi and Fenelon's testimonies were clear—they sought to enforce the team wear rule as directed by their superiors. In contrast, the General Counsel's witnesses only provided general, unpersuasive responses as to whether they saw other employees wear noncompliant team wear after the rule was enforced in August; these witnesses could not testify with certainty as to whether these employees were asked to comply with team wear. Thus, the General Counsel has not sustained his burden of proof, and I dismiss complaint paragraphs 7(t), (u), and (v).

### X. COMPLAINT PARAGRAPH 7(W): RESPONDENT DID NOT VIOLATE SECTION 8(A)(1) OF THE ACT WHEN SUPERVISOR DAVE TESTON, AT THE SPARKS FACILITY, IMPLIEDLY THREATENED AN EMPLOYEE FOR WEARING A UNION HAT

The General Counsel alleges that Supervisor Dave Teston (Teston) threatened employee Will Locklear (Locklear) with discipline for wearing a hat with union logo on it (GC Br. at 77–78). Respondent argues that Teston's comment to Locklear is privileged under Section 8(c) of the Act (R. Br at 121–123).

No witnesses testified at the hearing about this complaint allegation. Locklear did not testify at the hearing despite being issued a subpoena duces tecum by the General Counsel. The General Counsel, however, did not seek enforcement of the subpoena after I denied the General Counsel's request for video testimony from Locklear.

The parties submitted a written stipulation into the record that Teston would testify as follows, in relevant part (Jt. Exh. 3):

- Locklear was one of Teston's training coordinators from about December 2016 until at least February 5, 2018. Prior to that, Locklear was a production associate in Respondent's Sparks facility.

- Teston was Locklear's supervisor from June until November. Teston did not work with Locklear during his time at Respondent's Fremont facility.

- Teston only knew Locklear from work and did not have any association with Locklear outside of work.

- Teston knew that Locklear supported the Union because Locklear, at a date uncertain, informed Teston of his Union support.

- Teston recalls that during the summer or fall of 2017 Locklear wore a hat with a union logo on it. Teston also remembers that during that time period Locklear had a sticker on his laptop that said UAW as well as a union insignia on his safety glasses.

- On approximately September 8, Teston privately spoke to Locklear about the union hat that Locklear wore to work that day. Teston asked Locklear if he thought wearing the union hat was professional due to his training coordinator role. Teston asked this question on his own, no one told him to ask this question, and Teston chose to ask this question based on his own experience with the military and uniformity. Teston then told Locklear that he did not want Locklear to answer the question and that Locklear should think about it. This conversation occurred near Teston's desk on the second floor of Respondent's Sparks facility. It is unknown how many times Teston asked Locklear this question during their single conversation, but it was at least once. Locklear did not respond to Teston.

- Shortly after the conversation Teston had with Locklear about his union hat, Teston checked with higher level of-ficials within Respondent. Teston wanted to make sure that the hat with the Union logo was professional, since that is what Teston had said to Locklear the day before. Thus, Teston sent an email to Respondent about this is-sue (GC Exh. 72). In response to Teston's email, Senior Employment Counsel Jaime Bodiford (Bodiford) and Associate Manager of HR Steven Schwarzer (Schwarzer) told Teston that what an employee wears is their business and theirs alone if it's not offensive. The next day, Teston told Locklear that if he wanted to wear the union hat, he was welcome to wear it. Locklear was not wearing the union hat the next day when Teston talked to him, and Teston only remembers Locklear say-ing, "okay." However, Teston saw Locklear wearing the union hat after this conversation.

*Legal Analysis*

Section 8(a)(1) of the Act provides that it is an unfair labor practice for an employer to interfere with, restrain, or coerce em-ployees in the exercise of their statutory right to engage in, or restrain from engaging in concerted activity. "It is well settled that the test of interference, restraint, and coercion under Section 8(a)(1) of the Act does not turn on the employer's motive or whether the coercion succeeded or failed." *American Tissue Corp.*, 336 NLRB 435, 441 (2001) (citing *NLRB v. Illinois Tool Works*, 153 F.2d 811, 814 (7th Cir. 1946)). In making its deter-mination, the Board considers the total context in which the chal-lenged conduct occurs and is justified in viewing the issue from the standpoint of its impact on employees. Id. (citing *NLRB v. E.I. du Pont & Co.*, 750 F.2d 525, 528 (6th Cir. 1984)). How-ever, as discussed previously, Section 8(a)(1) is modified by Sec-tion 8(c) of the Act, which defines and implements the first amendment right of free speech in the context of labor relations.

I find, based on the totality of the circumstances, that Teston's statement to Locklear was not unlawful. Teston, who was Lock-lear's supervisor, asked Locklear a rhetorical question about his union hat. Teston did not ask Locklear to remove the hat. The following day Teston went back to Locklear to inform him that he was welcome to wear the hat. I do not find these circum-stances to be coercive but rather an opinion under Section 8(c). See *Cadillac of Naperville, Inc.*, 368 NLRB No. 3, slip op. at 4 (2019) (citing *NLRB v. Gissel*, supra, where Sec. 8(c) gives em-ployers the right to express their views about unionization or a particular union if those communications do not threaten repris-als or promise benefits). Based upon this limited scenario, I do not find that Respondent violated the Act as alleged and dismiss complaint paragraph 7(w).

XI. COMPLAINT PARAGRAPH 7(R): RESPONDENT DID NOT VIOLATE SECTION 8(A)(1) OF THE ACT WHEN SUPERVISOR ARNOLD CAMAT IMPLIEDLY THREATENED AN EMPLOYEE FOR WEARING A UNION HAT

The General Counsel argues that Camat's statement to Vasquez is an unlawful threat under the Act (GC Br. at 78). Re-spondent argues that Camat did not threaten Vasquez (R. Br. at 96–97).

Former employee Eric Vasquez (Vasquez), who in the spring of 2017 worked in quality control in the stamping department, testified that he wore a union shirt to work almost every day and wore a union sticker on his hat daily (Tr. 368). In addition, to wearing a union shirt and sticker on his hat, Vasquez participated in passing out leaflets inside and outside the Fremont facility (Tr. 369–370). Vasquez testified that he was never asked to change his shirt by management (Tr. 369). Vasquez also testified that 20 to 30 employees in the stamping department wore union shirts and/or union stickers on any given day.

Vasquez testified that in the spring of 2017, one morning after his shift ended, as he stood at the timeclock, a supervisor from BIW named "Arnold" told him to watch out with his union sticker which he had on his hat because "they're watching people with that sticker on" and "make sure you are on point with eve-rything" (GC Exh. 35; Tr. 353–356).

Based on the record, it appears that Vasquez was referring to Arnold Camat (Camat), who was a production supervisor for BIW and who supervised Vasquez from July 2016 to March (Tr. 2115–2116).[74] Camat testified that the only conversations he had with Vasquez concerned his tardiness, and these

---

[74] At the hearing, the parties stipulated that Camat is a supervisor within Sec. 2(11) of the Act (Tr. 2118–2119).

conversation occurred away from the production line and time clock (Tr. 2116, 2120–2121). After issuing Vasquez a written warning for tardiness, Respondent's management team decided in the spring of 2017 to transfer Vasquez to another department where the start time was later in the morning (Tr. 2117–2118). Camat denied discussing the Union with Vasquez, and could not recall Vasquez wearing a union shirt, hat, or sticker (Tr. 2118, 2120–2121, 2123). Camat denied making the statement that Vasquez attributed to him (Tr. 2118).

### Credibility Findings

I do not credit Vasquez' testimony. Vasquez provided clear details of what "Arnold" allegedly said to him one morning in the spring of 2017. However, on cross-examination, Vasquez could not answer even basic questions such as the name of his last supervisor or even "Arnold's" last name despite Arnold having been his supervisor for 9 months. Vasquez stated, "I don't remember" numerous times. He could not recall the date of the conversation with Arnold which is believable but could not even place the time period of the conversation. On direct examination, Vasquez testified the conversation occurred in the spring of 2017 but on cross-examination waffled his testimony such that the conversation could have occurred in September (Tr. 361). Vasquez provided unreliable testimony, and I decline to credit any portion of it. In contrast, Camat testified with sincerity as to his recollection of conversations with Vasquez. Camat answered questions completely, and his demeanor remained calm throughout his testimony.

### Legal Analysis

The allegation at complaint paragraph 7(r) is dismissed since I do not credit Vasquez' testimony that Camat made the comment attributed to him.

XII. COMPLAINT PARAGRAPH 7(S): RESPONDENT VIOLATED SECTION 8(A)(1) OF THE ACT IN AUGUST WHEN SUPERVISOR HOMER HUNT TOLD EMPLOYEES IT WOULD BE FUTILE TO SELECT THE UNION AS THEIR BARGAINING REPRESENTATIVE

The General Counsel argues that supervisor Homer Hunt (Hunt) made a statement of futility to welder Michael Williams (Williams) which violates Section 8(a)(1) of the Act (GC Br. at 78–80). Respondent argues that the allegation against Hunt is time barred (R. Br. at 100–103). Respondent also argues that even if the complaint allegation is not time barred, Hunt did not make a statement of futility to Williams (R. Br. at 99–100).

### Procedural Issue

Respondent alleges that complaint paragraph 7(s) is barred by Section 10(b) of the Act. On March 30, 2018, the Regional Director issued a third order consolidating cases, second amended consolidated complaint and notice of hearing with paragraph 7(s) alleging that in August, Hunt, at the Fremont facility, informed employees that it would be futile for them to select the Union as their bargaining representative. At the hearing, Respondent moved to dismiss the allegation at complaint paragraph 7(s) against Hunt as there is no "valid operative charge" related to Hunt (Tr. 224). Respondent, in its answer, alleged generally

that the complaint contained allegations that are beyond the applicable statute of limitations, and thus the allegations are barred. The General Counsel opposed such a motion and I reserved my ruling on the motion to this decision (Tr. 225–226). Now Respondent renews its motion to dismiss paragraph 7(s) in its post–hearing brief. The General Counsel did not address Respondent's timely raised Section 10(b) argument in its post-hearing brief, and thus, I rely upon the General Counsel's argument during the hearing. For the reasons that follow, I deny Respondent's motion to dismiss paragraph 7(s).

Beginning with complaint paragraph 7(s), in charge 32–CA–208614, filed on October 25, amended on March 13, 2018, the Union alleged that within the past 6 months, Tesla had violated the Act by "making a statement of futility regarding employee support for the Union" and "by these and other acts, Tesla, Inc. has violated Section 8(a)(1), (3), and (4) of the National Labor Relations Act (GC Exhs. 1(z), 1(hh)). The original charge included various allegations of intimidation and harassment from June to October as well as other acts for engaging in Section 7 right. Although the Hunt allegation was not specified in the original charge, I find that it was specified in the amended charge, thus I find that Redd-I test is satisfied. As for the first prong, the Hunt allegation of selecting the Union as futile would be analyzed similarly under Section 8(a)(1) of the Act. As for the second prong, the allegation against Hunt arose during the same union organizing campaign which was the subject of the original charge. This charge also encompassed the wearing of union apparel as well as the discharge of employees. The Hunt allegation falls squarely during this time period and cannot be distinguished. Finally, as for the third prong, Respondent's defenses would be similar such that no such conduct or statements occurred. Thus, paragraph 7(s) of the complaint is not time-barred.

Respondent cites several Board decisions to distinguish these charges from other charges the Board found to be untimely. However, unlike in *WGE Federal Credit Union*, supra, the allegations here in complaint paragraphs 7(s) would be analyzed under Section 8(a)(1) of the Act and involve the same union organizing campaign. See *Nickles Bakery of Indiana*, supra. The Hunt allegation concerns the union organizing campaign and does not concern facts separate and apart from the many allegations set forth in the charges and amended charges. See *Charter Communications, LLC*, supra. In sum, complaint paragraph 7(s) is not time barred.

### Statement of futility

In August, Williams had a conversation with his former supervisor, Hunt, who was supervisor of quality control (Tr. 237). Williams testified that he was at a specific welding station when he saw Homer and motioned for him to come over to Williams' workstation to discuss the lead position for which he had applied and was not chosen. Hunt stated that the selection was out of his hands. Williams then stated that this situation was a reason to have the Union at Tesla so that the correct individuals get chosen for the proper positions. Hunt then told Williams, "The Union's never getting in here. This is Tesla" (Tr. 238).[75] Hunt denied

---

[75] In his affidavit, Williams states that when Hunt and he spoke about his failure to be selected for the lead position, Hunt and he were "messing

around" compared to his hearing testimony where he stated Hunt and he were having a professional conversation (Tr. 254). I do not find the

that the Union ever came up during this conversation but also could not remember the conversation exactly (Tr. 2015–2016, 2112). Hunt testified that the conversation with Williams was like a "yelling contest" with Williams using profanity (Tr. 2103–2016). However, Hunt did not discipline Williams as a result of the conversation (Tr. 2106).

*Credibility Findings*

I credit Williams testimony as he testified in a forthright manner, providing significant details, and I saw no indication of bias as Respondent alleges. In contrast, Hunt exhibited a great deal of animosity during his testimony regarding the conversation with Williams. In addition, Hunt could not recall the details of his conversation with Williams but does recall profanity and angry outbursts by Williams. However, Hunt never disciplined Williams if the conversation occurred as alleged which undermines Hunt's credibility. Logically, such an outburst if it occurred would have resulted in at least a referral for an investigation or proposed disciplinary action, neither of which took place. Thus, I rely upon Williams' version of events.

