No. 21-60285

# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

### TESLA, INCORPORATED

**Petitioner Cross-Respondent**

### INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, AFL-CIO

**Petitioner**

**v.**

### NATIONAL LABOR RELATIONS BOARD

**Respondent Cross-Petitioner**

_____

## ON PETITIONS FOR REVIEW AND CROSS-APPLICATION FOR ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD

_____

## BRIEF FOR RESPONDENT CROSS-PETITIONER THE NATIONAL LABOR RELATIONS BOARD

_____

**KIRA DELLINGER VOL**
*Supervisory Attorney*

**MICAH P.S. JOST**
*Attorney*

***National Labor Relations Board***
**1015 Half Street, SE**
**Washington, DC 20570**
**(202) 273-0656**
**(202) 273-0264**

**JENNIFER ABRUZZO**
    *General Counsel*
**PETER SUNG OHR**
    *Deputy General Counsel*
**RUTH E. BURDICK**
    *Deputy Associate General Counsel*
**DAVID HABENSTREIT**
    *Assistant General Counsel*

**STATEMENT REGARDING ORAL ARGUMENT**

The Board submits that oral argument would not assist the Court. Most of the Board's Order is uncontested on appeal. The few remaining issues before the Court are neither novel nor complex, and they are governed by well-settled legal principles. If the Court nonetheless chooses to hear argument, the Board respectfully requests to participate.

# TABLE OF CONTENTS

**Headings**                                                           **Page(s)**

Jurisdictional statement................................................................................1

Introduction.................................................................................................1

Issue statement ...........................................................................................2

Statement of the Case..................................................................................3

    I.   The Board's factual findings .......................................................3

        A.  Richard Ortiz and Jose Moran lead a union-organizing campaign at Tesla ...........................................................................................3

        B.  Tesla prohibits unauthorized media communication................................3

        C.  Tesla interferes with distribution of union materials................................3

        D.  Ortiz and Jonathan Galescu obtain injury logs; Tesla interrogates them.. ...........................................................................................4

        E.  Moran delivers a safety petition; Tesla executives listen to his concerns. ...........................................................................................5

        F.  A supervisor threatens that unionizing would be futile ............................6

        G.  Moran and Ortiz use workday to post about anti-union employees' public comments on a pro-union Facebook page.....................................6

        H.  Tesla interrogates Oritz and Moran about their union activities ..............8

        I.  Tesla discharges Ortiz, promulgates a new Workday rule, and warns Moran for having violated it.................................................................10

        J.  Tesla's CEO threatens that employees will lose stock options if they unionize ...........................................................................................11

**Headings**                                                                                  **Page(s)**

   II.   The proceedings before the Board...................................................................11

  III.  The Board's conclusions and Order ..............................................................12

Summary of argument.......................................................................................13

Standard of review ...........................................................................................15

Argument..........................................................................................................16

   I.   The Board is entitled to summary enforcement of the portions of
       its Order remedying uncontested violations ................................................16

   II.  Substantial evidence supports the Board's finding that Tesla violated
       Section 8(a)(3) and (1) of the Act by discharging Ortiz...............................17

       A.  Tesla unlawfully discharged Ortiz for his protected response to
            unlawful interrogation about union activity...........................................18

           1.   The Act protects employee efforts to conceal union activity...........18

           2.   Ortiz had no obligation to disclose his or Moran's protected
               activities to Tesla ........................................................................21

       B.  The discharge was unlawful under *Wright Line* ....................................27

           1.   Union activity was a motivating factor in Tesla's discharge
               decision .....................................................................................28

           2.   Tesla did not prove its affirmative defense ....................................31

  III.  Substantial evidence supports the Board's finding that Tesla violated
       Section 8(a)(1) by threatening employees with loss of benefits if they
       unionized..................................................................................................34

       A.  Statements that tend to coerce employees are unlawful .........................34

**Headings**                                                                                                    **Page(s)**

      1.  Coerciveness is measured objectively, from the employees' perspective ...............................................................................34

      2.  The Board's coerciveness finding is entitled to deference...............37

      3.  A bare statement that unionization will cause lost benefits is an unlawful threat ..................................................................39

   B.  Employees reasonably would have interpreted Musk's tweet as a threat ...................................................................................41

      1.  The tweet threatened loss of benefits upon unionization ...............41

      2.  Tesla never repudiated its threat.....................................................45

      3.  Tesla's attempt to relitigate settled First Amendment law fails......50

IV.  The Board reasonably found that Tesla did not unlawfully solicit and promise to remedy grievances...............................................................52

V.  The Board's Order is within its broad remedial discretion.........................54

   A.  Tesla's remedial challenges fail............................................................55

   B.  The Board did not abuse its discretion by declining to require notice reading .....................................................................................57

Conclusion ...........................................................................................................59

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Agostini v. Felton,*
  521 U.S. 203 (1997) ................................................................................................ 51

*Aladdin Indus., Inc.,*
  147 NLRB 1392 (1964) ................................................................................... 20, 25

*Allegheny Ludlum Corp. v. NLRB,*
  301 F.3d 167 (3d Cir. 2002) ............................................................................ 35, 38

*Alpo Petfoods, Inc. v. NLRB,*
  126 F.3d 246 (4th Cir. 1997) .................................................................................. 29

*Alton H. Piester, LLC v. NLRB,*
  591 F.3d 332 (4th Cir. 2010) .................................................................................. 35

*Am. Steel Erectors, Inc.,*
  339 NLRB 1315 (2003) .......................................................................................... 27

*Amalgamated Clothing Workers v. NLRB,*
  424 F.2d 818 (D.C. Cir. 1970) ............................................................................... 39

*Bakersfield Mem'l Hosp.,*
  305 NLRB 741 (1991) ............................................................................................ 22

*Behring Int'l, Inc.,*
  252 NLRB 354 (1980), *enforced,*
  714 F.2d 291 (3d Cir. 1983) ................................................................................... 42

*Belcher Towing Co.,*
  265 NLRB 1258 (1982), *enforced in pertinent part,*
  726 F.2d 705 (11th Cir. 1984) ................................................................................ 42

*Blue Circle Cement Co. v. NLRB,*
  41 F.3d 203 (5th Cir. 1994) .................................................................................... 21

**Cases**  **Page(s)**

*Brown & Root, Inc. v. NLRB*,
  333 F.3d 628 (5th Cir. 2003)...................................................................... 36, 38

*C&W Super Mkts., Inc. v. NLRB*,
  581 F.2d 618 (7th Cir. 1978)........................................................................ 35

*Cadillac of Naperville, Inc. v. NLRB*,
  No. 19-1150, 2021 WL 4228453 (D.C. Cir. Sept. 17, 2021).............................. 51

*Carpenter Tech. Corp.*,
  346 NLRB 766 (2006) .................................................................................. 40

*Cellco Partnership v. NLRB*,
  892 F.3d 1256 (D.C. Cir. 2018) .................................................................... 25

*Cellnet Commc'ns, Inc. v. FCC*,
  149 F.3d 429 (6th Cir. 1998)........................................................................ 39

*Charter Commc'ns, Inc. v. NLRB*,
  939 F.3d 798 (6th Cir. 2019)........................................................................ 31

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) .................................................................................... 38

*Chinese Daily News*,
  346 NLRB 906 (2006), *enforced*,
  224 F. App'x 6 (D.C. Cir. 2007) .................................................................... 57

*Constellation Brands U.S. Ops., Inc. v. NLRB*,
  992 F.3d 642 (7th Cir. 2021)........................................................................ 40

**Cases**                                                                      **Page(s)**

*Cooper Tire & Rubber Co.*,
  340 NLRB 958 (2003), *bargaining order enforced*,
  156 F. App'x 760 (6th Cir. 2005) ....................................................... 48

*Cordua Rests., Inc. v. NLRB*,
  985 F.3d 415 (5th Cir. 2021)................................................... 20, 27, 28

*Crown Stationers*,
  272 NLRB 164 (1984) ...................................................................... 36

*Curwood, Inc.*,
  339 NLRB 1137 (2003), *enforced in part*,
  397 F.3d 548 (7th Cir. 2005)............................................................ 52

*Daco Indus. of Miss., Inc.*,
  207 NLRB 968 (1973) ...................................................................... 19

*DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
  485 U.S. 568 (1988)......................................................................... 51

*Donaldson Bros. Ready Mix, Inc.*,
  341 NLRB 958 (2004) ...................................................................... 42

*DynCorp*,
  343 NLRB 1197 (2004), *enforced*,
  233 F. App'x 419 (6th Cir. 2007) ................................................ 40, 42

*Eastex, Inc. v. NLRB*,
  437 U.S. 556 (1978)......................................................................... 21

*El Paso Elec. Co. v. NLRB*,
  681 F.3d 651 (5th Cir. 2012)............................................................ 16

## TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                         **Page(s)**

*N.W. Elec. Coop.*,
366 NLRB No. 132 (2018) ................................................................ 22

*Elonis v. United States*,
575 U.S. 723 (2015) ......................................................................... 36

*Fallbrook Hosp. Corp.*,
360 NLRB 644 (2014), *enforced*,
785 F.3d 729 (D.C. Cir. 2015) ......................................................... 58

*FDRLST Media, LLC*,
370 NLRB No. 49, 2020 WL 6940901 (2020), *pet. for review pending*,
Nos. 20-3434, 20-3492 (3d Cir.) ..................................................... 55

*Fed.-Mogul Corp. v. NLRB*,
566 F.2d 1245, 1259 (5th Cir. 1978) ..................................... 20, 38, 46

*Federated Logistics & Operations v. NLRB*,
400 F.3d 920 (D.C. Cir. 2005) ............................................. 42, 43, 48

*Federated Logistics & Operations v. NLRB*,
340 NLRB 255, 268 (2003), *pet. for review denied*,
400 F.3d 920 (D.C. Cir. 2005) ......................................................... 54

*Fibreboard Paper Prods. Corp. v. NLRB*,
379 U.S. 203 (1964) ......................................................................... 55

*Flex Frac Logistics, LLC v. NLRB*,
746 F.3d 205 (5th Cir. 2014) ........................................................... 37

*Frazier Indus. Co. v. NLRB*,
213 F.3d 750 (D.C. Cir. 2000) ......................................................... 17

**Cases**                                                                 **Page(s)**

*Fresenius USA Mfg., Inc.*,
  362 NLRB 1065 (2015) ................................................................ 20, 25

*Frontier Hotel & Casino*,
  323 NLRB 815 (1997) ...................................................................... 36

*Guess?, Inc.*,
  339 NLRB 432 (2003) .................................................................. 18, 26

*Harper & Row Publ'rs*,
  196 NLRB 343 (1972), *enforced*,
  476 F.2d 430 (8th Cir. 1973) ............................................................. 44

*HealthBridge Mgmt., LLC v. NLRB*,
  902 F.3d 37 (2d Cir. 2018) ................................................................ 35

*Hendrickson USA, LLC v. NLRB*,
  932 F.3d 465 (6th Cir. 2019) ............................................................. 40

*Hendrix Mfg. Co. v. NLRB*,
  321 F.2d 100 (5th Cir. 1963) ........................................... 35, 39, 41, 42

*Hertz Corp.*,
  316 NLRB 672 (1995) ...................................................................... 40

*In-N-Out Burger, Inc. v. NLRB*,
  894 F.3d 707 (5th Cir. 2018) ................................................. 15, 37, 47

*In-N-Out Burger, Inc.*,
  365 NLRB No. 39 (2017), *enforced*,
  894 F.3d 707 (5th Cir. 2018) ............................................................. 56

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                      **Page(s)**

*Intermedics, Inc.*,
  262 NLRB 1407 (1982), *enforced*,
  715 F.2d 1022 (5th Cir. 1983)....................................................................... 41

*J.P. Stevens v. NLRB*,
  417 F.2d 533 (5th Cir. 1969).......................................................................... 56

*Jays Foods, Inc. v. NLRB*,
  573 F.2d 438 (7th Cir. 1978).......................................................................... 21

*Knight First Amendment Inst. at Columbia Univ. v. Trump*,
  928 F.3d 226 (2d Cir. 2019), *vacated as moot*,
  141 S. Ct. 1220 (2021) .................................................................................. 49

*Lear Siegler Inc. v. NLRB*,
  890 F.2d 1573 (10th Cir. 1989)...................................................................... 35

*Lippincott Indus., Inc. v. NLRB*,
  661 F.2d 112 (9th Cir. 1981).......................................................................... 35

*Litton Fin. Printing Div. v. NLRB*,
  501 U.S. 190 (1991)........................................................................................ 38

*Lowes Home Ctrs., LLC v. NLRB*,
  850 F. App'x 886 (5th Cir. 2021) .................................................................. 16

*Marathon LeTourneau Co. v. NLRB*,
  699 F.2d 248 (5th Cir. 1983).......................................................................... 33

*McGraw-Edison Co. v. NLRB*,
  419 F.2d 67 (8th Cir. 1969)............................................................................ 42

*McLane/W., Inc. v. NLRB*,
  723 F.2d 1454 (10th Cir. 1983)...................................................................... 42

**Cases**                                                                                                      **Page(s)**

*Mead Corp. v. NLRB,*
  697 F.2d 1013 (11th Cir. 1983).................................................................... 35

*Med. Ctr. of Ocean Cnty.,*
  315 NLRB 1150 (1994) ............................................................................. 44

*Metro. Edison Co. v. NLRB,*
  460 U.S. 693 (1984)................................................................................... 18

*Middletown Hosp. Ass'n,*
  282 NLRB 541 (1986) ............................................................................... 44

*Miller Elec. Pump & Plumbing,*
  334 NLRB 824 (2001) ............................................................................... 35

*Mon River Towing, Inc. v. NLRB,*
  421 F.2d 1 (3d Cir. 1969).......................................................................... 39

*Monfort, Inc. v. NLRB,* No.,
  No. 90-9518, 1994 WL 121150 (10th Cir. Mar. 30, 1994) ................................. 46

*Nat'l Coal. for Men v. Selective Serv. Sys.,*
  969 F.3d 546 (5th Cir. 2020), *cert. denied,*
  141 S. Ct. 1815 (2021) .............................................................................. 51

*Nat'l Fabricators, Inc. v. NLRB,*
  903 F.2d 396 (5th Cir. 1990)..................................................................... 15

