# No. 21-60285

# In the United States Court of Appeals
## FOR THE FIFTH CIRCUIT

TESLA, INCORPORATED,

*Petitioner Cross-Respondent*

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, AFL-CIO,

*Petitioner*

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent Cross-Petitioner*

On Petitions for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board

## BRIEF OF INTERVENOR
## TESLA, INCORPORATED

David B. Salmons
Michael E. Kenneally
David R. Broderdorf
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC  20004
(202) 739-3000

*Counsel for Tesla, Incorporated*

# CERTIFICATE OF INTERESTED PERSONS

## *No. 21-60285, Tesla, Inc. v. NLRB*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1.      Petitioner Cross-Respondent Tesla, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

2.      Morgan, Lewis & Bockius LLP is Counsel for Tesla.

3.      David B. Salmons is Counsel for Tesla.

4.      Michael E. Kenneally is Counsel for Tesla.

5.      David R. Broderdorf is Counsel for Tesla.

6.      John C. Sullivan is Counsel for Tesla.

7.      Petitioner International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO ("UAW"), is a labor union.

8.      Schwartz, Steinsapir, Dohrmann & Sommers LLP is Counsel for the UAW.

i

9.  Daniel E. Curry is Counsel for the UAW.

10.  Margo A. Feinberg is Counsel for the UAW.

11.  Respondent the National Labor Relations Board is a federal agency.

12.  Jennifer Abruzzo is Counsel for the Board.

13.  Ruth E. Burdick is Counsel for the Board.

14.  Micah P. S. Jost is Counsel for the Board.

15.  Peter Sung Ohr is Counsel for the Board.

16.  Kira Dellinger Vol is Counsel for the Board.


Dated:  October 5, 2021                s/ Michael E. Kenneally
                                        Michael E. Kenneally

## STATEMENT REGARDING ORAL ARGUMENT

For the reasons stated in its petitioner's brief, Tesla Pet. Br. iii, Tesla respectfully submits that oral argument would be helpful to the Court in this case.

**TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS ..........................................i

STATEMENT REGARDING ORAL ARGUMENT ................................iii

TABLE OF AUTHORITIES.................................................................vi

INTRODUCTION.................................................................................1

STATEMENT OF ISSUES....................................................................2

STATEMENT OF THE CASE ..............................................................3

SUMMARY OF ARGUMENT...............................................................9

STANDARD OF REVIEW...................................................................10

ARGUMENT .....................................................................................11

I.   Substantial evidence supports the Board's reasons for rejecting the Union's solicitation-of-grievances theory. ................11

    A.   Tesla did not solicit the employees' grievances but reasonably reacted to their demands that Tesla listen and respond to their safety concerns. ...................................13

    B.   Tesla did not promise to remedy employees' grievances but instead highlighted existing opportunities to help improve workplace safety. ...................................................16

    C.   The First Amendment and NLRA protect employers' ability to discuss workplace concerns with employees.........20

II.   The Board did not err in rejecting a notice-reading remedy.........23

CONCLUSION ..................................................................................27

CERTIFICATE OF SERVICE.............................................................28

**TABLE OF CONTENTS**
(continued)

**Page**

CERTIFICATE OF COMPLIANCE.......................................................29

# TABLE OF AUTHORITIES

<b>Page(s)</b>

**CASES**

*Advancepierre Foods, Inc. v. NLRB,*
966 F.3d 813 (D.C. Cir. 2020) ........................................................ 25

*Belcher Towing Co. v. NLRB,*
614 F.2d 88 (5th Cir. 1980) ........................................................... 12

*Beverly Enters., Inc. v. NLRB,*
139 F.3d 135 (2d Cir. 1998) ............................................... 17, 21, 22

*Brown & Root, Inc. v. NLRB,*
333 F.3d 628 (5th Cir. 2003) ......................................................... 20

*Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.,*
467 U.S. 837 (1984) ....................................................................... 11

*Denton Cnty. Elec. Coop., Inc. v. NLRB,*
962 F.3d 161 (5th Cir. 2020) ............................................. 1, 24, 25, 26

*Federated Logistics & Operations,*
340 N.L.R.B. 255 (2003) ............................................................... 19

*Gilbert v. NLRB,*
56 F.3d 1438 (D.C. Cir. 1995) ....................................................... 19

*Greater Omaha Packing Co. v. NLRB,*
790 F.3d 816 (8th Cir. 2015) ......................................................... 21

*Health Mgmt., Inc. v. NLRB,*
210 F.3d 371 (6th Cir. 2000) ......................................................... 17

*HTH Corp. v. NLRB,*
823 F.3d 668 (D.C. Cir. 2016) .................................................... 2, 24

*IBEW, Loc. Unions 605 & 985 v. NLRB,*
973 F.3d 451 (5th Cir. 2020) ............................................. 11, 15, 19

**Page(s)**

*Idaho Falls Consol. Hosps., Inc. v. NLRB,*
731 F.2d 1384 (9th Cir. 1984)..................................................... 16, 17

