# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 31, 2023

Lyle W. Cayce
Clerk

No. 21-60285

Tesla, Incorporated,

*Petitioner Cross-Respondent*,

International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO,

*Petitioner*,

*versus*

National Labor Relations Board,

*Respondent Cross-Petitioner*.

Petition for Review of an Order of the
National Board of Labor Relation Board
NLRB Order No. 370 NLRB No. 101

Before Dennis, Southwick, and Wilson, *Circuit Judges*.

Per Curiam:

This case arises from a tense union campaign at Tesla's electric vehicle manufacturing plant in Fremont, California. The United Auto Workers union ("UAW") and three pro-union Tesla employees filed

multiple charges with the National Labor Relations Board ("NLRB") alleging unfair labor practices against Tesla. An Administrative Law Judge ("ALJ") found that Tesla had committed most of the alleged violations, and the NLRB issued an order largely affirming the ALJ. Both Tesla and the UAW filed petitions for review, and the NLRB filed a cross-application to enforce its order.

Tesla and the UAW each challenge two of the NLRB's findings through this appeal.[1] Tesla first challenges the NLRB's finding that Tesla CEO Elon Musk posted an unlawful threat on Twitter. In addition, Tesla objects to the NLRB's conclusion that employee Richard Ortiz was unlawfully terminated. The UAW, on the other hand, appeals the NLRB's finding that Tesla did not unlawfully solicit and promise to remedy grievances in response to a safety petition submitted by employees. The UAW also contends that the NLRB abused its discretion in not ordering a public notice-reading remedy. Yet the NLRB's findings were supported by substantial evidence, and it did not abuse its broad remedial discretion in declining to issue a notice-reading remedy. We therefore DENY the petitions for review, and GRANT the NLRB's cross-application to enforce its order.

## I. Factual and Procedural Background

Tesla, Inc. ("Tesla") is a "technology and design corporation" with a car manufacturing facility in Fremont, California, where the alleged labor violations in this case occurred. In the summer of 2016, Tesla employee Jose Moran reached out to the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, AFL-CIO ("UAW" or "Union") because he was interested in unionizing Tesla employees. As part of the unionization effort, the UAW created a Voluntary

---

[1] On appeal, much of the NLRB's order goes uncontested by either Tesla or the UAW.

Organizing Committee ("VOC") of employees who acted as union organizers. Along with Moran and others, Richard Ortiz, Jonathan Galescu, and Michael Sanchez were VOC members. This appeal centers around three separate incidents relating to efforts to unionize Tesla employees, which are described below.

### A. Tesla's Response to the Safety Petition

As part of the UAW campaign at Tesla, employees who supported unionization engaged in leafletting, distributed union paraphernalia, and wore union jackets and shirts to work. Both Moran and Ortiz also spoke to California state legislators to advocate on behalf of pro-union legislation. Ortiz further requested safety records from the California Division of Occupational Safety and Health, and employees requested safety statistics from Tesla as well. In February 2017, Moran posted online an article describing safety conditions and wages at Tesla and advocating for unionization. The day after the article was posted online and gained attention, union supporters handed out leaflets and copies of the article to employees in the parking lot. The article prompted a companywide email response from Musk to all Tesla employees two weeks later.

Between March and June 2017, VOC members (including Ortiz and Moran) distributed a petition regarding safety conditions at Tesla. On June 6, Moran emailed Musk and Josh Hedges, a senior human resources director for production and supply chain at Tesla. Hedges the safety petition on behalf of the VOC. The email discussed the safety concerns in the petition and the belief that a union would be the best way to improve safety, and requested a written response from Tesla to Moran. Moran also hand-delivered a copy of the petition to Hedges.

On June 7, 2017, Musk and Gaby Toledano, Tesla's "chief people officer,"[2] met with Moran and another employee, Tony Vega, to discuss the safety petition. During the meeting, Moran and Vega shared their safety concerns and desire to unionize; Toledano invited them to attend Tesla's weekly safety committee meeting to share their concerns. Musk added that if the safety committee meetings did not work out, "we'll give you your union." According to an email from Hedges, the safety committee meetings referenced during the June 7 meeting "are recurring and part of [Tesla's] existing safety review process," and are voluntary and open to "all employees." About a week after the meeting, Musk, Toledano, and others discussed via email having union supporters join Tesla's safety team full-time in order "to turn adversaries into those responsible for the problem," and to transition some of the more vocal union organizers into salaried safety team positions so that they would be considered part of management and thus unable to advocate for unionization.

