No. 21-60285

# In the United States Court of Appeals
## FOR THE FIFTH CIRCUIT

TESLA, INCORPORATED,

*Petitioner Cross-Respondent*

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, AFL-CIO,

*Petitioner*

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent Cross-Petitioner*

On Petitions for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board

## EN BANC BRIEF OF PETITIONER CROSS-RESPONDENT TESLA, INCORPORATED

DAVID B. SALMONS
MICHAEL E. KENNEALLY
DAVID R. BRODERDORF
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 739-3000

*Counsel for Tesla, Incorporated*

## CERTIFICATE OF INTERESTED PERSONS

### *No. 21-60285, Tesla, Inc. v. NLRB*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1.    Petitioner Cross-Respondent Tesla, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

2.    Morgan, Lewis & Bockius LLP is Counsel for Tesla.

3.    David B. Salmons is Counsel for Tesla.

4.    Michael E. Kenneally is Counsel for Tesla.

5.    David R. Broderdorf is Counsel for Tesla.

6.    Petitioner International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO ("UAW"), is a labor union.

7.    Schwartz, Steinsapir, Dohrmann & Sommers LLP is Counsel for the UAW.

8.    Daniel E. Curry is Counsel for the UAW.

9.    Margo A. Feinberg is Counsel for the UAW.

10.   Respondent the National Labor Relations Board is a federal agency.

11.   Ruth E. Burdick is Counsel for the Board.

12.   Micah P. S. Jost is Counsel for the Board.

13.   Kira Vol is Counsel for the Board.


Dated:  August 30, 2023              s/ Michael E. Kenneally
                                     MICHAEL E. KENNEALLY

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ..........................................i

TABLE OF AUTHORITIES ................................................................. vi

INTRODUCTION ................................................................................ 1

JURISDICTIONAL STATEMENT ..................................................... 5

STATEMENT OF ISSUES ................................................................. 5

STATEMENT OF THE CASE ............................................................ 6

I.     Statutory background ................................................................ 6

II.    Factual background ................................................................. 10

       A.    The UAW campaign criticizes compensation at Tesla,
             which, unlike compensation at other automakers,
             includes a significant stock-based component..................... 10

       B.    In answering a random Twitter user's question about
             unions, Musk identifies disadvantages of unionization....... 12

       C.    Tesla fires Ortiz for lying during an investigation into
             his alleged harassment of a coworker using company
             resources.......................................................................... 17

III.   Procedural background ............................................................ 21

SUMMARY OF ARGUMENT ........................................................... 24

STANDARD OF REVIEW ................................................................ 26

ARGUMENT ..................................................................................... 28

I.     The Board erred in ordering the deletion of Musk's tweet. .......... 28

# TABLE OF CONTENTS
(continued)

**Page**

A.  The First Amendment requires the Court to engage in non-deferential, de novo review of the NLRB's attempt to restrict speech. ............................................................ 29

B.  The Board failed to prove that Musk's tweet was an unlawful threat of reprisal. ................................................ 34

    1.  It would not have been reasonable for Tesla employees to interpret Musk's speech as a threat. ..... 36

        a.  The content was not objectively threatening. .... 36

        b.  The context precludes the Board's reading. ....... 38

    2.  Musk did not issue the tweet with a culpable and conscious disregard of the risk that employees would feel threatened. .................................................. 46

C.  The Board's deletion remedy was improper. ........................ 49

II.  The Board erred in ordering Ortiz's reinstatement with backpay. .......................................................................... 50

A.  The NLRA does not entitle employees to lie during investigations into workplace misconduct. ........................... 51

B.  Ortiz's termination was lawful under *Wright Line*. ............. 56

    1.  The Board failed to prove that anti-union animus motivated the discharge. .............................................. 58

    2.  Tesla proved it would have discharged Ortiz regardless of his union activity. ................................... 64

CONCLUSION ................................................................................. 65

iv

# TABLE OF CONTENTS
(continued)

**Page**

CERTIFICATE OF SERVICE.................................................. 66

CERTIFICATE OF COMPLIANCE....................................... 67

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allied Chem. & Alkali Workers of Am. v. Pittsburgh Plate Glass Co.*,
  404 U.S. 157 (1971) .............................................................. 28

*Asarco, Inc. v. NLRB*,
  86 F.3d 1401 (5th Cir. 1996) ......................................... 60, 62

*Bose Corp. v. Consumers Union of U.S., Inc.*,
  466 U.S. 485 (1984) .................................................... *passim*

*Brown & Root, Inc. v. NLRB*,
  333 F.3d 628 (5th Cir. 2003) ................................. 27, 33, 40

*Cadillac of Naperville, Inc. v. NLRB*,
  14 F.4th 703 (D.C. Cir. 2021) ............................................ 32

*Cellco P'ship v. NLRB*,
  892 F.3d 1256 (D.C. Cir. 2018) .................................. *passim*

*Chamber of Com. of U.S. v. Brown*,
  554 U.S. 60 (2008) ..................................................... *passim*

*Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) .......................................................... 32

*Circus Circus Casinos, Inc. v. NLRB*,
  961 F.3d 469 (D.C. Cir. 2020) .......................................... 64

*Citizens Publ'g & Printing Co. v. NLRB*,
  263 F.3d 224 (3d Cir. 2001) ............................................... 5

*Consol. Commc'ns, Inc. v. NLRB*,
  837 F.3d 1 (D.C. Cir. 2016) .............................................. 56

*Counterman v. Colorado*,
  143 S. Ct. 2106 (2023) ............................................... *passim*

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Crowell v. Benson,*
   285 U.S. 22 (1932)................................................................32

*Crown Cork & Seal Co. v. NLRB,*
   36 F.3d 1130 (D.C. Cir. 1994) .......................................8, 36

*D.R. Horton, Inc. v. NLRB,*
   737 F.3d 344 (5th Cir. 2013)...........................................27

*Dow Chem. Co. v. NLRB,*
   660 F.2d 637 (5th Cir. 1981).........................................45

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const.*
   *Trades Council,*
   485 U.S. 568 (1988)....................................................24, 33

*FDRLST Media, LLC,*
   370 N.L.R.B. No. 49 (Nov. 24, 2020) .................................49

*FDRLST Media, LLC v. NLRB,*
   35 F.4th 108 (3d Cir. 2022)..............................39, 44, 45, 49

*Fed.-Mogul Corp. v. NLRB,*
   566 F.2d 1245 (5th Cir. 1978).........................34, 45, 52, 64

*Fla. Steel Corp. v. NLRB,*
   529 F.2d 1225 (5th Cir. 1976).......................................53, 62

*Fla. Steel Corp. v. NLRB,*
   587 F.2d 735 (5th Cir. 1979).........................................34

*Ford Motor Co. v. NLRB,*
   441 U.S. 488 (1979)......................................................28

*Fresenius USA Mfg., Inc.,*
   362 N.L.R.B. 1065 (2015)..........................................53, 54

vii

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Frisby v. Schultz,*
  487 U.S. 474 (1988)................................................................50

*Guess?, Inc.,*
  339 N.L.R.B. 432 (2003)....................................................43, 55

*Hendrickson USA, LLC v. NLRB,*
  932 F.3d 465 (6th Cir. 2019)............................................37, 38

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.,*
  515 U.S. 557 (1995)..........................................................24, 30

*Lechmere, Inc. v. NLRB,*
  502 U.S. 527 (1992)................................................................28

*Lion Elastomers LLC,*
  372 N.L.R.B. No. 83, slip op. (May 1, 2023) .......................56

*Med. Ctr. of Ocean Cnty.,*
  315 N.L.R.B. 1150 (1994)......................................................38

*Metro. Edison Co. v. NLRB,*
  460 U.S. 693 (1983)..................................................................9

*Nat'l Tel. Directory Corp.,*
  319 N.L.R.B. 420 (1995).........................................................55

*Nichols Aluminum, LLC v. NLRB,*
  797 F.3d 548 (8th Cir. 2015).................................................61

*NLRB v. Arkema, Inc.,*
  710 F.3d 308 (5th Cir. 2013)......................................27, 57, 61

*NLRB v. Big Three Indus. Gas & Equip. Co.,*
  441 F.2d 774 (5th Cir. 1971).........................................33, 45

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*NLRB v. Fin. Inst. Emps. of Am.*,
  475 U.S. 192 (1986)................................................................27

*NLRB v. Gissel Packing Co.*,
  395 U.S. 575 (1969)....................................................... *passim*

*NLRB v. Golub Corp.*,
  388 F.2d 921 (2d Cir. 1967) ...............................................36

*NLRB v. Jones & Laughlin Steel Corp.*,
  301 U.S. 1 (1937)..................................................................9

*NLRB v. Ky. River Cmty. Care, Inc.*,
  532 U.S. 706 (2001).............................................................43

*NLRB v. Pentre Elec. Inc.*,
  998 F.2d 363 (6th Cir. 1993)...............................................43

*NLRB v. Ray Smith Transp. Co.*,
  193 F.2d 142 (5th Cir. 1951)...............................................62

*NLRB v. River Togs, Inc.*,
  382 F.2d 198 (2d Cir. 1967) ..........................................8, 35

*NLRB v. Transp. Mgmt. Corp.*,
  462 U.S. 393 (1983).........................................................9, 56

*NLRB v. Vill. IX*,
  723 F.2d 1360 (7th Cir. 1983).............................................43

*Peel v. Att'y Registration & Disciplinary Comm'n*,
  496 U.S. 91 (1990).........................................................30, 32

*Phila. Newspapers, Inc. v. Hepps*,
  475 U.S. 767 (1986).............................................................43

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Poly-Am., Inc. v. NLRB,*
260 F.3d 465 (5th Cir. 2001) .................................................. 57, 58, 64

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015) ................................................................ 34

*Selkirk Metalbestos, N. Am., Eljer Mfg., Inc. v. NLRB,*
116 F.3d 782 (5th Cir. 1997) ............................................... 46

*Snyder v. Phelps,*
562 U.S. 443 (2011) ........................................................ 30, 32

*STP Nuclear Operating Co. v. NLRB,*
975 F.3d 507 (5th Cir. 2020) ............................................... 28

*Thomas v. Collins,*
323 U.S. 516 (1945) ............................................................... 6

*Thornhill v. Alabama,*
310 U.S. 88 (1940) ................................................................. 7

*Tschiggfrie Props., Ltd. v. NLRB,*
896 F.3d 880 (8th Cir. 2018) ............................................... 61

*United States v. Stevens,*
559 U.S. 460 (2010) .............................................................. 34

*Universal Camera Corp. v. NLRB,*
340 U.S. 474 (1951) .............................................................. 27

*Valmont Indus., Inc. v. NLRB,*
244 F.3d 454 (5th Cir. 2001) ............................................... 57

*Watts v. United States,*
394 U.S. 705 (1969) ......................................................... 45, 46

