## No. 21-60285

# In the United States Court of Appeals
## FOR THE FIFTH CIRCUIT

TESLA, INCORPORATED,

*Petitioner Cross-Respondent*

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, AFL-CIO,

*Petitioner*

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent Cross-Petitioner*

On Petitions for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board

### EN BANC REPLY BRIEF OF TESLA, INCORPORATED

DAVID B. SALMONS
MICHAEL E. KENNEALLY
DAVID R. BRODERDORF
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC  20004
(202) 739-3000

*Counsel for Tesla, Incorporated*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ..................................................................................... 1

ARGUMENT ............................................................................................ 3

I.   The Board and Union mischaracterize the law and the facts
     relevant to Musk's tweet. ................................................................ 3

     A.   The Court should follow all Supreme Court precedent
          rather than adopt the Board's misreading of *Gissel*. ............. 3

          1.   *Gissel* does not obligate courts to defer to the
               NLRB's conclusions about the Constitution. ................. 3

          2.   *Gissel* supports, rather than bars, considering the
               speaker's mental state and the listener's reaction. ........ 8

     B.   The tweet did not threaten to unilaterally reduce
          employee benefits in retaliation for union support. ............. 13

     C.   The Board's deletion remedy is excessive ............................ 19

II.  The Board and Union fail to justify the Board's ruling that
     Tesla violated the NLRA by terminating Ortiz for his lie. .......... 20

     A.   Ortiz's lie was cause for discharge and precludes his
          reinstatement under the NLRA's plain terms. ..................... 21

     B.   The termination was also permitted under *Wright Line*
          given the ALJ's factual findings. ........................................ 27

CONCLUSION ....................................................................................... 30

CERTIFICATE OF SERVICE ................................................................ 32

CERTIFICATE OF COMPLIANCE ...................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*All. for Fair Bd. Recruitment v. SEC,*
  — F.4th —, 2023 WL 6862856 (5th Cir. Oct. 18, 2023) ...................... 8

*Amalgamated Clothing Workers v. NLRB,*
  424 F.2d 818 (D.C. Cir. 1970) ................................................... 14

*Behring Int'l, Inc.,*
  252 N.L.R.B. 354 (1980) .......................................................... 14

*Belcher Towing Co.,*
  265 N.L.R.B. 1258 (1982) ......................................................... 14

*Bose Corp. v. Consumers Union of U.S., Inc.,*
  466 U.S. 485 (1984) .......................................................... 5, 6, 7

*Cellco P'ship v. NLRB,*
  892 F.3d 1256 (D.C. Cir. 2018) ...................................... 23, 26, 27, 30

*Charge Card Ass'n v. NLRB,*
  653 F.2d 272 (6th Cir. 1981) ............................................... 22, 23

*Constellation Brands U.S. Operations, Inc. v. NLRB,*
  992 F.3d 642 (7th Cir. 2021) .................................................... 14

*Counterman v. Colorado,*
  600 U.S. 66 (2023) ....................................................... 10, 11, 12

*Creative Vision Res., L.L.C. v. NLRB,*
  882 F.3d 510 (5th Cir. 2018) ...................................................... 4

*Crown Cork & Seal Co. v. NLRB,*
  36 F.3d 1130 (D.C. Cir. 1994) .................................................... 13

*DynCorp, Inc. v. NLRB,*
  233 F. App'x 419 (6th Cir. 2007) ................................................ 14

ii

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*ECM BioFilms, Inc. v. FTC*,
　851 F.3d 599 (6th Cir. 2017)................................................................7

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const.*
　*Trades Council*,
　485 U.S. 568 (1988)................................................................6

*Epic Sys. Corp. v. Lewis*,
　138 S. Ct. 1612 (2018)................................................................6

*FDRLST Media, LLC v. NLRB*,
　35 F.4th 108 (3d Cir. 2022)........................................................12, 15

*Fed.-Mogul Corp. v. NLRB*,
　566 F.2d 1245 (5th Cir. 1978)....................................................21, 27

*Fresenius USA Mfg., Inc.*,
　362 N.L.R.B. 1065 (2015)................................................................24

*FTC v. Brown & Williamson Tobacco Corp.*,
　778 F.2d 35 (D.C. Cir. 1985)................................................................7

*Hendrix Mfg. Co. v. NLRB*,
　321 F.2d 100 (5th Cir. 1963)................................................................13

*Holder v. Humanitarian L. Project*,
　561 U.S. 1 (2010)................................................................6

*Intermedics, Inc.*,
　262 N.L.R.B. 1407 (1982)................................................................13

*Jefferson Cnty. v. Acker*,
　210 F.3d 1317 (11th Cir. 2000)................................................................5

*Kraft, Inc. v. FTC*,
　970 F.2d 311 (7th Cir. 1992)................................................................7

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*McGraw-Edison Co. v. NLRB,*
  419 F.2d 67 (8th Cir. 1969) ................................................................ 14

*McLane/W., Inc. v. NLRB,*
  723 F.2d 1454 (10th Cir. 1983) ........................................................ 14

*MikLin Enters., Inc. v. NLRB,*
  861 F.3d 812 (8th Cir. 2017) ............................................................ 15

*Mon River Towing, Inc. v. NLRB,*
  421 F.2d 1 (3d Cir. 1969) .................................................................. 14

*New York New York, LLC v. NLRB,*
  313 F.3d 585 (D.C. Cir. 2002) ............................................................ 3

*NLRB v. Bama Co.,*
  353 F.2d 320 (5th Cir. 1965) ............................................................ 13

*NLRB v. Big Three Indus. Gas & Equip. Co.,*
  579 F.2d 304 (5th Cir. 1978) ............................................................ 28

*NLRB v. Colony Printing & Labeling, Inc.,*
  651 F.2d 502 (7th Cir. 1981) ............................................................ 14

*NLRB v. Gissel Packing Co.,*
  395 U.S. 575 (1969) ................................................................... *passim*