*Legal Analysis*

Employer statements to the effect that the employer will never be a union shop are unlawful because they would reasonably give employees the impression that it would be futile for them to support the union, thus interfering with, restraining, and coercing them in the exercise of their right to select a union to represent them, in violation of Section 8(a)(1). *Venture Industries*, 330 NLRB 1133, 1133 (2000); *Wellstream Corp.*, supra; *Maxi City Deli*, 282 NLRB 742, 745 (1987). In response to a conversation Williams was having with Hunt regarding his failure to be promoted, Williams stated that his failure to be promoted was a reason for the employees to have union representation. In response, Hunt told Williams that there would never be a union at Tesla. Hunt's statement gave the impression to Williams that it would be futile to select the Union which violated Section 8(a)(1) of the Act as alleged at complaint paragraph 7(s).

XIII. COMPLAINT PARAGRAPH 8: RESPONDENT VIOLATED SECTION 8(A)(3) AND (1) OF THE ACT BY TERMINATING RICHARD ORTIZ ON OCTOBER 18, AND BY DISCIPLINING JOSE MORAN ON OCTOBER 19, AND VIOLATED SECTION 8(A)(1) OF THE ACT BY INTERROGATING EMPLOYEES AND ENFORCING AN UNLAWFUL RULE IN SEPTEMBER AND OCTOBER

The General Counsel argues that Respondent unlawfully disciplined Moran and terminated Ortiz, two well-known union activists, for their protected concerted activity when they criticized anti-union employees on a private Facebook page (GC Br. 80–81). During this investigation, the General Counsel alleges that Respondent's investigator unlawfully interrogated the employees in September and October and promulgated or disparately enforced a rule regarding the Workday program (GC Br. at 81–86). Moreover, the General Counsel argues that the proper analysis of the discipline and termination is *NLRB v. Burnup & Sims*, 379 U.S. 21 (1964) (GC Br. at 86–91). The General Counsel also argues that Moran and Ortiz' conduct did not lose the

protection of the Act under *Atlantic Steel Co.*, 245 NLRB 814 (1979) (GC Br. at 92–94). Respondent, on the other hand, argues that Moran and Ortiz were not engaged in concerted activity for the purpose of mutual aid or protection (R. Br. at 137–139). Respondent argues that Moran and Ortiz lost the protection of the Act by improperly using Workday and lying during the investigation, respectively (R. Br. at 139–143). Finally, Respondent argues that the proper analysis of the discipline and termination is *Wright Line*, 251 NLRB 1083 (1980), enfd. on other grounds 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982), approved in *NLRB v. Transportation Mgmt. Corp.*, 462 U.S. 393 (1983) (R. Br. at 143–150).

California state legislature

On about August 29, Ortiz, along with VOC members Galescu, Sanchez, and Phillips as well as union organizers, participated in meetings with the State of California legislature in Sacramento, California, to encourage the legislators to add in language to the electric vehicle rebate program that Respondent needed to be "fair and responsible" and ensure safety in the workplace (Tr. 491–492, 495). Also, during this time these employees posted a photo with one of the California State Senators with whom they had met on the public Facebook webpage, "A Fair Future at Tesla" (GC Exh. 46; Tr. 492–493).

After the meetings with VOC members, the California State Assembly held public hearings on September 13 and 14, to discuss the Budget Act of 2017, Assembly Bill (AB) 109 and 134 (Tr. 495, 2506; CP Exhs. 9 and 10). Specifically, AB 134, committee on budget, section 1, provision 2(c)(1) states, "The State Air Resources Board shall work with the Labor and Workforce Development Agency to develop procedures for certifying manufacturers of vehicles included in the Clean Vehicle Rebate Project as being fair and responsible in the treatment of their workers. It is the intent of the Legislature that beginning in 2018–2019 fiscal year, the Labor Secretary shall first certify manufacturers as fair and responsible in the treatment of their workers before their vehicles are included in any rebate program funded with state funds." During these public hearings, three employees for Tesla, maintenance technician Shaun Ives (Ives), lead equipment maintenance technician Travis Pratt (Pratt), and GA Production Supervisor Jean Osbual (Osbual) testified in opposition to AB 109 and 134. Of relevance, during these hearings, Pratt, who identified himself by name, testified that he started at Tesla as a maintenance technician, level 2, and made $130,000 gross income.

On approximately September 14, Ortiz, who did not attend the hearings, contacted political organizer "Hanna" who lobbied on behalf of the Union. Hanna told Ortiz that Tesla employees attended the hearings and spoke on behalf of Tesla. Hanna sent Ortiz a video link of the employees' public comments at the hearings (Tr. 496). The Tesla employees who attended the hearings were speaking against union-sponsored AB 109 and 134.

Because Ortiz could not open the video link, he sent the link to Moran via text message to see if he could open the link (Tr. 498; GC Exh. 43). Ortiz wrote to Moran, "Hanna is sensing[sic]

change in tenor of the conversation from a casual to a professional conversation to affect whether the statement was made by Hunt or not.

me a video of the suck asses Tesla been taking ti[sic] Sacramento" (GC Exh. 43). Moran responded by asking Ortiz to send it to him. Ortiz replied, "I cant[sic] view it with my phone so let me know who they are I want to walk up to them AND say see you in Sacramento suck ass" (GC Exh. 43 (emphasis in original)). Moran testified that he watched the video, noted the individuals' names, and looked up the individuals in Workday via the application on his personal phone to determine if they were actual Tesla employees (Tr. 723, 794).

To look up individuals in Workday, an employee must log into the Workday program, and use the search box to type in a name. Moran testified that he had previously searched for employees on Workday to compare his seniority with others (Tr. 724). Moran testified that he previously sent screenshots of employees' Workday profiles to Ortiz (Tr. 724–725). Moran testified that no one from Respondent discussed policies or limitations on using Workday (Tr. 672). Moreover, Moran testified that no one had ever told him that he could not take screenshots of Workday profiles and photos (Tr. 672).[76]

<u>Private Facebook page, "Tesla Employees for UAW Representation"</u>

Moran sent a text to Ortiz of the Workday profile screenshot photos of employees Ives and Pratt, and supervisor Osbual (Tr. 505–507). Other employees, who Ortiz could not recall, also sent him the Workday profile screenshots of these employees (Tr. 507). That same day, Ortiz posted one side-by-side screenshot of Pratt's photo and job title, and Ives' photo with no name or job title on the private Facebook webpage, "Tesla Employees for UAW Representation" (Tr. 506, 626–627). Above the photos of Pratt and Ives, Ortiz posted the following comment on the private Facebook webpage:

> These guys been in Sacramento saying we are lying about how things are at Tesla Management has been taking them one of them sez[sic] he made $130000 last year
> How many of you make . . .
> overtime
> This just proves how much kissing ass and ratting on people get you at Tesla and the ones that do the real work get passed over

(GC Exh. 28.) Ortiz, quickly thereafter, removed the post from Facebook because Pratt sent him a message via Facebook stating that name calling "wasn't a good way to start" (Tr. 515–516.)[77] Pratt wrote, "Say what you like about me behind closed doors . . . I made what I did last year almost entirely as a level two maintenance technician, which is where several of your colleagues from production now find themselves. I wish you luck but know there will be a lot of us on the otherside[sic]. Starting with name calling may not be the approach you want to take"

(GC Exh. 80).

<u>The investigation of Pratt's complaint</u>

Pratt then sent a text message to Hedges complaining about Ortiz' Facebook post; Pratt and Hedges also spoke on the phone (Tr. 1180, 1182, 1212–1213; GC Exh. 28). Pratt sent Hedges a screenshot of Ortiz' post on Facebook which included Pratt and Ives' Workday profile photos. The screenshot of the Facebook post includes a picture of a sleeping child and the following message, "Travis Pratt: Copy thanks" (GC Exh. 28). Hedges could not explain what this writing meant and did not appear to ask Pratt (Tr. 1255–1256). Pratt wrote the following text message under the Facebook screenshot he sent Hedges,



Hedges responded, "Wow. This is on Facebook?" Pratt responded, "Yea lol [laugh out loud] I'm pretty sure it's on their fair future at Tesla thing" (GC Exh. 28). It appears that Pratt's text message does not end at this point, but the remainder of his message cannot be seen in the exhibit (GC Exh. 28). Hedges testified that it is likely Pratt and he continued to text one another but he only sent the one-page screenshot to Copher and Bodiford and did not keep the other text messages since he had a new Tesla-owned phone and his computer had been stolen (Tr. 1219).

Hedges testified that during their phone conversation, Pratt did not specify on which Facebook page his photo appeared (Tr. 1214, 1217).[78] Hedges testified, "[Pratt] said he'd received this from a friend. He's not—he said he's not on social media very much, but he was surprised to see himself and [Ives] on this chat forum or whatever, and that he was kind of afraid that would happen when he went up to Sacramento, and he, you know, he felt kind of targeted by that. And I said well, I will, you know, pass this on to employee relations, and they might reach out to you to talk about, you know, how this happened and kind of look into it. And he said that was fine" (Tr. 1183–1184, 1213–1214). When asked what Pratt's concern was, Hedges testified that Pratt was concerned that his picture and Tesla information had been placed on Facebook (Tr. 1225). Hedges testified that Pratt had a legitimate concern as Pratt "felt targeted by another employee" (Tr. 1227–1229). Hedges then testified that Pratt's complaint warranted an investigation because Pratt "felt harassed and targeted by another employee. And so it's up to me when I get a complaint like that to make sure that it's fully investigated" (Tr. 1231, 1235–1236). Hedges testified that no one shared with him what, if anything, happened to this Facebook post (Tr. 1233).

As background, prior to the September 13 and 14 public hearings, Hedges invited Pratt to speak to the California State

---

[76] Multiple witnesses testified similarly. Phillips, who is a current employee, testified that no one had ever placed limitations on his ability to use Workday including limitations to use only for official business purposes even after October (Tr. 389–390). Galescu testified that no supervisor, manager, or HR employee ever told him that Workday could only be used for "legitimate and official business purposes" even after October (Tr. 833). Ortiz testified that Respondent briefly discussed Workday during his new employee orientation but did not place any limitations or restrictions on its use (Tr. 442–443). I credit these employees'

testimonies as to how Workday may be used, and that no limitations or restrictions were ever placed on its use.

[77] Since Ortiz deleted this Facebook post soon after posting it, the post no longer appears on the private Facebook webpage and Ortiz did not retain a copy of it (Tr. 516). Based upon documentary evidence, it was likely Pratt, not Ives as Ortiz testified, who sent the instant message to Ortiz via Facebook, complaining about the post.

[78] Pratt did not testify.

Assembly legislators after asking him what his employment experience had been at Respondent.[79] Hedges' request to Pratt appears to have been directed by Toledano who asked Hedges to find employees to go to Sacramento (Tr. 1212, 1230). Hedges wanted a "positive" employee experience to be provided to State legislators due to AB 109 and 134, sponsored by the Union (Tr. 1181–1182). Thus, Pratt and Ives, while on worktime, went to Sacramento with Hedges (Tr. 1246–1247).[80] Hedges knew that pro-union employees were also supporting the bill, and Hedges sought to "offer a different perspective" (Tr. 1211).

After receiving Pratt's complaint, Hedges spoke for approximately 5 minutes to Ricky Gecewich (Gecewich), an employee relations partner who conducts investigations, to give him a "heads up" about Pratt's complaint as Hedges had already "forwarded" the complaint to Copher (Tr. 1184, 1800–1801).[81] During this conversation, Hedges showed Gecewich the screenshot Pratt sent him and explained why Pratt and Ives were in Sacramento (Tr. 1235, 1801, 1894–1897).[82]

Gecewich's job responsibilities included investigating concerns brought by employees, supervisors, business leaders or HR partners, conducting witness interviews, gathering information related to employee concerns, meeting with anyone who is accused of violating Respondent's policies, drafting documentation and providing recommendations to business leaders on his findings (Tr. 1788, 1790). Gecewich testified that he conducted over 100 investigations while employed by Respondent (Tr. 1789). Gecewich explained that when taking information about a complaint, he seeks to understand why a complaint was made (Tr. 1799). Gecewich testified that the concerns would be taken seriously, but then the team would determine whether the concerns would be investigated (Tr. 1790). Gecewich explained that he may not interview all witnesses, but will take typed notes, which may be edited later for clarification, during the investigation and during interviews (Tr. 1791–1792). When an investigation is completed, Gecewich creates a report of findings as well as recommendations (such as no discipline, written warning, and

terminations); the decision on whether to follow the recommendations lays with the responsible business leaders who may or may not be an employee's direct supervisor (Tr. 1792–1794, 1797). Gecewich testified that when recommendations of termination occur, the employee relations and investigations team will speak to the director level or above (Tr. 1797). When an investigation is completed, Gecewich would inform the complaining person that the investigation is completed (Tr. 1797–1798).