*Nat'l Micronetics,*
  277 NLRB 993 (1985) ............................................................................... 54

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                                                  **Page(s)**

*Nat'l Tel. Directory Corp.*,
  319 NLRB 420 (1995) ........................................................................ 19

*New Jersey v. New York*,
  523 U.S. 767 (1998) .......................................................................... 38

*NLRB v. ADCO Elec. Inc.*,
  6 F.3d 1110 (5th Cir. 1993)........................................................... 18, 28

*NLRB v. Bama Co.*,
  353 F.2d 320 (5th Cir. 1965)................................................................ 41

*NLRB v. Big Three Indus. Gas & Equip. Co.*,
  441 F.2d 774 (5th Cir. 1971)............................................................... 38

*NLRB v. Big Three Indus. Gas & Equip. Co.*,
  579 F.2d 304 (5th Cir. 1978)............................................................... 31

*NLRB v. Brookwood Furniture*,
  701 F.2d 452 (5th Cir. 1983).............................. 16, 18, 28, 30, 33, 36

*NLRB v. Colony Printing & Labeling, Inc.*,
  651 F.2d 502 (7th Cir. 1981)............................................................... 42

*NLRB v. Consol. Biscuit Co.*,
  301 F. App'x 411 (6th Cir. 2008) ................................................. 30, 36

*NLRB v. Delta Gas., Inc.*,
  840 F.2d 309 (5th Cir. 1988)...................................................... 15, 28, 34

*NLRB v. Dickinson Press, Inc.*,
  153 F.3d 282 (6th Cir. 1998)............................................................... 42

**Cases**                                                                                       **Page(s)**

*NLRB v. Esco Elevators, Inc.*,
   736 F.2d 295 (5th Cir. 1984)............................................................................ 29

*NLRB v. Gallup Inc.*,
   62 F. App'x 557 (5th Cir. 2003) ...................................................................... 17

*NLRB v. Gen. Fabrications Corp.*,
   222 F.3d 218 (6th Cir. 2000)............................................................................ 30

*NLRB v. Gissel Packing Co.*,
   395 U.S. 575 (1969) .............................................. 14, 34, 35, 36, 37, 38, 39, 50, 51

*NLRB v. Great W. Coca-Cola Bottling Co.*,
   740 F.2d 398 (5th Cir. 1984)............................................................................ 35

*NLRB v. Intermedics, Inc.*,
   715 F.2d 1022 (5th Cir. 1983)........................................................................... 16

*NLRB v. Jones & Laughlin Steel Corp.*,
   301 U.S. 1 (1937) ............................................................................................. 50

*NLRB v. Katz*,
   369 U.S. 736 (1962) ......................................................................................... 45

*NLRB v. Lancer Corp.*,
   759 F.2d 458 (5th Cir. 1985).......................................................................... 32, 33

*NLRB v. Laredo Coca Cola Bottling Co.*,
   613 F.2d 1338 (5th Cir. 1980).......................................................................... 19, 43

*NLRB v. Mangurian's, Inc.*,
   566 F.2d 463 (5th Cir. 1978).......................................................................... 34, 37, 38

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**Cases** **Page(s)**

*NLRB v. Marine Optical, Inc.*,
 671 F.2d 11 (1st Cir. 1982) ..................................................................... 35

*NLRB v. Monfort, Inc.*,
 29 F.3d 525 (10th Cir. 1994) .................................................................. 46

*NLRB v. Neuhoff Bros., Packers*,
 375 F.2d 372 (5th Cir. 1967) .................................................................. 31

*NLRB v. Pope Maint. Corp.*,
 573 F.2d 898 (5th Cir. 1978) .................................................................. 52

*NLRB v. Riley-Beaird, Inc.*,
 681 F.2d 1083 (5th Cir. 1982) ..................................................... 37, 50, 52

*NLRB v. Roney Plaza Apts.*,
 597 F.2d 1046 (5th Cir. 1979) ..................................................... 16, 20, 28

*NLRB v. Schill Steel Prod., Inc.*,
 340 F.2d 568 (5th Cir. 1965) .................................................................. 42

*NLRB v. Syracuse Color Press*,
 209 F.2d 596 (2d Cir. 1954) ................................................................... 21

*NLRB v. V&S Schuler Eng'g, Inc.*,
 309 F.3d 362 (6th Cir. 2002) ............................................................ 52, 54

*Noah's Bay Area Bagels, LLC*,
 331 NLRB 188 (2000) ........................................................................... 42

**Cases**                                                                            **Page(s)**

*Noah's N.Y. Bagels*,
   324 NLRB 266 (1997) ........................................................................... 54

*Omega Constr. Servs., LLC*,
   365 NLRB No. 72, 2017 WL 2115670 (2017) ..................................... 55

*Operating Engineers, Local Union No. 150 (Lippert Components, Inc.)*,
   371 NLRB No. 8, 2021 WL 3169107 (July 21, 2021) ................................. 50, 51

*Pac. Molasses Co. v. NLRB Reg'l Off. No. 15*,
   577 F.2d 1172 (5th Cir. 1978).............................................................. 18

*Paragon Sys., Inc.*,
   362 NLRB 1561 (2015) ................................................................... 19, 24

*Penn. Glass Sand Corp.*,
   172 NLRB 514 (1968), *enforced sub nom.*,
   *Gen. Teamsters & Allied Workers Local Union No. 992 v. NLRB*,
   427 F.2d 582 (D.C. Cir. 1970) ............................................................. 43

*Postal Serv.*,
   339 NLRB 1162 (2003) ......................................................................... 57

*Radisson Plaza Minneapolis v. NLRB*,
   987 F.2d 1376 (8th Cir. 1993).............................................................. 17

*Regency Manor Nursing Home*,
   275 NLRB 1261 (1985) ........................................................................ 40

*Reliance Elec. Co.*,
   191 NLRB 44 (1971), *enforced mem.*,
   457 F.2d 503 (6th Cir. 1972) ................................................................ 53

**Cases**                                                                                  **Page(s)**

*Remington Lodging & Hosp., LLC v. NLRB,*
  847 F.3d 180 (5th Cir. 2017) ................................................................ 16, 18, 28, 33

*Richfield Oil Corp. v. NLRB,*
  231 F.2d 717 (D.C. Cir. 1956) ............................................................................. 45

*Russell Stover Candies, Inc. v. NLRB,*
  551 F.2d 204 (8th Cir. 1977) ............................................................................... 35

*Sara Lee Bakery Grp., Inc. v. NLRB,*
  61 F. App'x 1 (4th Cir. 2003) .............................................................................. 42

*Selkirk Metalbestos v. NLRB,*
  116 F.3d 782 (5th Cir. 1997) ............................................................................... 46

*Selkirk Metalbestos,*
  321 NLRB 44 (1996) ........................................................................................... 46

*Singer v. City of Waco, Tex.,*
  324 F.3d 813 (5th Cir. 2003) ............................................................................... 51

*Sioux Prod., Inc. v. NLRB,*
  684 F.2d 1251 (7th Cir. 1982) ........................................................................ 42, 45

*Solo Cup Co.,*
  176 NLRB 823 (1969) ......................................................................................... 42

*Spartan Plastics,*
  269 NLRB 546 (1984) ..................................................................................... 25, 26

*Squier Distrib. Co. v. Teamsters Loc. 7,*
  801 F.2d 238 (6th Cir. 1986) ............................................................................... 27

**Cases**                                                                         **Page(s)**

*St. Louis Car Co.*,
108 NLRB 1523 (1954) ............................................................................... 32

*St. Paul Park Ref. Co., LLC v. NLRB*,
929 F.3d 610 (8th Cir. 2019) ...................................................................... 29

*Stephens Media, LLC v. NLRB*,
677 F.3d 1241 (D.C. Cir. 2012) ............................................................ 23, 27

*Sturgis Newport Bus. Forms, Inc. v. NLRB*,
563 F.2d 1252 (5th Cir. 1977) .............................................................. 21, 50

*T.I.M.E.—DC, Inc. v. NLRB*,
504 F.2d 294 (5th Cir. 1974) ...................................................................... 32

*Taylor Chair Co.*,
292 NLRB 658 (1989), *aff'd mem.*,
899 F.2d 12 (5th Cir. 1990) ........................................................................ 48

*Teamsters Loc. Union No. 171 v. NLRB*,
863 F.2d 946 (D.C. Cir. 1988) .................................................................... 35

*Teksid Aluminum Foundry*,
311 NLRB 711 (1993) ................................................................................. 46

*Textile Workers Union v. Darlington Mfg. Co.*,
380 U.S. 263 (1965) .................................................................................... 36

*Torbitt & Castleman, Inc. v. NLRB*,
123 F.3d 899 (6th Cir. 1997) ...................................................................... 35

*Tradewaste Incineration*,
336 NLRB 902 (2001) ........................................................................... 20, 25

**Cases**                                                                    **Page(s)**

*TRW, Inc. v. NLRB*,
  654 F.2d 307 (5th Cir. 1981)............................................................. 49

*TRW-United Greenfield Div. v. NLRB*,
  637 F.2d 410 (5th Cir.1981)................................................... 36, 37, 44

*TRW-United Greenfield Div.*,
  245 NLRB 1135 (1979), *enforced*,
  637 F.2d 410 (5th Cir.1981)..................................................... 43

*U.S. Marine Corp. v. NLRB*,
  944 F.2d 1305 (7th Cir. 1991)........................................................ 17

*UNF W., Inc. v. NLRB*,
  844 F.3d 451 (5th Cir. 2016)....................................... 16, 26, 37, 40, 46

*United Nurses Ass'ns of Cal. v. NLRB*,
  871 F.3d 767 (9th Cir. 2017)........................................................ 19

*United Servs. Auto. Ass'n v. NLRB*,
  387 F.3d 908 (D.C. Cir. 2004) ........................................ 19, 24, 32, 33

*United Supermarkets, Inc. v. NLRB*,
  862 F.2d 549 (5th Cir. 1989)........................................................ 15

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951) ............................................................... 15

*Va. Elec. & Power Co. v. NLRB*,
  319 U.S. 533 (1943) ............................................................... 55

**Cases**                                                             **Page(s)**

*Veritas Health Servs., Inc. v. NLRB*,
  671 F.3d 1267 (D.C. Cir. 2012) ................................................................ 18

*Visador Co.*,
  245 NLRB 508 (1979), *enforced in part mem.*,
  628 F.2d 1352 (4th Cir. 1980) ............................................................. 52, 53

*Wake Elec. Membership Corp.*,
  338 NLRB 298 (2002) ............................................................................ 54

*Wal-Mart Stores, Inc.*,
  340 NLRB 637 (2003), *enforced as modified*,
  400 F.3d 1093 (8th Cir. 2005), *overruled on other grounds*,
  *Wynn Las Vegas, LLC*, 369 NLRB No. 91 (2020) ................................ 52

*Williams Litho Serv., Inc.*,
  260 NLRB 773 (1982) ............................................................................ 55

*Williams Motor Transfer*,
  284 NLRB 1496 (1987) .......................................................................... 36

*Woelke & Romero Framing, Inc. v. NLRB*,
  456 U.S. 645 (1982) ............................................................................... 17

*Wright Elec., Inc. v. NLRB*,
  200 F.3d 1162 (8th Cir. 2000) ............................................................... 19

*Wright Line*,
  251 NLRB 1083 (1980), *enforced on other grounds*,
  662 F.2d 89 (1st Cir. 1981), *approved in NLRB v. Transp. Mgmt. Corp.*,
  462 U.S. 393 (1983) ........................................................................... 27, 33

**Statutes and Constitutional Provisions**                    **Page(s)**

National Labor Relations Act, as amended
  (29 U.S.C. § 151 et seq.)

Section 7 (29 U.S.C. § 157) .............................. 17, 18, 20, 21, 26, 27, 43, 45, 46, 57
Section 8(a)(1) (29 U.S.C. § 158(a)(1)).........2, 12, 17, 18, 26, 28, 34, 37, 42, 50-53
Section 8(a)(3) (29 U.S.C. § 158(a)(3))................................................ 2, 12, 17, 18
Section 8(b)(4)(ii)(B) (29 U.S.C. § 158(b)(4)(ii)(B))..................................... 50, 51
Section 8(c) (29 U.S.C § 158(c)) ............................................................. 34, 38, 50
Section 10(a) (29 U.S.C. § 160(a)) ...................................................................... 1
Section 10(b) (29 U.S.C. § 160(b))..................................................................... 54
Section 10(c) (29 U.S.C. § 160(c)) ...................................................................... 55
Section 10(e) (29 U.S.C. § 160(e)) ........................................................... 1, 15, 17
Section 10(f) (29 U.S.C. § 160(f)) ....................................................................... 1

U.S. Const. amend. I ................................................. 14, 34, 38, 49, 50, 51


**Other Materials**                                              **Page(s)**

*FDRLST Media, LLC v. NLRB*, 3d Cir. Nos. 20-3434, 20-3492, ECF No. 55,
  NLRB Br. (filed June 7, 2021)........................................................................ 35

https://twitter.com/elonmusk/status/998454539941367808 ............................. 11, 47

https://twitter.com/elonmusk/status/999415738967277568 ................................... 47

https://help.twitter.com/en/using-twitter/delete-tweets .......................................... 56

Model Rules of Prof'l Conduct R. 3.3(a)(1)........................................................... 35

## JURISDICTIONAL STATEMENT

This case is before the Court on the petitions of Tesla, Inc. and International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO to review, and the cross-application of the National Labor Relations Board to enforce, the Board's Order against Tesla, reported at 370 NLRB No. 101 (Mar. 25, 2021). (ROA.6239-93.) The Board had jurisdiction over the unfair-labor-practice proceeding under Section 10(a) of the National Labor Relations Act ("the Act"). 29 U.S.C. § 160(a). The Court has jurisdiction under Section 10(e) and (f) of the Act, and venue is proper because Tesla does business within this Circuit. 29 U.S.C. § 160(e) and (f). The Act provides no time limit for petitions or cross-applications.

## INTRODUCTION

This case arises from Tesla's unlawful responses to its employees' statutorily protected efforts to secure union representation and better working conditions. As the Board found, Tesla repeatedly coerced, threatened, and discriminated against its employees.