*NLRB v. Homer D. Bronson Co.,*
273 F. App'x 32 (2d Cir. 2008) ..........................................................25

*NLRB v. Int'l Ass'n of Bridge Structural & Ornamental Iron Workers,*
864 F.2d 1225 (5th Cir. 1989)............................................................23

*NLRB v. K&K Gourmet Meats, Inc.,*
640 F.2d 460 (3d Cir. 1981) ....................................................... 16, 17

*NLRB v. Pope Maint. Corp.,*
573 F.2d 898 (5th Cir. 1978)..............................................................12

*NLRB v. Riley-Beaird, Inc.,*
681 F.2d 1083 (5th Cir. 1982).............................................................12

*NLRB v. United Food & Com. Workers Union, Local 23,*
484 U.S. 112 (1987)............................................................................26

*NLRB v. V&S Schuler Eng'g, Inc.,*
309 F.3d 362 (6th Cir. 2002).......................................................18, 19

*Raley's, Inc. v. NLRB,*
703 F.2d 410 (9th Cir. 1983)..............................................................21

*Selkirk Metalbestos, N. Am., Eljer Mfg., Inc. v. NLRB,*
116 F.3d 782 (5th Cir. 1997)..............................................................22

*Sure-Tan, Inc. v. NLRB,*
467 U.S. 883 (1984)............................................................................23

*UNF W., Inc.,*
361 N.L.R.B. 387 (2014)......................................................................26

*UNF W., Inc. v. NLRB,*
No. 14-1181, 2016 WL 6080795 (D.C. Cir. Jan. 15, 2016) ................26

*UNF W., Inc. v. NLRB,*
844 F.3d 451 (5th Cir. 2016) ...............................................24, 25, 26

*Wake Elec. Membership Corp.,*
338 N.L.R.B. 298 (2002) ...........................................................18, 19

**STATUTES & CONSTITUTIONAL PROVISION**

29 U.S.C.
§ 151 *et seq.* (National Labor Relations Act) ............................ *passim*
§ 153 (NLRA § 3) ...............................................................................26
§ 157 (NLRA § 7) .........................................................................12, 18
§ 158 (NLRA § 8) ..................................................................... *passim*
§ 160 (NLRA § 10) ......................................................................10, 23

U.S. CONST. amend. I .......................................................................9, 20

**OTHER AUTHORITIES**

@moran2017j, *Time for Tesla to Listen*, MEDIUM.COM (Feb. 9,
2017), https://medium.com/@moran2017j/time-for-tesla-to-
listen-ab5c6259fc88 ...........................................................................3

# INTRODUCTION

In its petitioner's brief, Tesla detailed the National Labor Relations Board's lack of evenhandedness in restricting truthful employer speech while immunizing deceitful employee speech. The Board contorted Elon Musk's constitutionally protected tweet into an unlawful threat against employees. Tesla Pet. Br. 27-52. Yet the Board ordered reinstatement (with backpay) of a pro-union employee discharged for concededly lying during a workplace misconduct investigation. Tesla Pet. Br. 52-64.

In its own petitioner's brief, the United Auto Workers Union faults the Board for not restricting employer speech even more severely. It insists that the Board should also have found it unlawful for Tesla management to talk with an employee about his workplace safety concerns even after the employee demanded that Tesla management listen and respond to those workplace safety concerns. And the Union thinks that the Board erred by not imposing a notice-reading remedy—"a mandated 'confession of sins' by the employer"—that this Court and the D.C. Circuit have likened to "the system of 'criticism-self-criticism' devised by Stalin and adopted by Mao," an extreme remedy that is "incompatible with the democratic principles of the dignity of man." *Denton Cnty. Elec. Coop.,*

1

*Inc. v. NLRB*, 962 F.3d 161, 174 (5th Cir. 2020) (quoting *HTH Corp. v. NLRB*, 823 F.3d 668, 675, 677 (D.C. Cir. 2016)).

The Union's appeal is misconceived and unfounded. There is more than enough evidence to support the Board's finding that Tesla did not "unlawfully solicit[] employees' safety concerns and impliedly promise[] to remedy them" because management's conversation with the employee was reactive, devoid of promises, and constitutionally protected. ROA.6244. And while there is ample precedent for reversing a Board's imposition of a notice-reading remedy, there is none for reversing a refusal to do so. Judicial deference is often at its greatest for the Board's choice of remedy, and that is certainly appropriate on this issue. The Union's petition should be denied.

## STATEMENT OF ISSUES

1. Whether the Board erred in holding that Tesla did not violate the NLRA in discussing workplace safety issues with two employees on June 7, 2017.

2. Whether the Board erred in not requiring Elon Musk to personally read or listen to a Board agent's reading of the Board's remedial notice to an assembly of Tesla employees.

2

## STATEMENT OF THE CASE

Tesla's opening brief has a more complete discussion of the statutory, factual, and procedural background of this dispute. Tesla Pet. Br. 5-22. To avoid repetition, this brief incorporates that discussion by reference and focuses on the facts pertinent to the Union's appeal.