## B. Tesla's Termination of Ortiz

In September 2017, three Tesla employees—including Travis Pratt, who was not a union supporter—went to the California legislature at the behest of Tesla to testify at a public hearing against legislation supported by the UAW. Ortiz and others had gone to the legislature the previous month to advocate for the proposal. Ortiz did not attend the hearing and had difficulty accessing a video recording, so he sent a link to Moran and asked if Moran could open the video and if he knew who the three employees were. Using his personal phone, Moran watched the video, noted the names of the

_____

[2] As "chief people officer," Toledano was in charge of overseeing day-to-day operations, as well as the environmental health and safety team; she reported directly to Musk.

employees, and used Tesla's "Workday" program[3] to search for the employees' names to verify that they were Tesla employees. Moran took screenshots of the Workday profiles of the three employees and sent them to Ortiz. The Workday profiles included a photo of each employee. At the time, Tesla had no policy prohibiting such use of Workday or otherwise restricting access to the program.

Ortiz posted two of the screenshots—including a screenshot of Pratt's profile—to a private "Tesla Employees for UAW Representation" Facebook page[4] and included a comment that the pictured employees were "in Sacramento saying we are lying about how things are at Tesla." Ortiz noted that Pratt said at the public hearing that his salary was $130,000, and commented, "[t]his just proves how much kissing ass and ratting on people get you at Tesla and the ones that do the real work get passed over." Though the Facebook group was private, and Pratt was not a member, someone sent him the post. Pratt then sent Ortiz a message, objecting to the "name calling," after which Ortiz quickly removed the post from Facebook.

Pratt also sent a text message and a screenshot of the post to Hedges. Pratt's text message said, referring to the testimony in Sacramento, "[l]ooks like we got under some people's skin," followed by a smiley face. Hedges asked whether the post was on Facebook, and Pratt responded, "Yea lol [laugh out loud] I'm pretty sure its on their fair future at Tesla thing." Pratt

---

[3] "Workday is a third-party HR software program that [Tesla] uses to electronically store and access employees' personnel files. Employees can access Workday to, among other things, view and electronically sign documents."

[4] Employees interested in unionizing voted on a campaign slogan, "Driving a Fair Future at Tesla," and the UAW created a public website and public Facebook group, "A Fair Future at Tesla," in support of its campaign. Moran also created a private, not publicly-viewable Facebook group called "Tesla Employees for UAW Representation." While the public group could be joined and viewed by anybody on Facebook, access to the private group was restricted and required approval from Moran or Ortiz.

also allegedly told Hedges by phone that he felt harassed and targeted because of the Facebook post.[5] After speaking with Pratt, Hedges submitted a complaint to Tesla's employee-relations team and contacted Tesla investigator Ricky Gecewich about the situation. A few days later, Gecewich interviewed Pratt, who repeated his story.

Gecewich also interviewed Ortiz, who said he apologized and removed the post after Pratt contacted him. Gecewich then asked where the pictures came from and Ortiz said he could not remember, which he later admitted was a lie. Gecewich obtained logs of who had viewed Pratt's Workday profile and identified Moran. Gecewich met with Moran, who said he accessed Pratt's Workday profile to confirm that he was a Tesla employee after seeing his testimony at the legislature. Moran told Gecewich that he needed to identify anti-union employees as part of the unionization campaign. He also told Gecewich he sent the screenshots to Ortiz. Gecewich met with Ortiz again, and Ortiz admitted that he had lied to protect Moran's identity.

Gecewich wrote a report that recommended firing Ortiz for "admittedly lying," and disciplining Moran "for accessing Workday for non-business related purposes." The report said Moran claimed he was asked by a UAW representative to verify whether Pratt and others were Tesla employees. The report also said that Moran had admitted to using Workday for other personal purposes in the past—for example, to compare his title to other employees. Hedges agreed with Gecewich's recommendations and chose Stephan Graminger, Tesla's Director of Body Manufacturing, to be the ultimate decisionmaker as to Ortiz.