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Whitney v. California,*
　274 U.S. 357 (1927).............................................................................50

*Wright Line,*
　251 N.L.R.B. 1083 (1980)............................................................. *passim*

**STATUTES & CONSTITUTIONAL PROVISION**

29 U.S.C.
　§ 151 *et seq.* (National Labor Relations Act) ............................. *passim*
　§ 157 (NLRA § 7)........................................................................ 6, 62
　§ 158 (NLRA § 8)........................................................................ *passim*
　§ 160 (NLRA § 10)...................................................................... *passim*

U.S. CONST. amend. I................................................................... *passim*

**OTHER AUTHORITIES**

@elonmusk, TWITTER (May 20, 2018, 11:44 PM PDT),
　https://twitter.com/elonmusk/status/998454539941367808 .............. 13

@elonmusk, TWITTER (May 22, 2018, 12:32 PM PDT),
　https://twitter.com/elonmusk/status/999010167793504256 .............. 14

@elonmusk, TWITTER (May 23, 2018, 3:24 PM PDT),
　https://twitter.com/elonmusk/status/999415738967277568 .............. 15

FED. R. CIV. P. 52(a)................................................................................29

Henry P. Monaghan, *Constitutional Fact Review*, 85 COLUM. L.
　REV. 229, 244 n.84 (1985) ................................................................31

Jeffrey M. Hirsch, *Labor Law Obstacles to the Collective
　Negotiation and Implementation of Employee Stock Ownership
　Plans: A Response to Henry Hansmann and Other
　"Survivalists,"* 67 FORDHAM L. REV. 957 (1998) .................................42

## INTRODUCTION

For many decades, the law has recognized that speech about labor disputes is a matter of public concern, receives robust First Amendment protection, and requires room for free and spirited debate. Yet the National Labor Relations Board ("NLRB" or "Board") has long sought to enforce a hardline view against employers' criticisms of unionization. This is a case in point. When Tesla's CEO responded to a random Twitter user's question, to explain why Tesla employees were not embracing union representation with open arms, the NLRB made a federal case out of it. In its view, Elon Musk's spontaneous, personal tweet to a non-employee was Tesla's way of threatening employees with economic reprisals if they voted for union representation—even though Musk quickly confirmed that his tweet was not meant as any threat. The Board has ordered Tesla to direct Musk to delete the tweet from Twitter.

An objective reader would not read the tweet in this way. In response to a wholly unprovoked question ("How about unions?"), Musk affirmed that there was "[n]othing stopping [the] Tesla team at our car plant from voting union . . . if they wanted." ROA.4536-37. "But why," he asked, "pay union dues & give up stock options for nothing?"

1

ROA.4537. That rhetorical question was not, as the Board maintains, a threat that Tesla would end employee stock options in retaliation—just as it was not a threat that Tesla would start pressuring employees to give their money to the union. Rather, it expressed an opinion about the drawbacks of unionization, which Musk followed with statements about the existing strengths of Tesla—namely that its "safety record [wa]s 2X better" than when the plant's workers were union-represented and that "everybody already gets healthcare," even without a union. ROA.4537.

On its face, the tweet was not the threat the Board made it out to be, and the context provides still further proof that reasonable Tesla employees would not have read it that way. Tesla employees already knew that stock-based compensation was a point of controversy between Tesla and the supporters of the United Auto Workers ("UAW" or "Union"). Earlier in the UAW's campaign, Union supporters had portrayed Tesla compensation as subpar, and in reply Musk spotlighted the stock-based component of employees' compensation, unique within the auto industry. Musk said that Tesla felt it important for employees to be part-owners of the company. It is common knowledge, though, that many unions oppose stock-based compensation. And the UAW is no exception. Against this

2

backdrop, a Tesla employee who stumbled across the tweet would have understood what Musk meant:  the Union, if elected, would negotiate to end stock options, just as it would negotiate to impose union dues.

A day and a half later, Musk explicitly confirmed that this was what he meant.  In the same Twitter thread, another random user asked pointblank whether Musk was "threatening to take away benefits from unionized workers."  ROA.4537.  Musk tweeted back that he was not: rather, "UAW does that" to create division between managers and workers.  ROA.4537.  Tesla described the tweet the same way through many media outlets.  It would have made no sense, in any case, for Musk to threaten workers in this setting, even if he had wanted to do so.  His original tweet was not a statement directed to Tesla employees.  He was responding to some random guy on the internet.  There is no evidence that any Tesla employee saw his tweet and construed it as a threat.  The Board's contrary interpretation is indefensible, warrants no deference from this Court, and should be set aside rather than enforced.

In contrast to its hypercritical attitude toward Musk's speech, the Board showed extreme protectiveness toward speech by a Union supporter, Richard Ortiz.  The Board did so even though the statement at

issue was a lie, as Ortiz himself would later admit. One of Ortiz's coworkers complained to Tesla when Ortiz posted the coworker's profile picture from Tesla's internal human resources database on a pro-Union Facebook page. In doing so, Ortiz accused the coworker of having gotten ahead at Tesla by "kissing ass and ratting on people" rather than doing "real work." ROA.3194. A Tesla employee relations investigator met with Ortiz, Ortiz lied about where he got the Tesla profile photos, and the NLRB found that Tesla "terminated Ortiz for lying during [this] investigation." ROA.6285. Even so, the NLRB ruled that the termination was unlawful. Ortiz, the Board decided, had a right to lie to Tesla during its investigation into his reported misconduct. It ordered that Tesla reinstate Ortiz with backpay.

That ruling conflicts with the text of the National Labor Relations Act ("NLRA" or "Act") and governing precedent. The statute says in plain terms that "[n]o order of the Board shall require the reinstatement of any individual . . . , or the payment to him of any back pay, if such individual was . . . discharged for cause." 29 U.S.C. § 160(c). Not surprisingly, this Court and others have recognized lying as grounds for discharge. The Court should not enforce this erroneous ruling, either.

4

## JURISDICTIONAL STATEMENT

The Board issued its Decision and Order on March 25, 2021. Tesla petitioned for this Court's review on April 2, 2021. The UAW petitioned for review in the Ninth Circuit on April 2, 2021. The U.S. Judicial Panel on Multidistrict Litigation consolidated the two petitions in this Court on April 13, 2021. The Board applied for enforcement of its Order on April 21, 2021. This Court has jurisdiction because the Decision and Order is a final order, and venue is proper because Tesla transacts business within this Circuit. *See* 29 U.S.C. § 160(e), (f). The petitions and cross-application are timely because the NLRA imposes no time limit for such filings. *See, e.g.*, *Citizens Publ'g & Printing Co. v. NLRB*, 263 F.3d 224, 232 (3d Cir. 2001).

## STATEMENT OF ISSUES

1.     Whether the Board erred in holding that Tesla violated the NLRA through Elon Musk's May 20, 2018 tweet.

2.     Whether the Board erred in holding that Tesla violated the NLRA through its investigation and discharge of Richard Ortiz.

## STATEMENT OF THE CASE

### I.    Statutory background

A.    Section 7 of the NLRA gives employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."  29 U.S.C. § 157.  Section 8(a)(1), in turn, makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of [those] rights."  *Id.* § 158(a)(1).

From the Act's early days, the Board took an "aggressive" position against employer speech about unions, on the theory that Sections 7 and 8 "demanded complete employer neutrality during organizing campaigns." *Chamber of Com. of U.S. v. Brown*, 554 U.S. 60, 66 (2008).  But the Supreme Court immediately rejected that approach. *Id.* at 66-67 (citing *NLRB v. Va. Elec. & Power Co.*, 314 U.S. 469, 477 (1941)).  Within a decade of the NLRA's passage, it was well settled that "employers' attempts to persuade to action with respect to joining or not joining unions are within the First Amendment's guaranty." *Thomas v. Collins*, 323

U.S. 516, 537 (1945).  Similarly, the Court had made clear that discussions about "labor relations are not matters of mere local or private concern," but rather are "indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society."  *Thornhill v. Alabama*, 310 U.S. 88, 103 (1940).

Yet even after those decisions, "the NLRB continued to regulate employer speech too restrictively in the eyes of Congress."  *Chamber of Com.*, 554 U.S. at 67.  So, in 1947, Congress made significant statutory changes to the NLRA through the Taft-Hartley Act.  *See id.*  Included in those changes was the addition of Section 8(c):

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

29 U.S.C. § 158(c).  This provision not only "implements the First Amendment" but also effectuates Congress's strong "intent to encourage free debate on issues dividing labor and management."  *Chamber of Com.*, 554 U.S. at 67 (quoting *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969), and *Linn v. Plant Guard Workers*, 383 U.S. 53, 62 (1966)).  The Supreme

Court has repeatedly instructed that Section 8(c) embodies an important policy judgment made by Congress itself, "favoring uninhibited, robust, and wide-open debate in labor disputes." *Id.* at 67-68 (quoting *Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 273 (1974)). Congress wanted to safeguard the "freewheeling use of the written and spoken word." *Id.* at 68 (quoting *Letter Carriers*, 418 U.S. at 272).

Even so, in the decades since, courts have voiced concern that the Board takes a slanted view against speech unfavorable to unions. *See, e.g.*, *NLRB v. River Togs, Inc.*, 382 F.2d 198, 202 (2d Cir. 1967) (Friendly, J.) ("Although the Board apparently thinks workers should be shielded from such disconcerting information, an employer is free to tell his employees what he reasonably believes will be the likely economic consequences of unionization that are outside his control, as distinguished from threats of economic reprisal to be taken solely on his own volition."); *Crown Cork & Seal Co. v. NLRB*, 36 F.3d 1130, 1140 (D.C. Cir. 1994) ("[I]f unions are free to use the rhetoric of Mark Antony while employers are limited to that of a Federal Reserve Board chairman, . . . the employer's speech is not free in any practical sense.").

B.     Section 8(a)(3) of the NLRA makes it an unfair labor practice to "discourage" union membership "by discrimination in regard to . . . tenure of employment."  29 U.S.C. § 158(a)(3).  As a result, employers must not discharge employees because of their union activities to discourage union activity more broadly.  *See, e.g.*, *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 394 (1983), *abrogated in part on other grounds by Dir., Off. of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267 (1994).  Because such violations of Section 8(a)(3), by definition, seek to interfere with union activity, they also count as "derivative" violations of Section 8(a)(1).  *See, e.g.*, *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 698 n.4 (1983).

At the same time, however, "[t]he act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them," and "the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than . . . intimidation and coercion."  *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 45-46 (1937).  In fact, Section 10(c) forbids the Board from ordering reinstatement or backpay in favor of an employee "discharged for cause."  29 U.S.C. § 160(c).

## II. Factual background

### A. The UAW campaign criticizes compensation at Tesla, which, unlike compensation at other automakers, includes a significant stock-based component.