*NLRB v. Mueller Brass Co.,*
  509 F.2d 704 (5th Cir. 1975) .............................................. 21, 22, 23

*NLRB v. Neuhoff Bros., Packers, Inc.,*
  375 F.2d 372 (5th Cir. 1967) ............................................................ 28

*NLRB v. Transp. Mgmt. Corp.,*
  462 U.S. 393 (1983) .......................................................................... 20

iv

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*NLRB v. U.S. Postal Serv.,*
   660 F.3d 65 (1st Cir. 2011) ..................................................... 3

*Reid v. Covert,*
   354 U.S. 1 (1957) ................................................................... 8

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.,*
   490 U.S. 477 (1989) ............................................................... 5

*Sara Lee Bakery Grp., Inc. v. NLRB,*
   61 F. App'x 1 (4th Cir. 2003) ............................................... 14

*Thornhill v. Alabama,*
   310 U.S. 88 (1940) ............................................................... 11

*United Services Auto. Ass'n v. NLRB,*
   387 F.3d 908 (D.C. Cir. 2004) ....................................... 26, 27

*United States v. Fernandez,*
   837 F.2d 1031 (11th Cir. 1988) ........................................... 18

*United States v. Hunt,*
   82 F.4th 129 (2d Cir. 2023) ................................................... 8

*Wright Line,*
   251 N.L.R.B. 1083 (1980) ....................................... 20, 27, 29

**STATUTES & CONSTITUTIONAL PROVISION**

18 U.S.C. § 115 ....................................................................... 7

29 U.S.C.
   § 151 *et seq.* (National Labor Relations Act) ............... *passim*
   § 158(c) (NLRA § 8(c)) ................................................. 15, 28
   § 160(c) (NLRA § 10(c)) ........................................... 2, 21, 27

U.S. CONST. amend. I ....................................................... *passim*

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

OTHER AUTHORITIES

Elana Ruth Hollo, Note, *The Quiet Revolution: Employee Stock Ownership Plans and Their Influence on Corporate Governance, Labor Unions, and Future American Policy*, 23 RUTGERS L.J. 561 (1992) ............................................................................... 17

Henry P. Monaghan, *Constitutional Fact Review*, 85 COLUM. L. REV. 229 (1985) ................................................................... 6

Jeffrey M. Hirsch, *Labor Law Obstacles to the Collective Negotiation and Implementation of Employee Stock Ownership Plans: A Response to Henry Hansmann and Other "Survivalists,"* 67 FORDHAM L. REV. 957 (1998) ................................. 16

Tim Higgins, *Whatever the UAW Strike Outcome, Elon Musk Has Already Won*, WALL ST. J., Sept. 16, 2023, https://www.wsj.com/ business/autos/uaw-strike-tesla-labor-costs-baf8b897 ...................... 18

# INTRODUCTION

In defending the Board's tweet ruling, the Board and Union rely heavily on mischaracterizations of *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 591 (1969). They argue that *Gissel* mandates highly deferential judicial review and a purely objective test for employer threats. They make these arguments to try to avoid contrary Supreme Court precedent, which holds that factfinders do *not* get deference when free speech is at stake and that unlawful threats must be both objectively *and* subjectively threatening. And they make these arguments to downplay the absence of evidence that Musk knew his tweet could be interpreted as a threat or that any Tesla employees interpreted it as such.

On all these points, the Board and Union seek special rules for restricting employer speech. Their arguments fail. Nothing in *Gissel* requires courts to give more deference to the NLRB than they would give to a trial judge or jury. Nor does *Gissel* imply that alleged threats of economic harm get less constitutional protection than threats of physical violence. If the Board wants to restrict speech on matters of public concern, it must follow the same constitutional rules as any other government actor.

While their arguments for policing Twitter run afoul of the Constitution, the Board and Union's arguments for reinstating Ortiz violate the statute. Section 10(c) of the NLRA could not be clearer: "No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause." 29 U.S.C. § 160(c). Lying in response to an employer's lawful questions is cause for discharge, as this Court and others have long recognized. And the NLRB found that Tesla "terminated Ortiz for lying during an investigation." ROA.6285.

That may be why neither the Board nor the Union even addresses Section 10(c). Instead, they critique aspects of Tesla's investigation and try to compare it to questioning that did nothing but try to elicit information about union support. But there is no comparison. Tesla was asking legitimate questions about the use of internal company resources to target an employee who complained to HR. The Board's order to reinstate Ortiz with backpay goes far beyond prior decisions and improperly negates Section 10(c). The Court should set aside the Board's ruling on both these issues.

## ARGUMENT

**I.    The Board and Union mischaracterize the law and the facts relevant to Musk's tweet.**

### A.    The Court should follow all Supreme Court precedent rather than adopt the Board's misreading of *Gissel*.

As Tesla's opening brief explained (at 29-32, 46-49), the Board's position conflicts with several distinct lines of Supreme Court precedent on the proper deference to give the agency and the constitutional requirements for restricting alleged threats.  The Board's main response is that this Court should not follow those cases; it should follow only the "earlier, on-point precedent" in *Gissel*.  NLRB Br. 32.

The Board's interpretation of *Gissel* is entitled to no deference.  *See, e.g., New York New York, LLC v. NLRB*, 313 F.3d 585, 590 (D.C. Cir. 2002) ("We are not obligated to defer to an agency's interpretation of Supreme Court precedent under *Chevron* or any other principle."); *NLRB v. U.S. Postal Serv.*, 660 F.3d 65, 68 (1st Cir. 2011) (same).  And, read objectively, *Gissel* does not say what the Board claims.

### 1.    *Gissel* does not obligate courts to defer to the NLRB's conclusions about the Constitution.

Across a wide range of free-speech settings, the First Amendment requires courts to conduct non-deferential, de novo review of factfinder

3

determinations that affect whether speech may be lawfully restricted. Tesla Br. 30. The Board maintains, however, that *Gissel* departs from the usual rule and deems the Board better positioned than courts to determine whether "employer statements tend to coerce." NLRB Br. 33. The Board therefore argues that ordinary substantial-evidence standards govern.