Gecewich began his investigation by calling Pratt on September 19 (Tr. 1085). Gecewich spoke to Pratt about the text messages and screenshot that Hedges showed him (Tr. 1805). Gecewich testified that Pratt "allud[ed] to something about Sacramento"; Gecewich did not ask about the details (Tr. 1805–1806, 1897).[83] During this conversation, Pratt told Gecewich that he sent the Facebook post to Hedges and had received the information from employee Bryan Kostich (Kostich) (Tr. 1086). Pratt told Gecewich that the Facebook post was from a Facebook page called, "Fair Future at Tesla" (Tr. 1086). Gecewich testified that Pratt told him that he thought the information in the Facebook post was inappropriate as it included how much money employees made at Respondent, and Pratt thought that he was being singled out (Tr. 1807–1808). Pratt complained that he felt uncomfortable with Ortiz speculating how much he made as well as the posting of his name and picture (Tr. 1807–1808). Pratt also told Gecewich he thought Ortiz did not act appropriately because he made a comment about people sucking up at Tesla (Tr. 1808). Gecewich never asked Pratt what he meant by his comment to Hedges: "Looks like we got under some people's skin" with a smiling face and eyes and rosy cheeks emoji (Tr. 1868–1869). After this conversation, Pratt forwarded to Gecewich a screenshot of the direct message he sent to Ortiz after he saw the Facebook post (Tr. 1808, 1911–1912; GC Exh. 80). Gecewich testified that Pratt told him that Ortiz then took the Facebook post down (Tr. 1912). Gecewich never asked Pratt about his usage of Workday or whether Pratt has shared his information such as job title and salary publicly (Tr. 1808–1809).[84]

---

[79] According to Hedges, Pratt told him that his experience at Tesla had been good, he had opportunities for promotion and Tesla had "done some good things" (Tr. 1181). Hedges testified that he asked Pratt to speak about his experience at Tesla "because [Pratt] had a positive experience and there were several others giving, you know, like a negative type of narrative. And I felt it would be useful to have, you know, somebody from the other side" (Tr. 1181).

[80] I do not find Hedges to be a credible witness. Hedges testified that he was not aware that Pratt testified in a public hearing before the California State Assembly, providing his name, job title and salary (Tr. 1225–1226). Hedges' testimony is simply unbelievable. Hedges directly asked Pratt to go to the California State Assembly to speak on behalf of Tesla, and Hedges testimony seems to indicate that he went to Sacramento with them. Even if Hedges did not go to Sacramento, considering the importance of this matter to Tesla and the need to ensure "positive" employees testify on behalf of Tesla, it seems unlikely that Hedges would not have followed up with these employees to learn what happened, and to listen to their public testimony. Thus, Hedges' testimony cannot be believed.

[81] Respondent admits that Gecewich was a supervisor as defined by Sec. 2(11) of the Act and an agent as defined by Sec. 2(13) of the Act. Gecewich no longer works for Respondent (Tr. 1781).

[82] Hedges claimed that he did not ask Gecewich to investigate Pratt's complaint and that Gecewich or Copher made the decision whether a matter should be investigated (Tr. 1209). However, I do not credit Hedges' claims of neutrality as to whether Gecewich should investigate Pratt's complaint or not. The circumstances of this situation point to the conclusion that Hedges did not simply refer an employee complaint to the employee relations and investigations team but took additional steps to call the issue to Gecewich's attention as he knew Gecewich would "look into it" (Tr. 1209). In addition, Hedges testified that Pratt's complaint of harassment and being targeted warranted an investigation. Moreover, Gecewich testified that Hedges approached him with the request to investigate (Tr. 1893–1894).

[83] Pratt did not only refer to something in Sacramento but instead, based on Gecewich's contemporaneous notes, Pratt told Gecewich that he was contacted by Hedges to go to Sacramento (GC Exh. 63).

[84] Gecewich is not a reliable witness as his contemporaneous notes during the investigation and hearing testimony differ in key details. Gecewich testified that Pratt expressed concern about Workday during his meeting with him, but he did not put this information in his notes (GC Exh. 63; Tr. 2181–2182, 2192–2193). Based upon Gecewich's notes, the first time the issue of Workday arose during this investigation is when Kostich mentioned the use of Workday and that Kostich wanted someone to investigate this matter (GC Exh. 64).

The day after he spoke to Pratt, on September 20, Gecewich phoned Kostich (Tr. 1814–1815, 1911). During this conversation, Kostich told Gecewich about the Facebook page, "Jose Organizer" (Tr. 1815). Kostich told Gecewich that "Jose Organizer" reached out to him to join a Facebook group called, "Tesla Employees for Union Access" (Tr. 1816). Gecewich did not investigate these Facebook pages Kostich mentioned to him, including the Facebook page where Ortiz posted about Pratt (Tr. 1816). Gecewich also did not investigate the privacy settings on these Facebook pages (Tr. 1816). Gecewich testified that based on his conversation with Kostich, he realized that this incident could have been related to the Union (Tr. 1816–1817, 1820). Gecewich testified that he then gained knowledge of Ortiz' involvement with the Union (Tr. 1817).[85] Gecewich never asked Kostich about his Workday usage (Tr. 1817).

<u>September 21: Gecewich's interrogation of Ortiz</u>

The following day, on September 21, Gecewich contacted Ortiz via email asking him to attend a meeting with him that day (Tr. 516–517, 629). Ortiz wore his union shirt and pin at the meeting (Tr. 529; GC Exh. 25). Gecewich began the meeting by asking Ortiz to keep the contents of the meeting confidential (Tr. 517).[86] Gecewich showed Ortiz a redacted version of the Facebook screenshot (Tr. 518, 1820; GC Exh. 28).[87] Ortiz immediately told Gecewich that he posted the message and apologized for what he posted. Ortiz told Gecewich that he received a message from "the gentleman" and removed the post "as quick as I could" (Tr. 518).[88]

Gecewich then told Ortiz that he wanted to ask him questions about Workday (Tr. 518–519). Ortiz told Gecewich he tried to use Workday but sometimes had trouble such as with his self-

review. Ortiz testified that he told Gecewich that Workday "is like a Facebook for Tesla; the people inside the building" (Tr. 520). Gecewich asked Ortiz how he received the photos that he posted on Facebook (Tr. 521). Ortiz did not tell Gecewich the names from whom he received the screenshots and told him that he did not know where the photos came from, but that he received the photos via text message (Tr. 1823). Gecewich asked Ortiz several times from whom he received the photos. During this meeting, Ortiz gave Gecewich his phone to look through his text messages, but Ortiz had a new phone which he had replaced that same day (Tr. 525, 620).[89] The meeting ended with a reminder to keep the meeting confidential.

On September 22, Gecewich sought to review the data logs of Workday even though Respondent does not routinely monitor employees' usage of Workday and does not have access to employees' sign-in and sign-out information in Workday; Respondent needs to request specific information from Workday as Workday is a third-party software program (Tr. 1827–1828). Working with Tesla employee Raj Nanda (Nanda), the day after he interviewed Ortiz, Gecewich requested that Workday provide a list of anyone who accessed the Workday pages/profiles of Pratt and Ives between September 10 and 16 (Tr. 1828–1829, 1831; GC Exh. 81).

On September 28, because he had still not received the requested information, Gecewich asked Nanda for an update on his request, and stated in his email, "Please be aware this case is being closely monitored by Gaby and I am providing updates as they come in" (GC Exh. 81). Still not receiving the information, on October 4, Gecewich elevated his request to Nanda's supervisor and informed him that "[. . .] we should update Gaby and team shortly" (GC Exh. 81).[90]

---

[85] I cannot credit Gecewich's testimony regarding his knowledge as to when he knew of union activity by Ortiz. Gecewich testified that he knew about unionization at the Fremont facility but denied knowing that there was a Facebook page, or a petition signed by employees (Tr. 1807). However, on July 20, HR partner Tanaka forwarded an email to Gecewich concerning an employee petition from several employees to Hedges, Toledano, and Musk (GC Exh. 70). This email with the subject line: "We Want to Know," asked several questions about compensation at Tesla, and stated that they sought to organize to address these issues. Ortiz and other employees signed this email. The petitions attached to the email also included the logo, "Driving a Fair Future at Tesla" as well as the related website. Gecewich could not recall reviewing this email or why Tanaka forwarded this email to him (Tr. 1868, 1914, 2241). Also at the hearing, after inconsistent testimony, Gecewich testified that before his meeting to discuss the findings of his investigation and his recommendations, he knew that Ortiz was involved with the Union but in Gecewich's January 8, 2018, affidavit to the Board, Gecewich handwrote that he had no knowledge of Ortiz' union activities at the time of that meeting (Tr. 1857–1858). Based upon my overall credibility determinations for Gecewich, I do not credit his claim that he did not know at least a few months prior to the Pratt complaint that employees Moran and Ortiz had been attempting to organize the workplace. Gecewich likely would have reviewed Tanaka's email in the course of his job duties. Also, as for Moran, Gecewich testified that he had seen Moran's name in his blog post prior to Gecewich's start with Tesla in May (Tr. 1838).

[86] Gecewich took notes of his meeting with Ortiz (GC Exh. 65). These notes include a reference to shirts Ortiz mentioned to Gecewich that he had passed out in the parking lot (Tr. 1912–1913). However, Gecewich claimed at the hearing that he did not know that Ortiz was

passing out union shirts (Tr. 1913). Again, Gecewich is not credible since his contemporaneous notes are inconsistent with his hearing testimony. Meanwhile, I cannot credit Ortiz' testimony that Gecewich twice mentioned the Confidentiality Agreement. Ortiz testified that Gecewich mentioned the Confidentiality Agreement and that he asked if he was fired (Tr. 521), but Gecewich's notes and testimony only reflect that he expected the meeting to remain confidential.

[87] The redacted version excludes the text messages between Pratt and Hedges as well as the picture of a child and a comment of "thanks" (Tr. 1821). Gecewich also testified he showed Ortiz an enlarged version of this Facebook post (Tr. 2252–2254).

[88] Ortiz is referring to the direct message Pratt sent him.

[89] Respondent attempts to attack Ortiz' credibility because he had a new phone that day and no longer had his old phone. Certainly, if Ortiz' credibility could be punctured at other points in his testimony, then his action of replacing his phone that same day could raise some eyebrows. However, in this instance, I see nothing nefarious about Ortiz' actions as he did not have advance notice that Gecewich planned to question him that day about the Workday profiles he posted on Facebook. In fact, Respondent received this text message string regardless of the phone replacement, and it is unclear what more Respondent would want (Tr. 620–622).

[90] Gecewich was not a credible witness. Gecewich incredibly testified that he only provided Toledano with updates once a month, and that despite his claims to Nanda, Toledano was not monitoring this investigation (Tr. 1873–1874, 1907, 2265, 2267). Gecewich claimed that he wrote untrue statements in his email to Nanda simply to get the information sooner (Tr. 1876, 2267). If Gecewich were to be believed that Toledano only received monthly updates, then Gecewich's investigatory

On October 6, Nanda provided a list of individuals who accessed the Workday profiles of Pratt and Ives (GC Exh. 81). The list revealed that Moran and Krista Washington (Washington), who was not identified during the hearing, on September 14, viewed Pratt and Ives' Workday profile pages (GC Exh. 81). Moran viewed Pratt and Ives' Workday profile pages 2 minutes apart. Gecewich testified that after receiving the logs, he looked at Moran's Workday profile photo and recognized his photo from the small bubble on Ortiz' Facebook post of the screenshots (Tr. 2273). Still Gecewich sought more information and wanted to know which pages Moran visited in September and sought to compare the data which "will explain his usage much better" (GC Exh. 81). Thereafter, on October 24, after the investigation concluded and the discipline and termination had been issued, Nanda sent Gecewich the Workday logs for Moran (Tr. 1829; GC Exhs. 79, 81).

#### October 12: Gecewich interrogates Moran

On October 12, Gecewich met with Moran in a conference room (Tr. 727). Gecewich introduced himself and stated that the meeting was to remain confidential (Tr. 729). Gecewich stated that he was investigating a concern with Workday. Gecewich then asked Moran a series of questions about Workday (Tr. 728). Gecewich asked Moran if he thought Workday was an internal or external platform, and Moran responded that he thought it was an internal platform. Gecewich asked Moran for what purposes he used Workday, and Moran stated that he used it to review his performance, update his contact information, and sign documents electronically (Tr. 730). Gecewich asked Moran if he used Workday for any other purposes. Moran told him that he used Workday to search for his co-workers to compare his seniority and pay (Tr. 730–731, 1834). Gecewich then told Moran that he knew that Moran took the screenshots of the employees' Workday profiles (Tr. 731). Gecewich asked why Moran took the screenshots, and Moran told Gecewich that he wanted to find out if the individuals were actual employees of Respondent (Tr. 732, 1835, 1899, 1945).[91] Gecewich never showed Moran the actual screenshots he received (Tr. 1836–1837, 1942–1943).

Gecewich asked Moran to look for the screenshots on his phone and on Facebook (Tr. 1837–1838). Moran could not find the screenshots on Facebook which had been removed by Ortiz after Pratt complained directly to Ortiz (Tr. 733). Thereafter, Gecewich asked Moran to look on his phone for the screenshots. After some time, Moran was able to find the screenshots in his text message communications with Ortiz (Tr. 733–734). Gecewich asked for a copy of the text messages to "prove, you know, my case that I didn't do anything wrong" (Tr. 735). Gecewich asked Moran if he did anything else with the

screenshots, and Moran told him that he sent the pictures to Ortiz. Gecewich mentioned that the pictures "got out somewhere in public" (Tr. 736). Gecewich thanked Moran for his honesty (Tr. 799). The meeting ended after 40 minutes to an hour (Tr. 796).