Tesla now concedes most of its unfair labor practices. It only disputes that it must: (1) reinstate a prominent union supporter discharged for responding untruthfully to an unlawful interrogation about union activity, and (2) direct its CEO to delete an unlawful threat he posted on Twitter. The Union, for its part,

only challenges the Board's findings that: (1) Tesla did not also unlawfully solicit employee grievances, and (2) a notice-reading remedy was not appropriate. Those limited challenges are meritless.

## ISSUE STATEMENT

1.  Whether the Board is entitled to summary enforcement of the uncontested portions of its Order.

2.  Whether substantial evidence supports the Board's findings that Tesla violated Section 8(a)(3) and (1) of the Act by discharging Richard Ortiz for his union activity.

3.  Whether substantial evidence supports the Board's finding that Tesla violated Section 8(a)(1) by threatening employees with loss of benefits if they unionized.

4.  Whether the Board reasonably found that Tesla did not violate Section 8(a)(1) by soliciting employee grievances.

5.  Whether the Board acted within its broad remedial discretion in requiring Tesla to direct Musk to delete his unlawful tweet, and in declining to order notice reading.

## STATEMENT OF THE CASE

**I.    The Board's Factual Findings**

**A.    Richard Ortiz and Jose Moran Lead a Union-Organizing Campaign at Tesla**

Tesla manufactures electric vehicles at a plant in Fremont, California. (ROA.6251-52; ROA.86-87.)  In the summer of 2016, its employees initiated a union-organizing campaign.  Richard Ortiz, Jose Moran, and several other employees took leadership roles.  (ROA.6251, 6254; ROA.57-59, 98-99, 444-45, 689-90.)  Moran created, and administered with Ortiz, a private Facebook group limited to hourly Tesla employees:  "Tesla Employees for UAW Representation." (ROA.6255; ROA.447-48, 582-84, 691-92.)

**B.    Tesla Prohibits Unauthorized Media Communication**

Early in the campaign, Tesla required all employees to sign a confidentiality agreement that stated, in relevant part, "regardless of whether information has already been made public, it is never OK to communicate with the media . . . about Tesla, unless you have been specifically authorized in writing to do so." (ROA.6240, 6255-56; ROA.386, 1185, 3200.)

**C.    Tesla Interferes with Distribution of Union Materials**

On February 9, 2017, Moran published an article online, criticizing high injury rates and low wages at Tesla and calling for employees to unionize. (ROA.6255; ROA.703-04, 3779-81.)  On February 10, Ortiz and other off-duty

3

employees handed out leaflets in Tesla's parking lot bearing the article and a letter from state legislators questioning the legality of Tesla's confidentiality agreement. (ROA.6255; ROA.118, 447, 465-71, 2916-17.)  Tesla representatives repeatedly told them to leave.  (ROA.6258-60, 6262-63; ROA.106-11, 122, 134, 138-41, 705-19.)  On February 24, Tesla CEO Elon Musk emailed employees, defending Tesla's safety record and wages, and stating that he was "distraught" that Moran was promoting the Union, which "does not share our mission."  (ROA.6255; ROA.4839-40.)  On March 23, a supervisor told employees that distribution of materials Tesla had not approved would be grounds for termination.  (ROA.6263-64; ROA.859-60.)

D. **Ortiz and Jonathan Galescu Obtain Injury Logs; Tesla Interrogates Them**

In April, Ortiz and employee Jonathan Galescu requested logs documenting work-related injuries, to which they were entitled under California law. (ROA.6264-65; ROA.483, 861-63, 2939-41.)  After multiple demands, Tesla provided the unredacted logs.  (ROA.6264-65; ROA.3181-82, 3540.)  On May 24, Ortiz and other employees distributed a union leaflet documenting high injury rates outside the facility.  Security guards ordered an employee to leave.  (ROA.6260-61, 6265; ROA.404-17, 491-93, 2919-20, 4500-04.)

That day, at the direction of Senior Director of Human Resources Josh Hedges, two Tesla officials questioned Ortiz and Galescu separately about what

4

they had done with the logs.  Ortiz denied doing anything.  (ROA.6265; ROA.496-500, 1130, 2385.)  Galescu refused to answer, but later reported he had shared the logs with the Union.  (ROA.6265-66; ROA.873-78, 3184-86.)

> **E.    Moran Delivers a Safety Petition; Tesla Executives Listen to His Concerns**

On June 6, Moran gave Hedges an employee petition expressing safety concerns and advocating union representation.  Moran emailed a copy to Musk, requesting that Tesla reply to him.  (ROA.6244-45, 6268; ROA.501, 720-21, 3192, 3772-74.)  The next day, Hedges summoned Moran to meet with Musk and Chief People Officer Gaby Toledano, and Moran brought employee Tony Vega.  At the meeting, Toledano acknowledged the petition and offered to hear Moran's concerns.  (ROA.6268-69; ROA.728-31.)  After listening, Toledano said it would be a "good idea" for Moran and Vega to attend Tesla's regular safety meetings.  (ROA.6269; ROA.732-35.)  Musk said if that did not work out, "we'll give you your union."  (ROA.6244; ROA.735.)

On June 12, Ortiz emailed Hedges and Musk to describe a safety incident.  (ROA.6269; ROA.3795-98.)  In resulting email discussions with managers, Musk proposed that Moran and Galescu join Tesla's safety team.  Toledano responded that it was "super smart" to "turn adversaries into those responsible for the problem" by assigning them to work on safety "vs work to pull in the [Union]," and Musk agreed.  (ROA.6269; ROA.3795.)  In another email, Toledano said she

would confirm whether, if those employees joined the safety team, "they would be considered part of management and not eligible to advocate for a union." (ROA.6269-70; ROA.3795.)

In July, prounion employees gave Hedges a petition about pay. A picture of Ortiz and other employees who delivered it appeared on the Union's public Tesla-campaign Facebook page, "A Fair Future at Tesla." (ROA.6268 n.52; ROA.503-04, 3190, 3226.)

### F. A Supervisor Threatens that Unionizing Would Be Futile

In August, a welder told his supervisor that a union would help ensure fair promotions. The supervisor responded, "The Union's never getting in here. This is Tesla." (ROA.6276; ROA.250-51.)

### G. Moran and Ortiz Use Workday To Post About Antiunion Employees' Public Comments on a Prounion Facebook Page

In late August, Ortiz traveled with union organizers to Sacramento, California, to encourage state legislators to add worker-safety requirements, which Tesla opposed, to the state's electric-vehicle rebate program. (ROA.6277; ROA.505-09, 629-30.) The Union posted a photograph of him lobbying on its public Tesla-campaign Facebook page. (ROA.6277; ROA.3228.) In September, at Toledano's request, Hedges brought employees Travis Pratt and Shaun Ives to Sacramento, on paid time, to oppose the legislation. (ROA.6277, 6279;

ROA.1198-1200, 1230, 1248, 1264-65.)  Pratt publicly testified that he earned $130,000.  (ROA.6277; ROA.2530, 4832.)

A union organizer sent Ortiz a video of the hearing, which he could not open.  Ortiz texted it to Moran for help identifying the employees.  (ROA.6277-78; ROA.511-14, 528, 3218-23.)  After viewing the video, Moran searched for the employees on "Workday," a program that allows Tesla employees to update their contact information, fill out human-resources paperwork, message each other, and view coworkers' profiles.  At the time, Tesla had no policy restricting employees' Workday use.  (ROA.6252-53, 6278, 6284-85; ROA.403-04, 455-57, 687-88, 739-40, 778, 849, 1150-51, 1900.)  Moran texted screenshots of Ives's and Pratt's Workday profiles to Ortiz.  His own Workday profile picture was visible in the screenshots.  (ROA.6278; ROA.519-21, 738-43, 2275-77, 3194.)

Ortiz posted the two screenshots on the private, prounion Facebook page.  Only Pratt's name and job title were displayed.  (ROA.6278; ROA.522, 3194.)  Ortiz's caption stated that the pictured employees had "been in Sacramento saying we are lying about how things are at Tesla," with one saying "he made $130000 last year."  (ROA.6278; ROA.3194.)  It continued, "This just proves how much kissing ass and ratting on people get you at Tesla and the ones that do the real work get passed over."  (ROA.6278; ROA.3194.)  When Pratt messaged Ortiz objecting

7

to "name calling," Ortiz immediately removed the post. (ROA.6278; ROA.529-30, 4712.)

Pratt sent a screenshot of Ortiz's post to Hedges, writing, "Looks like we got under some people's skin," with a smiling emoji. (ROA.6278; ROA.3194.) Hedges responded, "Wow. This is on Facebook?" (ROA.6278; ROA.3194.) Pratt wrote, "Yea lol I'm pretty sure it's on their fair future at Tesla thing." (ROA.6278; ROA.3194.) After speaking with Pratt, Hedges submitted a complaint to Tesla's employee-relations team and contacted Ricky Gecewich, a Tesla investigator. Hedges showed Gecewich the post and explained why Pratt and Ives had been in Sacramento. (ROA.6278-79; ROA.1202, 1253, 1821-23, 1915-18.)

## H. Tesla Interrogates Ortiz and Moran About Their Union Activities

On September 19, Gecewich contacted Pratt. Pratt told him the post was on a union Facebook page and said he was uncomfortable with Ortiz speculating about his earnings, posting his name and picture, and commenting about sucking up. (ROA.6279; ROA.1828-29.) Pratt acknowledged that when he complained, Ortiz removed the post. (ROA.6279; ROA.1933.)

On September 21, Gecewich summoned Ortiz to a meeting and showed him the post. Ortiz apologized and explained that he had removed it "as quick as [he] could" after Pratt contacted him. (ROA.6280; ROA.531-32, 1842-43.) Gecewich

8

repeatedly asked where Ortiz had gotten the pictures he posted. Ortiz said he received them via text, but did not recall from whom. (ROA.6280; ROA.534-38.)

On September 22, Gecewich asked a coworker to obtain Workday logs showing who had viewed Pratt's and Ives's profiles. (ROA.6280; ROA.4717-18.) On September 28, he followed up, writing that the case was "being closely monitored" by Toledano and he was "providing updates as they come in." (ROA.6280; ROA.4717.) On October 4, he again requested an update for Toledano on the "sensitive request." (ROA.6280; ROA.4717.) On October 6, Gecewich received the logs and recognized Moran as the employee pictured in miniature on the screenshots. (ROA.6281; ROA.2296, 4716.)

Gecewich met with Moran on October 12. (ROA.6281; ROA.743-44.) He asked why Moran had taken Workday-profile screenshots. Moran said that Pratt and Ives had testified about union-related issues and he wanted to confirm they were Tesla employees. For the campaign, he explained, it was important to know who opposed the union. (ROA.6281; ROA.747-49, 1856, 1920, 1855-56, 1920, 1966-68, 2308.) He provided screenshots of his texts sending the profiles to Ortiz. (ROA.6281; ROA.751.)

Later that day, Gecewich met with Ortiz again. Ortiz admitted Moran had sent the screenshots. (ROA.6281; ROA.544-45, 1863.) He explained that in the

previous meeting he had sought to protect Moran by not naming him. (ROA.6281; ROA.1865.)

### I. Tesla Discharges Ortiz, Promulgates a New Workday Rule, and Warns Moran for Having Violated It

Gecewich recommended discharging Ortiz and warning Moran. Hedges agreed, and they selected Director of Body Manufacturing Stephan Graminger as the decisionmaker for Ortiz. (ROA.6282; ROA.1204-05, 1240, 1928-29.) Gecewich's report to Graminger stated that Pratt had complained about Ortiz's Facebook post "based on the content of the message and because he understood Workday was an internal Tesla HR system intended for work purposes and not for broader distribution on social media." (ROA.6282; ROA.4760.) It also stated that a union representative had asked Moran to verify Pratt's and Ives's employment. (ROA.6282; ROA.4761.) Gecewich told Graminger that Ortiz and Moran had "leaked some internal information out of Workday including some telephone number and personal information and posted it on Facebook." (ROA.6282; ROA.1306.) After Gecewich and another manager told him that similar cases had been treated the same, Graminger approved Ortiz's discharge. (ROA.6283; ROA.1306-08, 1311-12, 1319-20.) He did not base the decision on any specific Tesla policy. (ROA.6283; ROA.1316-17, 1326.)

Tesla discharged Ortiz on October 18 and disciplined Moran the next day. (ROA.6283; ROA.545-47.) Gecewich told Ortiz that he had been dishonest in an

investigation and warned Moran that Workday was only for official business purposes.  (ROA.6283-84; ROA.545-47, 2088, 2331, 3788, 4720.)

### J. Tesla's CEO Threatens that Employees Will Lose Stock Options if They Unionize

Tesla CEO Musk maintains a Twitter account with approximately 22,700,000 followers, where he posts about Tesla's business plans, finances, and personnel matters.  (ROA.6288; ROA.4755-56.)  On May 20, Musk tweeted, in response to a question about his views on unions:

> Nothing stopping Tesla team at our car plant from voting union.  Could do so tmrw if they wanted.  But why pay union dues & give up stock options for nothing?  Our safety record is 2X better than when plant was UAW & everybody already gets healthcare.

(ROA.6288; ROA.4505.)[1]  At least one Tesla employee saw the tweet. (ROA.6289; ROA.755.)

## II. The Proceedings Before the Board

Acting on unfair-labor-practice charges filed by the Union, Ortiz, and two other employees, the Board's General Counsel issued a consolidated complaint against Tesla alleging numerous violations of the Act.  (ROA.6251; ROA.2744-48, 2788-2802.)  Following a hearing, an administrative law judge issued a recommended decision and order finding most alleged violations.  (ROA.6281-93;

---

[1]  https://twitter.com/elonmusk/status/998454539941367808 (last visited Sept. 28, 2021).

ROA.5887-5970.)  Tesla and the General Counsel filed exceptions with the Board. (ROA.6239; ROA.5994-6023, 6029-31.)