In February 2017, one of the Union's voluntary organizing committee members, Jose Moran, authored a blog post on Medium.com titled "Time for Tesla to Listen." ROA.6254-55; *see* ROA.703-04 (Moran); ROA.3779-81.[1] He also distributed leaflet copies inside and outside the Fremont facility. ROA.6255; *see* ROA.705-10 (Moran); ROA.2916. The blog post contended, among other things, that Tesla's "management team . . . underestimated the value of listening to employees" and that "an 'open-door policy' simply isn't a solution." ROA.2916. It also asserted that various issues, including worker safety, could not "be resolved without workers having a voice and being included in the process." ROA.2916. The post ended by expressing "hope that we can start a productive conversation about building a fair future for all who work at Tesla." ROA.2916.

---

[1] *See also* @moran2017j, *Time for Tesla to Listen,* MEDIUM.COM (Feb. 9, 2017), https://medium.com/@moran2017j/time-for-tesla-to-listen-ab5c6259fc88.

A couple weeks later, Tesla's CEO Elon Musk emailed employees to express some disagreement with the blog post's claims. ROA.6255; *see* ROA.4839-40. Musk explained that the company viewed safety as a paramount concern. ROA.4839-40. And he invited workers' input on ways to improve safety: "If you have a safety concern or an idea on how to make things better, please let your manager, safety representative or HR partner know. You can send an anonymous note through the Integrity Hotline (this applies broadly to any problems you notice at our company) or you can email safety@tesla.com." ROA.4840.[2]

Over the next few months, Moran and fellow union supporters prepared a petition on workplace safety. ROA.6243; ROA 6268; *see* ROA.500-01 (Ortiz); ROA.720-21 (Moran); ROA.3192. The petition stated that "[w]orkers are getting hurt on the job, and see work areas where accidents could easily happen," but asserted that "too many of our coworkers don't report injuries or other safety concerns because they are afraid of retaliation." ROA.6244; *see* ROA.3192. On June 6, 2017, Moran

---

[2] In describing Musk's response to Moran's blog post, the Union quotes from an online article on the Gizmodo website. UAW Pet. Br. 5 (quoting ROA.3826-27). The administrative law judge properly declined to rely on "[t]hese statements allegedly made by Musk for this article" because they "are hearsay." ROA.6255 n.21.

4

emailed this petition to Tesla human resources official Josh Hedges, and Musk as well.  ROA.6244; *see* ROA.3771-74.  The email had a lengthy cover message that started by discussing workers' safety concerns and Tesla's responses to date:

> As you are aware, our concerns about injury rates and overall health and safety conditions at Tesla have recently received national and global attention.  As employees concerned for our own safety on the job, we are encouraged by the company's recent efforts to address some of the issues we have raised, and we hope to see those efforts continue.  However, the issues we face on the shop floor are substantial and, in fact, the severity of recent accidents—resulting in lifelong disability or worse of our coworkers—demonstrate an overall lack of improvement.  Urgency to improve these conditions is escalating, and if Tesla is serious about making the factory a safer place to work, it is imperative for workers to have a voice in the process.

ROA.3772.  The email went on to express the voluntary organizing committee members' belief that union representation would give them "a true voice within the company." ROA.3772.  In closing, it requested that Tesla send "a response to this letter in writing" to Moran's email address, saying, "we hope for a positive response from you very soon."  ROA.3773.

The next day, on June 7, Hedges told Moran that Musk wanted to meet with him.  ROA.6244; *see* ROA.730 (Moran).  Moran and Tony Vega,

a coworker Moran had asked to join as a witness, met with Musk and Tesla's Chief People Officer, Gaby Toledano. ROA.6244; *see* ROA.729-30 (Moran). Toledano said they had seen the petition from the day before and wanted to hear Moran's safety concerns directly. ROA.6244; *see* ROA.731 (Moran). Both Moran and Vega shared some of their safety concerns. ROA.6244; ROA.732-33 (Moran). Toledano then explained that the facility had "safety committee meetings every week or every other week and that it would be a good idea for [Moran and Vega] to participate and to raise [their] safety concerns with the safety reps that go to the meetings." ROA.734 (Moran). According to Moran's testimony, Musk said, "if these safety committee meetings don't work out, then we'll give you your union." ROA.735 (Moran). Moran and others attended a voluntary safety meeting the next day, and Hedges wrote an email reaffirming Tesla's desire to hear directly from employees about any workplace safety concerns they might have. ROA.6269-70; *see* ROA.3769; ROA.3775-77. Hedges noted that safety meetings like the one Moran attended on June 8 "are recurring and part of [the company's] existing safety review process." ROA.3769. He also reiterated that Moran, or any

6

concerned employee, was welcome to volunteer on the safety teams. ROA.3769; ROA.3775.