---

[5] Pratt did not testify before the ALJ. Ortiz, Hedges, Moran, and Gecewich did. The ALJ found Moran credible, found Ortiz credible in part, and found Hedges and Gecewich not credible, giving reasons for each credibility finding.

Gecewich met with Graminger, along with Ortiz's direct manager, Juan Martinez, and another HR official. Gecewich told Graminger that Ortiz had leaked personal information and lied during the investigation. Graminger did not make an immediate decision, but first asked his superior, Peter Hoch-holdinger, whether similar cases involving lying during an investigation had resulted in termination and was told that, according to personnel policy, lying resulted in termination. After receiving this information, Graminger approved the decision to fire Ortiz.[6] Ortiz's employment at Tesla was terminated on October 18, 2017. Ortiz's termination was not based on any specific HR policy.

### C. Elon Musk's Twitter Activity

Elon Musk maintains the Twitter handle "@elonmusk" as his personal account, and uses it to tweet[7] about Tesla's business decisions and plans, finances, production goals, personnel matters, and breaking news. On May 20, 2018, Musk tweeted:

> Nothing stopping Tesla team at our car plant from voting union. Could do so tmrw if they wanted. But why pay union dues & give up stock options for nothing? Our safety record is 2X better than when plant was UAW & everybody already gets healthcare.

Musk's tweet was in response to another user, @dmatkins137, who asked Musk, in part, "How about unions?" Over the next few days, other users and Musk interacted on the same "thread"[8] of tweets, as well as on an additional

---

[6] The ALJ found Graminger to be a "more credible witness" than Hedges and Gecewich.

[7] "[T]he social media platform Twitter allows its users to publish short messages, photographs, videos, and hyperlinks (all called 'tweets') to the general public. Other users may respond or republish those tweets and engage in virtual dialogues with other users on the platform." *Campbell v. Reisch*, 986 F.3d 822, 823 (8th Cir. 2021).

[8] When one looks at a tweet, "[a] comment thread appears below the original tweet and includes both the first-level replies (replies to the original tweet) and second-level replies (replies to the first-level replies)." *Knight First Amendment Inst. at Columbia Univ.*

thread. In later tweets posted several days after the May 20 post, Musk stated that he believed that the "UAW does not have individual stock ownership as part of the compensation at any other company," and as such, Tesla employees would lose stock options if they unionized because "UAW does that." None of the Twitter users that Musk interacted with during these tweets were Tesla employees.

On May 23, 2018, the UAW filed an unfair-labor-practice charge based on the May 20 tweet, alleging that the tweet was a threat to rescind stock options if employees unionized in violation Section 8(a)(1) of the National Labor Relations Act ("NLRA").

### D. The Current Proceedings

The UAW, Ortiz, and two other employees (Galescu and Sanchez) filed multiple unfair-labor-practice charges with the NLRB, and the NLRB's General Counsel filed complaints against Tesla alleging violations of the NLRA. After a 13-day trial, the ALJ issued a recommended decision and order against Tesla on most of the alleged violations.

Both Tesla and the UAW filed exceptions with the NLRB. A three-member panel of the NLRB reviewed the ALJ's findings and issued a decision and order. The NLRB affirmed most of the ALJ's findings, dismissed several allegations, and modified the order against Tesla accordingly. Both Tesla and the UAW filed petitions for review; the NLRB filed a cross-application to enforce its order.

### II. Legal Standards

"Judicial review of NLRB decisions and orders is limited and deferential." *In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707, 714 (5th Cir.

---

*v. Trump*, 928 F.3d 226, 230 (2d Cir. 2019), *vacated as moot*, 141 S. Ct. 1220 (2021). Twitter threads thus "reflect multiple overlapping conversations among and across groups of users and are a large part of what makes Twitter a social media platform." *Id.* (citation and quotation marks omitted).