In 2016, the UAW launched a campaign to represent employees at Tesla's manufacturing facility in Fremont, California. ROA.6251, ROA.6254; *see* ROA.56-57 (Reed). Several employees joined the Union's voluntary organizing committee, including Jose Moran and Richard Ortiz. ROA.6254; *see* ROA.58-59 (Reed). Moran was familiar with the Union because it had represented him and his coworkers at New United Motors Manufacturing, Inc., a company that had previously occupied the Fremont facility but ultimately shut down. ROA.6254; *see* ROA.684-85, ROA.689 (Moran); ROA.2120 (Hunt).

The organizing committee members campaigned for the Union through various channels. Among other things, they created a website and Facebook group called "A Fair Future at Tesla." ROA.6254; *see* ROA.59-60 (Reed); ROA.695-700 (Moran); ROA.3784; ROA.3786. Moran also created a closed Facebook group called "Tesla Employees for UAW Representation." ROA.6255; *see* ROA.691-92 (Moran). Union supporters handed out many thousands of leaflets and flyers inside and outside the

Fremont facility.  ROA.6254-55; *see* ROA.60-62 (Reed).  Moran authored an online post arguing for the Union and criticizing Tesla's record on worker safety and compensation, and this post was distributed widely via leaflets at the Fremont facility and garnered much attention.  ROA.6255; *see* ROA.63 (Reed); ROA.703-04 (Moran); ROA.3779-81.

Safety and compensation were central topics in the Union campaign.  Among other channels, CEO Elon Musk disputed these arguments for UAW representation through an email to all Tesla employees on February 24, 2017.  ROA.6255; *see* ROA.4839-40.  As to safety, his email observed that Tesla's safety incident rate was less than half the industry average.  ROA.4840.  And as to compensation, he emphasized Tesla's unique commitment to stock-based compensation, which set Tesla apart from other car companies where the workers were already represented by the UAW:

> At Tesla, we believe it is important for everyone to be an owner of the company.  This is your company.  That is why, unlike other car companies, everyone is awarded shares and you get to buy stock at a discount compared to the public through the employee stock purchase program.  Last year, stock equity grants were increased significantly and it will happen again later this year once Model 3 achieves high volume.

> The chart below contrasts the total comp received
> by a Tesla production team member who started
> on January 1, 2013 against the total comp received
> over the same period at GM, Ford, and Fiat Chrys-
> ler. A four year period is used because that's the
> vesting length of a new hire equity grant. I believe
> the equity gain over the next four years will be
> similar. As shown below, a Tesla team member
> earned between $70,000 and $100,000 more in to-
> tal compensation than the employees at other US
> auto companies!

ROA.4840; *see also* ROA.3827 (online news article from February 9, 2017

reporting Musk's comments, in response to Moran, "that Tesla offers a

higher starting pay than those unionized in the United Automobile, Aer-

ospace and Agricultural Implement Workers of America (UAW) and that

'total compensation is higher for a given level of seniority when factoring

in stock grants.'").

**B.    In answering a random Twitter user's question about unions, Musk identifies disadvantages of unionization.**

On May 20, 2018, Musk tweeted a photo of a SpaceX rocket from

his personal Twitter account (@elonmusk). ROA.4536; ROA.4755 (¶ 13);

*see* ROA.3297 (¶¶ 3, 5). Twitter enables users to respond to other tweets

by adding their own messages as part of a larger "thread." ROA.4755

(¶ 5). Musk's SpaceX tweet garnered many responses, including from a

non-Tesla employee, David Atkins (@dmatkins137). He responded with

the headline of an article claiming that Tesla factory conditions were unsafe "because Elon Musk hates the color yellow." ROA.4536 (some capitalization omitted); ROA.4755 (¶¶ 7, 12). Musk criticized the reporting, and, unprompted, Atkins abruptly turned the discussion to unions:

| @elonmusk: | Tesla factory literally has miles of painted yellow lines & tape. Report about forklifts not beeping is also bs. These are both demonstrably false, but were reported as "facts" by Reveal. |
| @dmatkins137: | Yellow is fine, got it. How about unions? |
| @elonmusk: | Nothing stopping Tesla team at our car plant from voting union. Could do so tmrw if they wanted. But why pay union dues & give up stock options for nothing? Our safety record is 2X better than when plant was UAW & everybody already gets healthcare. |

ROA.4536-37; *see also* @elonmusk, TWITTER (May 20, 2018, 11:44 PM PDT), https://twitter.com/elonmusk/status/998454539941367808.

Less than two days later, Eric Brown (@ericbrownzzz)—again, not a Tesla employee—added another response. ROA.4755 (¶¶ 8, 12). He directly asked whether Musk was threatening to take away employees' stock options. Musk answered that he was not threatening to end employee stock options but that the UAW would seek to do so:

| | |
|---|---|
| @ericbrownzzz: | Hi Elon, why would they lose stock options?  Are you threatening to take away benefits from unionized workers? |
| @elonmusk: | No, UAW does that.   They want divisiveness & enforcement of 2 class "lords & commoners" system.   That sucks.  US fought War of Independence to get *rid* of a 2 class system!  Managers & workers shd be equal w easy movement either way.  Managing sucks btw.  Hate doing it so much. |

ROA.4537; *see also* @elonmusk, TWITTER (May 22, 2018, 12:32 PM PDT),

https://twitter.com/elonmusk/status/999010167793504256.

The next day, May 23, Musk reaffirmed that employees were free to vote for the Union but unlikely to want to, and that he was not making any threat, after another Twitter user (@AltWouss) highlighted Musk's earlier clarification:

| | |
|---|---|
| @elonmusk: | I've never stopped a union vote nor removed a union.  UAW abandoned this factory.  Tesla arrived & gave people back their jobs.  They haven't forgotten UAW betrayed them.  That's why UAW can't even get people to attend a free BBQ, let alone enough sigs for a vote. |
| @jackallisonLOL: | Yesterday you said they'd lose stock options if they unionized |

14

| | |
|---|---|
| @AltWouss: | You took that out of context, he clarified that in a response where he believed that UAW does not allow union workers to own stock. |
| @elonmusk: | Exactly. UAW does not have individual stock ownership as part of the compensation at any other company. |

ROA.4539; *see also* @elonmusk, Twitter (May 23, 2018, 3:24 PM PDT), https://twitter.com/elonmusk/status/999415738967277568. These two other Twitter users—@jackallisonLOL and @AltWouss—are apparently not Tesla employees, either. ROA.4755 (¶¶ 10-12).

The same day, the Union filed an unfair labor practice charge against Tesla based on Musk's May 20 tweet. ROA.3252. It claimed that Tesla violated the NLRA "by threatening to take away employee stock options in retaliation for Tesla employees engaging in protected union activity." *Id.*

The Union's charge attracted media attention, and Tesla issued a formal response. Many outlets—including *Bloomberg News*, CBS, CNBC, CNN, *The Hill*, and *Investor's Business Daily*—reported on the Union's accusation and Tesla's response, which stressed that the tweet was not a threat but part of a larger dialogue about compensation.

15

ROA.4893-4932. Some articles paraphrased Tesla's response, ROA.4922;

ROA.4931, while others reprinted it verbatim:

> Elon's tweet was simply a recognition of the fact that unlike Tesla, we're not aware of a single UAW-represented automaker that provides stock options or restricted stock units to their production employees, and UAW organizers have consistently dismissed the value of Tesla equity as part of our compensation package. . . .
>
> We fundamentally believe it's critical that all employees be owners of Tesla so that everyone is on the same team, with all sharing in the company's success. This has been highly successful and led to Tesla compensation being the highest in the auto industry.

ROA.4916-17; *see also* ROA.4896; ROA.4901; ROA.4905; ROA.4910-11;

ROA.4925.

The Union never submitted evidence that any UAW-represented automaker did offer stock-based compensation or that any of these Tesla statements were false. ROA.6180. Nor did any Tesla employees ever come forward claiming to have understood Musk's tweet as a threat. The record identifies only one Tesla employee—Moran—as having seen the tweet, and he did not say he found it threatening. ROA.755, ROA.839-43 (Moran); ROA.6179-80.

## C.     Tesla fires Ortiz for lying during an investigation into his alleged harassment of a coworker using company resources.

By this point, a separate controversy had arisen from Tesla's October 18, 2017 termination of Ortiz's employment.  ROA.6283; *see* ROA.545-47 (Ortiz).  The termination followed a month-long process prompted by Ortiz's inappropriate response to three coworkers' decision to testify against a California legislative proposal favored by the Union. ROA.6277; *see* ROA.509-10 (Ortiz); ROA.4832.  Ortiz did not attend the hearings and could not access online video recordings of them, but he wanted to know which of his coworkers had spoken out against the legislation.  ROA.6277; *see* ROA.511-12 (Ortiz).  He forwarded the online video link to Moran to see if Moran could open it.  ROA.6277; *see* ROA.512-13 (Ortiz).  Ortiz asked Moran who the employees were so that Ortiz could "walk up to them" and say, "see you in Sacramento suck ass." ROA.6278; *see* ROA.3218.

Moran watched the video and identified the employees.  Rather than just give Ortiz their names, Moran texted photos from their Tesla Workday profiles.  ROA.6278; *see* ROA.3220-23.  Workday is internal human resource software that hosts Tesla policies and personnel records.

17

ROA.6252-53; *see* ROA.454-55 (Ortiz); ROA.687 (Moran).  It is not acces-

sible to the public:  employees must use their own Tesla-provided login

information to access a coworker's Workday profile.    ROA.6278; *see*

ROA.687-88, ROA.739-40 (Moran).

Ortiz took the Workday pictures of two of these employees—Travis

Pratt and Shaun Ives—and posted them on the "Tesla Employees for

UAW Representation" Facebook group with this message:

> These guys been in Sacramento saying we are
> lying about how things are at Tesla Management
> has been taking them one of them sez he made
> $130000 last year . . . This just proves how much
> kissing ass and ratting on people get you at Tesla
> and the ones that do the real work get passed over

ROA.6278; *see* ROA.522-23 (Ortiz); ROA.3194.

Someone who saw this post forwarded it to Pratt.  ROA.6278; *see*

ROA.1836, ROA.2251 (Gecewich); ROA.4510-12.  In addition to confront-

ing Ortiz directly, Pratt texted Josh Hedges, a Tesla HR official who had

invited Pratt to testify against the California legislation.  ROA.6278-79

& n.79; *see* ROA.1199 (Hedges); ROA.3194.  Pratt said he felt harassed

and  targeted  by  Ortiz's  Facebook  post.    ROA.6278;  *see*  ROA.1201,

ROA.1231, ROA.1245, ROA.1249 (Hedges).  Hedges passed along Pratt's

concerns to Tesla Employee Relations, which opened an investigation on September 16.  ROA.6278-79; *see* ROA.1131-32, ROA.1202 (Hedges).