*Gissel* simply does not say that. As Tesla observed (at 31) and the NLRB and Union do not deny, the Supreme Court's opinion never uses the words "substantial evidence" to describe courts' task in reviewing the Board's threat determinations. Nor did the Board's brief ask the Supreme Court for that standard. The Board quotes a few snippets from its *Gissel* brief. But it ignores the brief's denial that Board "findings have presumptive validity" and acknowledgment that a court must "review the entire record and satisfy itself that the Board has not abridged the right of free speech." Brief for the National Labor Relations Board at 19-20, *Sinclair Co. v. NLRB*, 395 U.S. 575 (1969) (No. 585), 1969 WL 136819. These concessions defeat the Board's claim that it asked for ordinary substantial-evidence review. If the substantial-evidence test applied in its usual way, it *would* create a presumption of validity. *See, e.g., Creative*

*Vision Res., L.L.C. v. NLRB*, 882 F.3d 510, 515 (5th Cir. 2018) ("We may not reweigh the evidence, try the case de novo, or substitute our judgment for that of the Board, even if the evidence preponderates against the Board's decision." (citation, quotation marks, and brackets omitted)).

Because *Gissel* does not prescribe substantial-evidence deference for the ultimate constitutional issue—and because the NLRB did not even request it—*Gissel* cannot be the last word on this subject. The Board notes that lower courts cannot usurp the Supreme Court's exclusive prerogative to overrule a Supreme Court decision that conflicts with later Supreme Court decisions. NLRB Br. 32. That principle, however, applies only when the earlier decision "directly controls" the issue at hand. *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). Lower courts may not misuse this principle to read unstated instructions into the earlier decision, as the Board seeks to do here. On the contrary, lower courts must, when possible, "attempt to reconcile the later Supreme Court decision[s] with the earlier one." *Jefferson Cnty. v. Acker*, 210 F.3d 1317, 1321 (11th Cir. 2000).

It is not hard to reconcile *Gissel* with the later statements about First Amendment judicial review in *Bose Corp. v. Consumers Union of*

*United States, Inc.*, 466 U.S. 485 (1984), and its progeny. Under *Gissel*, reviewing courts "must recognize the Board's competence *in the first instance* to judge the impact of utterances made in the context of the employer-employee relationship." 395 U.S. at 620 (emphasis added). But that instruction from the Court need "not be understood to compel real deference to the board's view that the speech is unprotected." Henry P. Monaghan, *Constitutional Fact Review*, 85 COLUM. L. REV. 229, 244 n.84 (1985). It can mean, instead, that "the board's conclusion would act simply as a caution to the reviewing court." *Id.*

This interpretation not only harmonizes *Gissel* with *Bose*, but many other cases, too. The Supreme Court has held that the Board does not command deference when its rulings go beyond interpreting "its statute, the NLRA, in isolation," *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1629 (2018), or "raise serious constitutional problems," *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988). In other contexts, the Supreme Court has made clear that it "do[es] not defer to the Government's reading of the First Amendment, even when [national-security] interests are at stake." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010). None of these settled principles

6

squares with the Board's position that courts should defer to the Board's judgments on whether it has complied with the First Amendment.

Beyond overreading *Gissel*, the Board tries to underread the *Bose* line of precedent. It argues that *Bose* does not apply to agency findings, relying on FTC cases from the Sixth, Seventh, and D.C. Circuits. NLRB Br. 36. This argument ignores the context and reasoning of these FTC cases. They addressed false advertising in "commercial speech," which receives less First Amendment protection under Supreme Court precedent. And all three circuits emphasized that *Bose* "itself suggest[ed] that commercial speech might not warrant the higher standard of review established for libel cases." *ECM BioFilms, Inc. v. FTC*, 851 F.3d 599, 614 (6th Cir. 2017) (citation omitted); *Kraft, Inc. v. FTC*, 970 F.2d 311, 317 (7th Cir. 1992); *accord FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 42 n.3 (D.C. Cir. 1985); *see Bose*, 466 U.S. at 504 n.22. Unlike advertising, speech for or against a union does not receive diminished First Amendment protection. It involves matters of public concern and the full level of First Amendment protection. *See* Tesla Br. 6-7.

The Board also cites the Second Circuit's recent decision not to apply *Bose* to a jury verdict in a criminal threat case under 18 U.S.C. § 115.

NLRB Br. 38 (citing *United States v. Hunt*, 82 F.4th 129, 136 (2d Cir. 2023)). *Bose*'s applicability to criminal threat prosecutions is the subject of a circuit split. *See Hunt*, 82 F.4th at 135 & n.1. In *Hunt*, the Second Circuit refused to review the jury's findings de novo because those findings reflected "the sensibilities of ordinary people." *Id.* at 136. This rationale does not apply to NLRB determinations. Trial by a jury of one's peers lies at the core of American self-government. *See, e.g., Reid v. Covert*, 354 U.S. 1, 9-10 (1957). Trial by unelected political appointees does not. Whatever the proper division of authority between courts and juries in criminal cases like *Hunt*, the proper division between courts and agencies is clear: courts "review constitutional objections to agency actions *de novo*." *All. for Fair Bd. Recruitment v. SEC*, — F.4th —, 2023 WL 6862856, at *3 (5th Cir. Oct. 18, 2023) (collecting cases).

## 2. *Gissel* supports, rather than bars, considering the speaker's mental state and the listener's reaction.

The Board's second mischaracterization of *Gissel* is as adopting a purely objective test. NLRB Br. 16. *Gissel* does not say that, either.