#### October 12: Gecewich interrogates Ortiz

After meeting with Moran, Gecewich met with Ortiz again on October 12; Ortiz again wore his union shirt (Tr. 528).[92] During this meeting, which lasted longer than the first, Gecewich asked for the meeting to remain confidential. Gecewich started the meeting by asking about the Workday profile screenshots on the Facebook post. Gecewich and Ortiz then had a conversation about where the screenshots came from. Ortiz eventually admitted that it must have been Moran who sent the screenshots to him via text message but that he had received these screenshots from others as well (Tr. 530, 1842). Apparently prior to his meeting with Gecewich, Moran spoke to Ortiz about his meeting with Gecewich. During this meeting with Gecewich, Ortiz expressed concern about being fired and was worried in the prior meeting that he would be fired. Ortiz also spoke about his nature not to bring others into his own problems, and that he was protecting other employees including Moran (Tr. 1842–1844). By the end of this meeting, Ortiz had told Gecewich from where the photos had come (Tr. 1915).

#### Decision to terminate Ortiz for lying and to issue Moran a warning for Workday misuse

After these meetings with Ortiz and Moran, Gecewich drafted a report of his investigation with recommended actions (Tr. 1846, 1850). Gecewich testified that he based his recommendations on looking at similar cases as well as the "unique facts of this case" (Tr. 1851). Gecewich testified that he considered Workday profile photos and any Workday screenshots to be sensitive; Gecewich's characterization of the Workday photos or screenshots is based on his own belief that Workday is an internal data system (Tr. 1935). During his investigation, Gecewich claimed he never sought to learn what happened in Sacramento, went to the Facebook page to look at the page and never found out who were the members of the Facebook group (Tr. 1823, 1835). After drafting the report, Gecewich showed it to Tesla's in-house counsel (Tr. 1849). Gecewich's recommendation for termination of Ortiz and warning for Moran were "aligned with legal" (Tr. 1930). But a prior version of his report shows that Gecewich along with in-house counsel edited the investigatory report which was originally created on October 12 (GC Exh. 85). In a prior version of this report, Gecewich wrote, "This time frame corresponds to when these three Tesla employees went to Sacramento, California to speak with State legislatures about

---

tactics raises a red flag as he does not appear to be trustworthy which again diminishes his credibility.

[91] Gecewich's notes again contradict his testimony (GC Exh. 67). Gecewich testified that Moran told him that he used Workday at the request of a UAW representative to verify whether the individuals were employees (Tr. 1836). However, in his notes, Gecewich states that a representative from UAW told Moran that Tesla employees were in Sacramento, and Moran decided to look up the employees to see if they were actual employees. Moran did tell Gecewich that he would look at

Workday accounts of other employees when requested by a UAW representative.

[92] As for the second meeting with Ortiz, I cannot credit the entirety of Ortiz or Gecewich's testimony as to what happened. Gecewich's contemporaneous notes provide a much clearer picture as to what happened (GC Exh. 67). No matter which version I choose to credit, all versions demonstrate that Gecewich asked Ortiz several questions about the Workday screenshots and why he did not tell the truth during the first meeting. Thus, I rely on a compilation of the testimonies of Ortiz and Gecewich along with Gecewich's notes.

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

their experiences at Tesla" (GC Exh. 86). The sentence was removed from the final version of the report, but directly contradicts Gecewich's repeated testimony that he did not know anything about the employees' testimony in Sacramento on behalf of Tesla or what prompted the Facebook posts (Tr. 2185–2187). Gecewich attempted to correct his prior testimony to claim that he did know the purpose which was shared with him during the investigation but Gecewich also claimed to not have investigated the underlying events to the Facebook post (Tr. 2187).

Gecewich's response as to what he was investigating varied throughout his testimony. At one-point Gecewich testified that he was investigating why the Workday screenshots were released (Tr. 1898). Then he testified that he was investigating the release of the Workday photos on a public Facebook page (Tr. 1902). And the final report states, "This investigation was initiated to determine if proprietary business systems were accessed for non-business purposes" (CP Exh. 4). However, the investigation began based on Pratt's complaint that the release of his photo and information was inappropriate and made him feel singled out, harassed, or cyberbullied (Tr. 1903–1904). Gecewich claimed that he never investigated the Facebook post, and admitted he never sought to understand why Pratt made the complaint (Tr. 1939). Gecewich admitted that he knew "parts" of the Facebook posts "could have been protected" so he focused on the Workday profile photos (Tr. 1939–1940). Gecewich repeatedly testified that the posting of the Workday photos externally was concerning as this was Tesla's information (Tr. 1904). But the Workday photo is the same photo on the employees' badges and Gecewich testified that employees can take a photo of their own badge and post it elsewhere as there is no proprietary interest in the photo (Tr. 1927, 1957).

Hedges testified that he did not speak to Gecewich again until after he was finished with the investigation when Gecewich told him his findings and recommendations (Tr. 1186, 1188–1189, 1236–1237, 1907). Gecewich told Hedges that Ortiz lied during the investigation because Ortiz knew from whom he received the "information" and thus Gecewich was recommending termination. As for Moran, Gecewich testified that he was forthcoming and honest but used Workday improperly and he was recommending a warning be issued to Moran (Tr. 1187, 1237, 1915).[93] Hedges agreed with Gecewich even though he was not the decision maker (Tr. 1221). Hedges could not recall if he ever informed Toledano about Pratt's complaint (Tr. 1220). Hedges testified he spoke with Gecewich, Copher, and Bodiford (Tr. 1221). The record is unclear as to whether Hedges or Gecewich

decided that the decision maker in Ortiz' case should be Stephan Graminger (Graminger), the director for body manufacturing which included BIW,[94] since Hedges believed that this situation needed "more attention" and a decision maker at a "higher level to make an objective decision" rather than the BIW department manager Ron Martinez (Martinez) (Tr. 1187–1188, 1907–1908). Hedges testified that he suggested someone higher than Martinez make the decision because Ortiz and Moran were involved with the Union, and thus there would be more scrutiny with the decision and needed someone who was comfortable making the decision and farther removed from the day-to-day operations (Tr. 1190, 1239).[95]

On October 17, Gecewich met with Graminger along with Shtawney McIntosh (McIntosh), who was an HR business partner for BIW,[96] and Martinez in a conference room near BIW to discuss Ortiz (Tr. 1268, 1848; R. Exh. 15).[97] Prior to the meeting, Graminger did not know what the meeting was about (Tr. 1292). Gecewich presented the findings of his investigation and spoke about Ortiz (Tr. 1288, 1852, 2205–2206).[98] Graminger testified that he reviewed the entire report during the meeting (Tr. 1300–1301). The version of the report purportedly shown to Graminger notes that employee relations received a concern that Ortiz posted screenshots of Ives' and Pratt's Workday "landing page" which included pictures, full names, and business titles (CP Exh. 4). As for the summary and analysis of findings section, the report states, "On Sept. 16th, 2017, ER [employee relations] received a concern from Travis Pratt that Richard Ortiz posted screenshots of his and Shaun's Workday profile to a Facebook group. Travis was concerned based on the content of the message and because he understood Workday was an internal Tesla HR system intended for work purposes and not for broader distribution on social media" (CP Exh. 4). The report states that Moran was asked by a UAW representative to verify that the employees were Tesla employees (CP Exh. 4). Furthermore, Gecewich wrote that Moran volunteered to provide his text messages to Gecewich, and that Moran said Ortiz would be "dishonest" if he didn't say from where the screenshots came (CP Exh. 4). Gecewich further wrote, "After learning Jose shared the screenshots with Richard, ER spoke with Richard again" (CP Exh. 4).

Graminger testified that Gecewich stated that Ortiz and Moran "leaked some internal information out of Workday including some telephone number and personal information and posted it on Facebook" (Tr. 1288). Gecewich never mentioned to Graminger that Pratt and Ives had gone to Sacramento to testify on

---

[93] Gecewich could not recall whether he asked HR partners to document Moran's warning in his Workday file or keep it in an email (Tr. 1793–1794).

[94] Graminger no longer works for Respondent but during the relevant time period was a supervisor as defined by Sec. 2(11) of the Act (Tr. 1293).

[95] Hedges admitted that he knew Moran was an active Union organizer and had brought safety concerns to Musk and Hedges' attention (Tr. 1205–1206). Hedges also admitted that Ortiz was an active Union organizer and requested Cal/OSHA 300 logs and summaries (Tr. 1206). Hedges also admitted that he was familiar with the Union's Facebook page "A Fair Future at Tesla" and had visited the webpage at least 10 to 20 times (Tr. 1207).

[96] Even though McIntosh testified at the hearing, no party asked her any questions about this meeting.

[97] Gecewich and Graminger's testimonies differ significantly on what occurred during this meeting. Graminger, who appeared to be a nervous witness, was more reliable than Gecewich as to what occurred. Graminger appeared to be earnest in explaining what he learned during the meeting, and his thought process as to how to decide this matter. Based upon my overall findings that Gecewich was not a credible witness, I rely upon Graminger's testimony although there were some inconsistencies within his testimony as well.

[98] The record is unclear as to which version of the report Graminger reviewed.

behalf of Tesla (Tr. 2201). At the meeting, Graminger asked to see Ortiz' post on Facebook, and Gecewich showed Graminger a screenshot of the Facebook post (Tr. 1289, 1303).[99] Graminger testified that he was "quite sure" he asked Gecewich if similarly situated cases had been treated in the same way, and Gecewich responded that they had but did not provide any specific details of cases (Tr. 1293–1294, 1301–1302).[100]    At this meeting, Gecewich recommended that Ortiz be terminated for lying during the investigation. Gecewich testified that any mitigating circumstances would be raised by the HR partner or business leader and that he told Graminger their role during the meeting (Tr. 1929). Gecewich testified that Martinez made some "good comments" about Ortiz but those comments did not mitigate the recommended termination (Tr. 1930). In fact, Respondent conducted one performance review of Ortiz for the time period from January 1 to June 30 (GC Exh. 12). Ortiz received an overall rating of 3—consistently strong. Respondent also conducted a 2017 supplemental performance review for Ortiz from July 1, 2016 to June 30, where Ortiz received the same rating of 3—consistently strong (GC Exh. 13). As a result, on October 8, Respondent awarded Ortiz a performance award (GC Exh. 14).

Gecewich asked Graminger if he agreed with his recommendation, and because Graminger was new to Tesla and felt that this situation was a "sensitive case" he wanted to talk to Hochholdinger to get confirmation if there have been similar cases in the past to be certain he fully considered everything. The meeting ended without Graminger deciding (Tr. 1290, 1919).

Graminger went to Hochholdinger and told him that he had just left an investigation meeting "involving Richard Ortiz, a member of the union" (Tr. 1290, 1310).[101]    Graminger asked Hochholdinger if he was aware of the matter, but Hochholdinger was not aware. Then Graminger asked whether there have been similar cases where someone lying during an investigation would be terminated. Hochholdinger responded that there have been similar instances and that person would be terminated according to Respondent's personnel policy (Tr. 1290–1291). Graminger did not know which specific Tesla policies Ortiz violated nor did he review any policies (Tr. 1298–1299). Thereafter, Graminger informed McIntosh, Martinez and Gecewich via email to proceed as discussed and that Hochholdinger was aware of the decision to terminate Ortiz (Tr. 1290–1291; R. Exh. 15).

Graminger made the decision to terminate Ortiz on October

17 (Tr. 1265). Prior to making the decision to terminate Ortiz, Graminger had never spoken to or dealt with Ortiz (Tr. 1265–1266, 1290).

### October 18: Ortiz is terminated

On October 18, Gecewich, McIntosh, and Ortiz met in the north admin building; Ortiz wore his Union shirt (Tr. 532, 2064–2065).[102]   McIntosh testified that Gecewich began the meeting by informing Ortiz that the investigation he had conducted was closed (Tr. 2066). According to McIntosh, Gecewich told Ortiz that he was found to be dishonest during the process as he was not forthcoming about some images or where the images came from, and recommended termination (Tr. 2066, 2068). Ortiz was asked if he had any questions which he did not have, and McIntosh explained the termination process (Tr. 2066). McIntosh stated that the meeting lasted 5 to 10 minutes (Tr. 2066). McIntosh denied that the Union was mentioned during the meeting but knew that Ortiz was active in the Union as it was "common knowledge" since he wore Union shirts (Tr. 2067–2068).[103]

Toledano testified that she learned of Ortiz' termination after it occurred from Copher's status reports to her (Tr. 904). Toledano denied receiving status reports during the investigation of Ortiz, did not monitor the investigation of Ortiz, and was not involved in the investigation in any way (Tr. 905–909). Toledano also testified that Gecewich verbally informed her of the results of the investigation (Tr. 910, 933). Toledano could not recall what Gecewich told her. Toledano testified, generally, that she learned Ortiz lied during the investigation, but she did not know what the lie concerned and Copher's report did not provide details (Tr. 934). Again, I cannot credit Toledano's testimony. It is incredulous to believe that Toledano was unaware that a prominent union supporter was terminated or that he was even being investigated. Based on what is more likely than not, Toledano knew about the investigation as well as the reasons for Ortiz' termination.