## III.    The Board's Conclusions and Order

The Board (Chairman McFerran and Members Emanuel and Ring) found that Tesla violated Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by: coercively interrogating employees on five occasions; restricting employees' use of Workday in response to protected activity; threatening employees with loss of stock options if they unionized; and maintaining a confidentiality agreement that employees would reasonably interpret to interfere with protected activity. (ROA.6239-43.)  It further found that Tesla violated Section 8(a)(3) and (1), 29 U.S.C. § 158(a)(3) and (1), by discharging Ortiz and warning Moran. (ROA.6239.)  In the absence of exceptions, the Board affirmed the judge's findings that Tesla violated Section 8(a)(1) by:  twice interfering with employees' distribution of union leaflets; prohibiting employees from, and threatening them with discharge for, distributing union materials; and threatening that unionization would be futile.  (ROA.6239 n.1.)  The Board also dismissed several allegations (ROA.6239 n.1), including that Tesla unlawfully solicited employee grievances (ROA.6243-46 & n.17 (Chairman McFerran, dissenting)).  The Board severed and retained for further consideration other allegations.  (ROA.6239 n.3, 6249.)

The Board ordered Tesla to: cease and desist from the violations found; rescind or revise the unlawful portion of its confidentiality agreement; rescind its unlawful rules regarding distribution of union materials and employee use of Workday; direct Musk to delete the unlawful tweet and ensure compliance; offer Ortiz reinstatement and make him whole; remove from its files any reference to Moran's unlawful warning; and post a remedial notice at its facilities nationwide concerning the threat, and one at its Fremont facility concerning the violations it committed there. (ROA.6246-51.) The Board declined (Chairman McFerran, dissenting) to order a notice-reading remedy. (ROA.6247 & n.19.)

## SUMMARY OF ARGUMENT

1. The Board is entitled to summary enforcement of the portions of its Order Tesla fails to contest. The many uncontested violations provide context for the remaining issues, demonstrating Tesla's hostility to the Union and its disregard for employee rights, and undermining the limited challenges Tesla raises.

2. Substantial evidence supports the Board's finding that Tesla unlawfully discharged Ortiz for his protected union activity. It is well established that the Act protects employee efforts to shield union activity from employer probing. As Tesla knew, Ortiz and Moran engaged in union activity when they confirmed that Tesla's antiunion speakers were employees and responded to them on Facebook. Tesla had no legitimate justification for requiring Ortiz to reveal

13

who gave him the speakers' Workday-profile screenshots, which undisputedly did not contravene any then-existing Tesla policy. And Ortiz reasonably understood that Tesla was prying into union activity when it made that demand. Because Ortiz was entitled to keep union activity confidential, Tesla's assertion that he was discharged for doing so is a confession of unlawful motivation. Even if the issue is analyzed under a mixed-motive framework, as Tesla prefers, substantial evidence supports the Board's alternative finding that Ortiz's union activity was a motivating factor in the discharge, and Tesla did not establish that it would have discharged him absent that activity.

3.     Substantial evidence supports the Board's finding that Tesla unlawfully threatened employees. As myriad Board and Court decisions hold, it is unlawful coercion for an employer to communicate that benefits will be lost automatically if employees unionize. That is the run-of-the-mill threat Musk conveyed by tweeting, without explanation, that employees would "give up stock options" if they voted for the Union. Under settled law, Musk's and Tesla's later attempts to spin the tweet could not alter and did not disavow the initial coercive message. As a threat, Musk's tweet is "without the protection of the First Amendment." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969).

4.     The Board reasonably found that Tesla did not unlawfully solicit employee grievances and implicitly promise to remedy them. Tesla lawfully

14

listened to employee safety concerns and continued its preexisting policy of encouraging employee participation in safety meetings.

5. Neither Tesla nor the Union establishes an abuse of the Board's broad remedial discretion. In particular, Tesla is legally responsible for its CEO's unrepudiated threat, which remains on public display. The requirement that Tesla take steps to end that unlawful exhibition is well within the Board's authority.

## STANDARD OF REVIEW

"This Court's authority to review a Board order is narrowly limited." *NLRB v. Delta Gas., Inc.*, 840 F.2d 309, 310 (5th Cir. 1988). The Board's findings of fact are "conclusive" if supported by substantial record evidence. 29 U.S.C. § 160(e). The Court will not disturb them even if it would have made a contrary determination de novo. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88 (1951); *United Supermarkets, Inc. v. NLRB*, 862 F.2d 549, 551 (5th Cir. 1989).

The Court "will affirm the Board's legal conclusions if they have a reasonable basis in the law and are not inconsistent with the [Act]." *In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707, 714 (5th Cir. 2018) (quotation omitted). Recognizing "the Board's primary responsibility for administering the Act and its expertise in labor relations," the Court gives "significant deference to the Board's application of the law to the facts." *Id. Accord Nat'l Fabricators, Inc. v. NLRB*, 903 F.2d 396, 399 (5th Cir. 1990).

**ARGUMENT**

**I.  The Board Is Entitled to Summary Enforcement of the Portions of Its Order Remedying Uncontested Violations**

An employer waives challenges to a Board order that it does not raise in its opening brief.  *Remington Lodging & Hosp., LLC v. NLRB*, 847 F.3d 180, 186 n.24 (5th Cir. 2017).  By contesting only the portions of the Board's Order requiring "deletion of Musk's tweet" (Tesla.27) and "Ortiz's reinstatement" (Tesla.52), Tesla concedes that the Board is otherwise entitled to enforcement.  *El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 658 (5th Cir. 2012).  Specifically, the Board is entitled to summary enforcement of the provisions of its Order remedying the following violations of the Act:

1. Interfering with employee leafletting.  (ROA.6239 n.1, 6258-63.) *NLRB v. Roney Plaza Apts.*, 597 F.2d 1046, 1050 (5th Cir. 1979).

2. Prohibiting employees from, and threatening them with discharge for, distributing union materials without approval.  (ROA.6239 n.1, 6263-64.)  *NLRB v. Intermedics, Inc.*, 715 F.2d 1022, 1025 (5th Cir. 1983).

3. Threatening that selecting the Union would be futile.  (ROA.6239 n.1, 6276-77.)  *UNF W., Inc. v. NLRB*, 844 F.3d 451, 459 (5th Cir. 2016).

4. Prohibiting employees from communicating with the media about their employment.  (ROA.6240-43.)  *Lowes Home Ctrs., LLC v. NLRB*, 850 F. App'x 886, 889-90 (5th Cir. 2021) (per curiam).

5. Interrogating Ortiz, Galescu, and Moran about union activities. (ROA.6239, 6264-67, 6288.)  *NLRB v. Brookwood Furniture*, 701 F.2d 452, 460-63 (5th Cir. 1983).

6. Promulgating a rule restricting Workday use in response to Ortiz and Moran's union activity. (ROA.6239, 6287-88.) *NLRB v. Gallup Inc.*, 62 F. App'x 557 (5th Cir. 2003) (per curiam).

7. Disciplining Moran for his union activity. (ROA.6239, 6284-88; *see* pp.17-18, 27-28.)[2]

Those uncontested violations supply "the context in which the remaining issues are considered." *U.S. Marine Corp. v. NLRB,* 944 F.2d 1305, 1314-15 (7th Cir. 1991) (en banc) (quotation and brackets omitted). *Accord Radisson Plaza Minneapolis v. NLRB*, 987 F.2d 1376, 1382 (8th Cir. 1993). *See, e.g.*, *Frazier Indus. Co. v. NLRB*, 213 F.3d 750, 759 (D.C. Cir. 2000) (uncontested Section 8(a)(1) violations supported Board's finding of unlawful discharge).

## II. Substantial Evidence Supports the Board's Finding that Tesla Violated Section 8(a)(3) and (1) of the Act by Discharging Ortiz

Section 7 of the Act guarantees employees "the right to self-organization, to form, join, or assist labor organizations" and "to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 8(a)(3) prohibits employer discrimination to "discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). A violation of Section 8(a)(3) also violates Section 8(a)(1), 29 U.S.C. § 158(a)(1),

---

[2] Aside from Tesla's appellate waiver, the Court would lack jurisdiction to review the first three violations under Section 10(e) of the Act, 29 U.S.C. § 160(e), because Tesla did not except to them before the Board. (ROA.6239 n.1.) *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665-66 (1982).

which bars interference with Section 7 rights.  *Metro. Edison Co. v. NLRB*, 460

U.S. 693, 698 n.4 (1984).

"It is elementary that an employer violates section 8(a)(3) and (1) of the Act

by discharging employees because of their union activity."  *NLRB v. ADCO Elec.*

*Inc.*, 6 F.3d 1110, 1116 (5th Cir. 1993).  "More often than not, the employer's

motive is the critical question in such cases."  *Id.*  Whether a discharge was

unlawfully motivated is a question of fact, and the Court will "not lightly displace

the Board's factual finding of discriminatory intent."  *Brookwood*, 701 F.2d at 464.

Where the employer's admitted reason for the discharge was itself protected union

activity, the admission "constitutes substantial evidence of unlawful motive

sufficient to withstand [the Court's] deferential standard of review."  *Remington*,

847 F.3d at 184.

A.     **Tesla Unlawfully Discharged Ortiz for His Protected Response to Unlawful Interrogation About Union Activity**

1.     **The Act protects employee efforts to conceal union activity**

"It is well settled that Section 7 of the Act gives employees the right to keep

confidential their union activities."  *Veritas Health Servs., Inc. v. NLRB*, 671 F.3d

1267, 1274 (D.C. Cir. 2012) (Kavanaugh, J.) (quoting *Guess?, Inc.*, 339 NLRB

432, 434 (2003)).  That "right to privacy" is "necessary to full and free exercise of

the organizational rights guaranteed by the [Act]."  *Pac. Molasses Co. v. NLRB*

*Reg'l Off. No. 15*, 577 F.2d 1172, 1182 (5th Cir. 1978).  And the Board "zealously

seeks to protect the confidentiality interests of employees because of the possibility of intimidation by employers who obtain the identity of employees engaged in organizing." *Wright Elec., Inc. v. NLRB*, 200 F.3d 1162, 1165 (8th Cir. 2000). *Accord United Nurses Ass'ns of Cal. v. NLRB*, 871 F.3d 767, 785 (9th Cir. 2017); *Nat'l Tel. Directory Corp.*, 319 NLRB 420, 421 (1995).

The Board, accordingly, has long held that the Act protects an employee's efforts to conceal union activity from employer probing. *See NLRB v. Laredo Coca Cola Bottling Co.*, 613 F.2d 1338, 1342 n.7 (5th Cir. 1980) (endorsing Board's rule that employees are "entitled to keep from [the] employer" their views on union matters). If an employee has a "reasonable basis" for believing that the employer is attempting to pry into protected union activity, an evasive or untruthful response concerning that activity is not a lawful basis for discharge. *Paragon Sys., Inc.*, 362 NLRB 1561, 1565 (2015). *See United Servs. Auto. Ass'n v. NLRB*, 387 F.3d 908, 917 (D.C. Cir. 2004) ("dishonesty about [employee's] protected concerted activity did not constitute a lawful reason to discharge her"); *Daco Indus. of Miss., Inc.*, 207 NLRB 968, 969-70 (1973) (employer "could not complain because [employee] did not respond truthfully" to questioning about union activity). In sum, an employer cannot justify a discharge "by pointing to evasive statements by an employee in response to questioning inextricably

involved with the employee's protected conduct." *Cordua Rests., Inc. v. NLRB*, 985 F.3d 415, 429 (5th Cir. 2021).

At the same time, an employer may lawfully investigate "facially valid complaints of employee misconduct," provided that the questions are "reasonably tailored" to focus on a "legitimate business interest." *Fresenius USA Mfg., Inc.*, 362 NLRB 1065, 1065 (2015). In that circumstance, if an employee has "no reasonable basis" for believing that the employer is seeking to pry into union activity or that employees will suffer reprisals, the employee may have no legitimate interest in lying to shield protected activity. *Id. Compare Fed.-Mogul Corp. v. NLRB*, 566 F.2d 1245, 1259 (5th Cir. 1978) (lawful discharge for lying about absenteeism unrelated to protected activity), *with Roney*, 597 F.2d at 1050-51 (false denial of protected activity "cannot stand" as reason for discharge), *and Tradewaste Incineration*, 336 NLRB 902, 907 (2001) (unlawful to discharge employee for untruth about protected activity unrelated to his job performance or employer's business).

The Board's rule accords with the practical reality that employers can expect less-than-candid responses to questions that invade employees' Section 7 confidentiality. *See Aladdin Indus., Inc.*, 147 NLRB 1392, 1407 (1964) (noting employees' "normal reluctance to divulge" protected activity to employer). And it is consistent with the settled principle that untruthful answers to questioning about

union activity are evidence of employer coercion—not employee misconduct. *See Sturgis Newport Bus. Forms, Inc. v. NLRB*, 563 F.2d 1252, 1256 (5th Cir. 1977); *Jays Foods, Inc. v. NLRB*, 573 F.2d 438, 444 (7th Cir. 1978); *NLRB v. Syracuse Color Press*, 209 F.2d 596, 599-600 (2d Cir. 1954). If such untruthfulness were a lawful basis for discharge, an employer could easily rid itself of union supporters by asking questions about protected activity likely to provoke evasion.

### 2. Ortiz had no obligation to disclose his or Moran's protected activities to Tesla

As the Board found (ROA.6284-85), Ortiz reasonably understood that Gecewich sought to pry into union activity when he demanded the source of the Workday screenshots. Ortiz's dishonest response therefore was not unprotected "misconduct," as Tesla asserts (Tesla.60), and it could not justify his discharge.

As an initial matter, Tesla does not dispute that Ortiz and Moran's sharing of Workday profiles was union activity. As the Board found, it was part of a protected course of conduct in which Ortiz: travelled to lobby state legislators in support of a union-sponsored worker-safety initiative (ROA.6284-85);[3] jointly

---

[3] *See Eastex, Inc. v. NLRB*, 437 U.S. 556, 566 (1978) ("[E]mployees' appeals to legislators to protect their interests as employees are within the scope of [Section 7]."); *Blue Circle Cement Co. v. NLRB*, 41 F.3d 203, 210 (5th Cir. 1994) (employee's efforts in support of union's goals were protected).

administered a prounion Facebook page with Moran (ROA.6255, 6285);[4] and

worked with Moran to identify and respond to employees who publicly opposed

union goals (ROA.6284-85).[5]

There can be no doubt that Gecewich's goal at the September 21 meeting

was to pry into Ortiz and Moran's union activity. At that point, he understood the

union context surrounding the screenshots. (ROA.6278-80, 6288.) As described

above (p.8), Pratt made clear to Hedges that Ortiz's post was a response to his

antiunion testimony in Sacramento—which Hedges, in turn, explained to

Gecewich. Gecewich's report confirms that he interviewed Ortiz that day "to

understand how [Ortiz] obtained the Workday screenshots." (ROA.4760.) But

Gecewich could tell from the screenshots themselves—which bore a picture of

another employee—that Ortiz had received them from a coworker. What

Gecewich did not yet know, and sought to discover with the question that

provoked Ortiz's lie, was the identity of that collaborator.