Among the unfair labor practice charges filed by the Union and prosecuted by the Board's General Counsel was an allegation that Tesla violated Section 8(a)(1) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(1), by impermissibly soliciting employee grievances at the June 7, 2017 meeting of Musk, Toledano, Moran, and Vega. The General Counsel alleged that Tesla "solicited employee complaints about safety issues and impliedly promised to remedy their safety complaints if they refrained from their union organizational activity." ROA.2745. The Administrative Law Judge ("ALJ") sustained this charge. ROA.6267-71. But a majority of the Board reversed. ROA.6239, ROA.6243-46.

The Board disagreed with the ALJ's finding that Tesla "unlawfully solicited employees' safety concerns and impliedly promised to remedy them." ROA.6244. Tesla "did not summon Moran" to the June 7 meeting "on its own initiative," but reasonably reacted to the employee petition that Moran had emailed to Musk and Hedges the day before. ROA.6244. Given the petition's concerning but vague claims about unreported injuries and safety issues, Tesla "understandably felt compelled to

7

immediately learn more." ROA.6244. It was reasonable "to meet with Moran to discuss those concerns because the [voluntary organizing committee] had apparently designated him as its representative to receive [Tesla's] response to the petition." ROA.6244. In any event, Musk or Toledano did not "explicitly or implicitly promise[] to remedy the employees' safety concerns" during this meeting. ROA.6244. Rather, they listened and they invited the two employees to raise their concerns at the regularly scheduled safety committee meetings, even recognizing that the committee might not fully resolve the employees' concerns. ROA.6244-45.

The Board majority also rejected the ALJ's recommended remedy for the purported NLRA violations. ROA.6247. On top of the usual requirement that Tesla post a notice explaining the terms of the Board's cease-and-desist order, the ALJ recommended that Tesla also "be ordered to convene its employees and have Elon Musk (or, if he is no longer the chief executive officer, a high-ranking management official), in the presence of security guards, managers and supervisors, a Board agent and an agent of the Union . . . read the notice aloud to employees." ROA.6291. The ALJ did give Tesla an alternative, however, of having a Board agent

read the notice to the Fremont employees "in the presence of Musk." ROA.6292. But the Board majority (over Chairman McFerran's dissent) concluded that "a notice-reading remedy is neither necessary nor appropriate to remedy the violations in this case because the Board's traditional remedies will suffice." ROA.6247.

## SUMMARY OF ARGUMENT

I. There are three reasons why this Court should uphold the Board's conclusion that there was no unlawful solicitation of employee grievances at the June 7, 2017 meeting. *First*, the meeting was a direct response to Moran's demands that Tesla respond to the safety petition he had emailed to Musk, that it continue its efforts to improve workplace safety, and that it give employees a voice on safety issues. An employer does not unlawfully "solicit" grievances when it responds to those grievances in the way the employees demanded. *Second*, solicitation is not itself unlawful but instead requires, at a minimum, a promise to remedy the grievances. Here, the Board reasonably found that Tesla did not make any impermissible promise that the employees' concerns would be resolved to their satisfaction. And *third*, Tesla had a well-settled right under the First Amendment and the NLRA to speak with its employees

9

about existing channels to raise safety concerns. The Union is once again trying to use labor law to trample on an employer's free speech rights.

II. The Union has no colorable ground for challenging the Board's refusal to impose a notice-reading remedy. The Board has long enjoyed broad discretion in determining how to remedy unfair labor practices, and it is hard to imagine a more clearly appropriate use of that discretion. This Court has voiced great skepticism about the propriety of notice-reading remedies because they are extreme and almost always unnecessary. The lone exception is for employers who commit egregious repeat violations despite prior unfair labor practice adjudications. That exception plainly does not fit the facts here, and the Board did not err in declining to impose an unjustified, overly harsh remedy. Particularly not when the Union's contrary argument rests on supposed unfair labor practices that, as Tesla's appeal demonstrates, are not unfair labor practices at all.

## STANDARD OF REVIEW

The Board's factual findings are "conclusive" if "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); Tesla Pet. Br. 24. "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support

a conclusion." *IBEW, Loc. Unions 605 & 985 v. NLRB*, 973 F.3d 451, 457 (5th Cir. 2020) (citation omitted). "The court may not make credibility determinations or reweigh the evidence, and should defer to the plausible inferences the Board draws from the evidence, even if the court might reach a contrary result were it deciding the case de novo." *Id.* (cleaned up).

The Union's appeal, unlike Tesla's, does not contend that the Board's application of the NLRA infringes constitutional rights or raises constitutional doubts. *See* Tesla Pet. Br. 25-26. So in entertaining the Union's challenge, the Court reviews the Board's findings under the normal substantial evidence standard and reviews the Board's interpretations of the NLRA through the deferential lens of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). The Court "will uphold the Board's interpretations so long as they are rational and consistent with the Act." *IBEW*, 973 F.3d at 457 (cleaned up).

## ARGUMENT

### I. Substantial evidence supports the Board's reasons for rejecting the Union's solicitation-of-grievances theory.

The Board correctly ruled that the June 7, 2017 meeting among Musk, Toledano, Moran, and Vega did not violate NLRA Section 8(a)(1).