2018). The NLRB's factual findings are "conclusive" so long as they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion. It is more than a mere scintilla, and less than a preponderance." *IBEW, Loc. Unions 605 & 985 v. NLRB*, 973 F.3d 451, 457 (5th Cir. 2020) (citation omitted). "The court may not make credibility determinations or reweigh the evidence, and should defer to the plausible inferences the Board draws from the evidence, even if the court might reach a contrary result were it deciding the case de novo." *Id.* (cleaned up). "Only in the most rare and unusual cases will an appellate court conclude that a finding of fact made by the [NLRB] is not supported by substantial evidence." *Flex Frac Logistics, L.L.C. v. NLRB*, 746 F.3d 205, 208 (5th Cir. 2014) (citing *Merchs. Truck Line, Inc. v. NLRB*, 577 F.2d 1011, 1014 n. 3 (5th Cir. 1978)).

The NLRB's legal conclusions are reviewed *de novo. Id.* at 207. However, this court "accord[s] *Chevron* deference to the Board's interpretations of ambiguous provisions of the NLRA," and "will uphold the Board's interpretations 'so long as [they are] rational and consistent with the Act.'" *IBEW*, 973 F.3d at 457 (quoting *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 349 (5th Cir. 2013) (citation omitted)). "In recognition of the Board's primary responsibility for administering the Act and its expertise in labor relations, we give significant deference to the Board's application of the law to the facts[.]." *In-N-Out Burger, Inc,* 894 F.3d at 714. The NLRB's choice of remedy "must be upheld unless it can be shown that the board either abused its discretion or exceeded its statutory authority." *NLRB v. Kaiser Agric. Chem.*, 473 F.2d 374, 382 (5th Cir. 1973). "The close relationship between labor policy and choice of remedy, coupled with the board's competence and expertise in the field of labor relations, dictate that the board's judgment be given 'special respect by reviewing courts.'" *Id.* (quoting *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 n.32 (1969)).

## III. Discussion

Because the NLRB is entitled to summary enforcement of the uncontested portions[9] of its order, we address only the four issues raised by Tesla and the UAW in this appeal. *Remington Lodging & Hosp., L.L.C. v. NLRB.*, 847 F.3d 180, 186 n.24 (5th Cir. 2017) (challenges not raised in a petitioner's opening brief are waived). First, Tesla argues that the NLRB erred in finding that Tesla CEO Elon Musk's May 20, 2018, tweet that mentioned stock options constituted threatening employees with loss of benefits if they unionized in violation of the NLRA. Second, Tesla contends that the NLRB erred in concluding that Tesla violated the NLRA by firing Ortiz. Third, the UAW challenges the NLRB's finding that Tesla did not violate the NLRA by soliciting and promising to remedy grievances during the June 7 meeting. Finally, the UAW argues that the NLRB abused its discretion in not ordering a notice-reading remedy. We address each of these issues in turn.

### A. Elon Musk's Twitter Activity

The ALJ found that Musk's tweet[10] violated Section 8(a)(1) because it could only be reasonably understood by employees as a threat to unilaterally rescind stock options if employees unionized, rather than as a carefully

---

[9] Specifically, the NLRB asserts that it is entitled to summary enforcement of its order pertaining to the following violations: (1) interfering with employee leafletting; (2) prohibiting employees from distributing union materials without approval/threatening them with discharge; (3) threatening that selecting the UAW would be futile; (4) prohibiting employees from communication with the media about their employment; (5) interrogating certain employees about union activity; (6) promulgating a rule restricting Workday use in response to Ortiz and Moran's union activity; and (7) disciplining Moran for his union activity. We agree, and GRANT the NLRB's petition to enforce its order in this regard.

[10] As explained above, the tweet at issue stated "[n]othing stopping Tesla team at our car plant from voting union. Could do so tmrw if they wanted. But why pay union dues & give up stock options for nothing? Our safety record is 2X better than when plant was UAW & everybody already gets healthcare."

phrased prediction, based on objective fact, of the likely consequences of unionization beyond Tesla's control. The NLRB affirmed the ALJ's findings and ordered Musk to delete the tweet. Tesla argues that the tweet, especially when viewed in context, was not a threat and was instead protected by Section 8(c) of the NLRA and the First Amendment.