Ricky Gecewich led the investigation.  ROA.6279; *see* ROA.1820-21 (Gecewich).  He first talked to Pratt, who reiterated that he felt harassed, and then to the employee who had sent Pratt the Facebook post, who said he found the post disgusting and inappropriate.  ROA.6279-80; *see* ROA.1924-25 (Gecewich); ROA.4510; ROA.4514-15.  On September 21, Gecewich interviewed Ortiz.  ROA.6280.  Gecewich asked whether Ortiz had taken screenshots of the Workday photos himself.  ROA.535 (Ortiz).  Ortiz said he had not.  *Id.*  Gecewich then asked where the photos had come from, and Ortiz said he "didn't know" and could not remember.  *Id.*; *see also* ROA.537 (Ortiz); ROA.4519.  As Ortiz would later admit, that was a lie.  ROA.537, ROA.647-48 (Ortiz).

Computer records revealed that Moran was the source of the Workday photos.  ROA.6280-81; *see* ROA.2296 (Gecewich); ROA.4528; ROA.4717-18.  Gecewich spoke with Ortiz again, and this time Ortiz acknowledged he had not been truthful in the first interview.  ROA.6281; *see* ROA.1862-63, ROA.2321 (Gecewich); ROA.4534.

Because of Ortiz's dishonesty, Gecewich's report recommended discharge. ROA.6281; *see* ROA.4507-10.  It explained that Ortiz "knowingly misle[d]" Employee Relations, "lied about knowing the source of the Workday screenshots," and "admitted to not telling the truth during the investigation interviews." ROA.4508.  Gecewich based this recommendation not just on the facts of this case, but also on what Tesla had done in similar cases. ROA.6281; *see* ROA.1871-72, ROA.1936-37 (Gecewich).

The ultimate decisionmaker was Stephan Graminger. ROA.6282; *see* ROA.1283 (Graminger).  On October 17, Graminger met to discuss the matter with Ortiz's department manager, an HR official, and Gecewich. ROA.6282; *see* ROA.1285-86, ROA.1305-06 (Graminger). Graminger asked if similar cases had led to termination, and Gecewich confirmed that they had. ROA.6283; *see* ROA.1311-12 (Graminger); ROA.1873-75, ROA.1941 (Gecewich).  But Graminger did not make an immediate decision because he felt it was a sensitive case and he was new to the company. ROA.6283; *see* ROA.1307 (Graminger).  He instead asked his superior, Peter Hochholdinger, whether similar lies had prompted termination in the past. ROA.6283; *see* ROA.1283, ROA.1308 (Graminger).  Hochholdinger confirmed that other Tesla employees had

been terminated for lying in investigations. ROA.6283; *see* ROA.1308 (Graminger). Graminger then decided to terminate Ortiz's employment. ROA.6283; *see* ROA.1308-09 (Graminger). As he testified, Ortiz's union activity played no role in his decision. ROA.1309-10 (Graminger). The decision was based solely on Ortiz's lie to Gecewich. ROA.1326 (Graminger). Gecewich told Ortiz the next day, October 18. ROA.6283; *see* ROA.545-46 (Ortiz); ROA.2088 (McIntosh).

## III.    Procedural background

The Union filed unfair labor practice charges, ROA.6251, and the Board's General Counsel alleged that Tesla violated Section 8(a)(1) of the NLRA through Musk's May 20, 2018 stock-options tweet and violated Section 8(a)(1) and (a)(3) by investigating and terminating Ortiz. ROA.2798-2800; ROA.3379-83.[1] Tesla moved for summary judgment on the tweet-related allegations, ROA.5801-32; ROA.5869-84, but the Board summarily denied the motion, ROA.5886.

After thirteen days of testimony on assorted charges, ROA.6251, the ALJ ruled that Musk's tweet violated the NLRA. ROA.6288-90. She

---

[1] The Union and General Counsel alleged other NLRA violations, too, but Tesla's appeal here is limited to the issues related to the tweet and Ortiz termination. *See* ROA.6239.

characterized the tweet as a "threat of unilateral discontinuation of existing benefits if the employees unionized." ROA.6289. Although she briefly mentioned Musk's and the company's clarifications about the tweet, ROA.6288-89 & n.110, her analysis disregarded them without explanation, ROA.6290.

The ALJ also determined that Tesla violated the NLRA by investigating and firing Ortiz. ROA.6277-88. While finding that Tesla "terminated Ortiz for lying during an investigation," she decided that the NLRA entitled Ortiz to lie because Gecewich's questions implicated "concerted activity" by the Union-supporting employees. ROA.6285. She reached the same conclusion, in the alternative, under the two-step framework of *Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced on other grounds*, 662 F.2d 899 (1st Cir. 1981). ROA.6286. She also faulted Tesla for investigating Pratt's complaint in the first place: "What should have been a discussion between two employees regarding their individual rights to organize or to not organize became an investigation into Ortiz." *Id.* The ALJ did not identify examples of comparable misconduct that resulted in lesser discipline, and indeed noted that an executive at a Tesla subsidiary

had been fired for lying to investigators. ROA.6287. Yet she still found that Ortiz's termination for the same conduct was "pretextual." *Id.*

The ALJ ordered Tesla to reinstate Ortiz with backpay and interest. ROA.6291. She also ordered Tesla to post a notice pledging not to threaten employees with loss of benefits if they vote for the Union. ROA.6293. On top of that, she issued an admittedly "extraordinary" remedy of having Musk personally read the notice—or listen to a Board agent's reading of it—in the presence of Tesla's employees, security guards, managers, and supervisors, plus Union and Board agents. ROA.6291.

The Board largely affirmed the ALJ's findings and conclusions on both issues but modified the remedy. ROA.6239. The Board eliminated the ALJ's notice-reading but added requirements that Musk "delete the unlawful tweet from the @elonmusk Twitter account" and that Tesla take steps to ensure that Musk does so. ROA.6247.

A panel of this Court denied Tesla's petition for review. On July 21, 2023, the Court granted Tesla's petition for rehearing en banc and vacated the panel decision.

## SUMMARY OF ARGUMENT

I.    Musk's "stock options" tweet was constitutionally protected speech, not a violation of the NLRA.  And, importantly, this Court owes no deference to the NLRB's contrary conclusion.  Because "the reaches of the First Amendment are ultimately defined by the facts it is held to embrace," appellate courts must decide de novo the facts that dictate whether speech falls within the First Amendment's protection.  *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 567 (1995); *see also Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 (1984).  The Supreme Court has made clear, too, that courts should not defer to the Board's applications of the NLRA that raise substantial free speech concerns.  *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575-76 (1988).

No reasonable Tesla employee would have read the tweet as a threat.  And for all the record shows, none did so.  On its face, the tweet merely expresses Musk's opinion that unrepresented Tesla employees are better off without Union representation.  The tweet's context makes that conclusion inescapable.  Employees knew already, from Musk's February 24, 2017 email, that employee stock ownership was central to

Tesla's philosophy and differentiated Tesla from automakers with UAW representation.  As a result, employees would have correctly interpreted the tweet as a defense of Tesla's compensation and warning that the UAW would seek to change it.  Were there any doubt, however, it quickly disappeared when Musk expressly confirmed, in the same Twitter thread, that the tweet was no threat.  And even if some employee somehow missed that confirmation, Tesla widely disseminated the same explanation of the tweet in the press that same week.

Even if the tweet could be read objectively as a threat that Tesla would reverse position and abandon employee stock ownership, that would not be enough under the First Amendment to restrict it.  The Supreme Court recently held that even where threats of *violence* are at issue, objectively threatening content is not enough.  The First Amendment additionally "requires proof that the defendant had some subjective understanding of the threatening nature of his statements." *Counterman v. Colorado*, 143 S. Ct. 2106, 2111 (2023).  In particular, the speaker must have "consciously disregarded a substantial risk that his communications would be viewed as threatening." *Id.* at 2112.  The record here forecloses such a finding.  Musk did not post the first tweet knowing and accepting

25

that employees might read it is as a threat. As soon as a Twitter user brought that potential misinterpretation to his attention, Musk shot it down, and Tesla did likewise. The NLRB did not find, and could not have found, that Musk tweeted with the requisite wrongful mental state.

II.    The Board also erred in ordering Tesla to reinstate Richard Ortiz. There is no basis for that order given the Board's express finding that Tesla fired Ortiz for lying during an investigation. The person who made the decision to terminate Ortiz gave uncontradicted testimony that he harbored no animus toward the UAW (and was actually a union-supporter himself) and that he made sure, before firing Ortiz, that Tesla had previously imposed similar discipline for similar misconduct. The NLRA does not authorize the Board to second-guess an employer's reasonable and consistently enforced policy against lying during a workplace investigation. Nor does it immunize employees who engage in such misconduct merely because they support a union. The Court should therefore set aside this part of the Board's Order as well.

## STANDARD OF REVIEW

Under the NLRA, the Board's factual findings are "conclusive" if they are "supported by substantial evidence on the record considered as

a whole." 29 U.S.C. § 160(e).  In considering the record as a whole, courts must "take into account whatever in the record fairly detracts from" the Board's cited evidence.  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).  Under this standard, "the Court is not left merely to accept the Board's conclusions," *Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 633 (5th Cir. 2003) (citation omitted), or act as "a mere rubber stamp," *NLRB v. Arkema, Inc.*, 710 F.3d 308, 314 (5th Cir. 2013).

This Court "review[s] the Board's legal conclusions de novo." *Arkema*, 710 F.3d at 315; *see also Brown & Root*, 333 F.3d at 633.  Though the Board receives some deference for its interpretations of the NLRA, the interpretation still must be "rational and consistent with the Act." *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 349 (5th Cir. 2013) (citation omitted).  "Deference to the Board 'cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption of major policy decisions properly made by Congress.'"  *NLRB v. Fin. Inst. Emps. of Am.*, 475 U.S. 192, 202 (1986) (citation and ellipsis omitted).  Courts therefore "refuse[] enforcement of Board orders where they ha[ve] 'no reasonable basis in law,' either because the proper legal standard was not applied or because the Board applied the correct standard but failed to give the

plain language of the standard its ordinary meaning." *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497 (1979) (citation omitted); *see also, e.g.*, *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 539 (1992) ("We cannot accept the Board's conclusion, because it 'rest[s] on erroneous legal foundations[.]'" (citation omitted)); *Allied Chem. & Alkali Workers of Am. v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 182 (1971) ("[T]he legal standard to be applied is ultimately for the courts to decide and enforce.").

In short, judicial review of NLRB orders is not "*pro forma*," and "deference has limits." *STP Nuclear Operating Co. v. NLRB*, 975 F.3d 507, 513-14 (5th Cir. 2020) (citations and ellipsis omitted). Moreover, as detailed in Section I.A below, the Board commands no deference when it concludes that speech is unprotected by the First Amendment or applies the NLRA in a way that raises serious First Amendment concerns.