On the contrary, *Gissel* recognizes that the "duty" of the NLRB (and thus the reviewing court) is "to focus on the question: '[W]hat did the speaker intend and the listener understand?'" 395 U.S. at 619 (citation

omitted). Indeed, the reason the Court upheld the Board's decision in *Gissel* was that "the Board could reasonably conclude that *the intended and understood import* of [the employer's] message was not to predict that unionization would inevitably cause the plant to close but to threaten to throw employees out of work regardless of the economic realities." *Id.* (emphasis added) (citation omitted).[1]

Rather than take the Supreme Court at its word, the Board contends that *Gissel*'s repeated references to actual employer intent and actual employee understanding somehow endorsed an exclusively objective test. The Board's only evidence that *Gissel* adopted that test, however, is a sentence in the opinion's procedural-history section, some thirty pages earlier, which merely quoted the NLRB's statement about what the employer's communications had "reasonably tended to convey." *Id.* at

---

[1] The Board relies heavily on this use of the phrase "could reasonably conclude" in arguing that *Gissel* embraced agency deference. NLRB Br. 34-35. But the Board misleadingly quotes this phrase to suggest that the Court was upholding the Board's "reasonable conclusions" about the speech's *objective* meaning. In fact, the Court acknowledged the reasonableness of the Board's conclusions about "the intended and understood import" of the speech—basic, historical facts about what the speaker intended and the listeners understood. This sentence thus provides no support for the NLRB's claim to deference to the ultimate constitutional determination over whether the objective content of speech is constitutionally protected.

589; *see* NLRB Br. 16.  The Board's reading rests on a false dichotomy: *Gissel* can of course require *both* objectively threatening content *and* a wrongful state of mind.  In any event, the Supreme Court does not adopt a binding legal test when it quotes a lower tribunal's ruling in the procedural-history section of its opinion.  The test from *Gissel*'s legal analysis controls.

*Gissel* itself thus defeats the Board's strategy for avoiding *Counterman v. Colorado*, 600 U.S. 66 (2023).[2]  The Board insists that *Gissel* makes the "employer's mental state" irrelevant.  But *Gissel* in fact obligates the Board to ask what the employer "intended."  In addition, *Gissel* prohibits "conscious overstatements" that employers have "reason to believe will mislead [their] employees."  395 U.S. at 620.  That formulation tracks *Counterman*'s recklessness standard:  "consciously disregard[ing] a substantial risk that [the] communications would be viewed as threatening."  600 U.S. at 69; *see also id.* at 79-80.  And *Gissel* took this cue from the NLRB's own brief, which stressed that unlawful threats had

---

[2] The Union's brief, surprisingly, does not address *Counterman* at all; it addresses statutory requirements only.  UAW Br. 42.  That misses the point.  *Counterman* identifies a constitutional requirement that the First Amendment mandates even when the pertinent statute does not.  *See* 600 U.S. at 72.

been "uniformly characterized by *reckless if not deliberate* overstatement or misrepresentation." Brief for the National Labor Relations Board at 19, *Sinclair*, 395 U.S. 575 (No. 585), 1969 WL 136819 (emphasis added). If employers' mental state were irrelevant, as the NLRB now maintains, it would not matter whether the employer acted recklessly or deliberately. Nor would it matter whether the employer was "conscious" of the risk of employee harm or "intended" it. *Gissel*, 395 U.S. at 619-20.

In addition to rewriting *Gissel*, the NLRB suggests that *Counterman* applies only to threats of *violence*. NLRB Br. 29. The Board's idea seems to be that statements that could count as threats of violence need greater legal protection than statements that could count as threats of economic reprisal. NLRB Br. 29-31. The Board fails to identify any reason for this disparity. And there is none. Courts should not give greater protection to personalized messages from a cyber-stalker—along the lines of "You're not being good for human relations. Die," *Counterman*, 600 U.S. at 70 (citation omitted)—than to union-related tweets from a public figure. Labor-relations discussions are matters of public concern. *Thornhill v. Alabama*, 310 U.S. 88, 103 (1940). Surely the Board can agree that they rank higher, in any plausible comparison, than speech

that "cause[s] the victim to fear for her life" and "upend[s] her daily existence." *Counterman*, 600 U.S. at 120 (Barrett, J., dissenting).

Unlike *Counterman*, this case contains no evidence, at all, of actual listener harm. The NLRB's arguments that the Court should ignore the absence of such evidence fare no better than its arguments about ignoring the employer's mental state. *Gissel* says that the Board must consider what listeners actually understand. 395 U.S. at 619. The Board insists it has no such duty, NLRB Br. 17, but once again is incorrect. *See, e.g.*, *FDRLST Media, LLC v. NLRB*, 35 F.4th 108, 125 (3d Cir. 2022) (faulting the Board for failing "to even acknowledge" the noteworthy absence of evidence that any "employee perceived [the challenged] tweet as a threat").

In short, the Board faces far more problems under *Gissel* than Tesla. The Board does not contest Tesla's claims that there is no evidence of recklessness or actual employee coercion. Tesla Br. 44-45, 48-49; *see* NLRB Br. 24. Because *Gissel* affirms the importance of such evidence— and because *Counterman* unmistakably requires evidence of recklessness, at a minimum—the Board's ruling cannot stand.

**B.  The tweet did not threaten to unilaterally reduce employee benefits in retaliation for union support.**

Even under the NLRB's purely objective test, its arguments for treating Musk's May 20, 2018 as a threat of economic reprisal lack any merit.  The Board does not dispute that a threat must convey "that adverse consequences will be deliberately inflicted if employees unionize."  NLRB Br. 18; *see Crown Cork & Seal Co. v. NLRB*, 36 F.3d 1130, 1138 (D.C. Cir. 1994).  Rather than identify anything in Musk's words or actions that conveyed his intention to inflict harm in retaliation for unionizing, the NLRB unpersuasively compares Musk's tweet to very different employer statements in prior cases.  NLRB Br. 18-21.