### October 19: Moran is disciplined for violating a Workday rule

On October 19, Gecewich and Emee Cruz (Cruz), an HR partner, met with Moran. Gecewich thanked Moran for his honesty during the first meeting, and he would only be given a warning regarding his use of Workday (Tr. 738, 801). Gecewich told Moran that he could use Workday only for business purposes, not personal use (Tr. 2308). Thereafter, Gecewich sent Moran

---

[99] Gecewich could not recall showing Graminger the Facebook post (Tr. 2198). Again, I credit Graminger's testimony.

[100] In contrast, Gecewich testified that during the meeting, he provided Graminger a comparator case where a vice president of SolarCity had been terminated after an investigation where he lied about his use of a company vehicle, drugs and alcohol found in that vehicle and an improper relationship with another employee (Tr. 1853). Gecewich testified that this situation was the only comparator case used as the vice president was terminated only for lying during the investigation, not for the alleged acts (Tr. 1853–1854, 1920).

[101] Graminger testified that Ortiz' union activity was not discussed during the meeting and the Union was not brought up during the meeting but, Graminger knew that Ortiz was "a member of the union" and that the matter had such sensitivity that he needed another opinion (Tr. 1291–1292, 1301, 1855). Graminger testified that Ortiz' name was familiar because he had looked on the website, "A Fair Future for Tesla" and the Facebook page (Tr. 1291, 1298, 1313). Graminger knew before this

meeting with Gecewich that Ortiz was active in the Union. I do not credit Graminger's testimony that Ortiz' Union activity was not discussed during the meeting. It is obvious that all the attendees of the meeting knew that Ortiz was active with the Union, and it seems implausible that no one mentioned his union activity during this meeting especially considering Graminger admitted this was a "sensitive case."

[102] McIntosh testified credibly albeit a bit reluctantly with her responses.

[103] Ortiz, in his October 26, affidavit taken soon after he was terminated, did not state that Gecewich was at his termination meeting, and that McIntosh told him was being terminated for violating the Confidentiality Agreement (Tr. 644). I cannot credit any of Ortiz' testimony as to what occurred during the termination meeting. McIntosh testified in a clear, concise manner, and I rely upon her testimony to establish what occurred during this meeting. Ortiz again testified about the Confidentiality Agreement but based on logical inferences, this subject was not mentioned.

an email to follow up on their meeting that day (GC Exhs. 42, 82; Tr. 2308). Gecewich wrote, "As part of our investigation we found that you used an internal system, Workday, for personal purposes and without proper business justification. You are reminded that you should only access internal systems, including Workday, for legitimate and official business purposes" (GC Exhs. 42, 82). Gecewich testified that associate manager Brian Cunningham (Cunningham) agreed with the recommendation for a verbal coaching with written follow up to be issued to Moran (Tr. 2307).[104]

On October 19, Gecewich sent an email to Pratt, informing him that the investigation of the Facebook post and improper access/use of Workday had been completed (GC Exh. 83). Gecewich informed Pratt that while he could not tell him the specific outcome in this matter, Respondent took his concerns seriously and "aligned our action with similar cases across Tesla" (GC Exh. 83). However, Gecewich testified that as of January 2018, this case was the only scenario involving Workday use of employees (Tr. 1879). Furthermore, Respondent has no written policy requiring employees to be truthful during an investigation or any policy requiring employees only use Workday for legitimate and official business purpose (Tr. 1879).

*Credibility Findings*

Of all the witnesses who testified about these allegations, I credit Moran's version of events completely. Not only did Moran testify with few inconsistencies but Gecewich's contemporaneous notes also supported his testimony. Next, although I credited some portions of Ortiz' testimony, there are many portions of his testimony that I could not credit. For example, Ortiz testified that Gecewich asked him about the Confidentiality Agreement and asked him if he knew what a lie was. I cannot credit his testimony as the Confidentiality Agreement was not been mentioned by any other witness.

As for Respondent's witnesses, I cannot rely upon Hedges or Gecewich. I have set forth numerous examples within the statement of facts which explains why I cannot credit their testimony. As a Section 611(c) witness, Gecewich testified steadily but nervously. Under cross-examination, Gecewich's demeanor became argumentative when confronted with inconsistent statements such as his statement to Nanda that Toledano was watching the investigation "closely" after he claimed that he did not update her during the investigation. Gecewich's testimony that he did not know about the union organizers and the Facebook pages are not genuine. Gecewich testified in a purposefully evasive manner and appeared to be jittering in his chair. Moreover, Gecewich's testimony was filled with inconsistencies and his final report does not accurately reflect his interview notes.

Graminger was a more credible witness for Respondent but even his testimony was confusing and contradictory as described. On the one hand Graminger testified that Ortiz' union activity was not discussed during the meeting but on the other hand Graminger looked at the union organizing campaign website as well as Facebook page where he viewed Ortiz' posts before the meeting. This example of contradictions and

inconsistent statements are ripe within these set of facts.

McIntosh testified in a clear and straightforward manner. There were no inconsistent statements. Thus, I rely upon McIntosh's version of the October 18 meeting when Ortiz was terminated.

*Legal Analysis*

*Moran and Ortiz Engaged in Protected Concerted Activity, and Did Not Lose the Protection of the Act*

Before discussing whether Respondent violated the Act when terminating Ortiz and disciplining Moran, I must first address the issue of whether Ortiz and Moran engaged in protected concerted activity. Respondent argues that Moran and Ortiz were not engaged in concerted activity for the purpose of mutual aid or protection when Moran sent the Workday profile screenshots to Ortiz. Based on Board precedent, I disagree.

Section 7 of the Act protects the right of employees to engage in "concerted activity" for the purpose of collective bargaining or other mutual aid or protection. For an employee's activity to be "concerted" the employee must be engaged with or on the authority of other employees and not solely on behalf of the employee himself. *Meyers Industries (Meyers I)*, 268 NLRB 493 (1984), remanded sub nom. *Prill v. NLRB*, 755 F.2d 941 (D.C. Cir. 1985), cert. denied 474 U.S. 948 (1985), on remand *Meyers Industries (Meyers II)*, 281 NLRB 882 (1986), affd. sub nom. *Prill v. NLRB*, 835 F.2d 1481 (D.C. Cir. 1987), cert. denied 487 U.S. 1205 (1988). The statute requires the activities to be "concerted" before they can be "protected." *Bethany Medical Center*, 328 NLRB 1094, 1101 (1999). The Board has held that activity is concerted if it is "engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself. *Meyers I*, supra; *Meyers II*, supra; *Quicken Loans, Inc.*, 367 NLRB No. 112, slip op. at 3 (2019) (citations omitted) (profanity laced statement by single employee concerning customer call routed to him was not protected or concerted as employees as a group had no preexisting concerns about customer calls, and no evidence that employee sought to initiate or induce group action). The question of whether an employee has engaged in concerted activity is a factual one based on the totality of the circumstances. *National Specialties Installations, Inc.*, 344 NLRB 191, 196 (2005). The Act protects discussions between two or more employees concerning their terms and conditions of employment. Whether an employee's activity is concerted depends on the way the employee's actions may be linked to those of his coworkers. *Fresh & Easy Neighborhood Market*, 361 NLRB 151, 153 (2014). Concertedness is analyzed under an objective standard. *Fresh & Easy Neighborhood Market*, supra at 154. Employees act in a concerted manner for a variety of reasons, some altruistic and some selfish. Id. citing *Circle K. Corp.*, 305 NLRB 932, 933 (1991), enfd. mem. 989 F.2d 498 (6th Cir. 1993).

Both Ortiz and Moran clearly engaged in concerted activity which is protected. Upon learning that employees testified on behalf of Tesla during a union-sponsored California State

---

[104] Gecewich testified that he met with Cunningham, but his Board affidavit of January 8, 2018, does not reflect such a meeting (Tr. 2322–2323).

Assembly bill, Ortiz asked Moran to help him learn if these individuals were current employees. Moran, in working with Ortiz, then went to the Workday system to search for these employees. Once Moran found these employees, he sent screenshots of their Workday profiles to Ortiz. Ortiz then posted the screenshots with his comments on the employees' private Facebook page. Ortiz posted these screenshots without Moran's approval or consent. This private Facebook page had been set up as a forum for employees to discuss unionization at the workplace—essentially a virtual watercooler. Simply because Moran sent the screenshots to Ortiz and Ortiz decided to add the Workday screenshots to the private Facebook page does not mean that Moran and Ortiz did not act concertedly, as Respondent argues. They did not act together to post the pictures but each of their actions was to promote the union organizing drive at Tesla for the mutual aid and protection of all employees and to improve the terms and conditions for all employees. See *Kaiser Engineers*, 213 NLRB 752 (1974) (employee letters to legislators opposing relaxing of immigration restrictions for engineers); *Bethlehem Shipbuilding Corporation Ltd. v. NLRB*, 114 F.2d 930 (1st Cir. 1940) (employee appearances on behalf of their coworkers before legislative committees); *Triple Play Sports Bar & Grille*, 361 NLRB 308, 308–309 (2014) (Facebook communications between employees complaining about employer tax withholding error constituted " 'concerted activities' and they were 'for the purpose of . . . mutual aid or protection'"); *North West Electric Cooperative*, 366 NLRB No. 132, slip op. at 1, fn. 1 (2018). Respondent's insistence on a narrow reading of the law is not warranted by Board law or the purpose of Section 7 of the Act. Ortiz posted screenshots of Pratt and Ives' Workday profiles to point out employees who were not supportive of the Union. Pratt responded to Ortiz, informing him that this was not the way to get other employees on board with unionization. Thus, Ortiz removed the post. Still, Pratt decided to complain to Hedges, who originally asked him to go to Sacramento on behalf of Tesla. Pratt complained that Ortiz' Facebook post made him feel singled out, but this claim is disingenuous since he forwarded the Facebook post to Hedges with the remark, "Looks like we got under someone's skin" with a smiling face and eyes and rosy cheeks emoji. This addition of the emoji does not reflect a concern of harassment. This complaint launched the investigation into Ortiz and Moran's protected concerted activity.

Respondent argues that if Moran is found to have engaged in protected concerted activity, his action of accessing and utilizing Workday for nonbusiness purposes sufficiently removed the protection of Section 7 of the Act. Respondent bases its argument on disputed facts. Respondent never had a rule that employees could only use Workday for business purposes, or restricted employees' use of Workday. Several witnesses testified that they had never received such instructions from Respondent, nor did Respondent provide any evidence that this rule existed. Obviously, the access employees receive in Workday is based upon their positions at Tesla. Presumably, Moran along with others had access to employees' profiles. Respondent attempts to

analogize Moran's screenshots of Workday profiles to employees who steal business records or personnel files from their employers. Moran's actions came nowhere near such examples. Moran used Workday not only for his own personnel records, to which he accessed, but also to look up employees, where he is limited to the employees' names and job titles. The employee profiles were not private or confidential records. See *Ridgley Mfg. Co.*, 207 NLRB 193, 196 (1973). In sum, Moran did not lose the protection of the Act for violating a nonexistent rule.

As for Ortiz, he reasonably understood that Gecewich was trying to learn about his protected activities when he repeatedly asked who sent him the Workday profile screenshots which he posted on the private Facebook page. Under these circumstances, Ortiz was under no obligation to respond to questions to uncover protected activities. See *Paragon Systems, Inc.*, 362 NLRB 1561, 1567 (2015). Ortiz' "lying" was not related to his job performance or Respondent's business, but to a protected right under the Act which he was not obligated to disclose. See *St. Louis Car Co.*, 108 NLRB 1523, 1525–1526 (1954). In *Fresenius USA Mfg. Inc.*, 362 NLRB 1065 (2015), the Board found that an employee's dishonesty during an investigation of misconduct of alleged harassment and threats was unprotected by the Act due to the focus of the investigation on the allegation, and not on any union activity. That case in inapposite as a comparator. Here, Respondent did not investigate Pratt's specious claim of harassment and being singled out, but instead Respondent chose to disregard the original complaint, and fabricated its own investigation into the Workday profile screenshots. Ortiz did not lose the protection of the Act as the investigation focused solely on who provided him the screenshots that he posted on the private Facebook page.[105]

*Respondent Violated Section 8(a)(3) and (1) of the Act by Terminating Ortiz for Lying Regarding Protected Concerted Activity*

The credited evidence shows that Respondent terminated Ortiz for lying during an investigation. An employer may not terminate an employee for lying in response to questions regarding protected concerted activity. *Tradewaste Incineration*, 336 NLRB 902, 902 (2001) (employee's untruthful denial that he posted a wage-related notice was protected where it "did not relate to the performance of his job performance or the [r]espondent's business."); *St. Louis Car Co.*, 108 NLRB 1523, 1525–1526 (1954) (employee's untruthful denial of her union organizing activity was protected where the denial "related not to the [r]espondent's business at all, but to personal rights guaranteed by [the Act] which she desired not to disclose."). Here Respondent admitted that Ortiz was terminated for his lying during the investigation when he did not reveal from whom he received the screenshots, of which he was not obligated to disclose, Respondent violated Section 8(a)(3) and (1) of the Act when terminating Ortiz. The analysis regarding Ortiz' termination should end here but, in the alternative, I will consider Ortiz' termination under the *Wright Line*, supra, framework.