As the Board reasonably found (ROA.6285; *contra* Tesla.62-64), Gecewich

had no legitimate business reason to demand that identifying information from

Ortiz. Tesla's asserted interest in investigating Pratt's claims of harassment cannot

---

[4] *See N.W. Elec. Coop.*, 366 NLRB No. 132, 2018 WL 3495117, at *1 n.1 (2018) (protected Facebook posts on workplace safety).

[5] *See Bakersfield Mem'l Hosp.*, 305 NLRB 741, 746 (1991) (warning coworkers about antiunion employees is protected).

justify that question. To the extent any such concern may have motivated Tesla's investigation, it was addressed at the outset when Ortiz immediately admitted that he had posted, then removed, the Facebook message. (ROA.6280.) With nothing more to ask about harassment, Gecewich "chose to disregard the original complaint" and initiate his "own investigation into the Workday profile screenshots." (ROA.6285.) Tesla attacks (Tesla.62) the Board's characterization of Pratt's harassment claim as "specious" (ROA.6285). But the Board's point was not that an employer has no legitimate interest in investigating such claims. Rather it is that Gecewich did not seek to identify Ortiz's collaborator in furtherance of a harassment investigation—a finding amply supported in the record.

The legitimacy of the question that provoked Ortiz's lie thus hinges on Tesla's interest in investigating a potential violation of restrictions on employees' Workday use. But as the Board found, Tesla had no such restrictions. (ROA.6285.) *Cf. Stephens Media, LLC v. NLRB*, 677 F.3d 1241, 1256 (D.C. Cir. 2012) (employer unlawfully discharged employee for secretly recording meeting when "no then-existing company policy prohibit[ed]" such recordings). Gecewich conceded that there was no policy "regarding Workday being used for legitimate and official business purposes only." (ROA.1900.) And there was certainly no prohibition on employees sharing Workday profile pictures among themselves. The Board found that Tesla only promulgated Workday restrictions in response to

23

Ortiz and Moran's protected conduct—a separate, uncontested violation. (ROA.6239, 6287-88.) That finding is dispositive. In any event, Tesla's access to Workday records along with Moran's image on the screenshots allowed Tesla to determine their origin. There was thus no need to demand that information from Ortiz.

Ortiz, for his part, "reasonably understood that Gecewich was trying to learn about his protected activities when [Gecewich] repeatedly asked who sent him the Workday profile screenshots." (ROA.6285.) Ortiz was "scared to death" that he would be discharged and did not want to implicate Moran. (ROA.538, 543, 648.) That apprehension was justified: Tesla, as it no longer contests, unlawfully disciplined Moran for the union activity Ortiz tried to conceal. (ROA.6287.) *See Paragon*, 362 NLRB at 1565 (employees who reasonably believed employer "was attempting to pry into protected union activity" for which "they would suffer reprisal" could not be discharged for lying).

Under those circumstances, the Board reasonably found that Ortiz had no obligation to respond truthfully. (ROA.6285.) And the lie he told—that he could not recall who sent the screenshots—could not justify discharge because it related directly to union activity and had nothing to do with his job performance or Tesla's business. (*See* pp.19-20.) *E.g.*, *United Servs.*, 387 F.3d at 915-17 (employer unlawfully discharged employee for lying about who distributed flyers);

24

*Tradewaste*, 336 NLRB at 907 (lying about making flyer criticizing employer); *Spartan Plastics*, 269 NLRB 546, 552 (1984) (lying about authoring questions posed to management); *Aladdin*, 147 NLRB at 1407 (lying about involvement with union petition).

Tesla's cases (Tesla.62-63) do not support a different result. As the Board recognized (ROA.6285), the investigation in *Fresenius* "focused exclusively" on alleged, unprotected harassment and threats, and was "consistent with" the employer's extant anti-harassment policy. 362 NLRB at 1066. No such tailoring or preexisting policy justified Tesla's demands to know who gave Ortiz the screenshots. And in *Cellco Partnership v. NLRB*, the D.C. Circuit concluded that the employer appropriately asked about a conversation between two employees because one of them cited it as a defense to alleged misconduct. 892 F.3d 1256, 1264 (D.C. Cir. 2018). Disagreeing with the Board, the court concluded that the employer—unlike Tesla—was not "doing any more than conducting a valid inquiry with no motive to pry into or interfere with protected activities." *Id.* The court nonetheless reaffirmed the principle that governs this case: "employees are not obligated to answer truthfully if an employer is really seeking to probe into protected actions." *Id.* at 1263-64.

There is no merit to Tesla's assertion (Tesla.63-64) that the Board improperly relied on the coercive nature of Gecewich's interrogations to find

Ortiz's response protected. The Board's decision rests on the rule discussed above, which more broadly protects employee efforts to shield union activity from unwarranted employer prying. In any event, the unlawful coerciveness of the interrogation bolsters the Board's conclusion that Ortiz's evasion was protected. An employee "is obviously under no obligation to respond to unlawful coercion in any particular manner." *Spartan*, 269 NLRB at 552.

By failing to acknowledge or dispute it, Tesla has waived any appellate argument contesting the Board's reasonable finding that Tesla's interrogations of Ortiz were coercive under the "totality of the circumstances" (ROA.6288)— including Gecewich's intimidating role as investigator, the formality of the meeting, Tesla's history of violations, and Ortiz's unwillingness to respond forthrightly. *See UNF*, 844 F.3d at 461-62 (discussing factors Board considers to determine coerciveness of interrogation). And Tesla's failure to "demonstrate[] that its need for the information justifie[d] compromising its employees' Section 7 right to confidentiality" (ROA.6288) further supports the Board's finding that the interrogations violated Section 8(a)(1). *See Guess?*, 339 NLRB at 434 (interrogation about union activity is unlawful unless it is relevant to legitimate employer interest, does not have illegal objective, and employer's interest in obtaining information outweighs employee's Section 7 confidentiality interest).

As the Board found, "[t]he analysis regarding Ortiz' termination should end here." (ROA.6285.) Because Tesla admits that it discharged Ortiz for his protected response to Gecewich's questioning, this "is not a 'mixed motive' case requiring analysis under *Wright Line*." *Squier Distrib. Co. v. Teamsters Loc. 7*, 801 F.2d 238, 242 (6th Cir. 1986). *Accord, e.g.*, *Stephens*, 677 F.3d at 1251-52; *Am. Steel Erectors, Inc.*, 339 NLRB 1315, 1316 (2003). There is thus no need for the Court to review the Board's alternative finding that Tesla violated the Act under that framework. (ROA.6286.) In any event, substantial evidence supports that finding.

## B. The Discharge Was Unlawful Under *Wright Line*

Where—unlike here—an employer advances a facially lawful justification for a discharge, the Board evaluates the employer's motivation under *Wright Line*, 251 NLRB 1083, 1089 (1980), *enforced on other grounds*, 662 F.2d 889 (1st Cir. 1981), *approved in NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393 (1983). Within that framework, "[t]he Board may rely on circumstantial evidence to infer that an employee's protected activity was a motivating factor in an employer's decision to fire the employee." *Cordua*, 985 F.3d at 423. "In particular, the Board may infer a discriminatory motive where the evidence shows that: (1) the employee engaged in concerted activities protected by Section 7; (2) the employer knew of the employee's engagement in those activities; and (3) the employer harbored animus

27

toward the employee's protected activities." *Id.* If substantial evidence supports the Board's finding that union activity was a "motivating factor," the discharge is unlawful unless the record as a whole compels acceptance of the employer's affirmative defense that it would have taken the same action absent union activity. *Remington*, 847 F.3d at 183; *Delta*, 840 F.2d at 311.

Tesla does not dispute that Ortiz engaged in union activity. And as a manager admitted, his union activity was "common knowledge." (ROA.6286; ROA.2090.) Tesla only contests the Board's findings that union activity motivated Ortiz's discharge, and that Tesla did not establish that it would have discharged him regardless of that activity. (Tesla.52-61.)

### 1. Union activity was a motivating factor in Tesla's discharge decision

"Significant indicators for the Board in discerning employer motive" include "anti-union bias" and "open hostility to organized labor." *ADCO*, 6 F.3d at 1118 n.6. Tesla's contemporaneous, "vigorous and sometimes illegal antiunion campaign—including the [Section] 8(a)(1) violations directed at this employee—" strongly supports the Board's finding of unlawful motivation. *Brookwood*, 701 F.2d at 466. Tesla's multiple, undisputedly unlawful interrogations of Ortiz are especially clear "evidence tending to show discrimination." *Roney*, 597 F.2d at 1050 n.6. The individuals directly responsible for them—Hedges (ROA.6265) and Gecewich (ROA.6288)—also investigated Ortiz and recommended his discharge.

"A one-sided investigation into employee misconduct supplies significant evidence that disciplinary action was triggered by an unlawful motive." *NLRB v. Esco Elevators, Inc.*, 736 F.2d 295, 299 (5th Cir. 1984). As the Board found, Tesla "sought the result it desired." (ROA.6287.) It seized on a smiley-faced text about Ortiz's Facebook post to open an investigation, which it then redirected to discover who had aided him. (ROA.6286-87.) As the Board noted, Gecewich never bothered to talk to Ives, who was also pictured on Ortiz's post, or ask anyone but Ortiz and Moran about their use of Workday. (ROA.6287; ROA.1829, 1838, 2365.) *See St. Paul Park Ref. Co., LLC v. NLRB*, 929 F.3d 610, 617 (8th Cir. 2019) (inadequate investigation indicated unlawful motive). And Gecewich took the extraordinary step of providing running updates on the investigation to Toledano, the high-level manager who had asked Hedges to recruit speakers for Sacramento and who viewed Ortiz and other union supporters as "adversaries." (ROA.6279, 6280-81 n.90, 6287.)

Gecewich's repeated "attempt[s] to mislead" also indicate unlawful motivation. *Alpo Petfoods, Inc. v. NLRB*, 126 F.3d 246, 253 (4th Cir. 1997). In presenting his discharge recommendation, Gecewich falsely told Graminger that Ortiz and Moran "leaked some internal information out of [Workday] including some telephone number and personal information." (ROA.6282, 6287; ROA.1306.) His report erroneously stated that Ortiz had posted Ives's name and

29

job title (ROA.2219-21, 3194, 4760), and that a union representative—not Ortiz— had asked Moran for the information (ROA.6287; ROA.4761). And it inaccurately attributed concerns about Workday to Pratt. (ROA.6279 n.84, 6287; ROA.4760.) Later, Gecewich lied to distance Ortiz's union activity from the investigation. In a pre-hearing affidavit, he falsely stated that he had "no knowledge" of that activity before meeting with Graminger. (ROA.6280 n.85; ROA.1876-79.) And at hearing, he falsely denied knowing about the union-related background of the Facebook post—background he had detailed in an earlier draft of his report. (ROA.6287; ROA.2208, 4736, 4761.) *See NLRB v. Consol. Biscuit Co.*, 301 F. App'x 411, 423 (6th Cir. 2008) (memo "intentionally modified to omit the mention of union activity" supported finding of unlawful motivation); *NLRB v. Gen. Fabrications Corp.*, 222 F.3d 218, 227 (6th Cir. 2000) (manager's "false testimony" supported finding of discriminatory motive).

Finally, the timing of the investigation, which began within days of Ortiz and Moran's union activity, and the discharge soon thereafter, indicates an unlawful connection. (ROA.6287.) That inference is especially compelling because Ortiz was discharged "one day before the [discipline] of another active, high-profile union adherent, [Moran]—for which a legitimate business reason is similarly lacking." *Brookwood*, 701 F.2d at 465.

30

Tesla tries to sidestep the voluminous evidence of unlawful motivation by arguing that Graminger, the "actual decisionmaker," was not hostile to the Union. (Tesla.55.) But Graminger relied on Gecewich's flawed investigation (which Hedges initiated) and inaccurate report and recommendation (which Hedges approved). (ROA.1320, 2221.) Because Gecewich and Hedges "had a significant role in the discharge," their animus "significantly infected what might otherwise have been an innocent sterile act." *NLRB v. Neuhoff Bros., Packers*, 375 F.2d 372, 374-75 (5th Cir. 1967). *See NLRB v. Big Three Indus. Gas & Equip. Co.*, 579 F.2d 304, 312 (5th Cir. 1978) (discipline violated the Act where "causally connected" supervisor was unlawfully motivated). *Cf. Charter Commc'ns, Inc. v. NLRB*, 939 F.3d 798, 816 (6th Cir. 2019) (employer could not rely on decisionmaker's reasonable belief that employee engaged in misconduct when supervisor fabricated supporting facts).

### 2. Tesla did not prove its affirmative defense

The Board reasonably rejected Tesla's contention that it would have discharged Ortiz regardless of his union activity. (ROA.6287.) As an initial matter, Tesla cannot carry its burden of proof in that regard because its asserted reason—Ortiz's evasion to protect the confidentiality of Moran's union activity— is not, as demonstrated above, a lawful basis for discharge. But even if Tesla could have lawfully discharged Ortiz for lying during an investigation, the ample

evidence of Tesla's unlawful motivation discussed above supports the Board's finding that the discharge decision was in fact driven by Ortiz's protected efforts to push back against Hedges' hand-picked emissaries. As the Board found (ROA.6287), Tesla seized on Ortiz's falsehood as a pretext to rid itself of a prominent union supporter. *See NLRB v. Lancer Corp.*, 759 F.2d 458, 460-61 (5th Cir. 1985) (upholding Board's finding, based on faulty investigation and unlawful "attempts to thwart unionization," that employee's refusal to answer questions about alleged misconduct "played no part" in the discharge decision); *T.I.M.E.— DC, Inc. v. NLRB*, 504 F.2d 294, 303 (5th Cir. 1974) (employer's failure to conduct "fair and impartial investigation" and "previous history of [its] treatment of [the employee], indicate that the discharge was pretextual in nature and that the charge of 'dishonesty' was only a mask for a discriminatory motive"); *St. Louis Car Co.*, 108 NLRB 1523, 1524-25 (1954) (untrustworthiness was pretext; organizing activity was reason for discharge).