That provision makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" NLRA Section 7. 29 U.S.C. § 158(a)(1). The Section 7 rights include "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. *Id.* § 157; *see* Tesla Pet. Br. 5-6.

Tesla did not interfere with, restrain, or coerce any employees during the June 7 meeting. And so there is easily substantial evidence to support the Board's finding, "[b]ased on the specific factual circumstances here," that Tesla did not "unlawfully solicit[] employees' safety concerns and impliedly promise[] to remedy them." ROA.6244.[3]

---

[3] The Union cites various cases where the Board found a solicitation of grievances and where that finding, if appealed at all, was affirmed under the deferential substantial evidence standard of appellate review. UAW Pet. Br. 15-16; *see, e.g.*, *NLRB v. Riley-Beaird, Inc.*, 681 F.2d 1083, 1086 (5th Cir. 1982); *Belcher Towing Co. v. NLRB*, 614 F.2d 88, 91 (5th Cir. 1980); *NLRB v. Pope Maint. Corp.*, 573 F.2d 898, 905 (5th Cir. 1978). But the facts of these cases, which the Union scarcely discusses, do not resemble the facts here, and they certainly do not show how the Union could prevail under substantial evidence review.

**A.  Tesla did not solicit the employees' grievances but reasonably reacted to their demands that Tesla listen and respond to their safety concerns.**

First, the Board properly underscored the June 7 meeting was a direct response to the email and petition that Moran sent to Hedges and Musk.  ROA.6244; *see also* NLRB Br. 53.  "That petition," the Board observed, "stated that employees did not always come to work confident that they would 'return home to [their] families without being injured at work,' were 'getting hurt on the job,' witnessed 'work areas where accidents could easily happen,' and did not report injuries or other safety concerns in some instances because of fear of retaliation."  ROA.6244.  But because "the petition did not detail any specific hazards" or elaborate on these serious allegations, it was reasonable for Tesla to want "to immediately learn more" and to meet with Moran specifically because the voluntary organizing committee "had apparently designated him as its representative to receive the [company's] response to the petition."  ROA.6244.

Beyond the petition, Moran's cover email expressly demanded a response from the company.  ROA.3773.  It stated that the petitioning employees were "encouraged by the company's recent efforts to address some

13

of the issues [they had] raised" and that they "hope[d] to see those efforts continue." ROA.3772. The email insisted that it was "imperative for workers to have a voice in the process" if the company was "serious about making the factory a safer place to work." ROA.3772. On top of that, Moran had authored a blog post just a few months before raising similar workplace safety concerns, arguing that it was "Time for Tesla to Listen," that the "management team [had] underestimated the value of listening to employees," that worker safety could not "be resolved without workers having a voice and being included in the process," and that it was time for "a productive conversation" on such issues. ROA.2916. When employees make such demands, it cannot possibly be interference, restraint, or coercion simply to take them up on it, as the Board recognized.

The Board's findings are thus easily supported by substantial evidence, and the Union makes no real effort to argue otherwise. Nor does the Union try to explain how the Board's reasoning conflicts with the NLRA. The Union seems to simply assume that employees should be able to procure an employer's violation of the NLRA through entrapment: demand a response to serious complaints and then claim that the response demanded is actually an unfair labor practice. The ALJ likewise

14

offered no defense of that absurd position. She merely asserted that it is "irrelevant" that "Moran 'prompted' the meeting" through his email and petition. ROA.6270. But the Board's contrary determination—at the risk of understatement—is "rational and consistent with the Act" and merits deference from the Court. *IBEW*, 973 F.3d at 457 (citation omitted).

The Union proposes that it is "highly out-of-the-ordinary" for a CEO "to meet with a union supporter." UAW Pet. Br. 16. But here too, the Union is just ignoring the evidence. Months before this meeting, Musk had already penned a direct response to Moran's blog post and welcomed employee input on matters of safety. ROA.4840. At Tesla, the CEO's hands-on approach to employees' safety concerns was not unusual, which may be why Moran emailed the petition directly to Musk as well as Hedges. ROA.3771.[4] And for his part, Moran had taken up the mantle as the main employee spokesperson for these concerns—first through the blog post and then through the petition. So it was not at all strange, as the Board indicated, for Musk to meet with him. *See* NLRB Br. 53.

The Board correctly determined that Tesla "did not violate the Act simply by meeting with Moran and Vega to discuss the safety concerns

---

[4] Musk's engagement with random Twitter users similarly shows his personal attention to workplace safety at Tesla. *See* Tesla Pet. Br. 10.

15

raised in the petition." ROA.6244. The Union provides no basis for over-turning that determination under the applicable and deferential standard of review.

### B. Tesla did not promise to remedy employees' grievances but instead highlighted existing opportunities to help improve workplace safety.

The Board's second independent ground for rejecting the solicitation-of-grievances charge is that "neither Musk nor Toledano either explicitly or implicitly promised to remedy the employees' safety concerns during the June 7 meeting." ROA.6244. "They merely listened to the safety concerns raised by Moran and Vega and invited them to attend [Tesla's] weekly safety committee meetings to raise those concerns." ROA.6244.