Initially, the parties dispute the standard of review applicable to the NLRB's factual findings. Tesla argues that the court should conduct a *de novo*, non-deferential review of the facts. Yet binding precedent requires us to apply the substantial evidence standard of review to factual findings as to whether a written statement is reasonably understood as a threat or tends to be coercive. *See Gissel*, 385 U.S. at 619–20 (referring to written materials); *NLRB. v. Riley-Beaird, Inc.*, 681 F.2d 1083, 1086–87 (5th Cir. 1982) (applying substantial evidence standard of review to speech issue); *NLRB. v. Mangurian's, Inc.*, 566 F.2d 463, 466–67 (5th Cir. 1978) (simultaneously analyzing employer's argument that its statements were protected by NLRA Section 8(c) and the First Amendment).

"An unlawful threat is established under § 8(a)(1) [of the NLRA], if under the totality of the circumstances, an employee could reasonably conclude that the employer is threatening economic reprisals if the employee supports the union." *NLRB v. Delta Gas., Inc.*, 840 F.2d 309, 311 (5th Cir. 1988). "The test for determining 'whether an employer has violated § 8(a)(1) is whether the employer's questions, threats or statements tend to be coercive, not whether the employees are in fact coerced[.]'" *Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 634 (5th Cir. 2003) (quoting *NLRB v. PNEU Electric, Inc.*, 309 F.3d 843, 850 (5th Cir. 2002)). Whether an employer is making an unlawful threat is measured objectively, from the perspective of an employee, and is not contingent on "either the motivation behind the remark or its actual effect." *Miller Elec. Pump & Plumbing*, 334 NLRB 824, 824 (2001); *Brown & Root, Inc.*, 333 F.3d at 634 (stating that the test "is whether the employer's questions, threats or statements tend to be coercive, not whether the employees are in fact coerced").

Section 8(c) of the NLRA states that "[t]he expressing of any views, argument, or opinion, or the dissemination thereof . . . shall not constitute or be evidence of an unfair labor practice under any of the provisions of this sub-chapter, if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). To fall outside Section 8(a)(1), then, an employer's prediction of the effects of unionization "must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control." *Gissel*, 395 U.S. at 618. If the employer's statement instead carries "any implication that an employer may or may not take action solely on his own initiative" in response to unionization, then it may be a "threat of retaliation." *Id.* Thus, a statement implying that unionization will result in the loss of benefits, without some explanation or reference to the collective-bargaining process, economic necessity, or other objective facts, is a coercive threat, while such a statement is not a threat if made in the context, for example, of explaining that existing benefits may be traded away during the bargaining process. *UNF W., Inc. v. NLRB*, 844 F.3d 451, 458 (5th Cir. 2016).

While the NLRA "implements the First Amendment" and demonstrates "congressional intent to encourage free debate on issues dividing labor and management," that free debate is not without limits. *Chamber of Com. of U.S. v. Brown*, 554 U.S. 60, 67 (2008) (quoting *Linn v. Plant Guard Workers*, 383 U.S. 53, 62 (1966)); *see also Gissel*, 395 U.S. at 618 ("[A]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.'").

Tesla first argues that Musk's May 20, 2018, tweet "was not threatening on its face" because the tweet started out by saying that there was "[n]othing stopping" employees from unionizing and it is a strain to characterize "give up stock options for nothing" as a threat, because, unlike the threat of plant closure, compensation is not within the employer's unilateral

control once employees unionize and the parties engage in collective bargaining. However, because stock options are part of Tesla's employees' compensation, and nothing in the tweet suggested that Tesla would be forced to end stock options or that the UAW would be the cause of giving up stock options, substantial evidence supports the NLRB's conclusion that the tweet is as an implied threat to end stock options as retaliation for unionization. Moreover, the statement in the tweet is materially similar to other statements that the NLRB and our court have found to be threats. *See, e.g., NLRB v. Bama Co.*, 353 F.2d 320, 323 (5th Cir. 1965) (supervisors threatened "unionization would probably result" in lost benefits); *Hendrix Mfg. Co. v. NLRB*, 321 F.2d 100, 104 (5th Cir. 1963) ("if the Union came in, the current profit sharing plan would be discontinued"); *Intermedics, Inc.*, 262 NLRB 1407 (1982), *enforced by NLRB v. Intermedics, Inc.*, 715 F.2d 1022 (5th Cir. 1983) ("if the Company were to go union the employees would lose all their benefits").