## ARGUMENT

## I.    The Board erred in ordering the deletion of Musk's tweet.

The Board misapplied the NLRA and violated the First Amendment in ruling that Musk's May 20, 2018 tweet violated NLRA Section 8(a)(1). The Court should conduct a de novo, non-deferential review of the facts and law and set aside this part of the Board's Order.

A. **The First Amendment requires the Court to engage in non-deferential, de novo review of the NLRB's attempt to restrict speech.**

The NLRB maintains that this Court should defer to the agency's view that the First Amendment permits its efforts to restrict Musk's tweet. But that position contradicts blackletter doctrine. Ever since *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485 (1984), it has been clear that the First Amendment obligates appellate courts to independently and non-deferentially review a factfinder's determination that speech is unprotected by the First Amendment.

In *Bose*, a district court found after a bench trial that a defendant had knowledge or reckless disregard of the falsity of its allegedly libelous statement. *Id.* at 491. If true, that finding removed the speech from the First Amendment's protection. Rather than review the finding for clear error under Federal Rule of Civil Procedure 52(a), however, the appellate court reviewed it de novo and reversed. *Id.* at 492. The Supreme Court upheld the appellate court's decision because "an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Id.* at 499 (citations omitted).

29

This "rule of independent review" gives "judges a constitutional responsibility that cannot be delegated to the trier of fact"—whether judge or jury. *Id.* at 501. On critical First Amendment issues, appellate "[j]udges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold" for a content-based speech restriction. *Id.* at 511. Since *Bose*, the Supreme Court has consistently applied this rule across all free-speech contexts. *See, e.g.*, *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (whether speech addressed matters of public or private concern); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 567 (1995) (whether parade contained an element of expression); *Peel v. Att'y Registration & Disciplinary Comm'n*, 496 U.S. 91, 108 (1990) (plurality opinion) (whether commercial advertising had potential to mislead).

The Board maintains that agency findings are the exception to this rule. Appellate courts may independently review jury and bench trial verdicts, but they must defer to the NLRB's findings, the Board says, under the NLRA's substantial-evidence standard governs. This argument does not withstand scrutiny. The Board places heavy emphasis on *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969), but nowhere does that opinion

say, or even imply, that the statutory substantial-evidence standard trumps the constitutional requirement of independent judicial review. *Id.* at 8. To be sure, an employer did argue in *Gissel* that applying substantial-evidence review would violate the First Amendment. *See* Brief for the Petitioner at 49-51, *Sinclair Co. v. NLRB*, 395 U.S. 575 (1969) (No. 585), 1969 WL 120307. But the Supreme Court did not disagree. It did not explicitly address that argument at all, and never even used the phrase "substantial evidence" in the free-speech section of its opinion. *See Gissel*, 395 U.S. at 616-20. That could be because the Board largely conceded the point. It certainly did not advance its current extreme position. On the contrary, the Board affirmed the Court's obligation "to review the entire record and satisfy itself that the Board has not abridged the right of free speech." Brief for the National Labor Relations Board at 20, *Sinclair*, 395 U.S. 575 (No. 585), 1969 WL 136819. It pointedly declined to advance the claim, which it makes here, that "the Board's findings have presumptive validity" in this type of dispute. *Id.* at 19.

If a court follows *Bose* "rigorously," it should "not defer to the labor board's conclusion that certain employer speech is constitutionally unprotected." Henry P. Monaghan, *Constitutional Fact Review*, 85 COLUM.

L. REV. 229, 244 n.84 (1985); *see also Cadillac of Naperville, Inc. v. NLRB*, 14 F.4th 703, 723 (D.C. Cir. 2021) (Katsas, J., concurring in part and dissenting in part) (citing *Bose*, *Snyder*, and *Peel* as reasons not to defer to the NLRB's threat findings).  It would be backwards, under the Constitution's separation of powers, to afford more deference to the findings of politically motivated executive branch officials than courts afford to findings by judges and juries.  When core constitutional rights are at stake, "the judicial power of the United States necessarily extends to the independent determination of all questions, both of fact and law, necessary to the performance of [its] function."  *Crowell v. Benson*, 285 U.S. 22, 60 (1932); *see also* Monaghan, *supra*, at 239 (arguing that the reasons for de novo fact review are *more compelling* with agencies than with jury and bench trials because of "the 'legitimacy deficit' inherent in administrative adjudication").

    And in fact, the Supreme Court has repeatedly ruled that deference to the NLRB's application of the NLRA must yield to First Amendment concerns.  Under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the Board's interpretations of the NLRA command some deference.  But when those interpretations "raise serious

32

constitutional problems," the constitutional avoidance canon takes over and courts must "construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988).

Aside from being required by Supreme Court precedent, a non-deferential approach is also supported by this Court's precedent. For example, in *NLRB v. Big Three Industrial Gas & Equipment Co.*, 441 F.2d 774, 777 (5th Cir. 1971) (per curiam), the NLRB viewed a company letter as a "threat to withhold from the employees wage increases that otherwise would have been forthcoming." This Court rejected the NLRB's interpretation of the letter, emphasizing that "[i]nterpretations of the written word are questions of law, which this court is as capable of making as is the Board." *Id.* The Court was free to adopt a "differing legal interpretation of the Company's letter," and was not thereby rejecting "a factual determination of the Board." *Id.*; *see also, e.g., Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 635 (5th Cir. 2003) ("Although the Board and its ALJ are accorded deference when a factual finding rests on a resolution of witness credibility, the issue here does not turn on

credibility." (citation omitted)); *Fla. Steel Corp. v. NLRB*, 587 F.2d 735, 751 (5th Cir. 1979) ("It is well settled that the interpretation of a written instrument is a question of law to be decided by the courts."); *Fed.-Mogul Corp. v. NLRB*, 566 F.2d 1245, 1256 (5th Cir. 1978) ("While the courts may approve and adopt an interpretation of such a document made by an administrative agency if found to be correct, they are not bound to do so.").

The Court should pay no deference to the NLRB's resolution of the serious First Amendment issues in this case. It should review those questions de novo, as the Constitution requires.

## B. The Board failed to prove that Musk's tweet was an unlawful threat of reprisal.

Under both the First Amendment and the NLRA, the Board bore the burden of providing that Musk's May 20, 2018 tweet was a threat to take unlawful retaliatory action if employees elected Union representation. Although the First Amendment normally bars the government from "restrict[ing] expression because of its message," *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citation omitted), there is a narrow exception for certain "historic and traditional categories" of unprotected speech, *United States v. Stevens*, 559 U.S. 460, 468 (2010) (citation omitted). One

such category is "true threats," in which the speaker threatens to commit an unlawful act—usually an act of violence. *See, e.g.*, *Counterman v. Colorado*, 143 S. Ct. 2106, 2114 (2023). If threats to retaliate against union support falls within any category of historically unprotected speech, it is the category of "true threats."

Like the First Amendment, Section 8(c) of the NLRA prohibits the Board from premising unfair labor practices on the expression of "views, argument, or opinion" if it contains no "threat of reprisal or force." 29 U.S.C. § 158(c); *Chamber of Com. of U.S. v. Brown*, 554 U.S. 60, 67-68 (2008); *Gissel*, 395 U.S. at 617. An employer has a statutory right, as well as a constitutional one, to express "what he reasonably believes will be the likely economic consequences of unionization that are outside his control." *Gissel*, 395 U.S. at 619 (quoting *NLRB v. River Togs, Inc.*, 382 F.2d 198, 202 (2d Cir. 1967)). An employer may not, however, make "threats of economic reprisal to be taken solely on his own volition." *Id.* (quoting *River Togs*, 382 F.2d at 202).

In this setting, "a 'threat of reprisal' means a 'threat of retaliation' and this in turn means not a prediction that adverse consequences will develop but a threat that they will be *deliberately inflicted* in return for

an injury—'*to return evil for evil.*'"  *Crown Cork & Seal Co. v. NLRB*, 36 F.3d 1130, 1138 (D.C. Cir. 1994) (quoting *NLRB v. Golub Corp.*, 388 F.2d 921, 928 (2d Cir. 1967)).

Here, the Board failed to prove that a reasonable Tesla employee would have interpreted the tweet as a threat "to return evil for evil."  And, in any event, the Board separately failed to prove that the tweet, even if objectively threatening, was made with the subjective mental state needed to support legal liability.

### 1.    It would not have been reasonable for Tesla employees to interpret Musk's speech as a threat.

First, reasonable employees would not read Musk's "stock options" tweet as a threat to retaliate.  The tweet's content, on its face, was not threatening.  And the context also forecloses such an interpretation.

### a.    The content was not objectively threatening.

Even on its own, the May 20 tweet cannot reasonably be read as a threat.  Out of nowhere, a random Twitter user (@dmatkins137) asked for Musk's view about unions, and Musk responded by affirming employees' right to vote to unionize:  "Nothing stopping Tesla team at our car plant from voting union.  Could do so tmrw if they wanted."  ROA.4537.  Musk then gave two reasons why it made no sense for Tesla employees

to support the Union: "But why pay union dues & give up stock options for nothing? Our safety record is 2X better than when plant was UAW & everybody already gets healthcare." ROA.4537. This sort of opinion about unions is exactly the sort of expression that the First Amendment and Section 8(c) protect. *See, e.g.*, *Chamber of Com.*, 554 U.S. at 66-67; *Gissel*, 395 U.S. at 617.

Nothing in the tweet suggested that Tesla would commit retaliatory acts "solely on [its] own initiative." *Gissel*, 395 U.S. at 618. Like union dues, the end of stock options was something that the Union—not Tesla—would demand in negotiations if employees elected its representation.

The ALJ decided that the tweet was not simply identifying "an outcome that could occur due to good-faith collective bargaining." ROA.6289. She read the tweet that way because it failed to specifically "reference collective bargaining or express that the loss of stock options could be a result of negotiations." *Id.*

But the law did not require the tweet to do that. In *Hendrickson USA, LLC v. NLRB*, 932 F.3d 465, 473 (6th Cir. 2019), the Board similarly faulted an employer for a communication that "failed to explain that compensation would ultimately be determined based on the natural give

and take of good-faith negotiations." *Id.*  The Sixth Circuit disagreed,

holding that "the lack of these specific phrases" was not fatal and did not

imply "that the company was threatening" to violate its duty to bargain

in good faith.  *Id.*  The "phrasing" of the employer's actual speech was

decisive, whatever phrasing the Board might have preferred to see.  *Id.*

The Sixth Circuit reached that conclusion even for a letter that the em-

ployer deliberately circulated among its employees.  *Id.* at 468.  The facts

here make an even easier case:  if it is not reasonable to require an em-

ployer to elaborate on the collective bargaining process in a full-length

letter directed to employees, it is even less so with a 251-character, lim-

ited tweet directed to non-employees.[2]

### b.    The context precludes the Board's reading.

Any argument for interpreting the tweet as a threat falls apart im-

mediately when one considers its context.