In the NLRB's cited cases, an employer was talking directly to employees and claiming that they would lose a range of benefits—perhaps *all* their benefits—if they elected the union.  For example, in *Hendrix Manufacturing Co. v. NLRB*, 321 F.2d 100, 104 (5th Cir. 1963), supervisors visited every employee and claimed "that bonuses, pensions, holiday pay, and the like would be out if the Union won."  In *NLRB v. Bama Co.*, 353 F.2d 320, 323 (5th Cir. 1965), supervisors repeatedly told employees "that unionization would probably result in loss of Christmas bonus and vacation pay."  In *Intermedics, Inc.*, 262 N.L.R.B. 1407, 1411 (1982), a

supervisor held a meeting with 35 employees and said that if they elected the union they would lose "all their benefits."  And in *Amalgamated Clothing Workers v. NLRB*, 424 F.2d 818, 824 (D.C. Cir. 1970), and *Mon River Towing, Inc. v. NLRB*, 421 F.2d 1, 10 (3d Cir. 1969), the employers predicted that they would close their plants or operations.[3]

Here, in contrast, Musk was not speaking with employees.  He was responding to a random question about his views from a non-employee: "How about unions?"  ROA.4536.  Unlike anti-union speeches or letters directed to employees, this use of a personal Twitter account was far from

---

[3] The NLRB's other citations are similarly off point.  *Constellation Brands U.S. Operations, Inc. v. NLRB*, 992 F.3d 642, 649 (7th Cir. 2021) (bonus policy explicitly excluded union-represented employees); *Sara Lee Bakery Grp., Inc. v. NLRB*, 61 F. App'x 1, 11 (4th Cir. 2003) (threat that employees would "lose everything"); *McLane/W., Inc. v. NLRB*, 723 F.2d 1454, 1457 (10th Cir. 1983) (numerous threats, including plant closure); *McGraw-Edison Co. v. NLRB*, 419 F.2d 67, 70 (8th Cir. 1969) (threat of plant closure); *DynCorp, Inc. v. NLRB*, 233 F. App'x 419, 428 (6th Cir. 2007) (threat that "benefits would be taken away automatically if the union won *because* the union won"); *Belcher Towing Co.*, 265 N.L.R.B. 1258, 1267 (1982) ("benefits plan excluding employees who are represented by a labor organization"), *enforced in part*, 726 F.2d 705 (11th Cir. 1984); *Behring Int'l, Inc.*, 252 N.L.R.B. 354, 365 (1980) (manager threatened to handle negotiations personally *so that* employees would lose their benefits), *enforced*, 714 F.2d 291 (3d Cir. 1983); *NLRB v. Colony Printing & Labeling, Inc.*, 651 F.2d 502, 504 (7th Cir. 1981) (letter misrepresented employees' ability to speak directly with management).

14

the usual setting for an employer to threaten employees.  And Musk's response did not do so:  he said there was "[n]othing stopping" employees from voting for the union, and that they "[c]ould do so" immediately, "if they wanted."  ROA.4537.  Then, he gave reasons why employees would not want to vote for the Union—as the First Amendment and NLRA Section 8(c) entitled him to do.

The NLRB maintains that the "context reinforced the tweet's coerciveness" because it was "on social media."  NLRB Br. 20.  The Third Circuit has concluded, however, that personal tweets are *not* a natural choice for threatening employees.  *See FDRLST*, 35 F.4th at 126.  And the Board's cited case does not suggest otherwise.  It involved managers' use of an anti-union Facebook page to harass and disparage particular union supporters.  *MikLin Enters., Inc. v. NLRB*, 861 F.3d 812, 827 (8th Cir. 2017) (en banc).  Once again, the gulf between the facts of the Board's cases and the facts here reveal the lack of support for the Board's view.[4]

Musk's tweet also differs from the Board's examples because it was narrowly addressed to stock options and had objective support.  Musk did

---

[4]  If anything, *MikLin*'s facts more closely resemble Ortiz's Facebook post about specific coworkers than Musk's tweet.

not predict an end to a broad range of benefits, including bonuses, vacation pay, and the like—much less a plant closure—which any union would obviously oppose.  He discussed a single category of benefits.  And that category, as employees knew, was central to Tesla's philosophy about employees' stake in the company but foreign to the UAW's approach to compensation.  Tesla Br. 39-42; ROA.4840.

The NLRB tries to dismiss this context by comparing Musk's earlier defense of stock-based compensation to the employer's statements in *Gissel*.  NLRB Br. 25.  This comparison fails because Musk was making a specific point grounded in objective facts.  Unions historically have often wanted to avoid stock-based compensation to reinforce a "traditional dichotomy between management and labor," Jeffrey M. Hirsch, *Labor Law Obstacles to the Collective Negotiation and Implementation of Employee Stock Ownership Plans: A Response to Henry Hansmann and Other "Survivalists,"* 67 FORDHAM L. REV. 957, 965 (1998)—or, as Musk characterized it, a "2 class 'lords & commoners' system," ROA.4537.  Before the tweet, employees understood Musk's thoughts on the issue.  ROA.4840.  The *Gissel* employer, on the other hand, "had no support" and "no basis" for its claims about the likelihood of a strike and closure.  395 U.S. at 619.

The UAW argues that the record disproves Musk's characterization of the UAW's views.  UAW Br. 37-40.  Not true.  The UAW's only citation for this argument is its spokesperson's statement that "[t]he UAW does not have a policy preventing employees from owning stock options."  ROA.4905.  Musk did not claim, though, that the UAW has a *policy* that *prevents* employee ownership of stock options.  It is not clear how the UAW could even do that.  Musk claimed that employee stock ownership made Tesla "unlike other car companies" that have UAW representation, like GM, Ford, and Chrysler.  ROA.4840; *see also* ROA.4916.  The UAW never introduced evidence that its collective bargaining agreements with these or other carmakers included employee stock ownership.  Obviously, if those agreements included such compensation, the UAW easily could have proved it before the NLRB.[5]