---

[105] Respondent does not contend that Ortiz lost the protection of the Act for his Facebook post where a totality of the circumstances test analysis would be undertaken. *Pier Sixty, LLC.*, 362 NLRB 505, 506 (2015).

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

*Respondent Violated Section 8(a)(3) and (1) of the Act by Terminating Ortiz and Moran Under Wright Line*

When more than one motive exists for the alleged discriminatory action for protected concerted activity, a mixed motive analysis applies.[106] Under *Wright Line*, supra at 1089, the General Counsel has the initial burden to show that an employee's protected activities were a motivating factor in the employer's actions against him. 251 NLRB at 1089. The requisite elements to support a finding of discriminatory motivation are union or other protected concerted activity by the employee, employer knowledge of the activity, and animus on the part of the employer. To support its initial burden under *Wright Line*, "the General Counsel must prove by a preponderance of the evidence that union animus was a substantial or motivating factor in the adverse employment action." *Consolidated Bus Transit, Inc.*, 350 NLRB 1064, 1065 (2007), enfd. 577 F.3d 467 (2d Cir. 2009). The burden then shifts to the employer to demonstrate that it would have taken the same actions even absent the employees' protected conduct. *Wright Line*, supra at 1089; see also *Electrolux Home Products, Inc.*, 368 NLRB No. 34, slip op. at 3 (2019); *National Hot Rod Association*, 368 NLRB No. 26, slip op. at 4 (2019) (citations omitted) (an employer need not prove the disciplined employee had committed the alleged misconduct but only needs to show it had a reasonable belief that the employee committed the alleged offense and then it acted on that belief). First, I will discuss Ortiz' termination followed by Moran's discipline using the *Wright Line* framework.[107]

As set forth above, Ortiz engaged in protected concerted activity which did not lose the protection of the Act. Furthermore, Respondent was well-aware of Ortiz' activity. First, Hedges, who referred Pratt's complaint to Gecewich, knew that Ortiz' Facebook post regarding Pratt and Ives stemmed from the two employee's testimony during a California State Assembly hearing on the union-sponsored bill. Hedges knew that Ortiz was actively involved with the Union as he had also requested Respondent's Cal/OSHA safety records which were then the subject of a leaflet passed out by union supporters. Gecewich also knew of Ortiz' activities as he received a copy of the employee petition regarding wages which Ortiz had signed. Gecewich also knew that the Facebook post with screenshot arose from an issue in Sacramento which involved employees speaking about a union-sponsored legislative bill. I do not credit Gecewich's attempt to wall himself off from knowledge of Ortiz' union activity by claiming not to know the subject matter that caused Ortiz to post a comment on the employee's Facebook page. Finally, Graminger, the decisionmaker, also knew about Ortiz' union activity as he looked at the union website and knew that Ortiz was involved with the Union, which is why he went to Hochholdinger to confirm that termination would be appropriate. Graminger

also saw the screenshots Ortiz posted. Even McIntosh, who attended Gecewich's meeting with Graminger to present his findings and recommendations, testified that it was "common knowledge" that Ortiz actively participated in the organizing campaign.

The General Counsel has also proven Respondent's union animus towards Ortiz' actions. Animus can be established through direct evidence or inferred from circumstantial evidence. See *Medic One, Inc.*, 331 NLRB 464, 475 (2000) (noting that "[e]vidence of suspicious timing, false reasons given in defense, failure to adequately investigate alleged misconduct, departures from past practices, tolerance of behavior for which the employee was allegedly fired, and disparate treatment of the discharged employees all support inferences of animus and discriminatory motivation"); *Electrolux Home Products*, supra; *Temp Masters, Inc.*, 344 NLRB 1188, 1193 (2005); *Promedica Health Systems, Inc.*, 343 NLRB 1351, 1361 (2004).

First, the record is clear that Respondent exhibited animus towards Ortiz' actions as well as animus towards union supporters which is established by the numerous unfair labor practices and the entire record. See *Metro-West Ambulance Service*, 360 NLRB 1029 (2014); *Lucky Cab Co.*, 360 NLRB 271, 274 (2014) (employer's contemporaneous 8(a)(1) violations demonstrate its union animus); *Bates Paving & Sealing, Inc.*, 364 NLRB No. 46, slip op. at 3 (2016). Respondent sought to counter the Union's drive to pass a California State Assembly bill which could affect Respondent economically by sending "positive" employees to Sacramento to speak on behalf of Tesla. In reaction, Ortiz posted a comment along with the Workday screenshots of Pratt and Ives on the employees' private Facebook page. Pratt responded to Ortiz, who promptly removed the post. What should have been a discussion between two employees regarding their individual rights to organize or to not organize became an investigation into Ortiz. Even prior to this event, Respondent, as found herein, committed other violations of the Act such as interrogating Ortiz about the Cal/OSHA logs and to whom he gave them. By September, the union organizing campaign was well underway, and Ortiz' name was known to management. *Shamrock Foods Co.*, 366 NLRB No. 117 (2018).

The evidence shows examples of circumstantial evidence which point to Ortiz' termination being unlawfully motivated. *Shamrock Foods*, supra. Pratt complained to Hedges, albeit with little concern based on his text message reply to Hedges ("Looks we got under some people's skin" and smiling face and eyes and rosy cheeks emoji). Hedges, who had been asked by Toledano to find "positive" employees to appear on behalf of Tesla, referred the "complaint" to Gecewich who promptly agreed to investigate the manner. During Gecewich's initial intake of the complaint, Pratt conveyed his concern about the post and

---

[106] I agree with Respondent that the *Burnup & Sims*, supra framework is not applicable regarding Ortiz' discharge. Under *Burnup & Sims*, supra, an employer violates the Act by disciplining or discharging an employee based on a good-faith belief that the employee engaged in misconduct during otherwise protected activity, if the General Counsel shows that the employee was not, in fact, guilty of that misconduct. *Burnup & Sims*, supra, applies to cases involving mistakes of fact, not mistakes of law. Here, this is not a "mistake of fact" case, and *Burnup & Sims*, supra, would not apply. Likewise, an *Atlantic Steel* analysis

would not apply as the issue stems from Ortiz' off-duty, offsite use of Facebook to communicate with other employees. See *Triple Play Sports Bar & Grille*, supra; *Pier Sixty*, supra.

[107] Again, I disagree with the General Counsel and Respondent that a *Burnup & Sims* analysis is appropriate. The first prong of *Burnup & Sims* fails as Respondent could not have had an honest belief that Moran engaged in misconduct for improperly accessing and using Workday. Based on the totality of the circumstances, Respondent promulgated this rule in response to Moran's protected concerted activity.

Kostich who saw the Facebook post complained that he did not think it was proper for Ortiz to use Workday in the way he used it. Gecewich then decided to shift the focus of his investigation to Workday since he knew that the Facebook post was related to the Union. In so doing, Gecewich did not even speak to Ives whose photo was posted on Facebook. Gecewich providing shifting reasons for the purpose of the investigation where he claimed it was due to screenshots of Workday on Facebook, but in the investigatory summary he wrote "This investigation was initiated to determine if proprietary business systems were accessed for non-business purposes." During this investigation, Gecewich kept Toledano, who identified pro-union employees as adversaries, informed of the progress of the investigation. Gecewich did not ask Pratt or Kostich how they used Workday and never asked others at Tesla about the uses of Workday. Gecewich claimed he did not know what happened in Sacramento to prompt Pratt's complaint but a prior version of the report of investigation shows that he knew that the Sacramento matter involved employees speaking on behalf of Tesla and the Union. From the start of the investigation, initiated by Hedges, Respondent sought the result it desired. See *St. Paul Park Refining Co. d/b/a Western Refining*, 366 NLRB No. 83 (2018) (failure to conduct complete and objective investigation).

When finding comparable disciplinary actions, it should be noted that Gecewich did not inform Graminger of the details but simply noted that there were similar actions in the past. Later, the only instance Gecewich could find of comparable discipline was of a management official at another company owned by Tesla who lied when he was being investigating for alcohol and drug use in a company vehicle along with improper relations with a coworker. Respondent did not establish that it treated similar incidents involving employees similarly. Even after Ortiz told Gecewich from whom he received the Workday screenshots and why he did not want to divulge any names, Ortiz still recommended termination.

Graminger, who was to be the neutral decision maker, knew about the connection between the Facebook post and Workday as he asked to see the post. But the report was also filled with errors by Gecewich. For example, the report states that Ortiz disclosed confidential employee information and telephone numbers on Facebook. This statement is simply false. Any confidential information was disclosed by Pratt, and Ortiz did not disclose telephone numbers. Other errors in the report include attributing the Workday complaint to Pratt when instead Kostich complained about a perceived misuse of Workday. These errors support an inference that Respondent sought to terminate Ortiz with false information.

The timing of events also relates directly to Ortiz' protected activity as the investigation began quickly after Ortiz' Facebook post and within the next month he was terminated. *McClendon Electrical Services*, 340 NLRB 613, 613 fn. 6 (2003) (finding discharge that occurred a day after protected concerted activity supported a finding of unlawful motivation); *Mira-Pak, Inc.*, 147 NLRB 1075, 1081 (1964), enfd. 354 F.2d 525 (5th Cir. 1965) (finding termination unlawful where discharge occurred 2 days after protected concerted activity). Under all the circumstances of this matter, Respondent's termination of Ortiz is pretextual. Respondent sought to punish the employees who pushed back

against the employees who spoke on behalf of Tesla and knowing that they could not directly punish Ortiz for his Facebook post sought to find another way. Moreover, during this second meeting, Ortiz admitted he did not tell the truth during the first meeting with Gecewich as to whom he received the Workday screenshots because he did was not certain who sent him the screenshots and did not want to bring anyone else into this matter; he sought to protect his coworkers. A finding of pretext defeats any attempt by Respondent to show that it would have terminated Ortiz absent his protected activities. Even if no pretext exists, Respondent continues to fail to meet its burden because there were no comparators or other evidence to establish, they would have taken the same action against Ortiz. Thus, Respondent violated Section 8(a)(3) and (1) when unlawfully terminating Ortiz.

As for Moran, as set forth above, he engaged in protected concerted activity which did not lose the Act's protection. Respondent clearly knew about Moran's protected concerted activity. Moran publicly announced the organizing campaign at Tesla with his February blog post which drew a response from the head of the Company. Gecewich, who investigated Pratt's complaint, recognized Moran's name from the blog post. Moran also initiated an employee petition regarding safety which caused Musk and Toledano to meet with him where they engaged in multiple unfair labor practices. Toledano had been kept apprised on the investigation by Gecewich. Thus, it is beyond dispute that Respondent knew about Moran's protected concerted activity.

Next, the General Counsel has also proven animus regarding Moran. Again, Respondent violated the Act numerous times during this time period as described within which supports a finding of animus. Respondent's reason for warning Moran is pretextual which supports a finding of animus. See *Lucky Cab*, supra at 274. During Gecewich's meeting with Moran, although he already knew that Moran viewed Pratt and Ives' Workday profiles the same day they were posted by Ortiz on Facebook, Gecewich asked Moran many questions about how he used Workday. Thereafter, Gecewich directly asked Moran about Pratt and Ives' Workday profiles. Moran did not deny that he sent the screenshots to Ortiz. Thus, Gecewich could not find that Moran lied during the investigation, but he then decided to create a new Workday rule, claiming that Workday was to be used only for "legitimate and official business purposes." This rule never existed prior to disciplining Moran, and Respondent presented no comparable disciplinary actions. By promulgating this Workday rule and enforcing this rule disparately against Moran, Respondent violated Section 8(a)(3) and (1) of the Act. Gecewich's final report also contained many errors as explained above. In addition, Moran never claimed that the UAW asked him to look up the employees on Workday, and Moran never stated that if Ortiz did not tell the truth about where he received the Workday profile screenshots, he would be "dishonest." Respondent, in post hoc rationalization, claims that it would have disciplined Moran regardless of protected concerted activity due to other internal systems rules, but this explanation only comes now.

In sum, the General Counsel met its burden to show that Respondent terminated Ortiz and disciplined Moran for discriminatory reasons and promulgated a rule in response to protected concerted activity. I therefore find that Respondent violated Section

8(a)(3) and (1) of the Act by terminating Ortiz, disciplining Moran, and promulgating a rule in response to protected concerted activity as alleged in complaint paragraphs 8(b)(iii), (c), and (d).

### Respondent Violated Section 8(a)(1) when Interrogating Moran and Ortiz

As for the allegation that Gecewich interrogated Ortiz on September 21 and October 12, and Moran on October 12, the Board considers the totality of the circumstances in determining whether the questioning of an employee constitutes an unlawful interrogation. *Rossmore House*, supra (the Board set forth a test for examining whether an interrogation is unlawful); *Stoody Co.*, 320 NLRB 18, 18 (1995) (the Board considers background, nature of information sought, and method of interrogation). The test is an objective one that does not rely on the subjective aspect of whether the employee was, in fact, intimidated. *Multi-Ad Services*, 331 NLRB 1226, 1227–1228 (2000), enfd. 255 F.3d 363 (7th Cir. 2001). The Board has also found that questioning an employee about his protected concerted activity may constitute an unlawful interrogation. See *Best Century Buffet, Inc.*, 358 NLRB 143, 157 (2012).