Tesla's claim that it enforced a "reasonable and consistent policy" against lying (Tesla.61) rings hollow. Gecewich testified under oath that he repeatedly lied to his colleagues during the investigation. (ROA.6280-81 n.90; ROA.1894-97, 2289, 2346-47, 4609.) Evidently, Tesla's policy on honesty was "malleable" at best. *United Servs.*, 387 F.3d at 917. "Having determined that company policy did not provide a legitimate business reason for the discharge, the Board could

properly infer that the 'moving cause' of [Ortiz's] termination was antiunion animus." *Brookwood*, 701 F.2d at 465. And because Tesla's asserted reason was a pretext, its affirmative defense necessarily fails. *Wright Line*, 251 NLRB at 1084. *Accord Marathon LeTourneau Co. v. NLRB*, 699 F.2d 248, 252 (5th Cir. 1983).

Even aside from that pretext finding, Tesla did not meet its affirmative-defense burden by citing just one instance where a subsidiary company discharged a vice president who lied about his use of a company vehicle, drugs and alcohol in the vehicle, and an improper relationship with another employee. (ROA.6283 n.100; ROA.1874-75.) The Board reasonably found no meaningful comparison. (ROA.6287.) Even assuming a subsidiary's discipline could satisfy Tesla's burden, an upper manager's lie about misconduct is not comparable to feigned forgetfulness to protect a colleague from unlawful retaliation. As the Court has explained, "the details are important, and the Board was entitled to consider the substance" of the assertedly comparable conduct. *Remington*, 847 F.3d at 186. *Accord United Servs.*, 387 F.3d at 917 (discharges for dishonesty not comparable because "none of those employees were engaged in protected activity").

Finally, there is nothing to Tesla's argument (Tesla.3, 59-60, 64) that the Board substituted its business judgment for Tesla's. That is really just a misguided "attack [on] the Board's ruling as not founded on substantial evidence." *Lancer*

*Corp.*, 759 F.2d at 460.  Ample evidence supports the Board's finding that Ortiz's discharge was driven not by business judgment, but by his protected union activity.

**III.  Substantial Evidence Supports the Board's Finding that Tesla Violated Section 8(a)(1) by Threatening Employees with Loss of Benefits if They Unionized**

**A.  Statements That Tend To Coerce Employees Are Unlawful**

**1.  Coerciveness is measured objectively, from the employees' perspective**

An employer coerces employees in violation of Section 8(a)(1) "if under the totality of the circumstances, an employee could reasonably conclude that the employer is threatening economic reprisals if the employee supports the union." *NLRB v. Delta Gas., Inc.*, 840 F.2d 309, 311 (5th Cir. 1988).  Under Section 8(c) of the Act, an employer may lawfully state "'views, argument, or opinion,' so long as such expression contains 'no threat of reprisal or force or promise of benefit' in violation of [Section] 8(a)(1)." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969).  A threat is outside the protection of Section 8(c) and the First Amendment. *Id.* at 618.

Under Section 8(a)(1), the issue is whether the employer's words "tend to coerce in the context in which they are made." *NLRB v. Mangurian's, Inc.*, 566 F.2d 463, 466 (5th Cir. 1978).  The Board evaluates statements from the perspective of employees who are in a position of "economic dependence" and necessarily pick up threatening implications "that might be more readily dismissed

by a more disinterested ear." *Gissel*, 395 U.S. at 617.  The Board "does not

consider either the motivation behind the remark or its actual effect."  *Miller Elec.*

*Pump & Plumbing*, 334 NLRB 824, 824-25 (2001).[6]  Every circuit has approved

that exclusive focus on the objective tendency to coerce.[7]

Precedent thus forecloses the subjective inquiries Tesla (Tesla.45-50) and

the Chamber (Chamber.17) propose.  As the Court has explained, argument about

the employer's intended message or whether employees were actually coerced

"misses the whole point."  *Hendrix Mfg. Co. v. NLRB*, 321 F.2d 100, 105 (5th Cir.

1963).  It is likewise irrelevant whether the employer intended to communicate

with employees.  (*Contra* Chamber.20, 24.)  Threats that employees witness are

---

[6] NCLA misrepresents *Miller* by quoting language (NCLA.4) from the judge's
decision that the Board expressly repudiated.  334 NLRB at 824-25, 830.  NCLA's
counsel has been advised of the misstatement repeatedly and recently.  *FDRLST
Media, LLC v. NLRB*, 3d Cir. Nos. 20-3434, 20-3492, ECF No. 55, NLRB Br. at
15-16 (filed June 7, 2021).  *See* Model Rules of Prof'l Conduct R. 3.3(a)(1)
(lawyers shall not knowingly make false statements of law to a tribunal).

[7] *See Teamsters Loc. Union No. 171 v. NLRB*, 863 F.2d 946, 954 (D.C. Cir. 1988);
*NLRB v. Marine Optical, Inc.*, 671 F.2d 11, 18 (1st Cir. 1982); *HealthBridge
Mgmt., LLC v. NLRB*, 902 F.3d 37, 46 (2d Cir. 2018); *Allegheny Ludlum Corp. v.
NLRB*, 301 F.3d 167, 176 (3d Cir. 2002); *Alton H. Piester, LLC v. NLRB*, 591 F.3d
332, 336 (4th Cir. 2010); *NLRB v. Great W. Coca-Cola Bottling Co.*, 740 F.2d 398,
404 (5th Cir. 1984); *Torbitt & Castleman, Inc. v. NLRB*, 123 F.3d 899, 906 (6th
Cir. 1997); *C&W Super Mkts., Inc. v. NLRB*, 581 F.2d 618, 624 n.5 (7th Cir. 1978);
*Russell Stover Candies, Inc. v. NLRB*, 551 F.2d 204, 207-08 (8th Cir. 1977);
*Lippincott Indus., Inc. v. NLRB*, 661 F.2d 112, 114 (9th Cir. 1981); *Lear Siegler
Inc. v. NLRB*, 890 F.2d 1573, 1580 (10th Cir. 1989); *Mead Corp. v. NLRB*, 697
F.2d 1013, 1025 (11th Cir. 1983).

unlawful "whether or not the [employer] intended the coercive remarks to reach the[m]." *Williams Motor Transfer*, 284 NLRB 1496, 1499 (1987). *E.g.*, *Consol. Biscuit*, 301 F. App'x at 434 n.5 (coercive statement "within earshot of a current employee"); *Frontier Hotel & Casino*, 323 NLRB 815, 816 (1997) (statement overheard by hidden employee); *Crown Stationers*, 272 NLRB 164, 164 (1984) (letter discovered by employee).

Although the Court has occasionally noted the absence of actual coercion to bolster its finding that employer speech was lawful, it has, as Tesla concedes, consistently reaffirmed that the question is "'not whether the employees are in fact coerced,'" (Tesla.49 (quoting *Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 634 (5th Cir. 2003)).) *Accord, e.g.*, *Brookwood*, 701 F.2d at 459; *TRW-United Greenfield Div. v. NLRB*, 637 F.2d 410, 415 (5th Cir.1981). And although Tesla (Tesla.46, 48) and the Chamber (Chamber.9) note that *Gissel* asked what "the speaker intend[ed] and the listener underst[oo]d," 395 U.S. at 619, the test for answering that question is objective: whether the words, in context, "reasonably tended to convey" a threat, *id.* at 589.[8]

---

[8] Tesla (Tesla.46-47) and NCLA (NCLA.5, 12) cite cases interpreting criminal laws to include a mens-rea requirement. But the rule that "wrongdoing must be conscious to be criminal," *Elonis v. United States*, 575 U.S. 723, 734 (2015) (quotation omitted), has no application to unfair-labor-practice liability. *See Textile Workers Union v. Darlington Mfg. Co.*, 380 U.S. 263, 269 (1965) (Section

## 2. The Board's coerciveness finding is entitled to deference

"[W]hether statements have a threatening quality is a factual question." *UNF*, 844 F.3d at 462 n.7. And because "their possible impact upon employees is a question of fact," the Board's coerciveness finding "should not be overturned unless unsupported by substantial evidence." *Mangurian's*, 566 F.2d at 467 (quotation and ellipsis omitted).

That deferential standard applies to both spoken and written statements. (*Contra* Tesla.26.) In *Gissel*, the Supreme Court referred to "speeches, pamphlets, leaflets, and letters" when it instructed that a "reviewing court must recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship." 395 U.S. at 619-20. This Court, accordingly, reviews for substantial evidence the Board's finding of a written threat. *See NLRB v. Riley-Beaird, Inc.*, 681 F.2d 1083, 1086 (5th Cir. 1982) (slide show); *TRW-United*, 637 F.2d at 419-20 (letter). *See also In-N-Out*, 894 F.3d at 715-16 (granting "considerable deference" to finding that written rule violated Section 8(a)(1)); *Flex Frac Logistics, LLC v. NLRB*, 746 F.3d 205, 208 (5th Cir. 2014) (reviewing same for substantial evidence).

---

8(a)(1) "presupposes an act which is unlawful even absent a discriminatory motive").

37

The cases upon which Tesla relies (Tesla.26) are outliers that stand on an infirm foundation because they rely on principles governing the legal interpretation of contracts.[9] Whereas "[a]rbitrators and courts are still the principal sources of contract interpretation," *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 202 (1991) (quotation omitted), the Board has expertise in evaluating communications "in the context of the employer-employee relationship," *Gissel*, 395 U.S. at 620.

Finally, contrary to Tesla's assertions (Tesla.25; *see also* NCLA.13), the Board receives the same deference when an employer invokes Section 8(c) or the First Amendment. *Gissel*, 395 U.S. at 620. Courts defer to the Board's "rational resolution of the tension between the employer's First Amendment rights and the employee's right to organize freely." *Allegheny Ludlum Corp. v. NLRB*, 301 F.3d 167, 178 (3d Cir. 2002). *See Mangurian's*, 566 F.2d at 466 (deferring to finding that threat was not "mere opinion protected by [Section 8(c)] and the First Amendment").[10]

---

[9] *Federal-Mogul Corp. v. NLRB*, 566 F.2d 1245, 1256 (5th Cir. 1978), relied on contract-interpretation decisions of the former United States Court of Claims, and *NLRB v. Big Three Indus. Gas & Equip. Co.*, 441 F.2d 774, 777 (5th Cir. 1971) (per curiam), which cited no authority. *Brown & Root*, 333 F.3d at 635, applied substantial-evidence review. (*Contra* Tesla.26.)

[10] NCLA adds nothing (NCLA.7-21) by spinning out theories Tesla did not brief for overturning Supreme Court precedent. *See generally Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Courts do not consider amicus issues or arguments outside those properly raised by parties. *New Jersey v. New*

### 3. A bare statement that unionization will cause lost benefits is an unlawful threat

In *Gissel*, the Supreme Court recognized that an employer is entitled to "make a prediction as to the precise effects [it] believes unionization will have on [its] company." 395 U.S. at 618. Such a prediction, however, "must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond [its] control." *Id.* If the statement instead implies that the employer may respond negatively to unionization "on [its] own initiative," it is a "a threat of retaliation." *Id.*

An unexplained assertion that benefits will be lost upon selection of union representation is a threat because the employer—and not a union—"has it within [its] power to make the prediction come true." *Amalgamated Clothing Workers v. NLRB*, 424 F.2d 818, 824 (D.C. Cir. 1970) (quotation omitted). *See Mon River Towing, Inc. v. NLRB*, 421 F.2d 1, 10 (3d Cir. 1969) ("If the employer has the power to bring about the results projected, the language is deemed to contain an illegal implied threat."). Accordingly, without more, "statements that bonuses, pension plans, and similar financial benefits w[ill] be cut off" if employees unionize constitute "coercive threats." *Hendrix*, 321 F.2d at 105. *Accord*

---

*York*, 523 U.S. 767, 781 n.3 (1998); *Cellnet Commc'ns, Inc. v. FCC*, 149 F.3d 429, 443 (6th Cir. 1998).

*Constellation Brands U.S. Ops., Inc. v. NLRB*, 992 F.3d 642, 649 (7th Cir. 2021) (unlawful statement "suggest[ing] that employees who choose union representation will automatically be excluded"); *DynCorp*, 343 NLRB 1197, 1199 (2004) (same), *enforced*, 233 F. App'x 419 (6th Cir. 2007).

By contrast, a statement "is *not* a threat of reprisal where it [i]s made in a context indicating that bargaining is a process in which each side makes its own proposals, that it requires mutual agreement, and where existing benefits may be traded away." *UNF*, 844 F.3d at 458 (quotation and alterations omitted). *E.g.*, *Regency Manor Nursing Home*, 275 NLRB 1261, 1261 (1985) (lawful to state current benefits could be traded for different benefits in give-and-take of bargaining). Even then, it is unlawful to imply "that unionization itself would trigger the loss of the [benefit], and that loss would continue throughout negotiations unless and until it was restored." *Hertz Corp.*, 316 NLRB 672, 672 n.2 (1995). The employer must "make[] clear that the employees do not lose benefits or coverage during negotiations." *Carpenter Tech. Corp.*, 346 NLRB 766, 769 (2006).[11]

---

[11] *Hendrickson USA, LLC v. NLRB*, 932 F.3d 465 (6th Cir. 2019), which Tesla cites (Tesla.33-34), is not to the contrary. The letter there referenced "the negotiating process," *id.* at 472, and, the Sixth Circuit concluded, merely conveyed "that employees [would be] taking a risk in entering collective bargaining," *id.* at 473.