This finding is equally dispositive. *See* NLRB Br. 52-53. Indeed, courts around the country have long recognized that "solicitation of grievances is not in and of itself an unfair labor practice" and that "listen[ing] to suggestions does not in and of itself imply that the suggestion will be acted on." *NLRB v. K&K Gourmet Meats, Inc.*, 640 F.2d 460, 466 (3d Cir. 1981) (citations omitted); *see also, e.g.*, *Idaho Falls Consol. Hosps., Inc. v. NLRB*, 731 F.2d 1384, 1387 (9th Cir. 1984) ("An expressed willingness to

16

listen to grievances is not sufficient to constitute a violation."); *Health Mgmt., Inc. v. NLRB*, 210 F.3d 371, at \*8 (6th Cir. 2000) (Table) ("It is well established that mere solicitation does not violate the act.").  Rather, solicitation of grievances "is an unfair labor practice where the solicitation is accompanied by the employer's express or implied suggestion that the grievance will be resolved or acted upon only if the employees reject union representation."  *Beverly Enters., Inc. v. NLRB*, 139 F.3d 135, 143 (2d Cir. 1998) (cleaned up); *see also, e.g.*, *Idaho Falls Consol. Hosps.*, 731 F.2d at 1386-87 ("Solicitation becomes an unfair labor practice when accompanied by either an implied or express promise that the grievances will be remedied and under circumstances giving rise to the inference that the remedy will only be provided if the union loses the election.").  Courts have not hesitated to reverse the Board for disregarding these important principles.  *See, e.g.*, *Beverly Enters.*, 139 F.3d at 143-44; *Idaho Falls Consol. Hosps.*, 731 F.2d at 1387; *K&K Gourmet Meats*, 640 F.2d at 467; *Health Mgmt.*, 210 F.3d 371, at \*8.  But, unsurprisingly, the Union does not cite any decision that reverses the Board for **adhering** to them.  *See* UAW Pet. Br. 15-18.

The Board reasonably found that even the one statement that the ALJ found objectionable—Musk's alleged remark that Tesla would give employees a union if the safety meetings did not work out—showed that Tesla was not promising to remedy the employees' concerns without a union. ROA.6244-45. The remark acknowledged the safety committee might **not** satisfy the employees. ROA.6245 & n.15.

The Union, however, compares Musk's alleged remark to an improper request for a "second chance" before employees vote to unionize. UAW Pet. Br. 17. This comparison is baseless and ignores the Board's grounds for distinguishing the line of cases that the Union is invoking. ROA.6245 n.15 (discussing *Wake Elec. Membership Corp.*, 338 N.L.R.B. 298, 306-07 (2002)); *see also* NLRB Br. 53-54. Tesla gave no assurance that it would successfully resolve the employees' concerns and did not indicate that Tesla "could address their safety concerns sooner in the absence of the Union." ROA.6245 n.15. The cases cited by the Union posed a far greater risk of interference with employees' Section 7 rights because the comments attempted to sway an upcoming union vote. *See NLRB v. V&S Schuler Eng'g, Inc.*, 309 F.3d 362, 370 (6th Cir. 2002) (company president "asked employees for a commitment to give him time and to

18

vote 'No' in the quickly upcoming election"); *Wake Elec.*, 338 N.L.R.B. at 306 ("King told the employees that . . . the only way the employees could get benefits earlier was to cause the Union to withdraw the petition."); *Federated Logistics & Operations*, 340 N.L.R.B. 255, 268 (2003) (company vice president, at the end of September, "was clearly soliciting grievances with the promise to remedy them in order to induce the employees to abandon their support for the Union" just weeks before an October 6 election).

Here, in contrast, there was no explicit or "implicit" promise during this meeting that could support an unfair labor practice finding. And at a minimum, the Board's finding on this question is supported by substantial evidence—evidence that "is relevant and sufficient for a reasonable mind to accept as adequate to support [the Board's] conclusion." *IBEW*, 973 F.3d at 457 (citation omitted); *see also V&S Schuler Eng'g*, 309 F.3d at 371 (stressing that on solicitation-of-grievance issues, courts "must give the Board leeway in this area specially committed to its expertise if its findings are reasonable and supported by substantial evidence"); *Gilbert v. NLRB*, 56 F.3d 1438, 1445 (D.C. Cir. 1995) ("[W]here the circumstances of the prior cases are sufficiently different from those of the case

before the court, an agency is justified in declining to follow them, and the court may accept even a 'laconic explanation as an "ample" articulation of its reasoning.'" (citations omitted)).[5]