Tesla next argues that the tweet was not a threat because it was grounded in the objective fact that UAW-represented employees at other companies supposedly do not have stock options. But the test is whether the tweet would have been reasonably understood by employees as a threat and therefore whether it tended to be coercive, not whether employees would have been able to independently verify that the tweet was based in objective fact. *Brown & Root*, 333 F.3d at 634. Moreover, the tweet itself did not include any objective facts that would lead a reasonable employee to conclude that the UAW, rather than Tesla, would be the cause of employees giving up stock options.

Lastly, Tesla argues that the May 20, 2018, tweet is not a threat when placed within the context of the same Twitter thread as a whole, as well as a related Twitter thread, and a later press release.[11] Tesla argues that the ALJ

---

[11] As explained above, on May 22, 2018, two days after the initial tweet, Musk was asked by another Twitter user, in a reply to his initial May 20 tweet, "[a]re you threatening to take away benefits from unionized workers?", to which he responded "No, UAW does

erred by not analyzing the tweet in the context of later tweets and communications, which demonstrate that Musk believed the UAW would take away stock options and clarified that the original tweet was not a threat. First, Musk's later tweets and publications were not "contemporaneous," and thus cannot change whether the original tweet was a threat. *UNF W., Inc.*, 844 F.3d at 458 ("contemporaneous or earlier contextual factors can influence a statement's reasonable import for the listener at the time that the statement was uttered" (citation omitted)). Second, although "additional comments can be made to clarify, expand, or otherwise alter the context and reasonable import" of the original tweet, the parties' stipulated that "[i]t is not possible to know or determine if every individual that viewed the tweets by Elon Musk [on] May 20 also viewed the tweets by Elon Musk [from] May 22 and 23," *id.*, and Tesla's history of labor violations supports the NLRB's finding that employees would understand Musk's tweet as a threat to commit another violation by rescinding stock options as retaliation.

Based on the foregoing, we DENY Tesla's petition for review, and GRANT the NLRB's cross-application for enforcement of its order that Musk delete the tweet.

## B. Tesla's Termination of Ortiz

The ALJ determined that Tesla violated Section 8(a)(1) and (a)(3) of the NLRA by terminating Ortiz. First, the ALJ found that Ortiz and Moran were engaged in "protected concerted activity" when Moran sent the Workday profile screenshots to Ortiz, and further, that Ortiz reasonably understood that Gecewich was inquiring about those protected activities. Alternatively, the ALJ also analyzed the termination under the *Wright Line*

---

that." The next day, May 23, writing on a different Twitter thread, Musk tweeted "UAW does not have individual stock ownership as part of the compensation at any other company."

"mixed-motive" framework[12] and found that union activity was a motivating factor in his discharge and that Tesla's reason for the termination was pretextual.

"[A]n employer violates section 8(a)(3) and (1) of the Act by discharging employees because of their union activity." *NLRB v. ADCO Elec. Inc.*, 6 F.3d 1110, 1116 (5th Cir. 1993). While an employer has a legitimate right to investigate "facially valid complaints of employee misconduct, including complaints of harassment," the NLRA also protects an employee's right to keep his or her union activities confidential, even if that means giving evasive or untruthful answers in response to an employer's questions that an employee reasonably believes are inquiries into protected union activity. *Fresenius Usa Mfg., Inc.*, 362 NLRB 1065, 1065 (2015); *Paragon Sys., Inc. & Arthur J. Blake*, 362 NLRB 1561, 1565 (2015). Accordingly, "an employer cannot avoid liability by pointing to evasive statements by an employee in response to questioning 'inextricably involved' with the employee's protected conduct." *Cordua*, 985 F.3d at 429.