---

[2] The ALJ claimed to draw support from *Medical Center of Ocean County*, 315 N.L.R.B. 1150, 1154 (1994).  *See* ROA.6289.  But there, the Board stressed that the challenged statements were made directly to an employee in "a one-on-one conversation behind closed doors at the summons and instance of [a] supervisor," where "such a closed door conversation [had] never occurred before in the 10 years of [the employee's] employment."  *Med. Ctr.*, 315 N.L.R.B. at 1154.  Even if those statements were threatening in that context, the tweet here is closer to, and an even easier case than, the letter in *Hendrickson*.

For starters, the "mode of communication"—a personal tweet replying to an unprompted question from a non-employee—strongly weighs against finding the tweet as a threat. *FDRLST Media, LLC v. NLRB*, 35 F.4th 108, 126 (3d Cir. 2022) (declining to find an executive officer's personal tweet as a threat in part because he "posted his message on Twitter, a public platform that limits tweets to 280 characters, which encourages users to express opinions in exaggerated or sarcastic terms," and thus "sent his message to the timelines of his more than eighty thousand Twitter followers, not to the email inboxes of his . . . employees"). Twitter is a natural forum for public debate, but not for threatening a specific group of employees. *See id.*

In addition, Tesla employees already knew that stock-based compensation was a central topic in the UAW campaign, and they knew where the two sides stood. The Union criticized Tesla employees' compensation, and Tesla—through Musk himself—defended it in large part by emphasizing its stock-based component, which the Union overlooked. ROA.6255 & n.31. In particular, Musk's February 24, 2017 companywide email underscored Tesla's firm belief that "it is important for everyone to be an owner of the company" and explained "[t]hat is why, unlike other

car companies, everyone is awarded shares and you get to buy stock at a discount compared to the public through the employee stock purchase program." ROA.4840. The stock-based component set Tesla apart from other companies that already had UAW representation and, as Musk detailed, resulted in Tesla employees' receiving higher overall compensation than those other companies. ROA.4840. With this background understanding, the only reasonable interpretation of the tweet was as a prediction about how the Union would change employee compensation. *See, e.g.*, *Brown & Root*, 333 F.3d at 634 n.3 ("[T]he totality of the circumstances logically may include, objectively, consideration of the sophistication and past union experience of a particular type of audience and the likely response of such audience.").

What is more, that interpretation was proven definitively correct within a day and a half of the original May 20, 2018 tweet. On May 22, another random Twitter user asked whether Musk's first tweet was "threatening to take away benefits from unionized workers." ROA.4537. Musk unequivocally answered, "No, UAW does that." ROA.4537. The UAW does that, Musk explained, because "[t]hey want divisiveness & enforcement of 2 class 'lords & commoners' system" to separate

40

management from the workforce.  ROA.4537.  Musk strongly disagreed with this "2 class system," arguing that "[m]anagers & workers shd be equal w easy movement either way."  ROA.4537.

The next day, Musk reiterated that stock options would be at risk because of the Union's likely demands.  Yet another random Twitter user accused Musk of having threatened the loss of stock options, but someone else noted that such an interpretation took Musk's tweet "out of context" and that Musk had since "clarified . . . that UAW does not allow union workers to own stock."  ROA.4539.  Musk then replied to that response, "Exactly.  UAW does not have individual stock ownership as part of the compensation at any other company."  ROA.4539.

That same week, Tesla issued a widely shared statement to the press.  It echoed Musk's follow-up tweets:  "Elon's tweet was simply a recognition of the fact that unlike Tesla, we're not aware of a single UAW-represented automaker that provides stock options or restricted stock units to their production employees."  ROA.4916.  Many media outlets, including *Bloomberg News*, CBS, CNBC, CNN, *The Hill*, and *Investor's Business Daily*, reported the company's response.  *See also* ROA.4896; ROA.4901; ROA.4905; ROA.4909-10; ROA.4911; ROA.4922; ROA.4925;

ROA.4931. Several such reports came just days after the original May 20 tweet. ROA.4903-05; ROA.4911; ROA.4919-22; ROA.4929-32.

Importantly, neither the Union nor the Board ever sought to disprove these claims about compensation at other UAW-represented companies. The UAW did not argue that employees at those companies do receive stock-based compensation. Nor did it so much as hint that it would have welcomed employee stock ownership at Tesla. Of course, the UAW could easily have rebutted Musk's claims were it possible to do so. But in fact, it is well known that unions often oppose using employer stock to compensate employees, including for the reason Musk identified. *See, e.g.*, Jeffrey M. Hirsch, *Labor Law Obstacles to the Collective Negotiation and Implementation of Employee Stock Ownership Plans: A Response to Henry Hansmann and Other "Survivalists,"* 67 FORDHAM L. REV. 957, 964-65 (1998) (noting that unions typically oppose employee stock ownership because it "can create significant disparities among firms represented by a single union, thereby hurting a union's attempt to set industry-wide wages," and can unsettle "the traditional dichotomy between management and labor").

Despite this common knowledge, the ALJ faulted Musk for presenting "no objective facts to support his statement that employees would lose their stock options." ROA.6289. But the law does not condition Musk's right to speak on whether he contemporaneously offers enough proof to satisfy a government official. *See, e.g.*, *NLRB v. Vill. IX*, 723 F.2d 1360, 1368 (7th Cir. 1983) ("[W]e do not read *Gissel* to require the employer to develop detailed advance substantiation in the manner of the Federal Trade Commission, at least for predictions founded on common sense and general experience." (citation omitted)); *NLRB v. Pentre Elec. Inc.*, 998 F.2d 363, 371 (6th Cir. 1993) ("Requiring an employer to present, in advance and without a request from the Board, evidence to corroborate its predictions would, in our mind, defeat the integral purpose of section 8(c)."), *overruled in part on other grounds by NLRB v. Webcor Packaging, Inc.*, 118 F.3d 1115, 1119 n.2 (6th Cir. 1997). If Musk's claim were regulable because it was untrue, the burden of proving its falsity fell on the NLRB and Union, and they failed to present such proof. *See, e.g.*, *NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 712 (2001) (explaining that the Board General Counsel bears the burden of proving the elements of an unfair labor practice); *Phila. Newspapers,*

*Inc. v. Hepps*, 475 U.S. 767, 776 (1986) (holding that even private figures "bear the burden of showing falsity, as well as fault, before recovering damages" for speech on matters of public concern).

Given the back-and-forth before and immediately after the tweet, it is no surprise that no Tesla employee came forward claiming to have read the first tweet as a threat. That "noteworthy gap in the record" is also important context in deciding how a reasonable employee would have understood the tweet. *FDRLST*, 35 F.4th at 125 (placing significant weight on the fact that there was "no evidence that any [company] employee perceived [the] tweet as a threat"). As the Third Circuit recently noted, citing this Court's case law, "employees' subjective responses can be relevant to determining whether a reasonable employee—who is familiar with her employer and the context of a remark—would tend to be coerced." *Id.* (citing *Fed.-Mogul*, 566 F.2d at 1253). While many Tesla employees testified during the thirteen-day hearing, not one claimed to have taken Musk's tweet as a threat. The record shows only one employee who claimed to see the tweet, and not even he claimed to have felt threatened by it. ROA.755, ROA.839-43 (Moran); ROA.3304-08; ROA.6179-80. Evidence about real-life recipients of a purported threat can help show how

hypothetical recipients would reasonably have reacted. *See, e.g., Gissel*, 395 U.S. at 619 (identifying, as an important question, "[W]hat did . . . the listener understand?" (citation omitted)); *Watts v. United States*, 394 U.S. 705, 708 (1969) (per curiam) (considering "the reaction of the listeners" as one reason why speech could not be interpreted as a true threat); *Dow Chem. Co. v. NLRB*, 660 F.2d 637, 650 (5th Cir. 1981) (stressing that "[n]o witness testified that he considered any of the three questions coercive"). The lack of evidence that actual Tesla employees perceived a threat seriously undercuts the Board's speculation that a hypothetical reasonable employee would have perceived one. *See, e.g., FDRLST*, 35 F.4th at 125.

This Court has repeatedly rebuked the Board for doing what it did here: lifting "bits and pieces of statements . . . out of context" and assessing "those bits and pieces . . . in vacuo." *Dow Chem.*, 660 F.2d at 644; *see also, e.g., Fed.-Mogul*, 566 F.2d at 1254 ("[L]anguage used by parties involved in a union representation campaign must not be isolated nor analyzed in a vacuum, but must be considered in light of the circumstances existing when such language was written or spoken."); *Big Three Indus.*, 441 F.2d at 777-78 ("In assaying the legality of words spoken or

written in connection with a union campaign, the language should neither be isolated nor analyzed in a vacuum, but must be considered in the light of the surrounding circumstances in which it was written."). That reasoning applies with particular force where, as here, the employer makes "an overt disclaimer"—in real time—of the misinterpretation advanced by the Board. *Selkirk Metalbestos, N. Am., Eljer Mfg., Inc. v. NLRB*, 116 F.3d 782, 788 (5th Cir. 1997) (per curiam).

### 2. Musk did not issue the tweet with a culpable and conscious disregard of the risk that employees would feel threatened.

The foregoing discussion shows that a reasonable employee would not have read Musk's tweet as a threat of reprisal. The Court can stop there because the government cannot restrict speech as a purported "true threat" if it is not threatening as an objective matter. *See, e.g.*, *Counterman*, 143 S. Ct. at 2114; *Watts*, 394 U.S. at 708.

The Supreme Court recently clarified, however, that objectively threatening content, though necessary, is not *sufficient* for government regulation of a "true threat." The speaker's subject mental state forms a separate, independent requirement: "the First Amendment [also] requires proof that the defendant had some subjective understanding of the

threatening nature of his statements." *Counterman*, 143 S. Ct. at 2111. In particular, the government must prove "that the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening." *Id.* at 2112; *cf. Gissel*, 395 U.S. at 619 (identifying as a critical question, "[W]hat did the speaker intend[?]" (citation omitted)).

This requirement serves a vital speech-protecting purpose. As the Supreme Court explained, failing to impose such a requirement would create a "chilling effect" on constitutionally protected speech. *Counterman*, 143 S. Ct. at 2114. Because a speaker "may be unsure about the side of a line on which his speech falls," "may worry that the legal system will err," or "may simply be concerned about the expense of becoming entangled in the legal system," he may "self-censor[]" speech that the government could not lawfully restrict. *Id.* at 2115. "By reducing an honest speaker's fear that he may accidentally or erroneously incur liability, a *mens rea* requirement provides breathing room for more valuable speech." *Id.* (citation, brackets, and quotation marks omitted).