---

[5] The UAW feigns surprise that it would be portrayed as opposing stock ownership, and complains that a law review article Tesla cited did not discuss UAW by name.  UAW Br. 37.  But one of that article's cited sources singled out the UAW specifically, describing the UAW's attitude toward employee stock ownership as a "glaring example of the clash between union ideology and [employee stock ownership plans]."  Elana Ruth Hollo, Note, *The Quiet Revolution:  Employee Stock Ownership Plans and Their Influence on Corporate Governance, Labor Unions, and Future American Policy*, 23 RUTGERS L.J. 561, 590 n.115 (1992).  Contrary to the UAW's assertions, it *is* common knowledge that Tesla's stock options set it apart from carmakers with UAW

Given this backstory, the NLRB's interpretation of the tweet would be implausible even if Musk and Tesla had not disseminated clarifications on Twitter and across many press outlets within just a few days. Tesla Br. 40-42. The Board's dismissiveness toward those clarifications, however, is unjustified. Musk did not merely deny an intent to threaten; he explained the objective basis for his earlier rhetorical question: "UAW does not have individual stock ownership as part of the compensation at any other company." ROA.4539. The Board tries to compare this clarification to the response in *United States v. Fernandez*, 837 F.2d 1031, 1033 (11th Cir. 1988). There, the brother of a recently convicted drug offender told the federal prosecutor that he "better watch [his] back." *Id.* When the prosecutor asked if this individual was trying to threaten him, the man responded, "I'm not threatening you, but you had better watch your back. You better get somebody to protect you." *Id.* Once again, the Board's strained comparisons betray the weakness of its argument.

---

representation. *See, e.g.*, Tim Higgins, *Whatever the UAW Strike Outcome, Elon Musk Has Already Won*, WALL ST. J., Sept. 16, 2023, https://www.wsj.com/business/autos/uaw-strike-tesla-labor-costs-baf8b897 ("A key difference between Tesla employees' compensation and that of the UAW workers revolves around company upside. UAW workers have been getting profit-sharing bonuses while Tesla workers receive stock options[.]").

Musk's May 20 tweet does not say what the Board claims. That is true whether one focuses on the tweet itself—an off-the-cuff response to an unprompted question by a random non-employee—or the ongoing discussion over the value of employee stock ownership. Either way, the tweet does not reasonably convey that Tesla would unilaterally cut off employees' stock-based compensation in a fit of retaliation if they voted for Union representation. It is far more naturally read as a statement about the type of compensation that the UAW would bargain for—as Musk and Tesla made clear as soon as the potential misunderstanding came up. So even if the Court were to apply a deferential, purely objective test, it should set aside the Board's ruling.

## C.   The Board's deletion remedy is excessive.

The Board barely attempts to defend its instruction to wipe the five-year old post from Musk's personal Twitter account. Even if it were an unfair labor practice to post the tweet in the first instance, the Court should reverse the order that Tesla direct Musk to delete the tweet.

As Tesla noted, other aspects of the Board's remedy already "neutralize" any contrary implication that the original tweet might be thought to contain. NLRB Br. 43 (citation omitted). For example, the

Order requires Tesla to prominently post notice, at all its facilities nationwide, that the company will not threaten loss of benefits in in response to voting for the Union.  ROA.6247; ROA.6249-50.

And the Board never even acknowledges the harm that its remedy causes for unrelated third parties' speech.  As *amici* explain, deleting the May 20 tweet will simultaneously erase posts by hundreds of other Twitter users.  Chamber et al. Amicus Br. 26-27.  Restricting their ability to speak apparently does not trouble the Board at all.

## II. The Board and Union fail to justify the Board's ruling that Tesla violated the NLRA by terminating Ortiz for his lie.

Tesla's opening brief argued that Ortiz have no right under the NLRA to lie to Tesla's investigator (at 51-56) and that discharging Ortiz because of his admitted lie was not unlawful under *Wright Line* (at 56-65).  *See Wright Line*, 251 N.L.R.B. 1083, 1089 (1980), *enforced on other grounds*, 662 F.2d 899 (1st Cir. 1981); *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 394, 403 (1983), *abrogated in part on other grounds by Dir., Off. of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267 (1994). The Board's and Union's contrary arguments ignore the language of the NLRA and contravene a large body of judicial precedent.

### A.    Ortiz's lie was cause for discharge and precludes his reinstatement under the NLRA's plain terms.

Section 10(c) of the NLRA unambiguously prohibits the Board from ordering reinstatement and backpay when an employer discharges an employee "for cause."  29 U.S.C. § 160(c).  The Board and the Union completely ignore this provision.  They never explain how this provision could permit the Board to order Ortiz's reinstatement and backpay when he admittedly lied to Tesla's investigator and when this Court, like others, recognizes that employers have a right to insist that their employees not lie in response to legitimate questions.  *E.g.*, *Fed.-Mogul Corp. v. NLRB*, 566 F.2d 1245, 1259 (5th Cir. 1978).

The NLRB tries to distinguish *Federal-Mogul* on its facts.  It notes that the lie in *Federal-Mogul* concerned "absenteeism entirely unrelated to protected activity."  NLRB Br. 46.  But many other cases show that a nexus to protected activity is not a free pass for lying.  Lies about absenteeism often implicate protected activity and yet provide cause for lawful discipline.

For example, in *NLRB v. Mueller Brass Co.*, 509 F.2d 704, 710-12 (5th Cir. 1975), the employee lied about visiting a specific medical doctor for illness and argued that the employer investigated his absence only

because it knew of his union activities. This Court ruled that it did not matter that the employee may actually have been absent because of illness, because "[a]ny employer has the right to demand that its employees be honest and truthful in every facet of their employment." *Id.* at 713. Nor did it matter that the employer had shown union animus on other occasions and had proceeded with its investigation of the known union supporter. *Id.* at 711. When an "employee happens not only to break a Company regulation but also to evince a pro-Union sentiment, that coincidence alone is not sufficient to destroy the just cause for his discharge or suspension." *Id.* Accepting the Board's contrary interpretation of the NLRA "would be effectively to insulate every Union activist from investigation and discipline for violation of Company rules." *Id.* at 713.