As set forth above, Gecewich interrogated Ortiz on both September 21 and October 12, and Moran on October 12. He questioned Ortiz repeatedly about the Workday profile screenshots he posted even after he knew that Moran had sent these screenshots to Ortiz. Gecewich knew that Moran had sent the screenshots to Ortiz but asked him many questions about Workday, and continued to investigate his use of Workday, despite knowing that the screenshots were used in the course of protected concerted activity. All of Gecewich's questions were designed to elicit information from Ortiz and Moran about their protected concerted activity and their union organizing activities.

Section 7 of the Act gives employees the right to keep confidential their union activity. *Guess?, Inc.*, 339 NLRB 432, 434 (2003); *National Telephone Directory Corp.*, 319 NLRB 420 (1995). Each interrogation by Gecewich of Ortiz and Moran was unlawful as Respondent has not "demonstrated that its need for the information justifies compromising its employees' Section 7 right to confidentiality." *Guess?*, supra at 435. Gecewich clearly knew that the Workday profile screenshots arose from employees testifying on behalf of Tesla at a California State Assembly hearing. Gecewich knew there was a union organizing campaign as well and that Moran and Ortiz were prominent in this campaign. Moreover, after Gecewich investigated Workday, Gecewich knew that it more likely than not that Moran sent the screenshots to Ortiz. Thus, there was no need to probe into the matter any further. Under the totality of the circumstances, Gecewich's actions were coercive and sought information from Ortiz and Moran about their protected concerted activity. Hence, I find that Respondent violated Section 8(a)(1) of the Act with each interrogation alleged at complaint paragraphs 8(b)(i) and 8(b)(ii).

### XIV.  CONSOLIDATED COMPLAINT PARAGRAPH 6:[108] RESPONDENT VIOLATED SECTION 8(A)(1) OF THE ACT WITH ELON MUSK'S MAY 20, 2018 TWEET

The General Counsel alleges that Musk violated Section 8(a)(1) of the Act when he threatened employees with loss of stock options with this tweet on May 20, 2018:

> Nothing stopping Tesla team at our car plant from voting union. Could do so tmrw if they wanted. But why pay union dues & give up stock options for nothing? Our safety record is 2X better than when plant was UAW & everybody already gets healthcare.

(GC Br. at 68–71). Respondent argues that Musk's tweet was privileged under Section 8(c) of the Act as well as the First Amendment, cannot be considered in isolation, that Tesla should not be liable for Musk's tweet, and his statement could not be considered a threat (R. Br. at 174–186).

The parties stipulated the following facts (Jt. Exh. 4):

> There are approximately 157,000,000 daily active Twitter accounts and over 336,000,000 monthly active Twitter accounts. Tweets may be viewed, reviewed, republished, or reported on or in Twitter, Facebook, radio, television, newspapers, news media, and various other print and social media platforms. Musk has approximately 22,700,000 followers on Twitter. There are approximately 82 Twitter accounts worldwide that have more Twitter followers than Musk. The Twitter handle, "@elonmusk," as Musk's personal Twitter account. Musk's Twitter account also displays a blue verified employee badge, which according to www.Twitter.com lets people know that an account of public interest is authentic. Musk has used the "@elonmusk" Twitter handle to tweet about Respondent's business decisions and plans, finances, production goals, personnel matters, and breaking news. Respondent has its own Twitter handle, "@Tesla," which is used to make company statements on behalf of Respondent. Twitter, and the use of tweets, is a commonly accepted form in which some companies announce news in lieu of, or in addition to, press releases.

On May 20, 2018, Musk (@elonmusk) tweeted the following in response to three Twitter accounts:

> About 2% of Tesla, incl salaried & hourly, union and non-union were let go in annual review. Only known union person fired was a guy who repeatedly threatened non-union supporters verbally & on social media & lied about it.

(GC Exh. 38).[109] Also on May 20, 2018, Musk (@elonmusk) tweeted, replying to @dmatkins137 @ShayneRarma @NASA:

> Nothing stopping Tesla team at our car plant from voting union. Could do so tmrw if they wanted. But why pay union dues & give up stock options for nothing? Our safety record is 2X better than when plant was UAW & everybody already gets healthcare.

(GC Exh. 56). Several media outlets reported Musk's tweets (R. Exh. 45).[110] On May 23, 2018, Musk tweeted in response to

---

[108]  This complaint arises from case 32–CA–220777 which was consolidated into this matter.

[109]  This tweet appears to refer to Respondent's termination of Ortiz. I note that Musk provides a completely different justification for why Ortiz was terminated.

[110]  In these media articles, the authors' noted responses from a Tesla's spokesperson (R. Exh. 45). A Tesla spokesperson noted that Musk's tweet was "simply recognition of the fact that unlike Tesla, we're not aware of a single UAW-represented automaker that provides stock options or restricted unit to their production employees, and UAW

another tweet, "Exactly. UAW does not have individual stock ownership as part of the compensation at any other company." (R. Exh. 45(a)). Toledano testified that she followed Musk's tweets "to make sure our CEO was not tweeting dumb stuff" and understood that Musk tweeted on behalf of Tesla (Tr. 953–654).

Musk sent the two May 20, 2018 tweets, as stated above, from his #@elonmusk Twitter handle, which are still posted and viewable by the public. On Twitter, replies to tweets that are part of the same "thread" or conversation are indicated by replying to a Twitter account's username with "a@," i.e. "@elonmusk."

From May 20 to 23, 2018, Musk and several other Twitter users engaged in a "thread" which included the tweet which the General Counsel alleges is a threat (GC Exhs. 56, 69). The Twitter users included "@dmatkins137," which is associated with an individual named David Atkins, "@ericbrownzzz," which is associated with an individual named Eric Brown, "@Parker-Molloy," which is associated with an individual named Parker Molloy, "@jackallisonLOL," which is associated with an individual named Jack Allison, "@jAltWouss," which is associated with an individual named Wooter.

It is not possible to identify or determine the determine the number of individuals that viewed the tweets identified above across Twitter, Facebook, radio, television, newspapers, news media, and various other print and social media platforms. It is also not possible to know or determine if every individual that viewed the alleged unlawful tweet by Musk also viewed Musk's tweets in the thread. It is known that the tweets by Musk, identified in General Counsel Exhibits 38, 56, and 69, were republished and disseminated; however, it is not possible to determine the full extent to which Musk's tweets, as set forth in General Counsel Exhibits 38, 56, and 69, were republished or otherwise disseminated via Twitter, Facebook, radio, television, newspapers, news media, and various other print and social media platforms.

### Legal Analysis

The test to determine if a statement violates Section 8(a)(1) is whether "under all circumstances" the remark "reasonably tends to restrain, coerce, or interfere with the employee's rights guaranteed under the Act. *GM Electrics*, 323 NLRB 125, 127 (1997). Motivation nor actual effects are considered. *Miller Electric Pump & Plumbing*, 334 NLRB 824, 825 (2001). An employer violates Section 8(a)(1) of the Act by threatening employees with adverse consequences for engaging in union activities. *NLRB v. Gissel Packing Co.*, supra at 618–619. An employer is free to communicate to his employees any of his general views on unionism or any of his specific views about a union per Section 8(c) of the Act so long as the communications do not contain a threat of reprisal or force or promise of benefit. An employer's prediction concerning what will happen if employees unionize "must carefully be phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control." *Gissel*, supra at 618. If there is any implication that an employer may act on his own initiative unrelated to economic necessities, "the statement is no longer a reasonable

prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment." Id.

Here, Musk's tweet was sent out to 22,700,000 followers on Twitter, some of whom are employees of Tesla. Musk's tweet can only be read by a reasonable employee to indicate that if the employees vote to unionize that they would give up stock options. Musk threatened to take away a benefit enjoyed by the employees consequently for voting to unionize. The Board has held that statements reflecting the possible loss of existing benefits through good faith bargaining does not constitute an unlawful threat of the loss of existing benefits. *Wild Oats Markets, Inc.*, 344 NLRB 717, 717–718 (2005) (no threat where employer communicated to employees in a flyer that employees could lose benefits during collective bargaining). In contrast, Musk's statement cannot be read as an outcome that could occur due to good-faith collective bargaining but instead made this statement as a threat of unilateral discontinuation of existing benefits if the employees unionized. *Medical Center of Ocean County*, 315 NLRB 1150, 1154 (1994) (threat where statement to employees that "[y]ou could lose your benefits" was susceptible to interpretation that employer intended to discontinue existing benefit prior to bargaining). Musk did not reference collective bargaining or express that the loss of stock options could be a result of negotiations. Musk presented no objective facts to support his statement that employees would lose their stock options. In *Dyncorp*, 343 NLRB 1197, 1198–1199 (2004), the Board found that Respondent unlawfully threatened employees with the loss of employer stock contribution monies if the employees chose union representation. Musk's statement indicates that employee would lose stock options if they voted to unionize. Thus, his statement was not a prediction carefully phrased based on objective fact to convey Respondent's belief as to probable consequences beyond its control, and I find his statement violates Section 8(a)(1). Consequently, Musk's tweet lost the protection of Section 8(c) because Musk implied that Tesla would act on its own initiative to remove stock options if the employees chose to unionize.

As its affirmative defense, Respondent argues that Musk's Twitter account is his own and his message was directed to a non-employee of Tesla. However, the parties stipulated that Musk has over 22 million Twitter followers who would have seen the unlawful tweet; these followers included employees and nonemployees. With Twitter, who views comments is unclear. This dissemination is akin to a company official issuing a press release to the public where anyone including employees may read the statement. See *Vemco, Inc.*, 304 NLRB 911, 925 (1991) (press release broadcast to the public sufficiently communicated to the employees). In addition, the parties stipulated that Twitter, and the use of tweets, is a commonly accepted form in which some companies announce news in lieu of, or in addition to, press releases. Moreover, Toledano testified that she understood Musk to tweet on behalf of Tesla. It is important to note that Respondent presented no evidence that Musk disavowed any of Musk's tweets about the company. But even if Respondent had done so, under existing Board law, as discussed previously,

organizers have consistently dismissed the value of Tesla equity as part of our compensation package" (R. Exh. 45(a)).

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Tesla is liable for a Section 2(11) supervisor's actions—Musk who is CEO of the company. Furthermore, Respondent also argues that Musk's tweet is protected by the First Amendment, and that Tesla should not be held liable for his opinion. However, in *Gissel*, the Supreme Court specifically set forth that a statement loses the protection of the First Amendment if the statement is based on misrepresentation regarding the consequences of bargaining if the employees unionized. Musk is Tesla's highest-ranking officer, and Respondent cannot divorce itself from Musk's comments. Again, in as much as employers are responsible for a supervisor's conduct in the workplace, Tesla is responsible for Musk's comments in this instance where there is an allegation of an unlawful threat. See *Glenroy Construction Co*., 215 NLRB 866, 867 (1974) (employer violated the Act based on supervisor's unauthorized and "personal" statement), enfd. 527 F.2d 465 (7th Cir. 1975).

Respondent argues that Musk's entire Twitter "course of conduct" should be considered, and if not considered, Musk's Twitter statement in isolation is not a threat. In the context of the union organizing campaign, which had been active for at the least the prior year, any employee reading Musk's statement would reasonably conclude that Musk threatened to remove employee stock options if the employees chose unionization. Based on my research, this issue of whether Musk's Twitter statement could violate Section 8(a)(1) of the Act is an issue of first impression. I choose to analyze this issue similarly to how the Board has handled other social media matters, specifically with Facebook. The Board has recognized that employees have increasingly been using social media to communicate with one another about work. See *Triple Play Sports*, supra (Facebook "likes" may be protected activity); *Knauz BMW*, 358 NLRB 1754 (2012) (employee posted photos and comments to Facebook); *Hispanics United of Buffalo*, 359 NLRB 368, 368 (2012) (employees unlawfully discharged for their responses to coworkers' criticisms of their job performance). In my view, an analysis of a supervisor's statement on Twitter should be no different. In *Miklin Enterprises*., 361 NLRB 283, 290 (2014), the Board found that postings by two supervisors on an antiunion Facebook page violated Section 8(a)(1) of the Act where the supervisors encouraged employees to harass an employee for his union activity. In that instance, the Facebook page was "open" like the openness of Twitter posts, which are accessible to anyone. Likewise, here, Musk's statement violated Section 8(a)(1) as described in complaint paragraph 6.

CONCLUSIONS OF LAW

1. Respondent, Tesla, Inc., has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. The Union, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO, has been a labor organization within the meaning of Section 2(5) of the Act.

3. Respondent committed unfair labor practices in violation of Section 8(a)(1) of the Act by:

(a) Maintaining and enforcing a rule on February 10, 2017 and May 24, 2017, that in the absence of legitimate business reasons, prohibits off duty employees from distributing union

literature in the employees' parking lot.

(b) Promulgating a rule on March 23, 2017, prohibiting employees from distributing union stickers, leaflets, and pamphlets without first obtaining permission, and threatening discipline if failing to do so.