**B. Employees Reasonably Would Have Interpreted Musk's Tweet as a Threat**

**1. The tweet threatened loss of benefits upon unionization**

On May 20, Musk tweeted that there was "[n]othing stopping Tesla team at our car plant from voting union." (ROA.6288.) "But why," he asked, would employees "give up stock options for nothing?" (ROA.6288.) As the Board found, that communication "can only be read by a reasonable employee to indicate that if the employees vote to unionize," then "they would give up stock options." (ROA.6289.) As the Board explained, Musk's tweet provided no "objective facts to support his statement that employees would lose their stock options," or any suggestion that such loss would be outside of Tesla's control. (ROA.6289.) Nor did Musk reference collective bargaining. (ROA.6289.) He did not, for instance, suggest that the Union might trade stock options for other benefits in the give-and-take of negotiations. The only plausible reading of his tweet was that Tesla itself would rescind them upon unionization.

In countless cases, the courts of appeals have upheld the Board's findings that threats materially indistinguishable from Musk's were unlawful. *See, e.g.*, *NLRB v. Bama Co.*, 353 F.2d 320, 323 (5th Cir. 1965) (supervisors threatened "unionization would probably result" in lost benefits); *Hendrix*, 321 F.2d at 104 ("if the Union came in, the current profit sharing plan would be discontinued"); *Intermedics, Inc.*, 262 NLRB 1407, 1415 (1982) ("if the company was to go union

41

the employees would [lose] all their benefits"), *enforced*, 715 F.2d 1022 (5th Cir.

1983); *NLRB v. Colony Printing & Labeling, Inc.*, 651 F.2d 502, 504 (7th Cir.

1981) (employees would "give up" right to talk to employer).[12]

In finding a threat, the Board properly considered (ROA.6289-90) the

context of Tesla's years-long antiunion campaign, which informed "the

interpretation which the employees reasonably could put on" Musk's tweet.

*Hendrix*, 321 F.2d at 103-04.  Against the backdrop of Tesla's numerous unfair

labor practices, employees would have reasonably believed Tesla would again

violate the Act by rescinding stock options in retaliation for unionizing.  *See*

*Federated Logistics & Operations v. NLRB*, 400 F.3d 920, 927 (D.C. Cir. 2005)

(unfair labor practices "len[d] additional coercive meaning" to employer's words);

*Noah's Bay Area Bagels, LLC*, 331 NLRB 188, 189 (2000).[13]

---

[12]  *See also, e.g.*, *NLRB v. Schill Steel Prods., Inc.*, 340 F.2d 568, 570-71 (5th Cir. 1965); *Sara Lee Bakery Grp., Inc. v. NLRB*, 61 F. App'x 1, 11 (4th Cir. 2003); *McLane/W., Inc. v. NLRB*, 723 F.2d 1454, 1457 (10th Cir. 1983); *Sioux Prods., Inc. v. NLRB*, 684 F.2d 1251, 1254 (7th Cir. 1982); *McGraw-Edison Co. v. NLRB*, 419 F.2d 67, 70 (8th Cir. 1969); *DynCorp*, 343 NLRB at 1199; *Donaldson Bros. Ready Mix, Inc.*, 341 NLRB 958, 960 (2004); *Belcher Towing Co.*, 265 NLRB 1258, 1267 (1982), *enforced in pertinent part*, 726 F.2d 705 (11th Cir. 1984); *Behring Int'l, Inc.*, 252 NLRB 354, 365 (1980), *enforced*, 714 F.2d 291 (3d Cir. 1983).

[13]  The timing of an election, which the Chamber references (Chamber.16) bears on whether threats or other objectionable conduct invalidated the election result. *NLRB v. Dickinson Press, Inc.*, 153 F.3d 282, 286 (6th Cir. 1998).  Whether a statement violates Section 8(a)(1) is a different question.  Even if no election

Finally, Musk plainly spoke for Tesla, and employees received his message, points Tesla does not dispute. (ROA.6289-90.) Musk's tweet was "akin to a company official issuing a press release to the public" (ROA.6288-89; ROA.970-71, 4756), for which an employer is responsible. *E.g.*, *NLRB v. Laredo Coca Cola Bottling Co.*, 613 F.2d 1338, 1341 (5th Cir. 1980) (employer's statement quoted in newspaper); *TRW-United Greenfield Div.*, 245 NLRB 1135, 1135 n.1 (1979) (manager's television interview), *enforced*, 637 F.2d 410 (5th Cir. 1981); *Penn. Glass Sand Corp.*, 172 NLRB 514, 522 (1968) (press release), *enforced sub nom. Gen. Teamsters & Allied Workers Local Union No. 992 v. NLRB*, 427 F.2d 582 (D.C. Cir. 1970). And Musk's tweet was disseminated to millions of followers, including at least one Tesla employee. (ROA.6289; ROA.755.)

Tesla fails to show that "no reasonable factfinder could find" the stock-options tweet to be a threat. *Federated*, 400 F.3d at 924-25. There is no merit, first of all, to the argument that the tweet "made an objective claim," which Musk had no obligation to prove, that UAW-represented employees at other employers have no stock options. (Telsa.42-44; Chamber.15.) The tweet neither said nor implied anything of the sort. Representations about other unionized employers

---

petition is ever filed, threats of lost benefits unlawfully interfere with employees' exercise of Section 7 rights, including the "initial decision to engage or not to engage in concerted activities directed toward collective bargaining." *Solo Cup Co.*, 176 NLRB 823, 824 (1969).

came only in later communications which, as detailed below (pp.45-49), cannot retroactively erase Musk's threat.

Nothing within the tweet altered its threatening meaning. Tesla notes (Tesla.31) that Musk said that nothing prevented employees from voting for a union. But that claim offered no reassurance given his threat that they would forfeit stock options by doing so. *See Middletown Hosp. Ass'n*, 282 NLRB 541, 561 (1986) (threat where manager said she "believed in collective bargaining," but union representation "would be a backward step because the nurses would have to give up benefits"); *Harper & Row Publ'rs*, 196 NLRB 343, 348, 353 (1972) (manager said "he'd work with a union or without a union," but if a union came in, employees would lose benefits), *enforced in pertinent part*, 476 F.2d 430 (8th Cir. 1973).

Nor did Musk's reference to union dues as a downside of representation neutralize his threat by leading the reasonable employee to believe the Union controls stock options, as Tesla (Tesla.31-32) and the Chamber (Chamber.13) seem to argue. Employers commonly discourage union support by combining lawful references to dues with unlawful threats, and employees can understand the difference. *See, e.g.*, *TRW-United*, 637 F.2d at 419 (references to union dues "ha[d] no direct relevance at all" to plant-closure threat); *Med. Ctr. of Ocean Cnty.*,

315 NLRB 1150, 1154 (1994) ("You could lose your benefits; union dues are expensive; you could lose just about everything.").

Finally, it is laughable for Tesla to claim it "has no power to unilaterally reduce compensation after employees vote to unionize." (Tesla.33.) What Tesla lacks is the *legal right* to do that. *See NLRB v. Katz*, 369 U.S. 736, 743 (1962) (employer's "unilateral change" to mandatory subject of bargaining violates Act); *Richfield Oil Corp. v. NLRB*, 231 F.2d 717, 718 (D.C. Cir. 1956) (stock ownership plans are mandatory subject). The entire body of precedent governing loss-of-benefits threats (pp.39-42) refutes the notion (Tesla.33, 42) that such threats are harmless because employers must legally bargain before rescinding represented employees' benefits. As those cases establish, "threats to take away benefits upon a union victory . . . constitute[] precisely the type of conduct which is a demonstrable obstacle to the exercise" of Section 7 rights. *Sioux Prods., Inc. v. NLRB*, 684 F.2d 1251, 1254 (7th Cir. 1982). The illegality of the threatened act only heightens the coercion.

### 2. Tesla never repudiated its threat

Under settled law, Musk's subsequent tweets and Tesla's later media quotes could not change whether the initial tweet was a threat. (*Contra* Tesla.35-41; Chamber.10-11, 14-15.) The Board's rule, which the Court has upheld, is that "only contemporaneous or earlier contextual factors can influence a statement's

45

reasonable import for the listener at the time that the statement was uttered." *UNF*, 844 F.3d at 458. As Tesla concedes, statements "'must be considered in light of the circumstances existing when such language was written.'" (Tesla.38 (quoting *Fed.-Mogul*, 566 F.2d at 1254).)

That rule is consistent with Tesla's cases. In *Selkirk Metalbestos v. NLRB*, 116 F.3d 782, 788 (5th Cir. 1997) (per curiam) (Tesla.40), the statements the Court construed together were in the same document, one immediately after the other, *Selkirk Metalbestos*, 321 NLRB 44, 49 (1996). And in *NLRB v. Monfort, Inc.*, 29 F.3d 525, 528 (10th Cir. 1994) (Tesla.41; Chamber.11-12), the court deferred to a special master's interpretation of a "Protect Your Profit Sharing" banner in light of *prior* campaign materials explaining that benefits "would be subject to negotiation" if the union won and establishing, based on objective facts, that the union "was not interested" in profit sharing. *Monfort, Inc. v. NLRB*, No. 90-9518, 1994 WL 121150, at *3, *16 (10th Cir. Mar. 30, 1994).

Tesla's subsequent statements, the Board reasonably found, never disavowed Musk's threat. (ROA.6289.) To effectively repudiate a threat, later statements must be "timely, unambiguous, specific in nature, adequately published, accompanied by assurances against future interference with its employees' Section 7 rights, and free from other contemporaneous illegal conduct." *Teksid Aluminum Foundry*, 311 NLRB 711, 711 n.2 (1993). *Accord UNF*, 844 F.3d at 458-59

(applying *Teksid*). Because Tesla never argued to the Board that it satisfied that test, the Court lacks jurisdiction to consider such an argument, and Tesla has further waived it by failing to brief it here. *In-N-Out*, 894 F.3d at 720 & n.7.

In any event, Tesla could not possibly establish repudiation based on its later, ambiguous communications. As displayed at the links Tesla provides (Tesla.11 n.2, 13 n.4), two days after the initial tweet, Musk responded to one of many replies expressing concern that he was threatening employees' stock options if they unionized. He cryptically cast blame on the Union: "No, UAW does that. They want divisiveness & enforcement of 2 class 'lords & commoners' system."[14] The next day, in an entirely separate thread, Musk tweeted, "UAW does not have individual stock ownership as part of the compensation at any other company."[15] After the Union alleged that the stock-options tweet was unlawful, various media outlets reported Tesla's spin: the tweet was "simply a recognition of the fact that unlike Tesla, we're not aware of a single UAW-represented automaker that provides stock options." (ROA.6288 n.110; ROA.4893-4932.)

It is beside the point whether, as Tesla suggests (Tesla.40-41), those comments could be construed as lawful comparisons of unorganized and organized

---

[14] https://twitter.com/elonmusk/status/998454539941367808 (last visited Sept. 28, 2021) (scroll down to find May 22 Musk tweet reproduced at ROA.4537).

[15] https://twitter.com/elonmusk/status/999415738967277568 (last visited Sept. 28, 2021). (*See also* ROA.4539.)

operations.  *Cf. Federated*, 400 F.3d at 925 (reference to another facility where represented employees did not have 401(k) underscored threat).  None explained how the Union could eliminate stock options or otherwise dispelled the threat that Tesla would do so—much less stated that the Union had ever insisted, in bargaining, on eliminating stock options.[16]

Ultimately, Tesla's "failure to directly disavow or clarify the [initial] statement by explicitly informing employees that election of the Union would not result in the automatic loss of [stock options] only served to reinforce the threat." *Cooper Tire & Rubber Co.*, 340 NLRB 958, 959 (2003), *bargaining order enforced*, 156 F. App'x 760 (6th Cir. 2005).  And, crucially, even if subsequent communications had disavowed the stock-option threat, they utterly failed to assure employees that Tesla would respect their rights.  *See Taylor Chair Co.*, 292 NLRB 658, 658 n.2 (1989) (later statement lacking assurances against future violations failed to repudiate threat), *aff'd mem.*, 899 F.2d 12 (5th Cir. 1990).

Moreover, Tesla has not shown that its inadequate statements were either timely or adequately disseminated.  Tesla takes liberties in characterizing

---

[16] The Chamber (Chamber.10, 14) provides no record support for its bald claim that the Union categorically objected to employee stock-option plans (*cf.* ROA.4905 ("The UAW does not have a policy preventing employees from owning stock options[.]")), or its presumption that Tesla's employees would have known that.

statements issued days later as coming "quickly" (Tesla.2, 23, 49) or "in real time" (Tesla.38). And the parties stipulated that "[i]t is not possible to know or determine if every individual that viewed" the stock-options tweet "also viewed the tweets" Musk posted on May 22 and 23. (ROA.6289; ROA.4756.) This case is thus nothing like *TRW, Inc. v. NLRB*, 654 F.2d 307, 313 (5th Cir. 1981) (Chamber.10), where the Court observed that an employee was aware of every link in the "chain" of his personal interactions with a supervisor *before* the comment at issue. It is outlandish to suggest that responses well after the initial threat, buried far down-thread or sprinkled in a different thread—or in other media—would have cleared things up for everyone who saw the threat. The Board was not required to impose on employees a duty to spend the days after the tweet combing through "multiple overlapping conversations among and across groups of users." (Tesla.39 (quoting *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 230 (2d Cir. 2019), *vacated as moot*, 141 S. Ct. 1220 (2021)).)

3. **Tesla's attempt to relitigate settled First Amendment law fails**

Tesla and its amici seek to relitigate First Amendment issues that the Supreme Court, this Court, and the Board have resolved. Tesla, for example, implies it is an open question whether "perhaps" the government may prohibit "threats to unlawfully retaliate for union-related activities." (Tesla.28.) The

answer—"yes"—was settled long ago.  *Gissel*, 395 U.S. at 616-20; *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 33 (1937).

In cases like this one, "the issue before [the Court] is not where to draw the line separating protected from unprotected speech." *Riley-Beaird*, 681 F.2d at 1086. "That line is settled." *Id.* "The only issue is whether the Board correctly determined that [Tesla]'s conduct constituted a violation of section 8(a)(1)." *Id.* If, as the Board found, employees could have reasonably interpreted Musk's tweet as a threat, the Board's Order does not "impinge[] on [any] constitutionally protected right of free speech." *Id.* *See also Gissel*, 395 U.S. at 620 (rejecting the argument that Board law is "too vague to stand up under traditional First Amendment analysis"); *Sturgis*, 563 F.2d at 1258 (finding that employer's actions "had a tendency to coerce" employees "means that the [employer] can find no comfort in Section 8(c)").