### C. The First Amendment and NLRA protect employers' ability to discuss workplace concerns with employees.

Finally, the Union's proposed approach to this issue would double down on the errors that the Board committed in other parts of its ruling. As Tesla's opening brief explained, the First Amendment and the NLRA generally protect employer speech, even if the speech seeks to persuade employees not to support unionization. Tesla Pet. Br. 6-7, 27-30. NLRA Section 8(c), for example, prohibits the Board from basing an unfair labor practice finding on "[t]he expressing of any views, argument, or opinion" so long as "such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). In both its own appeal and its opposition to Tesla's appeal, the Union wants to construe that limiting clause so broadly that the exception becomes the rule: speech the Union does

---

[5] The Union also puts its spin on emails between Musk and Toledano after the June 7 meeting and what those emails imply about "their motivation." UAW Pet. Br. 17. But even when the "subjective intent" of the employer is "to discourage union involvement," that is not enough to justify restricting "employer speech under § 8(a)(1)" if the speech itself is not objectively problematic. *Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 634 n.3 (5th Cir. 2003).

not like is either an "implicit" threat or an "implicit" promise. But the law recognizes that "employers must be permitted a reasonable opportunity to exchange views with unrepresented employees about their collective concerns with the terms and conditions of their employment." *Greater Omaha Packing Co. v. NLRB*, 790 F.3d 816, 823 (8th Cir. 2015). "[U]nless the statement itself coerces an employee not to exercise his rights, it is protected by Section 8(c) and is not a violation of Section 8(a)(1)." *Id.*

That is particularly true in cases like this, where the employer is explaining resources that are already available to employees. *Raley's, Inc. v. NLRB*, 703 F.2d 410, 415 (9th Cir. 1983) ("The present case . . . clearly falls under the protection of section 8(c), because Raley's announced benefits that were in place at the time. Such an announcement could not be a promise or a threat, because it refers only to benefits granted in the past."), *modified in part on other grounds*, 728 F.2d 1274 (9th Cir. 1984); *Beverly Enters.*, 139 F.3d at 144 ("[B]ecause the discussion between Wilcox and Garcia resulted in the imparting of information regarding existing benefits, protected speech under section 8(c) was implicated."). As Tesla made clear to employees both before and after the

June 7 meeting, they had multiple ways to raise safety concerns. ROA.3769; ROA.3775; ROA.4836-40. Those opportunities included safety meetings like the ones Moran attended on June 8, which Toledano noted had already been taking place "every week or every other week." ROA.734 (Moran); *see also* ROA.4839 (discussing on February 24 the company's "regular safety meetings with operations leaders"); ROA.3775 (describing on June 12 employees' ability "to participate on the safety teams that have been so successful in identifying and solving safety issues"); ROA.3769 (explaining on June 14 that safety team meetings "are recurring and part of [the company's] existing safety review process"). As Board counsel correctly observe, "it was nothing new for Tesla to hold such meetings and encourage employees to attend." NLRB Br. 53.

The Board could not lawfully premise an unfair labor practice on Musk and Toledano's identification of existing ways that Moran and coworkers could raise safety concerns. *See, e.g.*, *Beverly Enters.*, 139 F.3d at 144 ("Section 8(c) protects the right of an employer to make truthful statements of existing facts." (quoting *Selkirk Metalbestos, N. Am., Eljer Mfg., Inc. v. NLRB*, 116 F.3d 782, 788 (5th Cir. 1997) (per curiam))).

## II. The Board did not err in rejecting a notice-reading remedy.

The Union's insistence on a notice-reading remedy fares no better. For starters, this argument utterly ignores the especially high level of deference that courts give to Board remedies. Section 10(c) of the NLRA gives "the Board the primary responsibility and broad discretion to devise remedies that effectuate the policies of the Act, subject only to limited judicial review." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 898-99 (1984) (reversing court of appeals for making the Board's remedial order more stringent). As a general rule, then, this Court displaces the Board's chosen remedy "only if it can be shown that it is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *NLRB v. Int'l Ass'n of Bridge Structural & Ornamental Iron Workers*, 864 F.2d 1225, 1235 (5th Cir. 1989) (cleaned up).

Here, the Board majority acted well within its remedial discretion in rejecting the ALJ's recommendation that Tesla "be ordered to convene its employees and have Elon Musk . . . read the notice aloud to employees" or look on as a Board agent reads the notice to the employees in Musk's presence. ROA.6291. The Board majority sensibly concluded that "a notice-reading remedy is neither necessary nor appropriate to remedy the

violations in this case because the Board's traditional remedies will suffice." ROA.6247.

But contrary to Board counsel's portrayal, NLRB Br. 57-58, the Union's appeal is misguided not only because of the degree of deference at play but also because of the "extraordinary" nature of a notice-reading remedy. *UNF W., Inc. v. NLRB*, 844 F.3d 451, 463 (5th Cir. 2016). This Court has expressed strong "skepticism" about this type of Board remedy and has limited it to cases involving a "repeat violator" of the NLRA. *Denton Cnty. Elec. Coop.*, 962 F.3d at 174. In doing so, it endorsed the D.C. Circuit's description of the remedy as "a mandated confession of sins by the employer [that] conjure[s] up the system of criticism-self-criticism devised by Stalin and adopted by Mao" and that is "incompatible with the democratic principles of the dignity of man." *Id.* (cleaned up) (quoting *HTH*, 823 F.3d at 675, 677). And "[t]he option to have the notice read by a board member does not assuage [these] concerns." *Id.* at 175. Where, as here, that option "still requires that the notice be read by a Board agent in the presence of" the singled-out company official, "[m]any of the same concerns . . . are present." *Id.* Under this precedent, the Board's refusal to order a notice-reading remedy could not possibly be improper.