On appeal, Tesla maintains that the NLRB's decision that Ortiz's termination was an unfair labor practice is not supported by substantial evidence because he was fired for cause—lying during an investigation into workplace misconduct. Tesla argues that the NLRB failed at *Wright Line* step one to prove union animus, and that Ortiz was fired for a legitimate reason at step two—lying during an investigation into employee misconduct. Apart from the *Wright Line* framework, Tesla argues that the NLRA does not protect employees who lie during investigations into workplace misconduct. However, substantial evidence supports the NLRB's determination that

---

[12] When an employer gives a facially lawful reason for discharging an employee, the employer's motivation is analyzed under the two-step *Wright Line* framework. *Wright Line, A Div. of Wright Line, Inc.*, 251 NLRB 1083 (1980). "Under this framework, an employer's termination of an employee violates Section 8(a)(1) if the employee's protected conduct was a motivating factor in the decision to discharge the employee." *Cordua Restaurants, Inc. v. NLRB*, 985 F.3d 415, 423 (5th Cir. 2021).

Ortiz was fired for lying about protected union activity and not related to his job performance or Tesla's legitimate business interests or workplace rules, and that union animus motivated—at least in part[13]—the complaint, investigation, and decision to terminate Ortiz.

Indeed, the ALJ found that the shift in the focus of the investigation from the alleged harassment caused by the Facebook post to the identity of who accessed Workday was circumstantial evidence of union animus. The ALJ based this finding on other unfair labor practices established on the record, as well as the fact that the aim of Gecewich's investigation was union activity since Gecewich knew the context within which the Facebook post and Workday use occurred, and the purpose of his questioning was to discover the identity of Ortiz's fellow pro-union colleague, Moran—information that Tesla did not have a legitimate right to discover, considering that Tesla had no rule restricting use of Workday. The ALJ also identified errors in Gecewich's report to Graminger, including an incorrect allegation that Ortiz publicly disclosed confidential employee information. The ALJ also found the initial complaint of harassment from Pratt to Hedges (and Hedges's complaint to Gecewich) to be disingenuous given the content of Pratt's text messages to Hedges.[14]

Substantial evidence thus supported the finding that discriminatory animus motivated Tesla's termination of Ortiz because Graminger relied on Gecewich's investigation (initiated by Hedges's complaint) and recommendation, and the ALJ plausibly found that union animus motivated the complaint, the investigation, and the decision to terminate Ortiz. Tesla has not presented a sufficient basis for displacing the NLRB's finding of discriminatory intent, especially in light of this court's special reluctance to

---

[13] Motivation can be inferred from circumstantial evidence, and union animus need not be the sole motivating factor. *Cordua*, 985 F.3d at 429.

[14] The NLRB affirmed the ALJ's factual findings.

overturn factual findings of discriminatory motive or intent. *See N.L.R.B. v. Brookwood Furniture, Div. of U.S. Indus.*, 701 F.2d 452, 464 (5th Cir. 1983) ("a reviewing court may not lightly displace the Board's factual finding of discriminatory intent").

For the above reasons, we DENY Tesla's petition for review, and GRANT the NLRB's cross-application for enforcement of its order that Ortiz be reinstated with backpay.

### C. Tesla's Response to the Safety Petition

The ALJ found that, at the June 7, 2017, meeting regarding Moran's safety petition, Tesla solicited grievances from Moran and Vega and implicitly promised to remedy those grievances, and in doing so, violated Section 8(a)(1). The NLRB, however, disagreed with the ALJ and did not adopt her findings on this alleged violation, instead finding no violation. In its petition for review, the UAW argues that the NLRB's decision is not supported by substantial evidence.

An employer violates Section 8(a)(1) if it solicits and promises to remedy employee grievances during a union campaign. *NLRB v. Pope Maint. Corp.*, 573 F.2d 898, 905 (5th Cir. 1978). However, there is no violation unless the employer promises the benefit of remedying the grievance. *See Riley-Beaird, Inc.*, 681 F.2d at 1086–87. When an employer begins a new policy of soliciting grievances in response to union activity, an inference can be made that there is an implied promise to resolve them, in violation of the NLRA. *Capitol EMI Music*, 311 NLRB 997, 1007 (1993); *Reliance Elec. Co.*, 191 NLRB 44, 46 (1971). However, no violation occurs if the employer merely maintains a past practice regarding employee grievances. *Kingsboro Med. Grp.*, 270 NLRB 962, 963 (1984).