Under *Counterman*, the government must therefore prove that the speaker uttered a true threat with a reckless state of mind. "A person

acts recklessly," on this view, "when he consciously disregards a substantial and unjustifiable risk that the conduct will cause harm to another." *Id.* at 2117 (citation, brackets, and quotation marks omitted).  Recklessness is distinct from, and more blameworthy than, mere negligence, which exists when the speaker "is not but should be aware of a substantial risk . . . that others will understand his words as threats."  *Id.* at 2117 n.5.

The record refutes any possible claim that Musk made his May 20 tweet with conscious disregard of the risk that employees would see it and understand it as a threat.  He had no reason to imagine such a risk since he knew that he had already made his, and Tesla's, philosophical commitment to employee stock ownership clear.  And more than that, the moment someone called the risk to his attention (the May 22 tweet by @ericbrownzzz), he took immediate action to eliminate the risk of misunderstanding.  That is not the conduct of someone who consciously chooses to ignore the risk of being misunderstood.

Although the May 20 tweet's lack of objectively threatening content is reason enough to set aside the Board's conclusion, the lack of any

subjectively wrongful mental state provides a second and independent reason for the same outcome.

### C.    The Board's deletion remedy was improper.

Finally, even if the Board could show the tweet was a threat, there still would be no justification for ordering its deletion from Musk's personal Twitter account.  ROA.6247; *see also* ROA.6248; ROA.6250.  Musk is not a party in this case, and Tesla does not operate the @elonmusk Twitter account, which is separate from the company's @Tesla account. ROA.4755-56 (¶¶ 13, 16).  It is unclear where the Board purports to get authority to issue instructions obligating one party to silence speech by a non-party.  Below, the Board cited its ruling in *FDRLST Media, LLC*, 370 N.L.R.B. No. 49, slip op. at 1 n.5 (Nov. 24, 2020), but that ruling made no effort to explain the source of the Board's claimed authority and has since been set aside by the Third Circuit for its failure to comply with the First Amendment, *FDRLST*, 35 F.4th at 126.

By its terms, the NLRA empowers the Board "to prevent [a] person from engaging in any unfair labor practice." 29 U.S.C. § 160(a).  It is hard to see how that power supports deleting a 2018 tweet more than five years later.  Even if employees could reasonably have felt threatened

when the tweet first appeared, the clarifying statements and the Board's own intervention dispel any reasonable fears without a further need for deletion.  In fact, the ALJ's original remedy ordered Tesla to assure workers it would not threaten them by posting a notice in its Fremont facility: "WE WILL NOT threaten employees with loss of benefits if you vote in favor of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO, or any other labor organization."  ROA.6293.  Such a notice is sufficient—and the most that could be justified—to counter any perceived threat from the May 20 tweet.  *Cf. Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (explaining that a content-based speech restriction survives strict scrutiny only "if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." (citation omitted)).  "[T]he remedy" for bad speech, after all, should be "more speech, not enforced silence."  *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring).

## II.    The Board erred in ordering Ortiz's reinstatement with backpay.

In quite the contrast to its hostility toward Musk's truthful tweet, the Board gave robust protection to Ortiz's admitted dishonesty during the investigation into his Facebook post.  As Ortiz explained at the ALJ

hearing, he originally told investigator Gecewich that he "wasn't sure" who sent him the Workday profile pictures, even though that statement was not "the truth."  ROA.537 (Ortiz); *see also* ROA.648 (Ortiz).  He also admitted to Gecewich "that he had not been truthful" in their first interview.  ROA.2321 (Gecewich); ROA.4534.  This admitted dishonesty was the only basis for Gecewich's recommendation that Tesla fire Ortiz.  ROA.4508.  And this dishonesty was why the ultimate decisionmaker, Graminger, decided on termination.  ROA.1326 (Graminger).  So as even the ALJ concluded, as an express finding of fact, Tesla "terminated Ortiz for lying during an investigation."  ROA.6285.

Yet the ALJ nonetheless held, and the Board affirmed, that the NLRA barred Tesla from terminating Ortiz for his lie.  That is wrong.  The NLRA does not give union supporters permission to lie during bona fide investigations into complaints of workplace misconduct.  The Board had no basis for treating Ortiz's discharge as an unfair labor practice or for ordering Tesla to reinstate Ortiz with backpay.

## A.    The NLRA does not entitle employees to lie during investigations into workplace misconduct.

The NLRA makes plain, in Section 10(c), that "[n]o order of the Board shall require the reinstatement of any individual as an employee

who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause." 29 U.S.C. § 160(c). It is well settled legal doctrine, and simple common sense, that lying to company investigators provides sufficient cause for discharge. This Court held long ago that "[a]ny employer has the right to demand that its employees be honest and truthful in every facet of their employment." *Fed.-Mogul*, 566 F.2d at 1259 (citation omitted). A lie is therefore "sufficient ground for . . . discharge." *Id.* Other circuits are in accord. *See, e.g.*, *Cellco P'ship v. NLRB*, 892 F.3d 1256, 1262 (D.C. Cir. 2018) ("It is clear that Verizon has made a legitimate business judgment—a not unusual one—that an employee lying during an investigation is a serious threat to management of the enterprise. The Board has no warrant to challenge that decision.").

The ALJ determined, however, that "[a]n employer may not terminate an employee for lying in response to questions regarding protected concerted activity." ROA.6285. That is a serious overstatement. As the D.C. Circuit has explained, the question is whether the employer has a right to ask its questions, not whether they relate to employees' protected concerted activity. *Cellco*, 892 F.3d at 1263. If the employee lies during

an investigation into allegations that implicate legitimate employer interests, the employee has no right to lie. *Id.* at 1263-64.

Here, as in *Cellco*, the company had a right to investigate. Gecewich understood that Pratt felt targeted and harassed by a fellow employee based on a derogatory Facebook post that included Pratt's official photo from Tesla's internal human resources platform. ROA.1924-25 (Gecewich). Even "[t]he Board has recognized that employers have a legitimate business interest in investigating facially valid complaints of employee misconduct, including complaints of harassment." *Fresenius USA Mfg., Inc.*, 362 N.L.R.B. 1065, 1065 (2015). The ALJ resisted this principle by deriding Pratt's concerns as "specious." ROA.6285. But that is a managerial decision that the ALJ had no license to make. *See, e.g.*, *Fla. Steel Corp. v. NLRB*, 529 F.2d 1225, 1234 (5th Cir. 1976) ("[M]anagement is for management. Neither Board nor Court can second-guess it or give it gentle guidance by over-the-shoulder supervision." (citation omitted)). There is no evidence that Gecewich had authority to disregard Pratt's stated concerns. Nor is there support for the ALJ's assertion that Gecewich "did not investigate Pratt's . . . claim of harassment and being singled out." ROA.6285. Her own findings

confirm that is exactly how the investigation began. ROA.6279-80. Gecewich had a good-faith basis to ask about the source of the internal company materials that Ortiz used to target his coworkers on social media to evaluate, among other things, whether those materials were at risk of misuse in the future. Ortiz, on the other hand, "had no reasonable basis to believe that [Tesla] was attempting to pry into protected union activity generally or that he would suffer reprisal for the activity in question because of its prounion content." *Fresenius*, 362 N.L.R.B. at 1066. On the contrary, Ortiz testified that he quickly deleted the Facebook post because he agreed it was inappropriate. ROA.642-43 (Ortiz).

Similarly, the Board cannot defend its decision based on the ALJ's determination that Gecewich's questioning violated Section 8(a)(1). *See* ROA.6288. There is no basis for the ALJ's statement that "[a]ll of Gecewich's questions were designed to elicit information from Ortiz and Moran about their protected concerted activity and their union organizing activities." *Id.* The record shows instead that Gecewich's first questioning of Ortiz (on September 21) furthered Tesla's legitimate interest in investigating social-media targeting of Tesla employees using internal

company materials. And Gecewich's second questioning of Ortiz (on October 12) furthered Tesla's legitimate interest in investigating whether Ortiz had deliberately misled Gecewich in their first conversation. The cases that the ALJ cited—where employers demanded to know the names of employees who attended union meetings—bear no resemblance to this investigation of potential workplace misconduct. *Guess?, Inc.*, 339 N.L.R.B. 432, 435 (2003); *Nat'l Tel. Directory Corp.*, 319 N.L.R.B. 420, 421 (1995).

The Board's attempt to create a broad right to lie in response to any questions implicating protected activity would have sweeping implications. Indeed, the D.C. Circuit refused to recognize such a breathtaking rule precisely because it "would undermine any company's . . . ability to institute a policy" against lying during company investigations. *Cellco*, 892 F.3d at 1263 (footnote omitted). The category of protected concerted activity is very broad, particularly in the Board's hands. As *Cellco* noted, it is not limited to activities involving unions, but more generally extends to activity between employees about employment-related matters. *See id.* at 1263 n.10.

The current Board construes the concept of protected concerted activity especially broadly. It recently ruled that even "racist taunts" can qualify. *Lion Elastomers LLC*, 372 N.L.R.B. No. 83, slip op. at 8 (May 1, 2023); *cf. Consol. Commc'ns, Inc. v. NLRB*, 837 F.3d 1, 20 (D.C. Cir. 2016) (Millett, J., concurring) ("[NLRB] decisions have repeatedly given refuge to conduct that is not only intolerable by any standard of decency, but also illegal in every other corner of the workplace."). If any arguable nexus with protected concerted activity justifies lying to one's employer, little remains of the employer's right to demand honesty in every facet of employment or of Section 10(c)'s restrictions on the Board's authority to award remedies to employees who were discharged with cause.

## B.    Ortiz's termination was lawful under *Wright Line*.

The ALJ alternatively ruled that Ortiz's termination was unlawful under the Board's *Wright Line* framework. ROA.6286-87; *see Wright Line*, 251 N.L.R.B. 1083, 1089 (1980), *enforced on other grounds*, 662 F.2d 899 (1st Cir. 1981); *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 394, 403 (1983), *abrogated in part on other grounds by Dir., Off. of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267 (1994).

56

Under *Wright Line*'s first step, the Board bears the "burden of proving through direct or circumstantial evidence that anti-union animus was a 'motivating factor' in the decision to discharge the employee." *Poly-Am., Inc. v. NLRB*, 260 F.3d 465, 488 (5th Cir. 2001) (citation omitted). "The evidence must support a 'reasonable inference of causal connection between the employer's anti-union motivation and the employee's discharge.'" *Id.* (citation omitted). Although *Wright Line* step one is sometimes called a "*prima facie* case," it is very different from the modest prima facie case that applies at summary judgment in employment discrimination disputes. *See, e.g.*, *Valmont Indus., Inc. v. NLRB*, 244 F.3d 454, 464 n.2 (5th Cir. 2001). The Board's General Counsel bears a full-fledged burden of persuasion in showing that animus motivated the discharge. *See id.* "Requiring the General Counsel to carry the burden is important to avoid 'immuniz[ing] union activists against legitimate discipline for genuine offenses, and [depriving] employers of the freedom to apply their own rules uniformly to all their employees.'" *NLRB v. Arkema, Inc.*, 710 F.3d 308, 321 (5th Cir. 2013) (citation omitted).