The Sixth Circuit followed *Mueller Brass* in *Charge Card Ass'n v. NLRB*, 653 F.2d 272, 275 (6th Cir. 1981). There, the employer suspended employees who had falsely said that they were absent because of illness, even though they were calling in sick to engage in a coordinated protest of work conditions. *Id.* "Had the employees truthfully announced that they were withholding their services for one day in protest of the work conditions, the suspensions would have clearly been improper." *Id.* The

discipline was lawful, however, because the employees had lied about the reason for their absences. *Id.* Citing *Mueller Brass*, the Sixth Circuit would not "excuse lying even if in the context of a protected activity." *Id.*

The Board argues, in contrast, that employees have a right to lie whenever they have "a 'reasonable basis' for believing that the employer is attempting to uncover protected activity." NLRB Br. 44. That is not the test in this Court or others. The question is not whether an employee could reasonably believe that an answer would reveal protected activities. It is whether the employer has a lawful basis to ask its questions. *Cellco P'ship v. NLRB*, 892 F.3d 1256, 1264 (D.C. Cir. 2018) ("[T]he company was entitled to inquire into the reason an employee walked off the job without management permission[.]"); *Mueller Brass*, 509 F.2d at 713 ("[T]he Company cannot be said to have committed an unfair labor practice by investigating the facts of Rogers' absence."); *Charge Card Ass'n*, 653 F.2d at 275 ("[I]t was not unreasonable for the employer to demand that the employees support their assertion of illness.").

Tesla had a lawful basis to ask Ortiz about the source of the Workday photos he used in his Facebook post.[6]  The Board itself recognizes "that employers have a legitimate business interest in investigating facially valid complaints of employee misconduct, including complaints of harassment." *Fresenius USA Mfg., Inc.*, 362 N.L.R.B. 1065, 1065 (2015). There was such a complaint here:  one of the employees targeted in the Facebook post (Pratt) submitted it to a member of the HR department (Hedges) and said he felt harassed and targeted by Ortiz.  ROA.6278. Then, when the employee relations investigator (Gecewich) spoke to Pratt, Pratt reiterated that the post made him feel singled out and uncomfortable, including because it used his name and picture.  ROA.6279. Gecewich next talked the Facebook group member who had sent Pratt the post (Kostich), who said he found the post malicious and inappropriate, including because it used Tesla's Workday photos.  ROA.6279-80 &

---

[6]  Contrary to the Board's and Union's assertions, Tesla's challenge to the Board's ruling on the Ortiz termination includes a challenge to the Board's ruling that Tesla's questioning of Ortiz on September 21 and October 12 was unlawful.  *See* Tesla Br. 54-55.  *Contra* NLRB Br. 13; UAW Br. 18.  Tesla has consistently argued in this Court that the questioning of Ortiz was lawful and that Ortiz therefore had no right to lie in response.  *See* Tesla Panel Br. 63-64; Tesla Panel Reply Br. 24 n.8; Tesla Br. 54-55.

n.84; ROA.6286-87; *see* ROA.4515. The NLRB ignores these concerns because Pratt's text message to Hedges about the post did not seem overly worried. Yet in deciding whether to ask Ortiz about it, Gecewich reasonably considered not just the text message but also his later conversations with Pratt and Kostich.[7]

The Board objects that Gecewich's questioning of Ortiz shifted from concerns about harassment to concerns about potential misuse of the company's Workday resource. But the concerns were closely related—as Gecewich knew by this point from his interview of Kostich. ROA.6279-80 & n.84; *see* ROA.4515. As Gecewich explained, the use of the Workday photos was "a component of [the] bullying or singling out." ROA.1959 (Gecewich). And Gecewich also knew, by this point, that the Facebook post was part of a larger employee debate over the merits of UAW

---

[7] The Union misstates the record in claiming that Hedges directed Gecewich to investigate the post. UAW Br. 5-6, 24. The ALJ found that Hedges spoke with Gecewich "to give him a 'heads up' about Pratt's complaint" because Hedges had already "forwarded" the complaint to Carmen Copher, the head of the employee relations and investigations team. ROA.6279. Although the ALJ did state that Hedges was not "neutral[] as to whether Gecewich should investigate," ROA.6279 n.82, she did not find that Hedges *directed* Gecewich to do so. Neither Hedges nor Gecewich testified to that effect, either; and both testified that Hedges had previously come to Gecewich directly with concerns. ROA.1202-03 (Hedges); ROA.1912-14 (Gecewich).

representation.    ROA.1837-38, ROA.1841, ROA.1960-61 (Gecewich). Gecewich steered his investigation away from that debate to focus on the potential misuse of company resources.  That decision, however, is evidence of a desire to *stay out* of protected activity, not evidence of antiunion motivation.  *See, e.g.*, *Cellco*, 892 F.3d at 1261 (antiunion motive cannot be based in a company's decision to "proceed[] carefully" when it knows it is investigating an employee that is "active in the union").

For these reasons, Tesla asked a lawful question when it asked Ortiz if he knew where the Workday photos in his post had come from. This case bears no resemblance to *United Services Automobile Ass'n v. NLRB*, 387 F.3d 908 (D.C. Cir. 2004), on which the Board and UAW rely. Unlike the employer there, Tesla did not ask questions merely to identify which employees had distributed fliers critical of the company.  *See id.* at 910.  And unlike the employee there, Ortiz did not respond by saying that he did not want to answer the question.  *See id.* at 912.  Ortiz did not say that he knew who sent the photos but did not want to get anyone else in trouble.  Nor did he say that Moran sent the photos but played no role in Ortiz's Facebook post.  Instead, he told Gecewich that he did not know, which was an outright lie—as Ortiz admitted a few weeks later.

ROA.537, ROA.647-48 (Ortiz).  As *United Services* itself recognizes, there is a difference between "outright dishonesty" and a "failure to volunteer information."  387 F.3d at 917.