(c) Interrogating employees about their union activities on May 24, 2017.

(d) Soliciting grievances from employees about safety concerns and impliedly promising to remedy them on June 7, 2017, during meeting with Respondent's chief executive officer and chief people officer during a union organizing campaign.

(e) Informing employees during meeting with Respondent's chief executive officer and chief people officer on June 7, 2017, that it would be futile to vote in favor of the Union by telling them that they have no voice with the Union.

(f) Maintaining and enforcing a rule in August 2017, prohibiting employees from wearing union insignia showing support for the Union or any other labor organization.

(g) Informing an employee in August 2017, that it would be futile to vote for the Union.

(h) Interrogating employees in September and October 2017, about their union activities.

(i) Promulgating a rule regarding Workday in response to protected concerted activity in October 2017.

(j) Threatening employees on May 20, 2018, with loss of stock options if they vote in favor of the Union.

4. By terminating Richard Ortiz on October 18, 2017, and disciplining Jose Moran on October 19, 2017, Respondent violated Section 8(a)(3) and (1) of the Act.

5. The unfair labor practices found affect commerce within the meaning of Section 2(6) and (7) of the Act.

6. All other allegations of the complaint are dismissed.

REMEDY

Having found that Respondent has engaged in certain unfair labor practices, I shall order it to cease and desist therefrom and to take certain affirmative action designed to effectuate the policies of the Act. Having found that Respondent has violated Section 8(a)(1) of the Act by maintaining and enforcing a rule on February 10 and May 24, 2017, that, in the absence of legitimate business reasons, prohibits off-duty employees from distributing union literature in the employees' parking lot, I shall order that Respondent rescind the rule. Having found that Respondent has violated Section 8(a)(1) of the Act by promulgating a rule on March 23, 2017, prohibiting employees from distributing union stickers, leaflets, and pamphlets without first obtaining permission, and threatening discipline if failing to do so, I shall order that Respondent rescind the rule. Having found that Respondent has maintained and enforced a rule in August 2017 prohibiting employees from wearing union insignia showing support for the Union or any other labor organization, I shall order that Respondent rescind the rule. Having found that Respondent has violated Section 8(a)(1) of the Act by promulgating a rule in October 2017, regarding Workday in response to protected concerted activity, I shall order that Respondent rescind the rule.

Respondent, having discriminatorily disciplined Jose Moran, must rescind the disciplinary action and remove all references from his personnel files. Respondent, having discriminatorily

terminated Richard Ortiz, must offer him reinstatement and make him whole for any loss of earnings and other benefits. Backpay shall be computed in accordance with *F. W. Woolworth Co.*, 90 NLRB 289 (1950), with interest at the rate prescribed in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB 6 (2010). In accordance with *King Soopers, Inc.*, 364 NLRB No. 93 (2016), Respondent shall compensate Richard Ortiz for his search-for-work and interim employment expenses regardless of whether those expenses exceed interim earnings, and such expenses shall be calculated separately from taxable net backpay, with interest at the rate prescribed in *New Horizons*, supra, compounded daily as prescribed in *Kentucky River Medical Center*, supra.

In accordance with *Don Chavas, LLC d/b/a Tortillas Don Chavas*, 361 NLRB 101 (2014), Respondent shall compensate Richard Ortiz for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and, in accordance with *AdvoServ of New Jersey, Inc.*, 363 NLRB 1324 (2016), Respondent shall, within 21 days of the date the amount of backpay is fixed either by agreement or Board Order, file with the Regional Director for Region 32 a report allocating backpay to the appropriate calendar year(s). The Regional Director will then assume responsibility for transmitting the report to the Social Security Administration at the appropriate time and in the appropriate manner.

The General Counsel also requests that I order Respondent to reimburse Richard Ortiz for consequential economic harm incurred by him as a result of its unlawful conduct, a remedy not traditionally included in Board orders (GC Br. at 109). See *Operating Engineers Local 513 (Long Construction Co.)*, 145 NLRB 554 (1963). I am obligated to following existing Board precedent, and thus, decline to recommend this remedy. See *Pathmark Stores, Inc.*, 342 NLRB 378, 378 fn. 1 (2004); *Waco, Inc.*, 273 NLRB 746, 749 fn. 14 (1984).

I will order that the employer post a notice at the Fremont facility in the usual manner, including electronically to the extent mandated in *J. Picini Flooring*, 356 NLRB 11, 15–16 (2010). In accordance with *J. Picini Flooring*, the question as to whether an electronic notice is appropriate should be resolved at the compliance phase. Id. supra at 13.

The General Counsel requests that I order that the notice be read aloud with the presence of security guards, managers and supervisors and the Union, if requested (GC Br. at 104–106). The Board has recognized that notice reading is an extraordinary remedy but, in this instance, I believe the facts present themselves to support such a request. *Sysco Grand Rapids, LLC*, 367 NLRB No. 111 (2019). Respondent by numerous supervisors and agents, including its chief executive officer and chief people officer committed many violations of the Act. See *Stern Produce Co.*, 368 NLRB No. 31, slip op. at 5 (2019) (citing *North Memorial Health Care*, 364 NLRB No. 61, slip op. at 1 (2016) (notice reading appropriate in part due to high-ranking responsible management officials in unfair labor practices), enfd. in

relevant part 860 F.3d 639 (8th Cir. 2017). Such pervasive unlawful conduct, as described and found herein, warrants a broad cease-and-desist order and a notice reading. Such a public reading of the notice will serve to reassure employees that that their employer and its managers are bound by the Act's requirements. *Homer D. Bronson Co.*, 349 NLRB 512, 515 (2007) (and cited cases), enfd. mem. 273 Fed.Appx. 32 (2d Cir. 2008).

Accordingly, I recommend that Respondent be ordered to convene its employees and have Elon Musk (or, if he is no longer the chief executive officer, a high-ranking management official), in the presence security guards, managers and supervisors, a Board agent and an agent of the Union, if the Region and/or the Union so desire, read the notice aloud to employees, or, at Respondent's option, permit a Board agent, in the presence Musk, to read the notice to the employees at the Fremont facility only. See *Bozzuto's, Inc.*, 365 NLRB No. 146, slip op. at 5 (2017). I do not order a notice reading at the Sparks facility as no violations of the Act occurred there.

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[111]

ORDER

Respondent, Tesla, Inc., Palo Alto, California, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Maintaining and enforcing a rule that, in the absence of legitimate business reasons, prohibits off-duty employees from distributing union literature in the employees' parking lot.

(b) Promulgating a rule prohibiting employees from distributing union literature, leaflets, and pamphlets without first obtaining permission, and threatening discipline if failing to do so.

(c) Interrogating employees about their union activities.

(d) Soliciting grievances from employees about safety concerns and impliedly promising to remedy them.

(e) Informing employees that it would be futile to vote for the Union.

(f) Maintaining and enforcing a rule prohibiting employees from wearing union insignia showing support for the union or any other labor organization.

(g) Promulgating a rule regarding Workday in response to protected concerted activity.

(h) Threatening employees with loss of benefits if vote in favor of the Union.

(i) Terminating and disciplining any employee because of their support for the Union or any other labor organization.

(j) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Rescind the rule orally announced to off-duty employees on February 10, 2017 and May 24, 2017, which prohibited employees from distributing on their nonwork time union literature in the employees' parking lot.

---

[111] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

(b) Rescind the rule orally announced to employees on March 23, 2017, which prohibited employees from distributing union stickers, leaflets, and pamphlets without first obtaining permission and threatening discipline if failed to do so.

(c) Rescind a rule prohibiting employees from wearing union insignia showing support for the Union or any other labor organization.

(d) Rescind a rule regarding Workday which was promulgated in response to protected concerted activity in October 2017.

(e) Within 14 days of the date of the Board's Order, remove from its files any reference to the unlawful warning issued to Jose Moran, and within 3 days thereafter, notify the employee in writing that this has been done and that the warning will not be used against him in any way.

(f) Within 14 days of the date of the Board's Order, offer Richard Ortiz full reinstatement to his former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to his seniority or any other rights or privileges previously enjoyed.

(g) Make Richard Ortiz whole for any loss of earnings and other benefits suffered as a result of the discrimination against him, in the manner set forth in the remedy section of this decision.

(h) Compensate Richard Ortiz for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and file with the Regional Director for Region 32, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year.

(i) Within 14 days of the date of the Board's Order, remove from its files any reference to the unlawful termination, and within 3 days thereafter, notify the employee in writing that this has been done and that the termination will not be used against him in any way.

(j) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(k) Within 14 days after service by the Region, post at its facility in Fremont, California, the attached notice marked "Appendix"[112] on forms provided by the Regional Director for Region 32, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, the notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such

means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since February 10, 2017.

(l) Within 14 days after service by the Region, hold a meeting or meetings, at the Fremont facility, scheduled to ensure the widest possible attendance, at which the "Notice to Employees" is to be read to the employees by Respondent's chief executive officer, Elon Musk or at Respondent's option, by a Board agent in the presence of Musk, along with security guards, managers and supervisors. If Musk is no longer an owner or officer of the Respondent, then the Respondent shall designate another owner or officer to conduct or be present for the reading.

(m) Within 21 days after service by the Region, file with the Regional Director for Region 32 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

IT IS FURTHER ORDERED that the complaint allegations are dismissed insofar as they allege violations of the Act not specifically found.

Dated, Washington, D.C. September 27, 2019

### APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

### FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT maintain and enforce a rule that, in the absence of legitimate business reasons, prohibits off-duty employees from distributing union literature in the employees' parking lot.

WE WILL NOT promulgate a rule that prohibits you from distributing union stickers, leaflets, and pamphlets without receiving permission, and threatening discipline if you fail to do so.

WE WILL NOT coercively question you about your union activities.

WE WILL NOT solicit your grievances and impliedly promise to remedy them in order to discourage union support or activity.

WE WILL NOT inform you that it is futile to support the

---

[112] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the

United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

TESLA, INC.

International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO or any other union.

WE WILL NOT maintain and enforce a rule that prohibits you from wearing union insignia to show your support for the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO or any other labor organization.

WE WILL NOT promulgate a rule regarding Workday in response to protected concerted activity.

WE WILL NOT threaten employees with loss of benefits if you vote in favor of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO, or any other labor organization.

WE WILL NOT terminate and discipline any of you because you support the International Union, United Automobile, Aerospace and Agricultural Workers of America, AFL–CIO (UAW) or any other labor organization.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL rescind the rule orally announced to off-duty employees on February 10 and May 24, 2017, which prohibited them from distributing during their nonworking time union literature in the employees' parking lot.

WE WILL rescind an oral rule of March 23, 2017, that prohibits you from distributing union stickers, leaflets, and pamphlets without receiving permission, and threatening discipline if you fail to do so.

WE WILL rescind a rule that prohibits you from wearing union insignia to show your support for the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO or any other labor organization.

WE WILL rescind a rule regarding Workday in response to protected concerted activity.

WE WILL, within 14 days from the date of the Board's Order, offer Richard Ortiz full reinstatement to his former job, and if that job no longer exists, to a substantially equivalent position, without prejudice to his seniority rights or any other rights or privileges previously enjoyed.

WE WILL make Richard Ortiz whole for any loss of earnings and other benefits resulting from his termination, less any net interim earnings, plus interest, and WE WILL make him whole for reasonable search-for-work and interim employment expenses, plus interest.

WE WILL within compensate Richard Ortiz for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and WE WILL file with the Regional Director for Region 32, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar years.

WE WILL, within 14 days from the date of the Board's Order, remove from our files any reference to the unlawful termination and discipline of Richard Ortiz and Jose Moran, and WE WILL, within 3 days thereafter, notify them in writing that we have done so and that we will not use the termination and discipline against them in any way.

TESLA, INC.

The Administrative Law Judge's decision can be found at https://www.nlrb.gov/case/32-CA-197020 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273–1940.



## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system, and a true and correct copy of the foregoing Petition for Review, with attachment, was served by FedEx overnight delivery and email on:

Ruth E. Burdick
Deputy Associate General Counsel
Appellate and Supreme Court Litigation
    Branch
National Labor Relations Board
1015 Half Street, SE
Washington, DC 20570
ruth.burdick@nlrb.gov
appellatecourt@nlrb.gov

In addition, and in accordance with 29 C.F.R. § 101.14, petitioner will ensure that the Board receives, by service upon its Deputy Associate General Counsel of the Appellate Court Branch, a court-stamped copy of the petition with the date of filing.

I further hereby certify that on April 2, 2021, a true and correct copy of the foregoing Petition for Review, with attachment, was served by FedEx overnight delivery and email on counsel for each other party admitted to participate in the agency proceedings:

Margo Feinberg
Daniel Curry
Schwartz, Steinsapir, Dohrmann &
    Sommers LLP
6300 Wilshire Boulevard, Suite 2000
Los Angeles, CA 90048-5268
margo@ssdslaw.com
dec@ssdslaw.com

Jeffrey Sodko
United Auto Workers
8000 E. Jefferson Avenue
Detroit, MI 48214
jsodko@uaw.net

Dated: April 2, 2021

*s/ Michael E. Kenneally*
Michael E. Kenneally

*Counsel for Petitioner Tesla, Inc.*