In an attempt to upset *Gissel*, Tesla and its amici latch onto a recent, inapposite Board decision. (Tesla.47-48 n.8; Chamber.18-21; NCLA.6.) In *Operating Engineers, Local Union No. 150 (Lippert Components, Inc.)*, the Board found that a union's display of an inflatable rat did not threaten a neutral employer in violation of Section 8(b)(4)(ii)(B), a provision that "protect[s] neutral employers from being enmeshed in labor disputes not their own" by making it an unfair labor practice for a union to "'threaten, coerce, or restrain any person'" with a

"proscribed secondary objective."  371 NLRB No. 8, 2021 WL 3169107, at *1, *4

(July 21, 2021) (Members Kaplan and Ring, concurring) (quoting 29 U.S.C.

§ 158(b)(4)(ii)(B)).  *Lippert* followed Supreme Court precedent construing the

relevant provision of the Act to avoid constitutional problems, and adhered to

Board precedent.  *Id.* at *5 (Members Kaplan and Ring, concurring) (citing

*DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568,

575-76 (1988)); *id.* at *2-3 (Chairman McFerran, concurring) (citing Board cases).

In this case, the Board likewise followed controlling Supreme Court

precedent that established that employers have no First Amendment right to

threaten employees.  Analyzing employer threats under Section 8(a)(1), *Gissel*

rejected just the sort of constitutional-avoidance argument Tesla and its amici urge.

395 U.S. at 617-20.  *See Cadillac of Naperville, Inc. v. NLRB*, No. 19-1150, 2021

WL 4228453, at *9 (D.C. Cir. Sept. 17, 2021) (*Gissel* requires rejecting

constitutional-avoidance argument).  That judgment is binding:  this Court "cannot

ignore a decision from the Supreme Court unless directed to do so by the Court

itself."  *Nat'l Coal. for Men v. Selective Serv. Sys.*, 969 F.3d 546, 549 (5th Cir.

2020) (per curiam) (quotation omitted), *cert. denied*, 141 S. Ct. 1815 (2021).

*Accord Singer v. City of Waco, Tex.*, 324 F.3d 813, 817-18 (5th Cir. 2003) (quoting

*Agostini v. Felton*, 521 U.S. 203, 237 (1997)).

## IV. The Board Reasonably Found that Tesla Did Not Unlawfully Solicit and Promise To Remedy Grievances

An employer violates Section 8(a)(1) if it solicits and promises to remedy employee grievances during a union campaign. *NLRB v. Pope Maint. Corp.*, 573 F.2d 898, 905 (5th Cir. 1978). "[I]t is not the solicitation of grievances itself that violates the Act, but rather the employer's explicit or implicit promise to remedy the solicited grievances that impresses upon employees the notion that union representation is unnecessary." *Wal-Mart Stores, Inc.*, 340 NLRB 637, 640 (2003), *enforced as modified*, 400 F.3d 1093 (8th Cir. 2005), *overruled on other grounds*, *Wynn Las Vegas, LLC*, 369 NLRB No. 91 (2020). Absent a promise, there is no violation. *NLRB v. V&S Schuler Eng'g, Inc.*, 309 F.3d 362, 370 (6th Cir. 2002). *Cf. Riley-Beaird*, 681 F.2d at 1086 (employer's statement is lawful if it contains no promise of benefit). Nor is there a violation when an employer "has a past practice of soliciting employee complaints and merely continues that practice during an organizing campaign." *Curwood, Inc.*, 339 NLRB 1137, 1139 (2003), *enforced in part*, 397 F.3d 548 (7th Cir. 2005). An unchanged practice does not imply a promise to remedy grievances. *Compare Wal-Mart*, 340 NLRB at 640 (employer lawfully continued pre-existing "open door" policy), *and Visador Co.*, 245 NLRB 508, 508 (1979) (promise to "be fair and listen to suggestions" lawful absent "any evidence that [employer] was deviating from past practice"), *enforced in part mem.*, 628 F.2d 1352 (4th Cir. 1980), *with Reliance Elec. Co.*, 191 NLRB

44, 46 (1971) (policy of soliciting grievances started during organizing campaign unlawfully implied promise to resolve them), *enforced mem.*, 457 F.2d 503 (6th Cir. 1972).

Consistent with those principles, the Board reasonably found that Tesla did not violate Section 8(a)(1) when Musk and Toledano spoke with Moran and Vega about employees' safety concerns. (ROA.6244-45.) Tesla reasonably responded to the employee safety petition by meeting with Moran to hear more. "To listen to suggestions does not in and of itself imply that the suggestions will be acted on." *Visador*, 245 NLRB at 508. Whether Musk regularly meets with employees or not, in this case he responded to a petition sent directly to him by meeting with the employee designated as the contact person. And although Musk and Toledano also invited Moran and Vega to participate in regular safety meetings, it was nothing new for Tesla to hold such meetings and encourage employees to attend—as both Moran's and Toledano's testimony established. (ROA.734, 737, 928-29, 980.) The Union cites no evidence that safety meetings were created in response to the safety petition. (UAW.25.)

Finally, Musk's statement that employees could have a union if the safety committee did not work out was not an unlawful request for a "second chance," as the Union claims (UAW.25-26). Such generalized requests "for 'another chance' or 'more time,' have been held to be within the limits of permissible campaign

propaganda." *Nat'l Micronetics*, 277 NLRB 993, 993 (1985). *See, e.g.*, *Noah's N.Y. Bagels*, 324 NLRB 266, 267 (1997) (employer lawfully alluded to past mistakes, asked for a second chance, and expressed wish to work with employees without a union). In the Union's cases, requests for another chance were unlawful only in conjunction with other promises. In *Wake Electric Membership Corp.*, 338 NLRB 298, 306 (2002), the employer promised that employees would get benefits sooner without union representation. As the Board noted (ROA.6245 n.15), Musk conveyed no similar certainty that Tesla would remedy safety concerns. And unlike Tesla, the employer in *V&S*, 309 F.3d at 371, promised employees further meetings, outside of any established practice, to address their concerns. Similarly, the employer in *Federated Logistics & Operations* said, "if the company could get a second chance, they would try to make things right." 340 NLRB 255, 268 (2003), *pet. for review denied*, 400 F.3d 920 (D.C. Cir. 2005). That was a promise to do something new, unlike Musk's lawful reference to existing safety meetings.[17]

## V.     The Board's Order Is Within Its Broad Remedial Discretion

In Section 10(c) of the Act, Congress conferred upon the Board the power to order a violator of the Act "to cease and desist" from unfair labor practices and

---

[17]  If the Court were to reject the Board's finding that no unlawful solicitation occurred, remand would be necessary for the Board to evaluate Tesla's statute-of-limitations defense to this allegation, which the Board declined to reach. (ROA.6244 n.14 (citing 29 U.S.C. § 160(b)).)

"take such affirmative action" as will "effectuate the policies of th[e] Act." 29

U.S.C. § 160(c). The Board's remedial power is "a broad discretionary one,

subject to limited judicial review." *Fibreboard Paper Prods. Corp. v. NLRB*, 379

U.S. 203, 216 (1964). Courts enforce the Board's chosen remedy "unless it can be

shown that the order is a patent attempt to achieve ends other than those which can

fairly be said to effectuate the policies of the Act." *Va. Elec. & Power Co. v.*

*NLRB*, 319 U.S. 533, 540 (1943).

## A. Tesla's Remedial Challenges Fail

Tesla's remedial arguments (Tesla.50-51) are patently meritless. The Board

ordered Tesla to stop threatening employees with loss of benefits, to direct Musk—

its CEO, agent, and supervisor—to remove a threat he issued and take appropriate

steps to ensure that he complies, and to notify employees of those commitments.

(ROA.6248.) Thus, the Order imposes an affirmative obligation on Tesla itself, in

its capacity as an employer responsible for its supervisor's unfair labor practice, to

remedy the specific violation found. The directive to take action to eliminate the

written threat accords with the Board's customary remedial practice.[18] Indeed, it is

---

[18] *See FDRLST Media, LLC*, 370 NLRB No. 49, 2020 WL 6940901, at *1 n.5
(2020), *pet. for review pending*, Nos. 20-3434, 20-3492 (3d Cir.). *See also, e.g.*,
*Omega Constr. Servs., LLC*, 365 NLRB No. 72, 2017 WL 2115670, at *5 (2017)
(ordering employer to rescind threat owner made by text message); *Williams Litho
Serv., Inc.*, 260 NLRB 773, 774 (1982) (rescind oral threat). *Cf. In-N-Out Burger,*

55

just like other uncontested provisions of the Board's Order requiring recission of other unlawful statements. (ROA.6248 (rescind or remove unlawful language from confidentiality agreement).)

Because the stock-options tweet is still posted, the need for "deleting a 2018 tweet today" (Tesla.51) is self-evident. A Board remedy "must dispel, compensate for, or at least neutralize, the frustrating effects of persistent illegal activity." *J.P. Stevens v. NLRB*, 417 F.2d 533, 541 (5th Cir. 1969). That cannot be achieved by a notice stating a commitment to stop threatening employees as long as Tesla, through its CEO, continues to display a threat on Twitter.

The order to end that years-long unlawful display is in no sense a prior restraint. (*Contra* Chamber.26.) And the Chamber's additional claim that deletion would limit other Twitter users' freedom of speech is both barred and waived because it was not urged before the Board or in Tesla's opening brief. (*See* pp.38-39 n.19, 47.) In any event, the extra-record material the Chamber cites (Chamber.26-27) explains that retweets with users' additional comments will be unaffected.[19]

---

*Inc.*, 365 NLRB No. 39, 2017 WL 1103798, at *1 (2017) (rescind unlawful rule and publish revised policy), *enforced*, 894 F.3d 707 (5th Cir. 2018).

[19] https://help.twitter.com/en/using-twitter/delete-tweets (last visited Sept. 28, 2021).

**B.     The Board Did Not Abuse Its Discretion by Declining To Require Notice Reading**

The Board may require a management official to attend a notice reading in front of employees "where the violations are so numerous and serious that the reading aloud of a notice is considered necessary to enable employees to exercise their Section 7 rights in an atmosphere free of coercion, or where the violations in a case are egregious." *Postal Serv.*, 339 NLRB 1162, 1163 (2003). Here, the Board found that remedy inappropriate and instead required Tesla to post notices in every workplace affected by the violations found (ROA.6247), as well as distribute the notices electronically to the extent Tesla customarily communicates with employees electronically (ROA.6249)—remedies the Board determined would "suffice to ameliorate the chilling effect of [Tesla's] unlawful conduct." (ROA.6247.) *See, e.g.*, *Chinese Daily News*, 346 NLRB 906, 909 (2006) (notice reading unnecessary to remedy multiple violations, including high-ranking manager's threat of reduced benefits), *enforced*, 224 F. App'x 6 (D.C. Cir. 2007).

The Union provides no reason to doubt Tesla's employees will thus be adequately reassured. It cites no authority (UAW.27-29) mandating notice reading to remedy multiple violations over time, in the absence of an intervening cease-and-desist order. *Cf. Fallbrook Hosp. Corp.*, 360 NLRB 644, 658 (2014) (noting Board has ordered notice reading to remedy ongoing violations after "multiple rounds of litigation, including a previous order to set aside an election"), *enforced*,

785 F.3d 729 (D.C. Cir. 2015).  And although it cites cases (UAW.29) in which the

Board required a manager responsible for numerous violations to attend notice

reading, here many individuals contributed to Tesla's violations.  In sum, the

Union fails to show that the Board abused its considerable remedial discretion.

## CONCLUSION

For the foregoing reasons, the Board respectfully requests that the Court deny Tesla's and the Union's petitions, grant the Board's cross-application, and enter a judgment enforcing the Board's Order in full.

Respectfully submitted,

s/ Ruth E. Burdick
RUTH E. BURDICK
*Deputy Associate General Counsel*

s/ Kira Dellinger Vol
KIRA DELLINGER VOL
*Supervisory Attorney*

s/ Micah P.S. Jost
MICAH P.S. JOST
*Attorney*

National Labor Relations Board
1015 Half St. SE
Washington, DC 20570
(202) 273-0656
(202) 273-0264

JENNIFER A. ABRUZZO
 *General Counsel*

PETER SUNG OHR
 *Deputy General Counsel*

RUTH E. BURDICK
 *Deputy Associate General Counsel*

DAVID HABENSTREIT
 *Assistant General Counsel*

National Labor Relations Board

September 2021

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

|  |  |  |
|---|---|---|
| TESLA, INCORPORATED, | ) | |
| | ) | |
| Petitioner Cross-Respondent | ) | |
| | ) | |
| INTERNATIONAL UNION, UNITED | ) | No. 21-60285 |
| AUTOMOBILE, AEROSPACE AND | ) | |
| AGRICULTURAL IMPLEMENT WORKERS | ) | |
| OF AMERICA, AFL-CIO, | ) | |
| | ) | |
| Petitioner | ) | |
| | ) | Board Case Nos. |
| v. | ) | 32-CA-197020, et al. |
| | ) | |
| NATIONAL LABOR RELATIONS BOARD, | ) | |
| | ) | |
| Respondent Cross-Petitioner | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2021, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify further that the foregoing document was served on all parties or their counsel of record through the appellate CM/ECF system.

s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC 20570
(202) 273-2960

Dated at Washington, DC
this 28th day of September 2021

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

| | | |
|---|---|---|
| TESLA, INCORPORATED, | ) | |
| | ) | |
| Petitioner Cross-Respondent | ) | |
| | ) | |
| INTERNATIONAL UNION, UNITED | ) | No. 21-60285 |
| AUTOMOBILE, AEROSPACE AND | ) | |
| AGRICULTURAL IMPLEMENT WORKERS | ) | |
| OF AMERICA, AFL-CIO, | ) | |
| | ) | |
| Petitioner | ) | |
| | ) | Board Case Nos. |
| v. | ) | 32-CA-197020, et al. |
| | ) | |
| NATIONAL LABOR RELATIONS BOARD, | ) | |
| | ) | |
| Respondent Cross-Petitioner | ) | |

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the Board

certifies that its motion contains 12,946 words of proportionally spaced, 14-point

type, and the word-processing system used was Microsoft Word for Office 365.


s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC  20570
(202) 273-2960

Dated at Washington, DC
this 28th day of September 2021