And, tellingly, the Union identifies no court, ever, that reversed a Board for **not** ordering such a remedy.[6]

In fact, ordering a notice-reading remedy would have been constitutionally problematic in its own right and ample ground for reversal. This case does not involve "repeated violations persisted in despite intervening declarations of illegality." *Denton Cnty. Elec. Coop.*, 962 F.3d at 174 (quoting *UNF W.*, 844 F.3d at 463). Each of the purported NLRA violations occurred before the Board even began its hearing into the Union's charges. (The last of the supposed violations—Musk's purportedly threatening tweet—took place on May 20, 2018, and the ALJ hearing got underway June 11, 2018. *See* Tesla Pet. Br. 10-11; ROA.12.) The Union halfheartedly tries to portray this case as a repeat-violator case by suggesting that the Board General Counsel's **complaints** against Tesla in 2017 and 2018 put the company "on notice." UAW Pet. Br. 20-21. But a

---

[6] The Union instead relies on court rulings that upheld (*UNF West*) or reversed (*Denton County Electric Cooperative*) Board decisions to impose a notice-reading remedy. Union Br. 18-19; *see also NLRB v. Homer D. Bronson Co.*, 273 F. App'x 32, 39 (2d Cir. 2008) (upholding the Board's remedy given the highly deferential standard of review); *Advancepierre Foods, Inc. v. NLRB*, 966 F.3d 813, 820-21 (D.C. Cir. 2020) (same).

General Counsel complaint provides nothing more than unproven "prosecutorial" allegations; the "resolution of contested unfair labor practice cases is adjudicatory" and the province of the five-member Board, not the agency's General Counsel. *NLRB v. United Food & Com. Workers Union, Local 23*, 484 U.S. 112, 125 (1987); *see also* 29 U.S.C. § 153(a), (d).[7]

The Board acted appropriately in rejecting the ALJ's proposed notice-reading remedy—particularly when the linchpin of the Union's argument for a notice-reading remedy, the May 20 tweet, is not an unfair labor practice but constitutionally protected speech. *See* Tesla Pet. Br. 27-52. And at a minimum, Tesla's and Musk's efforts to clarify that the tweet was not a threat defeat any possible argument that the tweet counts as the sort of "egregious" violation that might justify a notice-reading remedy. *Denton Cnty. Elec. Coop.*, 962 F.3d at 174; *see* Tesla Pet. Br. 35-41.

---

[7] In *UNF West*, for example, the employer committed a fresh set of unfair labor practices in May 2014, *see* 844 F.3d at 455-56, **after** the administrative law judge had issued a decision finding unfair labor practices in a prior case, *UNF W., Inc.*, 361 N.L.R.B. 387, 387 (2014), *enforced*, *UNF W., Inc. v. NLRB*, No. 14-1181, 2016 WL 6080795 (D.C. Cir. Jan. 15, 2016) (per curiam).

## CONCLUSION

For all these reasons, the Court should deny the Union's petition for review.

Dated: October 5, 2021

Respectfully submitted,

s/ Michael E. Kenneally
David B. Salmons
Michael E. Kenneally
David R. Broderdorf
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 739-3000

*Counsel for Tesla, Incorporated*

# CERTIFICATE OF SERVICE

I certify that on this 5th day of October, 2021, I served a true and correct copy of the foregoing Brief of Intervenor Tesla, Incorporated on counsel of record for all other parties through this Court's CM/ECF system:

Ruth E. Burdick
Micah P. S. Jost
Kira Dellinger Vol
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, S.E.
Washington, DC  20570
appellatecourt@nlrb.gov
micah.jost@nlrb.gov
kira.vol@nlrb.gov

*Counsel for Respondent*
*National Labor Relations Board*

Daniel E. Curry
Margo A. Feinberg
SCHWARTZ, STEINSAPIR,
   DOHRMANN & SOMMERS LLP
6300 Wilshire Boulevard
Suite 2000
Los Angeles, CA  90048
dec@ssdslaw.com
margo@ssdslaw.com

*Counsel for Petitioner*
*International Union, United*
*Automobile, Aerospace and*
*Agricultural Implement Workers*
*of America, AFL-CIO*

s/ Michael E. Kenneally
Michael E. Kenneally

*Counsel for Tesla, Incorporated*

# CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), this document contains 5,428 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and 5th Cir. R. 32.1, and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document was prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

Dated:  October 5, 2021                    s/ Michael E. Kenneally
                                           Michael E. Kenneally

                                           *Counsel for Tesla, Incorporated*