The NLRB found that Tesla neither solicited the grievances nor promised to remedy them, and thus did not violate the NLRA. The UAW challenges the NLRB's conclusion based on the unusual nature of a meeting with the CEO of the company, and the emails between Musk, Toledano, and

others that discuss the idea of neutralizing union organizers like Moran by making them managers. The UAW also argues that the NLRB erred because Musk's statements during the meeting constituted an unlawful request for a "second chance" before unionization, in violation of the NLRA.

Contrary to the UAW's contentions, however, the NLRB's determinations are supported by substantial evidence. The NLRB found that Tesla did not unlawfully solicit the employees' safety grievances because the June 7 meeting was prompted by the safety petition delivered by Moran the previous day, and because Musk's statement that "we'll give you your union" if the weekly safety committee meeting did not work out, did not convey an implied promise to remedy those concerns. *Nat'l Micronetics*, 277 NLRB 993, 993 (1985) (vague statements that express general desire to do better do not rise to level of illegal promise); *Noah's New York Bagels, Inc.*, 324 NLRB 266, 267 (1997) (same). Moreover, Tesla had a pre-existing practice of holding safety committee meetings and inviting employees to attend, and there is no evidence that the safety committee meetings were created in response to the petition or the June 7 meeting. *Kingsboro Med. Grp.*, 270 NLRB 962, 963 (1984) ("employer who has had a past policy and practice of soliciting employee grievances may continue such a policy and practice during a union's organizational campaign").

Because the NLRB's decision is supported by substantial evidence and its interpretation of the evidence is plausible, we DENY the UAW's petition for review of this decision.

### D. The Notice-Reading Order

The ALJ's recommended decision and order included a notice-reading remedy requiring that an NLRB-provided notice be read aloud to Tesla employees at the Fremont facility either by Musk himself or by a NLRB employee with Musk present. The NLRB amended the ALJ's remedy to remove the notice-reading requirement, determining that a notice-reading remedy was "neither necessary nor appropriate to remedy the violations"

because "the Board's traditional remedies will suffice." On appeal, the UAW argues that the NLRB abused its discretion in not ordering a notice reading.

Section 10(c) of the NLRA confers broad remedial discretion upon the NLRB. 29 U.S.C. § 160(c); *Fibreboard Paper Prod. Corp. v. NLRB*, 379 U.S. 203, 216 (1964) ("The Board's [remedial] power is a broad discretionary one, subject to limited judicial review."). Nonetheless, public notice reading is an "extraordinary remedy." *UNF W., Inc.*, 844 F.3d at 463. The NLRB will order a notice-reading remedy "where the violations are so numerous and serious that the reading aloud of a notice is considered necessary to enable employees to exercise their Section 7 rights in an atmosphere free of coercion, or where the violations in a case are egregious." *U.S. Postal Serv.*, 339 NLRB 1162, 1163 (2003).

The UAW argues that a notice-reading remedy is necessary because of the numerous unfair-labor practices found in this case, some involving the direct involvement of high-level management, including CEO Elon Musk. The UAW cites no authority mandating a notice reading to remedy repeated violations in the absence of intervening cease-and-desist orders. And, as Tesla emphasizes, the company at most continued to commit violations after having a complaint filed against it, not after being ordered to cease its conduct. *Cf. UNF W., Inc.*, 844 F.3d at 463 (notice-reading remedy warranted because employer committed "second round" of violations after ALJ ordered it to cease "the same problematic conduct" in a previous case); *Fallbrook Hosp. Corp.*, 360 NLRB 644, 658 (2014) (explaining that notice-reading remedy was warranted in earlier case that "involved multiple rounds of litigation, including a previous order to set aside an election"). Moreover, given the deferential standard of review and the "special respect" given to the NLRB's choice of remedy in light of its policy expertise and its broad, discretionary remedial powers, we decline to disturb the NLRB's order in this regard. *See Gissel*, 395 U.S. at 612 n.32; *Kaiser Agric. Chem.*, 473 F.2d at 382.

The UAW's petition for review of the NLRB's removal of the notice-reading remedy is DENIED.

## IV. Conclusion

For the foregoing reasons, we DENY the petitions for review, and GRANT the NLRB's cross-application to enforce its order.