Then, "[i]f the Board meets this burden" of establishing its case at step one, the second step of *Wright Line* requires the employer to "come

forward with evidence showing that the employee would have been discharged even absent the protected activity." *Poly-Am.*, 260 F.3d at 488-89.

Here, the Board's General Counsel failed to prove animus. And regardless, Tesla provided sufficient evidence that it would have discharged Ortiz regardless of his union activity.

### 1.    The Board failed to prove that anti-union animus motivated the discharge.

Given the ALJ's candid acknowledgment that Tesla "terminated Ortiz for lying during an investigation," ROA.6285, one would have expected significant evidence that Tesla had an additional motive as well. Yet the record here lacks any evidence that the decision to fire Ortiz was motivated not just by his lie but also by his union activity.

The actual decisionmaker, Graminger, unequivocally denied any anti-union motivation and testified that his decision was based solely on the lie. ROA.1309-10, ROA.1326 (Graminger). The ALJ did not address this testimony, let alone explain why it was not credible. The ALJ said Graminger was "more credible" than other Tesla witnesses but also called some of his testimony "confusing and contradictory." ROA.6284. But the example that the ALJ cited is neither confusing nor contradictory: "On

the one hand Graminger testified that Ortiz'[s] union activity was not discussed during the meeting but on the other hand Graminger looked at the union organizing campaign website as well as Facebook page where he viewed Ortiz'[s] posts before the meeting." *Id.* Graminger's visits to the Union's website and Facebook page do not imply that he or anyone else discussed Union activities at a particular meeting. The ALJ's reasoning makes no sense—especially after Graminger explained that his interest in the Union website and Facebook page was personal, and generally pro-union. During the Union's cross-examination, Graminger explained that he was still a dues-paying member of a labor union in Europe—even though he now lived in the United States—and was interested in the Union's efforts to organize at Tesla. ROA.1331 (Graminger). The ALJ had no basis not to credit Graminger's disavowal of anti-union animus.

Beyond his own testimony, uncontradicted evidence showed that Graminger insisted on confirming that Tesla had treated similar cases in the same fashion before deciding on termination. He first asked Gecewich, who testified about a case in which a Vice President of a Tesla subsidiary, SolarCity, was fired for lying in an investigation. ROA.1311-

12 (Graminger); ROA.1873-75, ROA.1941 (Gecewich). Then Graminger asked his own superior, Hochholdinger, who likewise confirmed that Tesla employees who lied during investigations were fired for it. ROA.1283, ROA.1308 (Graminger). The ALJ tried to turn this due diligence against Graminger, suggesting his actions were affected by his knowledge of Ortiz's union activity. ROA.6286. But there is nothing wrong with "proceed[ing] carefully" because one knows that an employee is "active in the union" and that his discharge would thus be "controversial." *Cellco*, 892 F.3d at 1261. A careful process is a good thing, particularly when meant to ensure that a union supporter receives no harsher discipline than other similarly situated employees. The Board often tries to show animus by proving "disparate treatment" in the employer's discipline of union supporters. *Asarco, Inc. v. NLRB*, 86 F.3d 1401, 1408 (5th Cir. 1996). But there is no evidence of inconsistency here.

These points—Graminger's lack of animus and Tesla's lack of inconsistency—defeat the Board's case. Yet the ALJ fixated on other individuals, criticizing (1) Hedges for passing along Pratt's complaint to Gecewich, (2) Pratt for not showing greater alarm when he complained to Hedges, and (3) Gecewich for focusing his investigation on Workday

misuse rather than the employees' dispute over unionization. ROA.6286-87. None of these contentions helps show that Graminger's decision was motivated by anti-union animus. The same is true of the ALJ's other examples of friction between Tesla and the Union and unrelated unfair labor practices, none of which implicates Graminger or Gecewich. ROA.6286. To meet the General Counsel's initial burden under *Wright Line*, "general animus" is insufficient. *Arkema*, 710 F.3d at 322; *see also Nichols Aluminum, LLC v. NLRB*, 797 F.3d 548, 554 (8th Cir. 2015) ("Simple animus toward the union 'is not enough.'" (citation omitted)). Instead, "the General Counsel must prove that animus was a motivating factor in the decision" to fire Ortiz. *Arkema*, 710 F.3d at 322; *see also Tschiggfrie Props., Ltd. v. NLRB*, 896 F.3d 880, 886 (8th Cir. 2018) ("[T]he General Counsel must prove a connection or nexus between the animus and the firing."). The General Counsel failed to prove that here.

In any event, the ALJ's critiques fail even on their own terms. The ALJ faulted Gecewich for wanting to interview Ortiz a second time after learning of Moran's role. ROA.6287. But if Gecewich suspected that he had caught Ortiz in a deliberate lie, he had a valid managerial reason to see whether that was so. He was not legally required to accept purposeful

dishonesty merely because Ortiz was a Union supporter.  This Court has told the Board time and again that union activity "is not a guarantee against discharge," *NLRB v. Ray Smith Transp. Co.*, 193 F.2d 142, 146 (5th Cir. 1951), nor a source of "immunity," *Asarco*, 86 F.3d at 1410.

The ALJ's attempt to fault Hedges and Pratt for not leaving this episode as "a discussion between two employees," with no need for an investigation, ROA.6286, is even more disturbing.  It would clearly violate the NLRA to hold that Tesla should have discounted Pratt's reports of feeling harassed and targeted merely because he and Ortiz were on opposite sides of the labor dispute.  The NLRA expressly protects the right of employees like Pratt "to refrain from any or all [concerted] activities," including supporting a union, if they wish to do so—just as the Act protects the right of employees like Ortiz to favor a union if that is their preference.  29 U.S.C. § 157.  Besides, as a general rule, "[m]anagement can discharge for good cause, or bad cause, or no cause at all," so long as it does "not discharge when the real motivating purpose is to do that which Section 8(a)(3) forbids." *Fla. Steel*, 529 F.2d at 1234 (citation omitted).  There was no such improper purpose here because Tesla fired Ortiz for his admitted dishonesty, as the ALJ found.  The ALJ may have

thought Gecewich, Pratt, and Hedges should have let bygones be bygones, but that is not the NLRB's decision to make.

Once again, this case resembles *Cellco*, where the D.C. Circuit recently refused to enforce a Board decision at *Wright Line* step one. *Cellco*, 892 F.3d at 1261. There, too, the employer fired a "prominent union supporter" for "lying during an investigation." *Id.* at 1257. But the ALJ insisted on "unabashedly taking on the company's business judgment chair" to flyspeck the company's disciplinary practices. *Id.* at 1262. The court found that to be improper given the employer's "legitimate business judgment . . . that an employee lying during an investigation is a serious threat to management of the enterprise." *Id.* The Board had "no warrant to challenge that decision." *Id.* The "only legitimate question" under the *Wright Line* framework "was whether the company applied the policy reasonably consistently." *Id.* Because there was no evidence of inconsistency to raise an inference that the decision was motivated by animus, the *Cellco* court denied enforcement of the Board's order. *Id.* at 1264. The same result is warranted here.

### 2.    Tesla proved it would have discharged Ortiz regardless of his union activity.

For many of the same reasons, Tesla rebutted the General Counsel's case at *Wright Line* step two.  There is no dispute that Tesla reasonably believed Ortiz had engaged in misconduct through his admitted dishonesty to the investigator.  *See, e.g.*, *Fed.-Mogul*, 566 F.2d at 1259 (noting that an employee's dishonesty "alone was sufficient ground for the Company to discharge him").  And again "[t]here is no evidence" that Tesla's response to this dishonesty "differed in any way from its handling of [the dishonesty] of other employees."  *Poly-Am.*, 260 F.3d at 491 (holding that an employer prevailed at *Wright Line* step two).  The only evidence on this point is that Tesla consistently fired employees who lied to investigators.  ROA.1308, ROA.1311-12 (Graminger);  ROA.1873-75, ROA.1941 (Gecewich).  Tesla's reasonable and consistent policy against lying to investigators suffices to carry its burden at step two.  *See, e.g.*, *Circus Circus Casinos, Inc. v. NLRB*, 961 F.3d 469, 482 (D.C. Cir. 2020) ("The Board cannot second guess an employer's legitimate and consistently enforced policies[.]").  And again, the evidence showed that the decisionmaker, Graminger, was not influenced by Ortiz's union activity and was a union supporter himself.  ROA.1309-10, ROA.1326, ROA.1331

(Graminger). That too proves that Ortiz was fired irrespective of his union activity.

## CONCLUSION

For these reasons, the Court should grant Tesla's petition for review, set aside the Board's findings of unfair labor practices and associated remedies based on Musk's tweet and Ortiz's discharge, and deny the Board's cross-application to enforce those parts of the Order.

Dated:  August 30, 2023

Respectfully submitted,

s/ Michael E. Kenneally
DAVID B. SALMONS
MICHAEL E. KENNEALLY
DAVID R. BRODERDORF
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC  20004
(202) 739-3000

*Counsel for Tesla, Incorporated*

# CERTIFICATE OF SERVICE

I certify that on this 30th day of August, 2023, I served a true and correct copy of the foregoing En Banc Brief of Petitioner Cross-Respondent Tesla, Incorporated on counsel of record for all other parties through this Court's CM/ECF system:

Ruth E. Burdick
Micah P. S. Jost
Kira Dellinger Vol
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, S.E.
Washington, DC  20570
appellatecourt@nlrb.gov
micah.jost@nlrb.gov
kira.vol@nlrb.gov

*Counsel for Respondent*
*National Labor Relations Board*

Daniel E. Curry
Margo A. Feinberg
SCHWARTZ, STEINSAPIR,
   DOHRMANN & SOMMERS LLP
6300 Wilshire Boulevard
Suite 2000
Los Angeles, CA  90048
dec@ssdslaw.com
margo@ssdslaw.com

*Counsel for Petitioner*
*International Union, United*
*Automobile, Aerospace and*
*Agricultural Implement Workers*
*of America, AFL-CIO*

s/ Michael E. Kenneally
MICHAEL E. KENNEALLY

*Counsel for Tesla, Incorporated*

66

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,880 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and 5th Cir. R. 32.1, and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document was prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.


Dated:  August 30, 2023          s/ Michael E. Kenneally
                                 MICHAEL E. KENNEALLY

                                 *Counsel for Tesla, Incorporated*