Although the Board now claims otherwise, *see* NLRB Br. 56 n.26, the ALJ unequivocally, and correctly, found that Tesla "terminated Ortiz for lying" in this way.  ROA.6285.  Because the lie was proper cause for discharge, the NLRA entitled Tesla to make this decision.  *See Cellco*, 892 F.3d at 1264; *Fed.-Mogul*, 566 F.2d at 1259; 29 U.S.C. § 160(c).

## B.  The termination was also permitted under *Wright Line* given the ALJ's factual findings.

The Board's and UAW's arguments under *Wright Line* fare no better.  And the ALJ's own findings, which the Board adopted, simplify the inquiry enormously.

Most notably, the ALJ expressly found that "[t]he credited evidence shows that [Tesla] terminated Ortiz for lying during an investigation."  ROA.6285.  Realizing the inconsistency between this finding and its *Wright Line* analysis, the Board now asserts that this finding was not a finding about "Tesla's true motive."  NLRB Br. 56 n.26.  But there is nothing else it could be.  The ALJ unequivocally found that Tesla terminated

Ortiz for lying, which is what the record plainly establishes, and the Board cannot run away from this finding now.

Given this finding about Tesla's motive, one would expect the Board to have significant evidence that improper motives were at work as well. It does not. Its main argument rests on the claim that Tesla was opposed to the Union. NLRB Br. 52. This argument fails for two reasons. First, the NLRA does not permit the Board to treat Tesla's opinions on the Union as evidence of an unfair labor practice. Section 8(c) expressly bars treating the mere expression of anti-union views as "evidence of an unfair labor practice." 29 U.S.C. § 158(c). Second, there is no evidence that any antiunion motivation influenced Gecewich's decision to ask the question to which Ortiz lied in response, Gecewich's recommendation to discharge Ortiz for the lie, or Graminger's acceptance of that recommendation. The Board quibbles with a few alleged errors in Gecewich's report. NLRB Br. 54. None of those alleged errors, however, was "causally connected to" Tesla's decision. *NLRB v. Big Three Indus. Gas & Equip. Co.*, 579 F.2d 304, 312 (5th Cir. 1978).

Nor is there evidence that Hedges's alleged views about the Union played any role. This case is nothing like *NLRB v. Neuhoff Brothers,*

*Packers, Inc.*, 375 F.2d 372, 375-76 (5th Cir. 1967), where the antiunion supervisor, who had previously threatened to fire anyone who signed a union card, said that he was going to fire a particular employee who had signed a union card, and then persuaded the ultimate decisionmaker to fire that employee.

And even if the Board had established some relevant antiunion animus at *Wright Line* step one, Tesla showed that it would have discharged Ortiz for his lie regardless of such feelings at *Wright Line* step two. The Board and Union's argument that the lie was a pretext, rather than Tesla's actual motive, again contradicts the ALJ's finding that Tesla "terminated Ortiz for lying." ROA.6285.

Their main support for this argument, in any event, is meritless on its face. They argue that Tesla did not have a consistent policy against lying because Gecewich admitted, in his October 2018 testimony before the ALJ, to having told certain lies. NLRB Br. 56-57. Those admissions prove nothing, however, because Gecewich no longer worked for Tesla at this time. ROA.1802 (Gecewich). No evidence suggests that anyone at Tesla knew about the lies, had an opportunity to discharge Gecewich because of them, and failed to do so.

All the evidence indicates that Tesla discharged employees if it discovered that they had lied in investigations. The Board contends that the concrete example that Tesla has identified is not comparable because the lied-about conduct in that investigation was worse. But the seriousness of the lied-about misconduct did not affect Tesla's decision to discharge that employee: like Ortiz, the employee was discharged for the admitted lie, not the other conduct. ROA.1941 (Gecewich).

The Board may not second-guess the wisdom of Tesla's policy of discharging employees who admit to lying to its investigators. The Board may only ask whether the company's policy was "reasonably consistent." *Cellco*, 892 F.3d at 1263. Because all the evidence shows that it was, the Board's ruling on the Ortiz discharge should be reversed.

## CONCLUSION

For these reasons and those presented in Tesla's prior appellate briefing, the Court should grant Tesla's petition for review, set aside the Board's findings of unfair labor practices and associated remedies based on Musk's tweet and Ortiz's discharge, and deny the Board's cross-application to enforce those parts of the Order.

Dated: November 3, 2023        Respectfully submitted,

                                     s/ Michael E. Kenneally

                                     DAVID B. SALMONS
                                     MICHAEL E. KENNEALLY
                                     DAVID R. BRODERDORF
                                     MORGAN, LEWIS & BOCKIUS LLP
                                     1111 Pennsylvania Avenue, N.W.
                                     Washington, DC  20004
                                     (202) 739-3000

                                     *Counsel for Tesla, Incorporated*

# CERTIFICATE OF SERVICE

I certify that on this 3rd day of November, 2023, I served a true and correct copy of the foregoing En Banc Reply Brief of Tesla, Incorporated on counsel of record for all other parties through this Court's CM/ECF system:


Ruth E. Burdick
Micah P. S. Jost
Kira Dellinger Vol
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, S.E.
Washington, DC 20570
appellatecourt@nlrb.gov
micah.jost@nlrb.gov
kira.vol@nlrb.gov

*Counsel for Respondent*
*National Labor Relations Board*

Daniel E. Curry
Margo A. Feinberg
SCHWARTZ, STEINSAPIR,
    DOHRMANN & SOMMERS LLP
6300 Wilshire Boulevard
Suite 2000
Los Angeles, CA 90048
dec@ssdslaw.com
margo@ssdslaw.com

*Counsel for Petitioner*
*International Union, United*
*Automobile, Aerospace and*
*Agricultural Implement Workers*
*of America, AFL-CIO*


s/ Michael E. Kenneally
MICHAEL E. KENNEALLY

*Counsel for Tesla, Incorporated*

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), this document contains 6,442 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and 5th Cir. R. 32.1, and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document was prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.


Dated:  November 3, 2023          s/ Michael E. Kenneally
                                  MICHAEL E. KENNEALLY

                                  *Counsel for Tesla, Incorporated*